1  Mildred K. O'Linn (State Bar No. 159055)
2      *missy.olinn@manningkass.com*
   Yury A. Kolesnikov (State Bar No. 271173)
3      *yury.kolesnikov@manningkass.com*
   Roslynn Wilfert (State Bar No. 303024)
4      *roslynn.wilfert@manningkass.com*
5  **MANNING & KASS**
   **ELLROD, RAMIREZ, TRESTER LLP**
6  801 S. Figueroa St, 15th Floor
7  Los Angeles, California  90017-3012
   Telephone:  (213) 624-6900
8  Facsimile:   (213) 624-6999
9
10 *Attorneys for Defendants City of Covina, Vanessa*
   *Cardoza, David Meadows, and Billy Sun*
11
12          **UNITED STATES DISTRICT COURT**
13          **CENTRAL DISTRICT OF CALIFORNIA**
14

| | |
|---|---|
| E.V. and X.V., minors by and through their guardian *ad litem*, Karla Juarez; D.V., a minor, by and through his guardian *ad litem*, Elias Valdivia; individually and as successors-in-interest to Daniel Luis Valdivia, deceased; JESSICA VALDIVIA; LUIS VALDIVIA JR., individually,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF COVINA; VANESSA CARDOZA; DAVID MEADOWS; BILLY SUN; DOES 1–10, inclusive,<br><br>Defendants. | Case No. 5:23-cv-1562 CBM (SHK)<br><br>**Defendants' Notice of Motion and Motion for Summary Judgment as to Plaintiffs' Complaint; Memorandum of Points and Authorities in Support Thereof**<br><br>*Filed concurrently with Defendants' Statement of Uncontroverted Facts, Declaration of Yury A. Kolesnikov, and [Proposed] Order*<br><br>Date:    July 15, 2025<br>Time:    10:00 a.m.<br>Judge:   Hon. Consuelo B. Marshall<br>Courtroom:  8D<br><br>Filed Dated:    August 4, 2023<br>Trial Date:       October 21, 2025 |

Defendants' Motion for Summary Judgment

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on July 15, 2025, at 10:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 8D of the above-referenced Court located at 350 West 1st Street, Los Angeles, California 90012, Defendants City of Covina, Vanessa Cardoza, David Meadows, and Billy Sun ("Defendants") will and hereby do move this Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting summary judgment in favor of Defendants as to all of Plaintiffs' claims asserted in the complaint.

This motion is made on the ground that Defendants are entitled to judgment as a matter of law and on the following grounds:

1. Defendants Cardoza, Meadows, and Sun ("Officer Defendants") are entitled to judgment on Plaintiffs' second cause of action for violation of the Fourth Amendment on the basis of excessive force because undisputed facts demonstrate that the force used was reasonable under the totality of the circumstances facing the officers. Furthermore, the Officer Defendants are entitled to qualified immunity because there is no evidence that the use of force violated any clearly-established law.

2. The Officer Defendants are entitled to judgment on Plaintiffs' fourth cause of action for violation of substantive due process because undisputed facts demonstrate that their actions were not undertaken for any purpose to harm unrelated to a valid law enforcement objective and, thus, did not shock the conscience. Furthermore, the Officer Defendants are entitled to qualified immunity because there is no evidence that the use of force violated any clearly-established law.

3. The Officer Defendants are entitled to judgment on Plaintiffs' seventh cause of action for battery because undisputed facts demonstrate that the force used by the officers was objectively reasonable. Furthermore, the City of Covina is not vicariously liable because there are no underlying wrongful acts.

4. The Officer Defendants are entitled to judgment on Plaintiffs' eighth cause of action for negligence because undisputed facts demonstrate that the officers

Defendants' Motion for Summary Judgment

acted reasonably under the totality of the circumstances and did not breach any duty of due care that they owed to the decedent. In addition, the Officer Defendants are statutorily immune from liability for any pre-shooting conduct. Furthermore, the City is not vicariously liable because there are no underlying wrongful acts.

5. The Officer Defendants are entitled to judgment on Plaintiffs' ninth cause of action for violation of the Bane Act because undisputed facts demonstrate that there was no underlying constitutional violation. Furthermore, there is no evidence of any specific intent to violate the decedent's constitutional rights. The City is not vicariously liable because there are no underlying wrongful acts.

This motion is based on this notice of motion and motion, the attached memorandum of points and authorities, the concurrently-filed statement of uncontroverted facts and declaration of Yury A. Kolesnikov (with exhibits), all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any such additional evidence or argument as the Court may allow prior to ruling on the motion.

**STATEMENT REGARDING CONFERENCE OF COUNSEL**

Pursuant to Civil Local Rule 7-3, the parties met and conferred via videoconference on May 27, 2025, regarding the issues raised in this motion. Yury A. Kolesnikov participated on behalf of Defendants and Marcel Sincich participated on behalf of Plaintiffs. The videoconference lasted approximately 30 minutes. During the conference, the parties thoroughly discussed each issue to be raised in Defendants' forthcoming motion for summary judgment as well as potential resolution to some of the claims. At the end of the conference, Plaintiffs' counsel agreed to revisit some of the claims alleged in the complaint. The parties engaged in further discussions over e-mail correspondence on May 29 and 30, 2025. As a result of those discussions, and in order to narrow the issues for the Court, Plaintiffs have agreed to voluntarily dismiss claims 1, 3, 5, and 6 of the complaint. The parties were unable to reach a resolution as to the remaining claims.

Defendants' Motion for Summary Judgment

1  DATED:  June 3, 2025

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

By:  _____*/s/ Yury A. Kolesnikov*_____
Mildred K. O'Linn
Yury A. Kolesnikov
Roslynn Wilfert

*Attorneys for Defendants City of Covina,*
*Vanessa Cardoza, David Meadows, and*
*Billy Sun*

MANNING | KASS

---
4

Defendants' Motion for Summary Judgment

# MEMORANDUM OF POINTS AND AUTHORITIES

## Table of Contents



I.    INTRODUCTION ..................................................................................... 1

II.   STATEMENT OF FACTS ......................................................................... 2

    A.   Valdivia Engages in Argument with Several Other Persons and Brandishes a Firearm, Causing Multiple Parties to Call the Police .......................................................................................... 2

    B.   Officers Arrive and Confront Valdivia ........................................ 3

    C.   Officer Defendants' Interviews and Deposition Testimonies ............... 5

        1.   Officer Sun ........................................................................ 5

        2.   Officer Meadows ............................................................... 7

        3.   Officer Cardoza ................................................................ 8

    D.   Officers Promptly Render and Summon Medical Assistance ............. 10

    E.   Valdivia's Gun ............................................................................ 10

    F.   DOJ Investigation ....................................................................... 12

III.  LEGAL STANDARD ............................................................................. 12

IV.   ARGUMENT ........................................................................................ 13

    A.   The Officer Defendants Are Entitled to Qualified Immunity on Valdivia's Fourth Amendment Excessive-Force Claim (Claim 2) ................................................................................. 13

        1.   No Fourth Amendment Violation .................................... 13

            a.   Valdivia Posed an Imminent Threat ................... 14

            b.   Other *Graham* Factors ...................................... 18

        2.   No Violation of Any Clearly-Established Law ................. 20

    B.   No Violation of Substantive Due Process (Claim 4) ..................... 21

    C.   Battery Claim Fails (Claim 7) ..................................................... 22

    D.   Negligence Claim Fails (Claim 8) ............................................... 22

    E.   Bane Act Claim Fails (Claim 9) .................................................. 25

i

V.    CONCLUSION ............................................................25

CERTIFICATION PURSUANT TO LOCAL RULE 11-6.2 ...................................27

MANNING | KASS

Defendants' Motion for Summary Judgment

# Table of Authorities

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................12

*Conway v. Cnty. of Tuolumne*,
231 Cal. App. 4th 1005 (2014) ...............................................................24

*District of Columbia v. Wesby*,
583 U.S. 48 (2018) ...........................................................................13, 20

*Estate of Strickland v. Nevada Cnty.*,
69 F.4th 614 (9th Cir. 2023) ................1, 13, 14, 15, 16, 17, 18, 20

*Graham v. Connor*,
490 U.S. 386 (1989) ...............................................................................13

*Hayes v. Cnty. of San Diego*,
57 Cal.4th 622 (2013) .................................................................22, 23, 24

*Johnson v. Cnty. of L.A.*,
340 F.3d 787 (9th Cir. 2003) ...................................................................22

*Kisela v. Hughes*,
584 U.S. 100 (2018) ...............................................................................20

*Long v. City & Cnty. of Honolulu*,
511 F.3d 901 (9th Cir. 2007) .............................................................17, 21

*Martinez v. Cnty. of Los Angeles*,
47 Cal. App. 4th 334 (1996) ....................................................................24

*Monzon v. City of Murrieta*,
978 F.3d 1150 (9th Cir. 2020) ....................................................18, 20, 22

*Napouk v. Las Vegas Metro. Police Dep't*,
123 F.4th 906 (9th Cir. 2024) ............................................................19, 25

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*,
210 F.3d 1099 (9th Cir. 2000) .................................................................12

*Plumhoff v. Rickard*,
572 U.S. 765 (2014) ...............................................................................18

Defendants' Motion for Summary Judgment

*Porter v. Osborn*,
    546 F.3d 1131 (9th Cir. 2008)................................................................21

*Reese v. Cnty. of Sacramento*,
    888 F.3d 1030 (9th Cir. 2018)................................................................25

*Sabbe v. Wash. Cnty. Bd. of Comm'rs*,
    84 F.4th 807 (9th Cir. 2023)................................................................20

*Scott v. Harris*,
    550 U.S. 372 (2007) ................................................................12

*Scott v. Henrich*,
    39 F.3d 912 (9th Cir. 1994)................................................17, 19, 21

*Waid v. Cnty. of Lyon*,
    87 F.4th 383 (9th Cir. 2023)................................................13, 21

*Watts v. Cnty. of Sacramento*,
    136 Cal. App. 3d 232 (1982)................................................24, 25

*White v. Pauly*,
    580 U.S. 73 (2017) ................................................................20

*Wilkinson v. Torres*,
    610 F.3d 546 (9th Cir. 2010)................................................18, 21

**Statutes**

CAL. CIV. CODE § 52.1................................................................25

CAL. GOV. CODE § 815.2................................................................25

CAL. GOV. CODE § 820.2................................................................24

CAL. PENAL CODE § 417................................................................19

CAL. PENAL CODE § 835a................................................................22, 24

Defendants' Motion for Summary Judgment

## I.    INTRODUCTION

"When someone points a gun at a law enforcement officer, the Constitution undoubtedly entitles the officer to respond with deadly force." *Estate of Strickland v. Nevada Cnty.*, 69 F.4th 614, 617 (9th Cir. 2023).[1]  The same is true even if the person points *a replica gun* that the officer believes is real.  Thus, "[i]f the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *Id.* at 620.  More importantly, "[t]hese principles apply even when officers are reasonably mistaken about the nature of the threat." *Id.* at 621.  As such, "[o]fficers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of an immediate threat, and in those situations courts will ***not*** hold that they have violated the Constitution." *Id.*

*Strickland* controls this case and establishes that, under the totality of the circumstances, it was objectively reasonable for Officers Billy Sun, David Meadows, and Vanessa Cardoza ("Officer Defendants") to believe that Plaintiffs' decedent (Daniel Valdivia) posed ***an imminent threat*** when he reached for, retrieved, and started pointing a replica Glock 17 gun at the officers—a gun that had the weight, feel, texture, and operation of a Glock 17 firearm.  Just like in *Strickland*, viewing the facts in the light most favorable to Plaintiffs, Valdivia was carrying a replica gun, disregarded multiple warnings not to reach for it, and pointed it at the officers.  "While the misidentification of the replica gun adds to the tragedy of this situation, it does ***not*** render the officers' use of force objectively unreasonable." *See id.* at 623.

Because the officers' use of force was objectively reasonable, Plaintiffs' Fourth Amendment excessive-force claim fails.  The substantive due process claim similarly fails because there is absolutely no evidence that the Officer Defendants acted with any improper "purpose to harm" unrelated to a legitimate law enforcement objective.  In any event, the Officer Defendants are entitled to qualified immunity on both claims

---

[1] Unless otherwise noted, all internal citations and quotation marks are omitted, and all emphasis is added.  "**UF __**" references are to Defendants' Statement of Uncontroverted Facts.

Defendants' Motion for Summary Judgment

because Plaintiffs cannot establish that the Officer Defendants' conduct violated any clearly-established law or that it was unconstitutional beyond debate.

Plaintiffs' state-law claims for battery and negligence similarly fail because the officers' conduct was reasonable under the totality of the circumstances. To the extent Plaintiffs are challenging the officers' pre-shooting conduct, they cannot demonstrate any injury from such conduct and, in any event, the Officer Defendants are entitled to statutory immunity. Finally, Plaintiffs' Bane Act claim fails because there is absolutely no evidence that the Officer Defendants acted with any specific intent to violate Valdivia's constitutional rights. For all these reasons, and the reasons set forth below, the Court should grant Defendants' motion for summary judgment in full.

## II.    STATEMENT OF FACTS

### A.    Valdivia Engages in Argument with Several Other Persons and Brandishes a Firearm, Causing Multiple Parties to Call the Police

On April 9, 2022, Jonathan Logan, an employee of Country Liquor, located at 124 East Arrow Highway in the City of Covina, went to the parking lot in front of the store to take out the trash and smoke a cigarette. **UF 1.** While he was outside, Logan was approached by Valdivia, who informed Logan that he was with a gang and that he "kill[s] n[****]s like you, all day." **UF 2.** Valdivia also showed Logan what "looked like a g[***] d[***] gun." **UF 3.** According to Logan, Valdivia told him: "I'll shoot you, m[***] f[***]." **UF 4.**

When asked to describe the gun, Logan said it was "black" and, after noting that he "know[s] guns," described it as a "45." **UF 5.** According to Logan, "the m[***] f[***] was real." **UF 6.** When asked what type of gun it was, Logan said: "It was a Glock. It was a g[***] d[***] Glock." **UF 7.** And then he added, twice more: "It was real." **UF 8.** Logan also explained that he has seen fake guns before, and it appeared to him that the gun that Valdivia showed him was "real," not fake. **UF 9.** To Logan, the gun looked like a real Glock because it did not have an orange tip (that a fake gun would normally have). **UF 10.**

Defendants' Motion for Summary Judgment

Logan explained that Valdivia had the gun in his hand and showed it to him about four to five times. **UF 11.** Valdivia told Logan that he wanted to "use" the gun and to shoot somebody. **UF 12.** And to Logan, it seemed like Valdivia "wanted to shoot someone tonight" and "wanted to shoot a person." **UF 13.** During his interview with a detective, Logan emphasized several times that the way Valdivia was acting, it looked as if he wanted to kill someone or get himself killed. **UF 14.**

The incident was witnessed by multiple persons, who became scared of Valdivia brandishing the gun and threatening people. **UF 15.** At least three of those witnesses called 911 to report the incident. **UF 16.** Thus, a Starbucks manager called 911 to report that there was a man outside "flashing his gun," which scared the customers. **UF 17.** Another caller told 911 that there was a customer outside of his business having an argument and it seemed like he had a gun. **UF 18.** According to the caller, the man was "arguing with people" and "showing his gun." **UF 19.** A third person also called 911 to report a man with a gun outside of a liquor store next to Starbucks. **UF 20.** According to the caller, "there were people running away from him." **UF 21.** The caller indicated that the man was holding the gun in his hand. **UF 22.** She described him as a Hispanic male wearing a black sweater and black shorts. **UF 23.** The caller described the gun as "a black handgun." **UF 24.**

At approximately 10:12 p.m., dispatch broadcasted to the officers that a 40-year-old Hispanic male with facial hair wearing a black sweater and shorts was at a liquor store "holding a can of beer *and a black handgun* in his hands." **UF 25.** At approximately 10:15 p.m., dispatch advised the officers that the suspect was *actively disturbing the peace* with others in the area and that there were already three calls received. **UF 26.** At approximately 10:16 p.m., just as the officers arrived at the scene, dispatch advised that the subject *had the gun "in his front pocket."* **UF 27.**

### B.    Officers Arrive and Confront Valdivia

Several officers responded to the scene, including Sun, Meadows, and Cardoza. **UF 28.** While enroute, Officer Sun took charge of setting up a containment and

3

directed other units as to where they should park once they are on the scene.  **UF 29.** To that end, Officer Sun (1) told Officer Meadows that he and Officer Sun would park near the Starbucks and approach on foot, (2) directed Officers Dixon and Cardoza to the east side, (3) directed Officer Avila to be on the northwest side, and (4) directed the officer arriving after Officers Sun and Meadows to be on the south side.  **UF 30.**

Officers Sun and Meadows arrived on the scene and exited their patrol vehicles at approximately **10:16:30 p.m.  UF 31.**  They walked over to the liquor store and obtained visual of Valdivia approximately twenty seconds later.  **UF 32.**  Officer Cardoza arrived on the scene shortly before Officers Sun and Meadows did and was in the process of observing Valdivia from the north as Officers Sun and Meadows approached him from the west.  **UF 33.**

At **10:16:54 p.m.**, Officer Sun yells to Valdivia:  "Hey, let me see your hands! Let me see your hands!" and when that fails to get Valdivia's attention, continues with:  "Put your hands up!  Don't fucking move!"  **UF 34.**  Officer Meadows similarly tells Valdivia:  "Police!  Put your hands up!  Put your hands up!"  **UF 35.**  Instead of complying, Valdivia moves the beer bottle that he had in his right hand to his left hand and ***immediately reaches for his waistband with his right hand***.  **UF 36.**  Officer Sun tells him not to reach:  "Hey, get your fucking hands out of your pocket, dude!"  **UF 37.**  Valdivia says:  "Whatever!" but complies and raises his hands.  **UF 38.**

At this point, Officer Meadows tells Valdivia to get on the ground:  "Get on the ground, now!"  **UF 39.**  As Valdivia starts getting on the ground, Officer Meadows tells him:  "Don't reach for anything!"  **UF 40.**  As Sun and Meadows were giving commands to Valdivia, Cardoza run toward them to provide assistance.  **UF 41.**

Valdivia proceeds getting on the ground, but only with left elbow on the ground and the right hand propping him up.  **UF 42.**  Valdivia then ***shifts his weight*** to his left elbow and ***reaches for his waistband*** with his right hand at **10:17:07 p.m.  UF 43.**  Officer Sun radios that Valdivia "reached for his waist."  **UF 44.**  Simultaneously, Officers Sun and Meadows yell to Valdivia:  "Don't reach for it!"  **UF 45.**  Valdivia

Defendants' Motion for Summary Judgment

1  proceeds to retrieve the gun and bring it forward until it is pointing in the direction of
2  Officers Sun and Meadows.  **UF 46.**  Shots are fired between **10:17:08 p.m.** and
3  **10:17:11 p.m.  UF 47.**  Valdivia's gun drops in front of him.  **UF 48.**

4      Logan, who was standing right next to Valdivia when the officers arrived and
5  during the shooting, confirmed that Valdivia was "ready to pull that thing" (the gun)
6  during his interaction with the officers.  **UF 49.**  And then, once he got on the ground,
7  Valdivia "pulled it out on the officers."  **UF 50.**  According to Logan, "it looked like
8  [Valdivia] pointed that s[***] at … them," referring to the officers.  **UF 51.**

9      **C.    Officer Defendants' Interviews and Deposition Testimonies**
10         **1.    Officer Sun**

11     Officer Sun testified that he received the call at around 10:14 p.m.  **UF 52.**  He
12  was familiar with the area because it was "undoubtedly our most serviced area of the
13  city" due to a large volume of crime, including stabbings, domestic violence, and
14  narcotics and alcohol violations.  **UF 53.**

15     The initial call informed him that the subject was a Hispanic male in his 40's
16  wearing black sweater and shorts, holding a bear and a gun, and that he was suspected
17  of violating Penal Code § 417 by brandishing a gun.  **UF 54.**  While enroute, Officer
18  Sun received additional information, including that more people have called 911
19  regarding the same subject and that the subject was "actively 415" with several other
20  individuals, which to Officer Sun meant that he was "argumentative, aggressive,
21  trying to start a fight."  **UF 55.**  Officer Sun testified that the fact that there were
22  multiple callers reporting similar information gave more credibility to the received
23  information.  **UF 56.**  As he was getting out of his patrol car, Officer Sun also received
24  information that the subject placed the gun in his right pocket.  **UF 57.**

25     Upon making his approach, Officer Sun observed Valdivia arguing with two
26  other individuals.  **UF 58.**  Given Valdivia's clothing and his actions, which matched
27  the information provided by the 911 callers, Officer Sun was immediately able to
28  identify Valdivia as the subject of the 911 calls.  **UF 59.**  Upon arrival, Officer Sun

Defendants' Motion for Summary Judgment

commanded Valdivia to show him his hands and then to put up his hands.  **UF 60.**
Valdivia did not immediately comply.  **UF 61.**  Instead, Valdivia reached for his
waistband, which prompted Officer Sun to tell him get his hands out of his pocket.
**UF 62.**  Eventually, Valdivia raised his hands and was then ordered to get on ground
by Officer Meadows.  **UF 63.**

Officer Sun testified that Valdivia did not get fully on the ground as
commanded; instead, he "started leaning to his left" and getting into what to Officer
Sun looked like "a modified prone shooting position."  **UF 64.**  To Officer Sun,
Valdivia's actions looked deliberate, as if he was preparing to reach for his gun.  **UF
65.**  Valdivia then starts reaching for his waistband, causing Officer Sun to yell as
loudly as he could not to reach for it.  **UF 66.**  Valdivia, however, ignored the
command, lowered his hand, and almost immediately pulled out a gun.  **UF 67.**
Officer Sun testified that the way Valdivia pulled out the gun and had a good grip on
it was another huge flag because it told him that Valdivia was either a "trained
shooter" or had "some kind of firearms experience" to be able to get such a good grip
on the gun so quickly.  **UF 68.**  After retrieving the gun, Valdivia proceeded to raise
it until it was almost pointing in the direction of Officers Sun and Meadows.  **UF 69.**

According to Officer Sun, once Valdivia raised the gun so that the barrel was
pointing in his direction, he felt that he had no choice but to shoot to avoid Valdivia
shooting him or Officer Meadows.  **UF 70.**  At the time Officer Sun fired his first
shot, Valdivia was leaning to his left side while on the ground and had the gun in his
right hand pointing in the direction of Officers Sun and Meadows.  **UF 71.**  Officer
Sun fired six rounds.  **UF 72.**  There was less than a second and a half between the
first and the sixth shot.  **UF 73.**  He testified that he assessed after each shot.  **UF 74.**
According to Officer Sun, he perceived Valdivia continuously pointing the gun in his
direction during his six shots.  **UF 75.**  He testified that he genuinely feared that
Valdivia would kill him and his partner at the time that he fired.  **UF 76.**  Officer Sun
stopped shooting when he no longer perceived Valdivia as a threat, which was when

Defendants' Motion for Summary Judgment

1  the gun was no longer pointed in the officers' direction. **UF 77.**

2         **2.**    **Officer Meadows**

3       Officer Meadows testified that he received the call at around 10:13 p.m. **UF**

4  **78.** He was familiar with the location because it was in a high crime area known for

5  narcotics violations, assaults with deadly weapons, and other violent crimes. **UF 79.**

6       The call indicated that the subject was brandishing a firearm outside of a liquor

7  store, which to Officer Meadows meant that he was showing the gun to others in a

8  threatening manner. **UF 80.** Upon receiving the call, Officer Meadows followed

9  Officer Sun to the Starbucks parking lot. **UF 81.** While enroute, he received

10  additional information, including that there were multiple calls and that the subject

11  was either threatening or arguing with other individuals. **UF 82.** As he was arriving,

12  he also received information that the subject placed the gun in his right pocket, which

13  was consistent with where he would later observe the gun on Valdivia. **UF 83.**

14       Upon making his approach, Officer Meadows could hear several persons

15  arguing. **UF 84.** Officer Meadows identified Valdivia as the subject of the 911 calls

16  based on his actions and clothing. **UF 85.** Upon arrival, Officer Meadows identified

17  the officers as "police" and ordered everyone to put their hands up. **UF 86.** The two

18  individuals with whom Valdivia was arguing complied but Valdivia did not and,

19  instead, started to reach toward his waistband. **UF 87.**

20       As he raised his hands, Valdivia's sweatshirt lifted and ***Officer Meadows could***

21  ***see the grip of a firearm protruding from his waistband***. **UF 88.** According to

22  Officer Meadows, he could see the finger groves in the handle of the gun, which to

23  him "looked like a Glock pistol." **UF 89.** As a result, he ordered Valdivia to get on

24  the ground, which he felt was the safest position to take Valdivia into custody and to

25  prevent Valdivia from fleeing or potentially taking hostages. **UF 90.**

26       As Valdivia started getting on the ground, Officer Meadows observed that he

27  posted himself on the ground with his left arm and begun reaching again for his

28  waistband with his right hand in the direction where his gun was. **UF 91.** Officers

MANNING | KASS

7

Defendants' Motion for Summary Judgment

Meadows and Sun both gave Valdivia commands not to reach for it. **UF 92.** Valdivia, however, ignored the commands, removed the gun from his waistband, and started to bring it up in the direction of Officers Meadows and Sun. **UF 93.** Officer Meadows could see clearly as the muzzle started to raise up in their direction. **UF 94.**

Officer Meadows sidestepped to the side to avoid being in Valdivia's line of fire and pulled the trigger before Valdivia could get a round off. **UF 95.** According to him, at the time that he fired, Valdivia's gun was pointed in the direction of him and Officer Sun. **UF 96.** He testified that he fired because he was genuinely afraid that Valdivia was going to start shooting and kill either him or Officer Sun. **UF 97.** Officer Meadows fired only one shot. **UF 98.** Thereafter, he reassessed and stopped shooting because Valdivia no longer had a gun in his hand. **UF 99.**

Officer Meadows testified that no shots were fired while Valdivia was still reaching for the gun. **UF 100.** In addition, based on his perception, all of the shots were fired as Valdivia was pointing his gun at him and Officer Sun. **UF 101.** Officer Meadows further testified that Valdivia's right arm with the gun was extending and moving in the direction of the officers while the shots were being fired. **UF 102.**

Once Valdivia's gun was secured, Officer Meadows immediately checked for pulse and started CPR by doing chest compressions. **UF 103.** He also confirmed that the paramedics were called. **UF 104.** He continued performing CPR, alternating with Officer Marquez, until he was relieved by other officers on the scene. **UF 105.**

### 3.    Officer Cardoza

Officer Cardoza similarly indicated that she was familiar with the area where the 911 calls originated, describing it as having a lot of drug sales and physical altercations. **UF 106.** When she heard that only three units were initially dispatched, she attached herself to the call to assist the other officers given the area and the nature of the call (man with a gun). **UF 107.** Officer Cardoza heard dispatch inform the officers that the subject was a Hispanic male in his 40's with facial hair and wearing a black sweater and shorts, that he was waving a firearm, and that people in the area

8

Defendants' Motion for Summary Judgment

1   were fearful.  **UF 108.**  While enroute, Officer Cardoza also learned that the subject

2   was in a verbal argument with two other persons, that he was holding a beer in his

3   hand, and that he had placed the firearm in his pocket.  **UF 109.**

4        Upon arrival, Cardoza could see Valdivia, whom she was able to identify based

5   on his appearance, which matched the description provided by dispatch.  **UF 110.**  She

6   could see that he was in some sort of verbal altercation with two other individuals.

7   **UF 111.**  As she was observing Valdivia, she heard Officer Sun announce over the

8   radio that he was arriving on scene.  **UF 112.**  Based on prior radio traffic, she knew

9   that Officer Meadows would be with him and that they would park behind Starbucks

10  and make their approach from there.  **UF 113.**

11       Officer Cardoza was able to observe Valdivia for a only a couple of seconds

12  before Officers Sun and Meadows made their approach.  **UF 114.**  She observed the

13  officers start giving Valdivia commands and she run toward them to provide

14  assistance.  **UF 115.**  She testified that there was insufficient time to retrieve the non-

15  lethal shotgun.  **UF 116.**  Officer Cardoza heard additional commands being given to

16  Valdivia as she was running, including not to reach for anything.  **UF 117.**  She also

17  observed Valdivia being noncompliant.  **UF 118.**

18       Given her position (approaching Valdivia from the side), Officer Cardoza was

19  able to observe how Valdivia started lifting up his sweater with his right hand as he

20  started to lay down.  **UF 119.**  As Valdivia lifted up his sweater, ***she observed the***

21  ***handle of a black handgun*** in his waistband.  **UF 120.**  Immediately thereafter, she

22  observed Valdivia reach for the gun with his right hand, pull it out, and start to point

23  it at Officers Sun and Meadows.  **UF 121.**  She also testified hearing the other officers

24  tell Valdivia "don't reach for it" before she fired her first shot.  **UF 122.**

25       Officer Cardoza indicated that she started firing when she observed Valdivia

26  pointing the gun at Officers Sun and Meadows because she afraid he was going to

27  shoot and kill one or both of them.  **UF 123.**  Officer Cardoza testified that at the time

28  that she fired her first shot, Valdivia was leaning to the side on his left arm, his legs

9

were in a sort of a "mounted stance," and his right hand was holding a gun that was pointed or in the process of being pointed at Officers Sun and Meadows. **UF 124.**

Cardoza fired five rounds. **UF 125.** There was less than a second between the first and fifth shot. **UF 126.** She testified that assessed after each shot and perceived Valdivia continuously pointing the gun in the direction of Sun and Meadows during her five shots. **UF 127.** Cardoza testified that she genuinely feared that Valdivia would kill her partners at the time that she fired. **UF 128.** Valdivia was still pointing the gun at the officers at the time of her last shot. **UF 129.** Officer Cardoza testified that Valdivia dropped the firearm after she fired her five rounds. **UF 130.** She stopped shooting once Valdivia dropped the gun because he was no longer a threat. **UF 131.**

### D.  Officers Promptly Render and Summon Medical Assistance

Shots were fired at 10:17:08 p.m. **UF 47.** The CAD log reveals an almost immediate request for paramedics ("Shots fired[,] roll fire."). **UF 135.** Less than a minute later, at **10:17:59 p.m.**, Officer Sun repeats: "I need fire now." **UF 136.**

Immediately after the shooting, the officers approached Valdivia, who was lying next to his gun, and Officer Sun secured the gun by moving it away from Valdivia. **UF 137.** At 10:17:56 p.m., the officers start handcuffing Valdivia. **UF 138.** Officer Meadows immediately asks for a first aid kit. **UF 139.** Once Valdivia is secured, Officer Meadows checks for pulse and informs: "No pulse. I'm going to start CPR." **UF 140.** Officer Meadows starts performing CPR on Valdivia at **10:18:27 p.m.**—approximately 1 minute and 17 seconds after the shooting. **UF 141.**

The officers performed CPR ***continuously*** for more than 7 minutes until the paramedics arrived and took over. **UF 142–143.** Valdivia was taken to a hospital, where he was pronounced deceased at 11:06 p.m. **UF 144.** Testing of Valdivia's blood sample revealed the presence of alcohol and methamphetamine. **UF 145.**

### E.  Valdivia's Gun

Immediately after the shooting, Officer Sun approached Valdivia and secured Valdivia's gun by moving it away from him. **UF 146.** After the officers started CPR,

10

Defendants' Motion for Summary Judgment

Officer Sun grabbed Valdivia's gun and went to secure it in his patrol car. **UF 147.** As Officer Sun picked up the gun, he identified it as a "Glock." **UF 148.**

In addition to being a SWAT operator and a range and rifle instructor, Officer Sun is also a Glock armorer. **UF 149.** According to him, when Valdivia pulled out the gun, "it looked like a semiautomatic handgun," similar to the Glock that he had. **UF 150.** He further explained that when he picked it up, "the weight, the feel of it, everything felt like it was just like" his duty gun. **UF 151.** According to Officer Sun, the finger grooves, the textured pattern on the grip, and even the magazine release "was consistent with the Generation 3 Glock 17." **UF 152.** It even had "Glock 17" marking on the side. **UF 153.** Officer Sun also noticed the metal slide, which was worn down as if the gun has been unholstered and re-holstered multiple times, which was similar to Officer Sun's gun. **UF 154.**



**UF 159.**

It was only after Officer Sun released the magazine and noticed that the gun could not chamber a round that he realized that Valdivia's gun was actually a .177 caliber replica Glock 17 BB gun that "was made to be an exact replica" of a Glock 17 gun, including the weight, the texture, the feel, and even the operation manipulations. **UF 155.** According to the California DOJ's physical evidence examination report, Valdivia's gun was a "GLOCK, Model 17 Blowback Action Pistol" that "functioned as a semi-automatic air ($CO_2$) powered BB gun." **UF 156.**

Defendants' Motion for Summary Judgment

1    Multiple witnesses at the scene, including the three 911 callers, Logan, and

2    other witnesses at the Country Liquor and Starbucks, as well as the responding

3    officers, all believed that Valdivia was in the possession of a real gun.  **UF 157.**  The

4    photos of the gun similarly confirm that it looks like a real Glock 17 firearm.  **UF 158.**

5        **F.    DOJ Investigation**

6        Pursuant to California Assembly Bill 1506, the California DOJ conducted a

7    thorough investigation of the incident and issued a report in August 2024, concluding

8    that, based on the totality of circumstances, the evidence did not demonstrate that the

9    Officer Defendants' actions were unreasonable.  **UF 160.**

10   **III.   LEGAL STANDARD**

11       Summary judgment is proper where the movant "shows that there is no genuine

12   dispute as to any material fact and the movant is entitled to judgment as a matter of

13   law."  FED. R. CIV. P. 56(a).  A moving party without the ultimate burden of

14   persuasion at trial can meet its burden in one of two ways:  by either "produc[ing]

15   evidence negating an essential element of the nonmoving party's case" or "show[ing]

16   that the nonmoving party does not have enough evidence of an essential element of

17   its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire &*

18   *Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  The

19   nonmoving party then "must set forth specific facts showing that there is a genuine

20   issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

21       In addition, although the Court must view the facts in the light most favorable

22   to Plaintiffs, where, as here, the entire interaction was captured on multiple videos

23   and the videos "quite clearly contradict[] the version of the story" told by Plaintiffs,

24   the Court is ***not*** required to adopt the version of the facts that is "blatantly contradicted

25   by the record" and, instead, must viewed the facts "in the light depicted by the

26   [videos]." *See Scott v. Harris*, 550 U.S. 372, 378, 380–81 (2007).

27   / / /

28   / / /

Defendants' Motion for Summary Judgment

## IV.    ARGUMENT

### A.    The Officer Defendants Are Entitled to Qualified Immunity on Valdivia's Fourth Amendment Excessive-Force Claim (Claim 2)

"Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Waid v. Cnty. of Lyon*, 87 F.4th 383, 387 (9th Cir. 2023).  It protects government officials "***unless*** (1) they violated a federal statutory or constitutional right, ***and*** (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018).  Here, Plaintiffs' claim fails under both prongs.

#### 1.    No Fourth Amendment Violation

The pertinent question under the Fourth Amendment is whether the use of force was "***objectively reasonable*** in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989).  The Court must weigh the "nature and quality of the intrusion on an individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396.  Factors that are considered in assessing the government interests at stake include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

The "***most important***" factor is whether the suspect posed an "***immediate threat***" to the safety of the officers or others. *Strickland*, 69 F.4th at 620.  Moreover, reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 397.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." *Id.* at 396–97.  Here, undisputed evidence demonstrates that the

1  force used was reasonable and not excessive under the totality of the circumstances.

### a.    Valdivia Posed an Imminent Threat

The dispositive factor here is the threat posed by Valdivia. *See Strickland*, 69 F.4th at 620, 623. Undisputed video evidence demonstrates that Valdivia disregarded multiple commands not to reach for his waistband and, instead, reached for, retrieved, and started pointing a gun at the officers. **UF 36–37, 40, 43, 45–46, 49–51, 62, 66–71, 91–94, 119–124.** In addition, each of the officers testified that they reasonably believed that Valdivia presented ***an imminent threat to themselves or their fellow officers*** when they opened fire. **UF 68–71, 75–76, 95–97, 123–124, 127–129.**

To that end, Officer Sun testified that he only fired in self-defense and defense of others (Meadows) after he observed Valdivia retrieve the gun and raise it so that the barrel was pointing in his direction. **UF 64–70.** He genuinely feared that Valdivia would kill him and his partner at the time that he fired. **UF 76.** He continued firing because he perceived Valdivia continuously pointing the gun in his direction. **UF 72–75.** And he stopped firing when the gun was no longer pointed at them. **UF 77.**

Similarly, Officer Meadows testified that he only fired in self-defense and defense of others (Sun) after he observed Valdivia retrieve the gun and start raising the muzzle in his direction. **UF 91–96.** He genuinely feared that Valdivia would kill him and his partner at the time that he fired. **UF 97.** Officer Meadows only fired one shot and stopped shooting when Valdivia dropped the gun. **UF 98–99.**

Likewise, Officer Cardoza testified that she only fired in defense of others (Sun and Meadows) after she observed Valdivia retrieve the gun and start pointing it at the officers. **UF 119–124.** She genuinely feared that Valdivia would kill her partners when she fired. **UF 123, 128.** She continued firing because she perceived Valdivia continuously pointing the gun in the direction of her partners during her five shots. **UF127, 129.** And she stopped firing when Valdivia dropped the gun. **UF 130–131.**

Under these facts, which are undisputed and were all captured on multiple videos, Valdivia presented ***a clear and immediate threat*** to the safety of the officers,

14

clearly justifying the use of deadly force.  *See Strickland*, 69 F.4th at 620–23.

*Strickland* controls this case.  Indeed, the facts in *Strickland* were substantially more in the plaintiffs' favor but the Ninth Circuit, nonetheless, found (on a motion to dismiss) that the use of deadly force was objectively reasonable.  In *Strickland*, the police were called after Strickland was observed walking in a residential area with "what appeared to be a shotgun."  69 F.4th at 618.  Unlike here, the officers "recognized Strickland [from their interactions with him two days earlier] and knew he was homeless with mental health issues and had been released from custody days before."  *Id.*  In addition, unlike here, Strickland's shotgun was "marked with an orange tip, which signified that it was a replica, not a real firearm."  *Id.*  Strickland also specifically ***told*** the officers that the gun was "a BB gun" and "slapped the gun with his hand, making a noise that sounded more like plastic than metal."  *Id.*  The officers heard this, and one of the officers even reported to dispatch:  "He's saying it's a BB gun."  *Id.*  Strickland also "pointed to the orange top on the barrel."  *Id.*

Strickland refused multiple commands to drop the gun.  *Id.*  Eventually, he began pointing the BB gun in the direction of the officers.  *Id.*  "Seconds later, after Strickland lowered the barrel toward the officers, [they] opened fire, striking Strickland several times."  *Id.*  The Court found the officers' actions to be objectively reasonable.  *Id.* at 623.  It observed that the "most important" factor was "whether the suspect posed an immediate threat."  *Id.* at 620.  And it concluded that under the totality of the circumstances, Strickland posed an imminent threat.  *Id.* at 621–23.

The Court observed that "when a suspect points a gun in an officer's direction, the Constitution undoubtedly entitles the officer to respond with deadly force."  *Id.* at 620.  Moreover, ***"[r]easonableness also doesn't always require officers to delay their fire until a suspect turns his weapon on them***."  *Id.*  "Officers shouldn't have to wait until a gun is pointed at them before they are entitled to take action."  *Id.*  Rather, "[i]f the person is armed—***or reasonably suspected of being armed***—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."  *Id.*

Defendants' Motion for Summary Judgment

As relevant here, the Court reiterated that "[t]hese principles apply ***even when officers are reasonably mistaken about the nature of the threat***." *Id.* at 621. "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of an immediate threat, and in those situations courts will ***not*** hold that they have violated the Constitution." *Id.* In fact, "the Constitution even allows for officer's action that resulted ***from a reasonable mistake of fact***." *Id.* "When an officer's use of force is based on a mistake of fact, [the Court] ask[s] whether a reasonable officer would have or should have accurately perceived that fact." *Id.*

In *Strickland*, the Court concluded that even though the suspect possessed only a replica gun with an orange tip and tried to tell the officers that the gun was fake, "the officers' mistaken belief that [he] possessed a dangerous weapon ***was reasonable*** and they were justified in the use of deadly force when he pointed it at them." *Id.* In so holding, the Court observed that the officers "met ***a tense, uncertain, and rapidly evolving circumstance*** when they confronted Strickland." *Id.* "They found him on a residential street carrying what appeared to be a firearm." *Id.* According to the Court, "[t]he pivotal moment occurred when Strickland began pointing the replica gun in the officers' direction." *Id.* "At that point, they had probable cause to believe that Strickland posed a significant threat of death or serious physical injury to themselves and it became objectively reasonable for them to use lethal force." *Id.* at 621–22.

The Court noted that "[t]his analysis ***doesn't change*** because the weapon turned out to be a replica given the officers' reasonable belief that Strickland possessed a real firearm." *Id.* at 622. "They were called to the scene based on reports of a man walking down a residential street with what appeared to be a shotgun." *Id.* And "[a]lthough Strickland tried to convince officers that the object was a BB gun, even slapping it to make a plastic sound, … [t]he officers were reasonably justified in not taking Strickland's assurances at face value," particularly because "***misplaced trust in this circumstance could be fatal for the officers***." *Id.* In sum, the Court concluded that under the totality of the circumstances, "it was objectively reasonable

16

1   for the officers to believe Strickland posed an immediate threat" because, even

2   viewing the facts in his favor, "he was carrying a replica gun, disregarded multiple

3   warnings to drop it, and pointed it at the officers."  *Id.* at 622–23.

4          The same is true here.  Just like in *Strickland*, the officers were called because

5   multiple people reported that Valdivia was standing outside of a liquor store with a

6   beer and brandishing a gun causing people to be afraid.  **UF 15–25, 54, 80, 108.**  The

7   people who called 911 believed the gun to be real.  **UF 17–20, 22, 24, 157.**  Logan,

8   whom Valdivia threatened with the gun earlier, also believed the gun to be real.  **UF**

9   **3, 5–10.**  Unlike in *Strickland*, Valdivia's gun did ***not*** have an orange tip and Valdivia

10  did not try to tell the officers that the gun was fake.  **UF 10, 158–159.**  When the

11  Officer Defendants observed Valdivia's gun, they believed it to be real (including

12  Officer Sun, who is a Glock armorer).  **UF 88–89, 120, 148–154.**  And the subsequent

13  photos and examination of the gun confirmed that it was a Glock 17 BB gun that had

14  the weight, feel, texture, and operation of a real Glock 17.  **UF 156, 158–159.**

15         Simply put, under the totality of the circumstances, even viewing the facts in

16  Valdivia's favor, "it was objectively reasonable for the officers to believe that

17  [Valdivia] posed an immediate threat" to the officers when he reached for, retrieved,

18  and started pointing the gun at them.  *See Strickland*, 69 F.4th at 622–23.  Once

19  Valdivia started pointing the gun at the officers, they were justified in responding with

20  deadly force and did ***not*** have to "delay their fire" until Valdivia fully pointed the gun

21  at them.  *See id.* at 620; *see also Long v. City & Cnty. of Honolulu*, 511 F.3d 901,

22  906–07 (9th Cir. 2007) (officer was justified in shooting the suspect where he heard

23  radio transmission suggesting that the suspect was shooting at officers and observed

24  him pointing a rifle in the direction of other officers); *Scott v. Henrich* ("*Henrich*"),

25  39 F.3d 912, 914 (9th Cir. 1994) (use of deadly force was not constitutionally

26  excessive where the suspect held a "long gun" and pointed it at the officers).

27         The Officer Defendants' actions were particularly reasonable in light of the

28  information available to them.  Each officer testified that they knew that they were

17

Defendants' Motion for Summary Judgment

responding to a situation involving a man with a gun who already brandished it to other persons.  **UF 54–56, 80, 82, 107–109.**  They were also aware that the neighborhood they were responding to was in a high crime area.  **UF 53, 79, 106.** Given their knowledge that Valdivia was "armed" or, at least, "reasonably suspected of being armed," his refusal to follow commands not to reach for his waistband (the general area where the officers knew the gun was located) (**UF 27, 57, 83, 109**), his quick retrieval of the gun (**UF 67–68, 93, 121**), and his process of moving the gun to point in the direction of the officers, all of it clearly created "an immediate threat" justifying the use of lethal force.  *See Strickland*, 69 F.4th at 620.[2]

Finally, undisputed evidence demonstrates that Officer Sun's six shots and Officer Cardoza's five shots were taken in a span of approximately 2–3 seconds.  **UF 47, 73, 126.**  As the Supreme Court has observed, "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended."  *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014).  Here, Sun and Cardoza both testified that they perceived Valdivia to be a continuing threat while they fired as they perceived him still holding the gun during their shots.  **UF 74–75, 127, 129.**  All of them stopped firing once they perceived Valdivia as no longer being a threat when he dropped the gun.  **UF 77, 130–131.**

### b.    Other *Graham* Factors

Where, as here, the suspect posses an immediate threat to the officers, the use of deadly force is objectively reasonable ***regardless*** of the other *Graham* factors.  *See Strickland*, 69 F.4th at 620, 623 (concluding that the officers' actions were objectively

---

[2] That Officer Cardoza was not in the line of Valdivia's potential fire is irrelevant.  "Officers are permitted to use deadly force to protect the lives of other officers."  *Monzon v. City of Murrieta*, 978 F.3d 1150, 1159 (9th Cir. 2020).  Here, Officer Cardoza was justified in using deadly force to protect her partners from an imminent threat of being shot and killed by Valdivia once he reached for, retrieved, and started pointing a gun at Officers Sun and Meadows.  **UF 119–123, 127–129.**  On these facts, "[a] reasonable officer in the position of [Officer Cardoza] would have probable cause to believe that [Valdivia] posed ***an immediate threat to the safety of one or more of the other officers***."  *See Monzon*, 978 F.3d at 1158; *see also Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010) (observing that "the critical inquiry is what [the officer] perceived").

18

Defendants' Motion for Summary Judgment

reasonable where the decedent posed an immediate threat to the officers, even though "the bulk of the *Graham* factors favor[ed]" the decedent).  In any event, unlike in *Strickland*, the other *Graham* factors in this case also weigh in Defendants' favor.

With regard to the severity of the crime at issue, the officers were responding to calls that Valdivia has brandished a gun in a threatening manner in violation of Penal Code § 417.  **UF 25–26, 54–55, 80, 82, 107–109.**  The Ninth Circuit has "used the severity of the crime at issue as a proxy for the danger a suspect poses at the time force is applied."  *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 919 (9th Cir. 2024).  Similar to *Napouk*, Valdivia was not only suspected of brandishing a gun at others, but he also "committed assault with a deadly weapon as the event unfolded by [pointing the gun at officers] and refusing to respond to the officers' orders."  *See id.* at 919; *see also* CAL. PENAL CODE § 417(c) (making it illegal to "draw[] or exhibit[] any firearm" "in the immediate presence of a peace officer").  "This is a sufficiently serious and dangerous crime."  *See Napouk*, 123 F.4th at 919.  As discussed above, "that the weapon turned out to be [fake] has no bearing on the severity of the crime because the officers on the scene reasonably believed it was real."  *See id.*

Similarly, undisputed evidence shows that although Valdivia did not try to flee, he was repeatedly non-compliant and reached for the gun ***despite multiple commands*** not to reach for it.  *See* **UF 34–37, 40, 43–46, 60–62, 64–71, 86–87, 91–94, 117–123.**

That the officers did not utilize less-lethal alternatives is not dispositive.  To begin with, Officer Cardoza testified that there was insufficient time to retrieve the non-lethal shotgun.  **UF 116.**  Moreover, the Officer Defendants also testified that given the nature of the call (man with a gun), it would ***not*** have been prudent to engage him with a non-lethal weapon, which would have endangered the officers and the public.  **UF 134.**  In any event, case law is clear that officers "need ***not*** avail themselves of the least intrusive means of responding to an exigent situation."  *Henrich*, 39 F.3d at 915.  Here, Valdivia's actions "endangered the officers and left them ***with only seconds*** to consider less severe alternatives."  *See Monzon*, 978 F.3d

Defendants' Motion for Summary Judgment

at 1157. Undisputed evidence shows that this was a "very dynamic and chaotic" situation (*id.* at 1158) that was caused ***solely*** by Valdivia's actions of brandishing a gun at others and, thereafter, failing to comply with the officers' commands and, instead, reaching for, retrieving, and pointing a gun at the officers. The officers "were forced to make split-second decisions" in response to Valdivia's actions, and it would be "a serious mistake" to "dissect, evaluate, and second-guess the officers' actions piecemeal" and with the benefits of hindsight. *See id.* at 1157–58.

### 2.    No Violation of Any Clearly-Established Law

"Clearly established" means that, "at the time of the officer's conduct, the law was ***sufficiently clear*** that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 63. "[E]xisting law must have placed the constitutionality of the officer's conduct ***beyond debate***." *Id.* "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id.* The Supreme Court has repeatedly told courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (*per curiam*). "Specificity is especially important in the Fourth Amendment context," and "officers are entitled to qualified immunity ***unless*** existing precedent ***squarely governs*** the specific facts at issue." *Id.* Plaintiffs bear the burden of identifying "a case where an officer ***acting under similar circumstances*** … was held to have violated the Fourth Amendment." *See White v. Pauly*, 580 U.S. 73, 79 (2017).

Plaintiffs cannot meet their burden. On the contrary, relevant precedent at the time of the shooting established that where the suspect is armed, or reasonably suspected of being armed, it is ***not*** unreasonable for the officers to use deadly force when the suspect starts pointing a gun at them. *See Strickland*, 69 F.4th at 620–23 (not objectively unreasonable to shoot a suspect who started pointing a BB gun at the officers) (January 1, 2020 incident); *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 828 (9th Cir. 2023) ("Our case law is clear that when a suspect reaches for a gun or aims a weapon at officers, responding with deadly force does not violate the

20

1   Constitution.") (January 12, 2018 incident); *Long*, 511 F.3d at 906–07(officer was

2   justified in shooting the suspect where he heard radio transmission suggesting that the

3   suspect was shooting at officers and observed him pointing a rifle in the direction of

4   other officers); *Henrich*, 39 F.3d at 914 (use of deadly force was not constitutionally

5   excessive where the suspect held a "long gun" and pointed it at the officers).

6          **B.**    **No Violation of Substantive Due Process (Claim 4)**

7        Official conduct only violates substantive due process when it "shocks the

8   conscience." *See Waid*, 87 F.4th at 392. Liability turns on "whether the

9   circumstances are such that actual deliberation is practical." *Id.* Where, as here, "a

10   law enforcement officer makes ***a snap judgment*** because of an escalating situation,

11   his conduct may only be found to shock the conscience if he acts ***with a purpose to***

12   ***harm*** unrelated to legitimate law enforcement objectives." *Id.*

13        Here, undisputed evidence clearly demonstrates that the officers had to make a

14   snap judgment when Valdivia reached for, retrieved, and tarted pointing his gun at

15   them. **UF 42–46.** Indeed, less than ***twenty seconds*** elapsed from the officers' arrival

16   on the scene to the shooting, and there were only a few seconds between when

17   Valdivia started going to the ground and reaching for his gun. *See* **UF 34, 43, 47**; *see*

18   *also Waid*, 87 F.4th at 392 (applying "purpose to harm" standard where the officers

19   encountered the approaching suspect seconds after entering the house); *Wilkinson*,

20   610 F.3d at 554 (same where the situation evolved "[w]ithin a matter of seconds");

21   *Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008) (finding actual deliberation

22   was not practical where a five-minute altercation between the officers and victim

23   evolved quickly and forced the officers to make "repeated split-second decisions").

24   In addition, the Officer Defendants' interviews with the DOJ and deposition

25   testimonies confirm that their conduct in responding with deadly force was taken for

26   a legitimate law enforcement objective (self defense and defense of others) and ***not***

27   for any improper purpose to harm. **UF 70–71, 75–76, 94–97, 100–102, 123–124,**

28   **127–129.** In sum, there is absolutely ***no evidence*** that the officers intended to harm

Valdivia for any reason other than the legitimate law enforcement objectives of self defense and defense of others, thus entitling them to summary judgment.

In any event, the Officer Defendants are entitled to qualified immunity on this claim because Plaintiffs cannot point to ***any*** case involving the same circumstances where the suspect pulled a gun on the officers within a few seconds and where the court found that the officers were not entitled to qualified immunity.

## C.    Battery Claim Fails (Claim 7)

Plaintiffs' battery claim is dependent on the officers applying an ***unreasonable*** amount of force.  *See Johnson v. Cnty. of L.A.*, 340 F.3d 787, 794 (9th Cir. 2003). Here, as discussed above, the force used was objectively reasonable.  Thus, the battery claim fails.  *See id.*; *Monzon*, 978 F.3d at 1164 ("The battery claim fails because plaintiffs cannot show that the officers used unreasonable force.").  Because the underlying claim fails, so does the vicarious liability claim against the City.

## D.    Negligence Claim Fails (Claim 8)

"[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013).  Police officers "have a duty to act reasonably when using deadly force." *Id.* at 629.  "The reasonableness of an officer's conduct is determined in light of the totality of circumstances." *Id.*  Here, as discussed above, the use of deadly force was reasonable under the totality of the circumstances because it was necessary to defend against an imminent threat of death. Thus, the negligence claim fails.  *See* CAL. PENAL CODE § 835a(c)(1)(A) ("a peace officer is justified in using deadly force … when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary … [t]o defend against an imminent threat of death or serious bodily injury"); *Monzon*, 978 F.3d at 1164–65 (negligence claim failed where the officers "acted reasonably under the circumstances leading up to and at the moment of their use of deadly force").

22

To the extent Plaintiffs assert a **separate** negligence claim premised on the officers' pre-shooting conduct, they cannot show any **separate injury** attributable to any such negligence. In *Hayes*, the California Supreme Court held that the negligence claim is broader than the Fourth Amendment excessive-force claim because it allows for consideration of the officers' pre-shooting conduct. 57 Cal. 4th at 639. The Court, however, emphasized that this does **not** make the officers' pre-shooting conduct **independently** actionable; rather, it merely means that the pre-shooting conduct is "relevant" in determining whether the use of force was objectively reasonable under the totality of the circumstances. *Id.* at 626, 629–30, 639–40.

In *Hayes*, the Court observed that "the only injury plaintiff alleged [was] the loss of her father" and that "she did not allege an additional injury as a result of the conduct of law enforcement personnel *preceding* her father's shooting." *Id.* at 630. As a result, the Court concluded that the case "involve[d] only a single indivisible cause of action, seeking recovery for a single wrong—*the shooting itself*." *Id.* Similarly, here, the **only** injury that Plaintiffs have alleged is the use of deadly force against Valdivia. *See* Dkt. No. 1 at ¶ 101. Thus, similar to *Hayes*, "this case involves **a single primary right** … , which necessarily corresponds to **a single duty** (the duty not to use deadly force in an improper manner), and the breach of that duty gives rise to a single indivisible cause of action." *See* 57 Cal. 4th at 631.

Because Plaintiffs did not allege a separate injury from the officers' pre-shooting conduct, such conduct is only relevant "to the extent it shows, as part of the totality of circumstances, that **the shooting itself** was negligent." *See id.* "The reasonableness of the deputies' pre-shooting conduct should **not** be considered in isolation, however; rather, it should be considered **as part of the totality of circumstances** surrounding the fatal shooting of [Valdivia]." *See id.* at 637.

Here, as discussed above, the officers had to respond quickly to the scene given the nature of the call (a man brandishing a firearm and scaring people). Given the nature of the call, the use of non-lethal alternatives would have exposed the officers

23

Defendants' Motion for Summary Judgment

and the public to greater danger.  **UF 134.**  Likewise, not approaching Valdivia could have caused him to escalate the situation, flee, or take hostages.  **UF 132.**  In *Hayes*, the Court confirmed that "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." 57 Cal. 4th at 632; *accord* CAL. PENAL CODE § 835a(a)(4). Crucially, "as long as an officer's conduct falls ***within the range of conduct*** that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence." *Hayes*, 57 Cal. 4th at 632.

Here, given the substantial threat presented by Valdivia in brandishing a firearm in a public and the imminent threat presented by him when he reached for, retrieved, and started pointing the gun at the officers, the officers' use of deadly force was objectively reasonable under the totality of circumstances, entitling them to summary judgment. *See, e.g.*, *Martinez v. Cnty. of Los Angeles*, 47 Cal. App. 4th 334, 345 (1996) ("[A]n officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack.").

In any event, any negligence claim premised on the officers' pre-shooting conduct fails because they are entitled to statutory immunity.  Section 820.2 provides that, "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." CAL. GOV. CODE § 820.2.  "Discretionary immunity under section 820.2 has been found to apply to many areas of police work." *Conway v. Cnty. of Tuolumne*, 231 Cal. App. 4th 1005, 1015 (2014).  For example, "[a] decision to arrest, or to take some protective action less drastic than arrest, is an exercise of discretion for which a peace officer may not be held liable in tort." *Watts v. Cnty. of Sacramento*, 136 Cal. App. 3d 232, 234 (1982).  Here, to the extent Plaintiffs challenge the officers' discretionary

24

1  decisions as to how to safely contain the situation, whether to detain Valdivia, and

2  how to safely detain him, any such claim would be barred by § 820.2 immunity. *See*

3  *Napouk*, 123 F.4th at 924 (applying Nevada's similar discretionary immunity statute

4  to bar battery and negligence claims where police shot a man wielding a fake weapon).

5  Because the officers are immune from liability for their performance of

6  discretionary acts, the City of Covina, as the officers' employer, is likewise immune.

7  *See Watts*, 136 Cal. App. 3d at 234–35; CAL. GOV. CODE § 815.2(b).

8  **E.   Bane Act Claim Fails (Claim 9)**

9  The Bane Act provides for liability for interference with an individual's rights

10  "by threat, intimidation, or coercion." CAL. CIV. CODE § 52.1(b). Here, the Bane Act

11  claims fails because there is no evidence of underlying constitutional violation.

12  Furthermore, the Bane Act requires "***specific intent*** to violate the arrestee's right to

13  freedom from unreasonable seizure." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030,

14  1043–45 (9th Cir. 2018). Here, there is absolutely no evidence that the officers acted

15  with any specific intent to interfere with Valdivia's rights unrelated to a legitimate

16  law enforcement objective of self-defense. Rather, undisputed evidence demonstrates

17  that the officers were only reacting to the imminent threat presented by Valdivia.

18  All of the officers testified they were responding to an active threat of a man

19  with a gun and were motivated by: (1) initially, desire to set up a containment and

20  deescalate the situation by diverting Valdivia's attention to themselves (**UF 132–133**),

21  and (2) after he reached for, retrieved, and started pointing a gun, their need to protect

22  themselves and others from an imminent threat (**UF 70–71, 75–76, 94–97, 100–102,**

23  **123–124, 127–129**). Because the record is devoid of any evidence of specific intent,

24  the Officer Defendants are entitled to summary judgment. And because the

25  underlying claim fails, so does the vicarious liability claim against the City.

26  **V.   CONCLUSION**

27  The Court should grant Defendants' motion and enter summary judgment in

28  their favor. In the alternative, the Court should grant partial summary judgment.

25

Defendants' Motion for Summary Judgment

DATED:  June 3, 2025

Respectfully submitted,

**MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP**

_____/s/ Yury A. Kolesnikov_____
Mildred K. O'Linn
Yury A. Kolesnikov
Roslynn Wilfert

*Attorneys for Defendants City of Covina, Vanessa Cardoza, David Meadows, and Billy Sun*

Defendants' Motion for Summary Judgment

## **CERTIFICATION PURSUANT TO LOCAL RULE 11-6.2**

The undersigned, counsel of record for Defendants, certifies that this brief contains 25 pages, which complies with the Court's standing order on motions for summary judgment.

DATED:  June 3, 2025

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**


By:  _____/s/ Yury A. Kolesnikov_____
Mildred K. O'Linn
Yury A. Kolesnikov
Roslynn Wilfert

*Attorneys for Defendants City of Covina,*
*Vanessa Cardoza, David Meadows, and*
*Billy Sun*

MANNING | KASS

Defendants' Motion for Summary Judgment