1  **LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (SBN 144074)
2  dalekgalipo@yahoo.com
Marcel F. Sincich, Esq. (SBN 319508)
3  msincich@galipolaw.com
21800 Burbank Boulevard, Suite 310
4  Woodland Hills, CA 91367
Phone: (818) 347-3333
5  Fax: (818) 347-4118

6  *Attorneys for Plaintiffs*

7

8

9

10  **UNITED STATES DISTRICT COURT**

11  **CENTRAL DISTRICT OF CALIFORNIA**

12

13

14  E.V. and X.V., minors by and through       Case No.: **5:23-cv-01562-CBM-SHK**
their guardian ad litem, Karla Juarez;
15  D.V., a minor, by and through his          [*Honorable Consuelo B. Marshall*]
guardian ad litem, Elias Valdivia;          Magistrate Judge Shashi H. Kewalramani
16  individually and as successors-in-interest
to Daniel Luis Valdivia, deceased;          **PLAINTIFFS' MEMORANDUM OF**
17  JESSICA VALDIVIA; LUIS                     **POINTS AND AUTHORITIES IN**
VALDIVIA JR., individually,                 **OPPOSITION TO DEFENDANTS'**
18                                             **MOTION FOR SUMMARY**
Plaintiffs,                  **JUDGMENT**
19
vs.                                 [Separate Statement of Genuine
20                                             Disputes and Additional Material Facts;
CITY OF COVINA; VANESSA                     Objections to Defendants Separate
21  CARDOZA; DAVID MEADOWS;                    Statement; Declaration of Marcel F.
BILLY SUN; DOES 1-10, inclusive,            Sincich and attached exhibits;
22                                             Declaration of Roger Clark; Declaration
Defendants.                  of Scott Holdaway*;* Opposition to
23                                             Defendants' Request for Judicial Notice
*filed concurrently herewith*]
24
Hearing:      July 15, 2025
25                                             Time:         10:00 a.m.
Crtrm:        8D
26
Trial Date: October 21, 2025
27                                             Complaint Filed: August 4, 2023

28

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES..............................................1

I.     INTRODUCTION .................................................................................1

II.    STATEMENT OF RELEVANT FACTS .................................................2

III.   LEGAL STANDARD UNDER RULE 56.............................................6

IV.    DEFENDANTS ACTED WITH A PURPOSE TO HARM............................7

V.     DEFENDANTS USED EXCESSIVE FORCE................................................8

       A.     Nature and Quality of the Intrusion – Unparalleled ...............................9

       B.     Government Interest Factors Confirm Excessive Force........................9

              1.     No immediate threat of death or serious bodily injury..............10

              2.     Other Graham factors weight in Plaintiffs' favor.......................14

       C.     It Was Obviously Clearly Established That Shooting an Unarmed, Non-Resistive, Non-Threatening, Compliant Man, Is Excessive .........................................................................15

VI.    PLAINTIFFS' STATE LAW CLAIMS SURVIVE .......................................23

VII.   CONCLUSION .........................................................................................25

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*A.D. v. Cal. Highway Patrol,*
    712 F.3d 446 (9th Cir. 2013) ................................................................ 8

*A.K.H. ex rel. Landeros v. City of Tustin,*
    837 F.3d 1005 (9th Cir. 2016) ........................................................ 9, 22

*Adickes v. S.H. Kress & Co.,*
    398 U.S. 144 (1970) ............................................................................ 7

*Aguirre v. County of Riverside,*
    29 F.4th 624 (9th Cir. 2022) .............................................................. 18

*Anderson v. Creighton,*
    483 U.S. 635 (1987) ............................................................................ 7

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ............................................................................ 7

*Blanford v. Sacramento County,*
    406 F.3d 1110 (9th Cir. 2005) ............................................................. 9

*Blankenhorn v. City of Orange,*
    485 F.3d 463 (9th Cir. 2007) .............................................................. 9

*Breithaupt v. Abram,*
    352 U.S. 432 (1957) ............................................................................ 8

*Bryan v. MacPherson,*
    630 F.3d 805 (9th Cir. 2010) ..................................................... 9, 10, 12

*C.V. by & through Villegas v. City of Anaheim,*
    823 F.3d 1252 (9th Cir. 2016) ........................................................... 16

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................ 7

*Chew v. Gates,*
    27 F.3d 1432 (9th Cir. 1994) .............................................................. 9

*Collender v. City of Brea,*
    605 F.App'x 624 (9th Cir. 2015) ........................................................ 17

*Cousins v. Lockyer,*
    568 F.3d 1063 (9th Cir. 2009) ........................................................... 23

*Cruz v. City of Anaheim,*
    765 F.3d 1076 (9th Cir. 2014) ........................................................... 22

*Curnow v. Ridgecrest Police,*
    952 F.2d 321 (9th Cir. 1991) ....................................................... 10, 20

*Davis v. City of Las Vegas,*
    478 F.3d 1048 (9th Cir. 2007) ........................................................... 15

*Deorle v. Rutherford,*
    272 F.3d 1272 (9th Cir. 2001) ........................................................... 15

*Drummond v. City of Anaheim,*
    343 F.3d 1052 (9th Cir. 2003) ........................................................... 10

*Est. of Aguirre v. Cnty. of Riverside*,
    29 F.4th 624 (9th Cir. 2022) ............................................................... 15

*Garlick v. Cnty. of Kern*,
    167 F. Supp. 3d 1117 (E.D. Cal. 2016) ................................................... 8

*George v. Morris*,
    736 F.3d 829 (9th Cir. 2013) ....................................................... 10, 20

*Glenn v. Washington County*,
    673 F.3d 864 (9th Cir. 2011) ................................................ 7, 10, 15

*Green v. City and Cty. of San Francisco*,
    751 F.3d 1039 (9th Cir. 2014) ............................................................. 15

*Harris v. Roderick*,
    126 F.3d 1189 (9th Cir. 1997) ........................................... 10, 17, 19

*Hayes v. Cnty. of San Diego*,
    736 F.3d 1223 (9th Cir. 2013) ............................................................... 8

*Hayes v. County of San Diego*,
    57 Cal.4th 622 (2013) ...................................................................... 17, 23

*Hervey v. Estes*,
    65 F.3d 784 (9th Cir. 1995) ................................................................... 8

*Hunter v. City of Leeds*,
    941 F.3d 1265 (11th Cir. 2019) ......................................................... 19

*Isayeva v. Sacramento Sheriff's Dep't*,
    872 F.3d 938 (9th Cir. 2017) ............................................................... 10

*Johnson v. Bay Area Rapid Transit Dist.*,
    724 F.3d 1159 (9th Cir. 2013) ............................................................. 23

*Knapps v. City of Oakland*,
    647 F. Supp. 2d 1129 (N.D. Cal. 2009) ............................................. 25

*Lake Nacimiento Ranch Co. v. San Luis Obispo Cnty.*,
    841 F.2d 872 (9th Cir. 1987) ................................................................. 7

*Longoria v. Pinal County*,
    873 F.3d 699 (9th Cir. 2017) ............................................................... 21

*Lopez v. Gelhaus*,
    871 F.3d 998 (9th Cir. 2017) ...................................................... passim

*Lui v. DeJoy*,
    129 F.4th 770 (9th Cir. 2025) ............................................................. 13

*Medina v. Cram*,
    252 F.3d 1124 (10th Cir. 2001) ......................................................... 21

*Megargee v. Wittman*,
    550 F.Supp.2d 1190 (E.D. Cal. 2008) ............................................... 25

*Mullenix v. Luna*,
    577 U.S. __, 136 S. Ct. 305 (2015) .................................................... 16

*Munoz v. City of Union City*,
    120 Cal.App.4th 1077 (2004) ............................................................. 23

*Nelson v. City of Davis*,
    685 F.3d 867 (9th Cir. 2012) ............................................................... 10

*Nicholson v. City of Los Angeles*,
   935 F.3d 685 (9th Cir. 2019)................................................................8, 14

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ..........................................................................16

*Porter v. Osborn*,
   546 F.3d 1131 (9th Cir. 2008)..............................................................8

*Roque v. Harvel*,
   993 F.3d 325 (5th Cir. 2021)................................................................17

*S.R. Nehad v. Browder*,
   929 F.3d 1125 (9th Cir. 2019)..........................................................7, 10

*Santos v. Gates*,
   287 F.3d 846 (9th Cir. 2002)................................................................9

*Saucier v. Katz*,
   533 U.S. 194 (2001) ..........................................................................15

*Scott v. Harris*,
   550 U.S. 372 (2007) ........................................................................7, 9

*Smith v. City of Hemet*,
   394 F.3d 689 (9th Cir. 2005)........................................................9, 10, 15

*Strickland v. Nevada County*,
   69 F.4th 614 (9th Cir. 2023)........................................................1, 12, 16

*Tabares v. City of Huntington Beach*,
   988 F.3d 1119 (9th Cir. 2021)........................................................10, 23

*Tan Lam v. City of Los Banos*,
   976 F.3d 986 (9th Cir. 2020)........................................................16, 20

*Tennessee v. Garner*,
   471 U.S. 1 (1985) ............................................................................10

*Tennison v. City and Cnty. of San Francisco*,
   570 F.3d 1078 (9th Cir. 2009)..............................................................8

*Ting v. United States*,
   927 F.2d 1504 (9th Cir. 1991)............................................................19

*Torres v. City of Madera*,
   648 F.3d 1119 (9th Cir. 2011)........................................................11, 14

*Tubar v. Clift*,
   453 F. Supp. 2d 1252 (W.D. Wash. 2006)..............................................20

*Velazquez v. City of Long Beach*,
   793 F.3d 1010 (9th Cir. 2015)..............................................................9

*Vos v. City of Newport Beach*,
   892 F.3d 1024 (9th Cir. 2018)..............................................................7

*Wall v. County of Orange*,
   364 F.3d 1107 (9th Cir. 2004)............................................................21

*Wealot v. Brooks*,
   865 F.3d 1119 (8th Cir. 2017)............................................................14

*Wilkins v. City of Oakland*,
   350 F.3d 949 (9th Cir. 2003)................................................................7

*Wilkinson v. Torres*,
610 F.3d 546 (9th Cir. 2010) ........................................................... 7

*Williams v. City of Burlington, Iowa*,
27 F.4th 1346 (8th Cir. 2022) ....................................................... 14

*Wilson v. City of Des Moines*,
160 F. Supp. 2d 1038 (S.D. Iowa 2001) ........................................ 20

*Zion v. County of Orange*,
874 F.3d 1072 (9th Cir. 2017) ................................... 8, 10, 18, 23

<u>Statutes</u>

42 U.S.C. § 1983 ....................................................................................... 10

CACI No. 1305B ....................................................................................... 24

California Government Code § 815.1 ......................................................... 25

California Government Code § 820 ............................................................ 25

California Government Code § 820.2 ......................................................... 25

California Penal Code § 835a .................................................................... 10

Federal Rules of Civil Procedure, Rule 56 ............................................... 2, 6

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.  INTRODUCTION

3    This civil rights action arises from the excessive and unreasonable shooting of

4    Decedent Daniel Valdivia by Officers Vanessa Cardoza, Cheng Sun, and David

5    Meadows, on April 9, 2022. Viewing the evidence in the light most favorable to

6    Plaintiffs, Officers rapidly approached Valdivia in a parking lot, failed to give a

7    warning, failed to de-escalate, and failed to attempt less-intrusive alternatives; then

8    Officers repeatedly shot Valdivia after he complied with several commands, put his

9    hands up, got on the ground, and when he was not resisting, not fleeing, and had

10   visibly empty hands—when he did not pose an immediate threat of death or serious

11   bodily injury. Defendants' Motion must fail by their impermissible addition of

12   hindsight evidence, and unsupported arguments based on self-serving statements that

13   lack credibility and require jury scrutiny. This is not a case where officers shot a man

14   while pointing a gun (*see Strickland v. Nevada County*, 69 F.4th 614, 617 (9th Cir.

15   2023)). <u>This is a case where officers **assessed**, **in slow motion**, saw Valdivia **drop a**</u>

16   <u>**gun**, **display full submission**, then decided to repeatedly shoot Valdivia dead.</u>

17   [Below image: Declaration of Marcel F. Sincich, ¶10, Exh. I at 1, Shots Screenshots.]

18
19
20
21
22

| | | | | |
|---|---|---|---|---|
| Cardoza Shot 1 | Sun Shot 1 | Meadows Shot | Sun Shot 2 | Cardoza Shot 2 |
| Sun Shot 3 | Cardoza Shot 3 | Sun Shot 4 | Cardoza Shot 4 | Sun Shot 5 |

23
24
25
26
27
28

Further, Defendants' Motion fails because it is based on their flagrant disregard of Rule 56's requirement that there be no disputed issues of material fact and that the record must be viewed in the light most favorable to the nonmoving party. Despite <u>video evidence directly contradicting Defendants' claim</u> that the shots were fired as Valdivia was pointing a gun at officers, **significant material facts are in dispute** – requiring denial of summary judgment – including: whether (1) Officers could have given a warning; (2) had reasonable alternatives; (3) Valdivia never pointed the gun; and (4) was not "actively disturbing the peace." Importantly, **undisputed facts** from videos and Officers' admission preclude summary judgment: (5) Valdivia complied with several commands; (6) did not have the gun in his hand at the time of any shot, he was visibly unarmed; (7) moved his hand away from the gun after discarding it; (8) Officers never gave a warning; (9) never attempted less-lethal options; (10) saw Valdivia in slow motion; and (11) shooting a man dead who drops a gun is obviously excessive and unreasonable because he is no longer a threat.

A reasonable jury could find that Valdivia was not an immediate threat of death or serious bodily injury and that the use of deadly force was obviously unreasonable and violated clearly established law when, in slow motion, Officers saw Valdivia comply with several commands, go to the ground, drop the gun, move his hand away from the gun, and lay flat, face down, in submission and without any flight or resistance. Defendants unreasonably fired their first round; then in slow motion assessed to see that Valdivia was still unarmed, and fired again; and assessed and fired again, and again, and again despite seeing the gun on the ground not pointed in their direction. Defendants' use of deadly force was excessive and unreasonable, and they are not entitled to summary judgment or qualified immunity.

## II.    STATEMENT OF RELEVANT FACTS

The call de-escalated from brandishing to the gun placed in the subject's pocket; still, did not reasonably indicate an emergency response and the allegations needed to be investigated for accuracy. (Plaintiffs' Additional Facts ("AF") 161-163.)

Believing there was no supervisor, Sun took charge, and "locked down" the area to prevent escape. (AF 164-166.) Besides setting containment, telling Cardoza to grab the less-lethal shotgun, and telling Meadows to approach together, there was no attempt to establish a tactical plan. (AF 167.) No officers checked with Cardoza to ensure she had the less-lethal shotgun, and she failed to arm herself with the same despite her plan to do so. (AF 168.) Officer Sun did not know if Cardoza would even join the approach or if Meadows was lethal cover. (AF 169.) Officer Cardoza also did not advise her partners of her location or observation of the subjects. (AF 170.)

Officer Sun erroneously thought Officer Marquez was already in contact with a subject, so Sun rushed into the scene. (AF 171.) Officer Meadows had to jog to catch up with Sun to prevent him from approaching alone. (AF 172.) Officer Cardoza also rushed in without her less-lethal shotgun because the other officers started giving commands. (AF 173.) Valdivia was not pointing a gun at anyone and did not even have a gun in hand or visible on his person. (AF 174.) Despite training to avoid giving simultaneous and/or conflicting commands that cause confusion and cause the subject to not be able to hear and/or understand commands, both Sun and Meadows started giving simultaneous and conflicting commands, which also led to an inadequate police announcement. (AF 175-178.) Nevertheless, Valdivia complied with commands to not reach, to put his hands up, and to get on the ground. (AF 179.)

Officers were trained on the equation, Distance + Cover = Time, and Time = Options. (AF 180.) Cover was available to Officers, yet Sun and Cardoza did not use the cover when using force. (AF 195.) A K9 team, air support, and Special Response Team, were available as well as ballistic shields. (AF 181-183.) Officers are told to carry batons, and Tasers, which cause neuromuscular incapacitation, allowing officers to take a subject into custody during the five-second cycle. (AF 183-184.) Officers Cardoza and Meadows left their OC spray in his patrol vehicle, which causes burning to the eyes and nose and can cause the subject to be disoriented. (AF 185.) Officer Cardoza was supposed to be the less-lethal option but chose to leave her

baton and less-lethal shotgun in her vehicle despite having the opportunity to get it. (AF 186-187.) Officer Meadows specifically responded to this call in part because he knew he had the K9 option, which is trained for apprehension and used to gain compliance and make the subject less likely to flee. (AF 188-189.) Despite not knowing if there was going to be a less-lethal shotgun option, Meadows chose to leave the K9 in the vehicle. (AF 190.) The Taser, less-lethal shotgun, and K9 were options here, yet Officers failed to consider them. (AF 191-192.) Another safety option was to command the subject to face away from officers, making it more difficult to use a firearm but Officers failed to consider that option as well. (AF 193-194.) Officers should have considered their backdrop when using deadly force for the safety of the public and involved parties, including because officers can miss and their shots could ricochet and harm innocent people. (AF 196.) Officer Cardoza's backdrop was in the direction of the two other subjects, and a store occupied by several people while Sun and Meadows' backdrop included businesses and several other civilians. (AF 197-198.) Here, two civilian vehicles were struck, and one civilian was hit by shrapnel from officer bullets. (AF 199-200.)

Defendants never gave a deadly force warning. (AF 201.) Within 45 seconds of arriving, Sun intentionally used deadly force firing six rounds with the intent of striking Valdivia center mass, knowing his hollow-point rounds designed to expand upon impact could cause death. (AF 202.) Officer Sun used a red dot optic to better view the incident and Valdivia with both eyes open. (AF 203.) Appearing in slow motion, Sun assessed Valdivia's actions between each shot as required and important to continuously evaluate the threat and determine if deadly force was inappropriate. (AF 204-205.) Officer Cardoza intentionally used deadly force by firing five rounds with the intent of striking Valdivia center mass, knowing it would cause death. (AF 206.) Officer Cardoza also used a red dot optic to aim more accurately and fire with both eyes open to assess while shooting. (AF 207.) Also in slow motion, Cardoza assessed between shots and decided to continue shooting. (AF 208-209.) After

hearing Sun shoot, Meadows intentionally used deadly force firing one round intended to strike Valdivia center mass, knowing even one shot can cause death. (AF 210.) Time also slowed for Meadows' assessment such that he could see exactly every step Valdivia was doing. (AF 211.)

Not knowing what Valdivia was thinking, officers must analyze apparent intent by observed conduct. (AF 212.) Defendants had never met Valdivia before, had no information about his life, criminal history, gang involvement, drug or alcohol history, or experience handling weapons. (AF 213.) Valdivia never verbally threatened any officer and was not yelling. (AF 214-216.) Valdivia never attempted to harm anyone and never attempted to flee. (AF 217-218.) Instead, Valdivia was compliant with several commands showing his apparent intent to comply and to discard the gun, which he did, prior to the shots being fired. (AF 219-220.)

Valdivia dropped the gun, moved his hand away, went face-down, did not reach for the gun, and had visibly empty hands at the time of all the shots. (AF 221.) Thereafter, Valdivia did not have the capability nor opportunity to imminently cause death or serious bodily injury—he was unarmed on the ground. (AF 222.) Yet, Sun saw Valdivia drop the gun and put his hand down, no longer perceived a threat because the gun was not pointed at him and continued shooting until Valdivia stopped moving. (AF 223-225.) Officer Sun admitted, even if a person points a gun, then drops it and does not make any movement towards it, the subject is no longer an imminent threat because the subject lost the ability to cause death or serious bodily injury, and it would not be permissible to use deadly force. (AF 226-227.) Likewise, Meadows knew that there was no imminent threat when he saw exactly what Valdivia was doing, saw the gun on the ground, and because Valdivia did not reach for the gun, the admitted deadly force was inappropriate because there would not be a perceived imminent threat, but still shot Valdivia. (AF 228-230.) Officer Cardoza stated that she stopped firing because Valdivia was no longer a threat because he no longer had a gun in his hand, admitting that once there is no objectively perceived

deadly threat, officers should not use deadly force. (AF 231-232.) Nevertheless, Cardoza saw Valdivia drop the gun and assessed between shots, knowing that even if a person points a gun but then discards it, it would not be appropriate to use deadly force because they are unarmed and would not be a threat. (AF 233-34.)

The ultimate objective was to avoid or minimize injury, including by de-escalation. (AF 235.) Officers should only use force when it reasonably appears *necessary* under the totality of circumstances, which includes the officer's conduct leading up to the use of force. (AF 236.) But to use <u>deadly force</u> there specifically must be an imminent threat of death or serious bodily injury, meaning the subject must have the present ability, opportunity, and apparent intent to immediately cause death or serios bodily injury. (AF 237-238.) <u>"Imminent"</u> *is not* <u>fear of future harm no matter how great the fear and no matter how great the likelihood of the harm</u>. (AF 239.) Officers cannot use deadly force based on subjective fear alone but must control their fear; cannot use deadly force merely because a person is not complying with commands, has a gun, or *might* pick it up once discarded. (AF 240-241.) Officers must have reverence for human life, knowing just one shot could kill, they must justify every shot fired. (AF 242.) Valdivia was shot to the head, shoulder, abdomen, thigh, and back, and died because of Defendants' shots. (AF 243-244.) While face down on the ground, having complied several times, Officers repeatedly shot Valdivia despite his visibly empty hands. (AF 245.) Valdivia was not an immediate threat of death or serious bodily injury, and the use of deadly force was unnecessary. (AF 246-251.) Any reasonable officer would know that they cannot use deadly force where a subject complies with officer commands, goes to the ground, discards a gun, then once visibly unarmed as observed by officers' assessment in slow motion, before Officers repeatedly open fire. (AF 252.)

## III.    LEGAL STANDARD UNDER RULE 56

Summary judgment is only appropriate when there is no genuine issue as to any material fact, the burden of which lies with the moving party. Fed. R. Civ. P. 56;

*see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Here, a court's function is not to weigh evidence, make credibility determinations, or determine the truth but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if its proof or disproof is essential to an element of Plaintiffs' case. *Celotex Corp.*, 477 U.S. at 322-23. A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Even entirely circumstantial evidence is sufficient to create a triable issue of fact. *Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir. 1992). Further, the reasonableness of an officer's belief "is a quintessentially 'fact-specific' question, not a question that judges should try to answer 'as a matter of law.'" *Brosseau v. Haugen*, 543 U.S. 194, 206 (2004) (Stevens J., dissenting); *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003). In ruling here, the Court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *Lake Nacimiento Ranch Co. v. San Luis Obispo Cnty.*, 841 F.2d 872, 875 (9th Cir. 1987). The undisputed video evidence shows Valdivia was shot with visibly empty hands precluding summary judgment in addition to several genuine disputes of fact.

Finally, the record is viewed in light most favorable to the nonmovants, so long as it is not blatantly contradicted by the video evidence. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018); *see also Scott v. Harris*, 550 U.S. 372, 380-81 (2007). A reasonable factfinder could even draw divergent conclusions from the video evidence. *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1132-39 (9th Cir. 2019); *Glenn v. Washington County*, 673 F.3d 864, 878 (9th Cir. 2011) ("a jury should have the opportunity to assess the reasonableness of the force").

## IV.    DEFENDANTS ACTED WITH A PURPOSE TO HARM

Due process violations occur when official conduct "shocks the conscience." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). But the meaning "depends on

the context." *Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009). The deliberate indifference standard applies when the officer has time to deliberate. *Id*. The higher standard only applies in situations "that escalate so quickly that the officer must make a snap judgment." *Porter v. Osborn*, 546 F.3d 1131, 1137-40 (9th Cir. 2008). However, the "snap judgment" to use deadly force must be a reaction to an unforeseen escalation by the subject, which is not the case here. *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013). Here, Officers had time on this non-emergency call and chose not to use it—deliberation was practical (e.g., Officer Cardoza was watching Valdivia for over 30 seconds before running in and shooting Valdivia (AF 187)). An officer's unreasonable haste does not logically mean no time existed. *See Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1165 (E.D. Cal. 2016). However, it is foreseeable under these circumstances for the subject to discard the gun. Still, the Officers assessed, meaning they saw Valdivia go to the ground, saw him drop the gun, saw him move his hand away, saw him lay face down in submission, not resisting, visibly unarmed, and continued to fire shot after shot, center mass until Valdivia died. Thus, a reasonable jury could find that the Officers' use of deadly force shocks the conscience. *See*, *e.g.*, *Nicholson v. City of Los Angeles*, 935 F.3d 685, 693 (9th Cir. 2019) (noting officer's immediate force without communication, failure to seek cover, and failure to formulate a plan, all contrary to training and policy); *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 458 (9th Cir. 2013); *Zion v. County of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017). Shooting dead an unarmed and non-threatening man after he complied with officer commands and went to the ground then voluntarily discarded his gun "'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency." *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957).

## V.    DEFENDANTS USED EXCESSIVE FORCE

Defendants' use of excessive force is analyzed under the Fourth Amendment's objective reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989).

Under which, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. The *Graham* test applies "the clear principle that the force used to make an arrest must be balanced against the need for force." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1025 (9th Cir. 2015) (*citing Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007)). It is a careful balance of "the nature of the harm and quality of the intrusion" on Valdivia's rights "against the countervailing governmental interests at stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010); *see also Scott*, 550 U.S. at 383-84; *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002) (excessive Force when greater than reasonable). Taking all reasonable inferences in Plaintiffs' favor, a reasonable jury could conclude that the Officers' used excessive deadly force.

### A.    Nature and Quality of the Intrusion – Unparalleled

The inquiry as to whether the use of force was reasonable begins by assessing both the type and amount of force used. *See Bryan*, 630 F.3d at 824; *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). Here, it is undisputed that Officers shot Valdivia repeatedly, a use of deadly force. *See*, *e.g.*, *Blanford v. Sacramento County*, 406 F.3d 1110, 1117-19 (9th Cir. 2005). It is well-established that deadly force is "extreme," unmatched, and should only be used in limited circumstances. *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016). "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a fundamental interest in his own life and because such force frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *Id.* (quotations and citations omitted). The nature and quality of the intrusion here cannot be understated. Officers shot and killed Valdivia with visibly empty hands.

### B.    Government Interest Factors Confirm Excessive Force

The use of deadly force must be balanced against the purported need for it. *See*

*Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946-47 (9th Cir. 2017); *see also Glenn*, 673 F.3d at 871; *Bryan*, 630 F.3d at 823. The government interest factors include (1) the severity of crime at issue, (2) the immediacy of the specific threat at issue, (3) whether there is active resistance or attempt to evade (*Graham*, 490 U.S. at 396), (4) the availability of alternative methods (*Smith*, 394 F.3d at 701), and (5) whether a warning was given (*Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012)). <u>The Ninth Circuit has cautioned that summary judgment in excessive force cases should be granted sparingly.</u> *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003). Further, the Ninth Circuit reaffirmed that "summary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." *Nehad*, 929 F.3d at 1133 (noting there were genuine doubts about officer's credibility regarding his perceptions as compared to other evidence). No government interest supports the use of such extreme force here.

### 1. *No immediate threat of death or serious bodily injury.*

The most important (second) *Graham* factor is whether the subject posed an immediate threat of death or serious physical injury to safety. *Smith* , 394 F.3d at 702; *see Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1126 (9th Cir. 2021); *see also Zion*, 874 F.3d at 1076. The fact that a suspect was armed with a deadly weapon does not render the officers' response reasonable. *See George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013); *Glenn*, 673 F.3d at 872-73; *see also Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) (police "may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed"); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 323, 325 (9th Cir. 1991) (deadly force is unreasonable where, according to the plaintiff's version of facts, the decedent possessed a gun but was not pointing it at the officers and was not facing the officers when they shot him). The use of deadly force is only permissible in the most limited circumstances – when necessary to prevent death or serious bodily injury. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985); Cal. Pen. Code § 835a.

Viewing the facts and all reasonable inferences in the light most favorable to Plaintiffs, Valdivia did not pose an immediate threat of death or serious bodily injury to any person at the time of the shooting. Valdivia was not displaying any assaultive or aggressive behavior, was not resisting, and did not verbally threated officers prior to the use of excessive force. *See Lopez v. Gelhaus*, 871 F.3d 998, 1008 (9th Cir. 2017). Officers had no information that anyone was harmed; no information that Valdivia ever harmed anyone; no information that Valdivia was about to harm anyone; Officers never heard Valdivia verbally threaten anyone; never saw Valdivia attempt to harm anyone; and never saw Valdivia attempt to run or flee. Instead, they saw compliance. (AF 212-220.) Officers were not responding to an emergency call but had the time and opportunity to craft a detailed plan, brief, and execute a plan to take Valdivia into custody while minimizing the potential need to use force. Yet, Officers chose not to plan, rushed into the parking lot, closing the distance without cover, not knowing their own role and responsibilities. Officers chose to yell simultaneous and conflicting commands. Still, Valdivia, complied and did not reach for his waist, complied and put his hands straight in the air, and complied by going to the ground—a clear indication of compliance and submission, and to communicate that he was not a threat to anyone. Despite Valdivia's compliance and non-resistance, Officers saw Valdivia discard the gun onto the ground and still subsequently opened fire. Then, assessed between rounds to see his empty hands but continued to shoot.

Not all errors in perception or judgment are reasonable, as displayed here, and Officers' actions are judged without the 20/20 vision of hindsight. *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). Defendants' contention that they fired while the gun was pointed at them is contradicted by objective evidence, making their credibility a jury question. Here, Officers state that they saw Valdivia drop the gun; saw Valdivia in slow motion; and assessed between rounds. Further, Officers admit shooting a subject who discards a gun would be inappropriate—because the subject is unarmed and not a threat. This was not a situation where if Officers waited

would/could have been shot, because when Officers intentionally shot Valdivia, his empty hands were already away from the discarded gun. There was no present ability to immediately cause death or serious bodily injury. There was no opportunity for a downed, compliant, and unarmed subject to immediately cause death or serious bodily injury. (AF 221-244.) "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Bryan*, 630 F.3d at 826. Valdivia already complied – he was not shot while pointing a gun – he was shot unarmed and in submission. It was incumbent on Officers to control their emotions and actions and not overreact by using deadly force. (AF 235-242.)

Given the video evidence showing Valdivia's empty hands after discarding the gun, and taking the Officers' statements as true, that they assessed and saw what was occurring in slow motion, there are no justification to believe that Valdivia was an immediate threat of death or serious bodily injury. *See Deorle*, 272 F.3d at 1281 ("a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."); *Lopez*, 871 F.3d at 1008-1010 (finding the armed subject's position and movement immediately prior to the shooting did not support a reasonable belief of a threat). Accepting Plaintiffs' version of the facts, as the Court is required to do on summary judgment, Valdivia complied, did not resist or threaten officers, discarded the gun, moved his face and hands to the ground, was flat on the ground, making him no threat at all, and then Defendants opened fire—and continued to fire. A reasonable jury could easily find that Valdivia was not an immediate threat of death or serious bodily injury—and find that the use of deadly force was obviously excessive and unreasonable.

Defendants' reliance on and attempts to make this matter resemble *Strickland* are misplaced. Judge Bumatay was clear in the opinion's opening paragraph, given the obviousness that pointing a gun at an officer entitles the officer to respond in self-defense, *Strickland* only asks whether it was objectively reasonable to mistakenly

believe a toy rifle was real. 69 F.4th at 617. Plaintiffs do not dispute that the BB gun looks real. Plaintiffs dispute that Valdivia ever pointed it at officers, and it is undisputed that it was not pointed at the officers when the shots were fired. The reasonably held mistaken nature of the threat in *Strickland* was the belief that the toy gun was real despite the orange tip and Stickland saying it is fake. *Id*. at 622. Once that was resolved as being a reasonable mistake, it logically led to the Court's opinion that the use of deadly force was justified because Stickland was pointing "a gun in the direction of officers." *Id*. Here, Officers are unjustifiably and egregiously mistaken – as contradicted by video evidence – that the gun was ever pointed, and whether "a gun was pointed in the direction of officers" when they opened fire and continued to fire at and kill Valdivia. Defendants do not argue that the Officers mistakenly believed Valdivia pointed the gun, instead they assumed the disputed fact that Valdivia ever pointed the gun and was pointing the gun during the shots to argue mistaken identification of the replica gun. (Mot. at 1:2-21.) Thus, Defendants forfeited any argument in reply as to a mistake in pointing the gun. *See Lui v. DeJoy*, 129 F.4th 770, 780 (9th Cir. 2025). <u>*Strickland* does not control here.</u>

Further, Strickland was reported to be walking on a residential road with a shotgun slung over his shoulder; officers responded and saw Strickland with the replica firearm; additional officers arrived, recognized Strickland as a homeless man with mental health issues who was just released from custody a few days prior; officers surrounded Strickland with their guns drawn; repeatedly yelled "drop the gun!"; Strickland stood with the barrel pointed to the ground; one officer asked for cover as he approached; one officer had his taser out; Strickland dropped to his knees; then Strickland pointed the replica gun at the officers; one officer deployed his taser; then Strickland pointed the replica gun at the officers again; and while pointing the replica gun at the officer, the officers opened fire and killed him. *Id*. at 618.

Valdivia was not in a residential area, but commercial parking lot; Valdivia did not have a gun out upon officer approach, but it in his waistband; Officers did not see

the gun upon approach; Officers did not recognize Valdivia or know of his history; Officers did not say "drop the gun" without compliance, but said "put your hands up" and "get on the ground" both **with compliance**; <u>**Valdivia never pointed the gun at any officer**</u>; then Valdivia discarded/**dropped the gun**; and **while Valdivia's hands were visibly empty, not pointing a gun, Officers opened fire and killed him**.

The dispositive and "most important" factor is whether Valdivia posed an immediate threat of death or serious bodily injury. *Id*. at 620. "[T]he Constitution does not tolerate the use of lethal force to 'seize and unarmed, nondangerous suspect by shooting him dead.'" *Id*. at 621 (citing *Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011)) In fact, *Stickland* informs how courts should rule where the "decision [does not] hinge on the misidentification of the gun" but on whether the subject was pointing it at anyone. *Id*. at 622. Showing that in those cases, like this case, *Nicholson*, 935 F.3d 685 and *Lopez*, 871 F.3d 998 controls. *See also Williams v. City of Burlington, Iowa*, 27 F.4th 1346, 1351 (8th Cir. 2022) (excessive force where body-camera video shows officer looked directly at the dropped gun, subject was nearly prone on the ground when fatally shot, rather than in a "firing position"); *Wealot v. Brooks*, 865 F.3d 1119, 1122-23 (8th Cir. 2017) (officers responded to a domestic call, saw man fire shots at people, drop the gun as he ran, then officer fired several times as man turn around—court found genuine disputes of material fact: whether the officers saw the man throw his gun and thus knew he was unarmed, and whether he was turning around with his hands raised to surrender). A jury could find that Valdivia was not an immediate threat of death or serious bodily injury.

### 2.    Other Graham factors weight in Plaintiffs' favor.

Next, <u>Valdivia was not actively committing a crime when officers arrived,</u> certainly not a serious or violent crime. Valdivia was merely in a parking lot speaking with two men, no gun in hand or visible. Nothing that would necessitate the use of deadly force. Further, Officers were not even responding to an emergency call and had no information that Valdivia had ever used a firearm or ever harmed anyone.

Thus, this factor weighs in favor of finding that the Officers' use of deadly force was excessive. *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) (govt. interest in using deadly force diminished when person was not committing a serious crime). Third, it is <u>undisputed that Valdivia was not actively resisting arrest or attempting to evade arrest by flight</u>. Instead, Valdivia respected the police presence and <u>complied with several commands</u> including putting his hands up and going to the ground. *See Lopez*, 871 F.3d at 1006-07. The videos do not depict Valdivia attempting to fight or flee. The videos show Valdivia submit to officers before he was shot. This factor also weighs heavily in Plaintiffs' favor. Fourth, <u>Officers ignored numerous less-intrusive alternatives</u>, such as continuing to use verbal commands, which were working against the compliant Valdivia, as demonstrated on the videos. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (quoting *Smith*, 394 F.3d at 701) (courts may consider the availability of alternative methods). No force was necessary to seize the non-resistive Valdivia. Officers also could have employed de-escalation techniques, which he failed to do. Though no force was necessary at the time, Officers had less-lethal options available to him. *See Glenn*, 673 F.3d at 872; *Green v. City and Cty. of San Francisco*, 751 F.3d 1039, 1051 (9th Cir. 2014). This factor also weighs heavily in Plaintiffs' favor. Finally, before using deadly force, law enforcement must issue a warning, when feasible. *Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022). Here it is <u>undisputed that no warning was given by any Officer prior to the use of deadly force</u> even though it was feasible to do so. *See Lopez*, 871 F.3d at 1007. Thus, Defendants are not entitled to summary judgment.

### C.  It Was Obviously Clearly Established That Shooting an Unarmed, Non-Resistive, Non-Threatening, Compliant Man, Is Excessive

The qualified immunity analysis has two prongs: (1) whether there was a deprivation of a constitutional or statutory right (as established above), and (2) whether that constitutional or statutory right was "clearly established" at the time of the incident (as established below). *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001);

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Here, the following facts must be assumed: Valdivia did not point the gun; dropped the gun; was unarmed; did not verbally threaten anybody; was not actively committing a crime; did not attempt to assault anybody; was not resistive; was not attempting to flee; and complied with commands; while no warning was given prior to the use of deadly force even though it was feasible; there were reasonable alternatives to the use of deadly force; and Valdivia was not an immediate threat of death or serious bodily injury. Based on Plaintiffs' facts and all reasonable inferences therefrom, the Officers are not entitled to qualified immunity. *See C.V. v. City of Anaheim*, 823 F.3d 1252, 1256 (9th Cir. 2016) (deadly force is not objectively reasonable even when the subject <u>had</u> a gun, officers ordered the subject to put his hands up, and as he was complying, an officer resorted to deadly force without warning); *Aguirre*, 29 F.4th at 629 (where the subject posed no immediate threat to the officers or others, the "'general constitutional rule' applies 'with obvious clarity'" rendering the officer's decision to shoot objectively unreasonable); *Strickland*, 69 F.4th at 620 (citing *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1001 (9th Cir. 2020)) ("it is 'clearly established that shooting a nonthreatening suspect would violate the suspect's constitutional rights.'").

Qualified immunity is an affirmative defense that "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson*, 555 U.S. at 244. Although a right is not clearly established where merely defined "at a high level of generality," qualified immunity does not "require a case directly on point." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (per curiam). "[T]he focus is on whether the officer had fair notice that [the officer's] conduct was unlawful." *Id.* (quoting *Brosseau*, 543 U.S. at 198). "Precedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." *Kisela*, 138 S.Ct. at 1153 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 312 (2015)). "'Of course, general statements of the law are not

inherently incapable of giving fair and clear warning to officers.'" *Id.* The general rules set forth in *Garner* and *Graham* by themselves create clearly established law in the obvious case. *Id.* Plaintiffs' contends that the right to be free from deadly force falls among the obvious when a person complies with officer commands, goes to the ground, drops the gun, and moves his empty hands away from the dropped gun as the officers open fire on the unarmed, non-threatening, non-resistive, downed subject.

Accepting the material facts in Plaintiffs' favor, Valdivia did not have a gun in his hand when the force was used, never pointed a gun at anybody, and showed several acts of compliance before he was shot. Thus, it was clearly established that the use of deadly force against Valdivia was unconstitutional. *Lopez*, 871 F.3d at 1006-13 ("On these facts, a reasonable jury could conclude that [Valdivia] did not pose an 'immediate threat to the safety of the officers or others'"); *see Harris*, 126 F.3d at 1204 (mere possession of a weapon is insufficient to justify deadly force); *Hayes*, 736 F.3d at 1227-28 (unreasonable force where officers shot man without warning while holding a weapon in a non-threatening manner); *Collender v. City of Brea*, 605 F.App'x 624, 628-29 (9th Cir. 2015) (a jury could find unreasonable deadly force on a suspect who had committed armed robbery was unarmed, despite non-compliance and lowering his left arm towards his pocket, at which point an officer shot and killed him).

This was an obvious case clearly established by the Supreme Court in *Garner*, 471 U.S. at 11, holding that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." "Although the officer in *Garner* shot and killed a fleeing burglary suspect who was never armed, [courts] have applied *Garner* to situations where a suspect has a weapon but is incapacitated or otherwise incapable of using it (functionally unarmed)." *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021). The general principle in *Garner* is instructive here. Valdivia was unarmed and nondangerous when he lay flat on the ground, head facing down, visibly empty hands toward his head, after showing several acts of compliance, after discarding the gun, never attempting to harm anyone, not verbally threatening any

officer, and never attempting to resist or flee. Thus, it was clearly established that deadly force should not have been used against him. The Ninth Circuit has also held that shooting an unarmed suspect who no longer poses an immediate threat is an "obvious" case in which qualified immunity does not apply. *See Aguirre v. County of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (discussing pre-2022 precedent).

On the date of the shooting, Officers had sufficient notice that deadly force against Valdivia was unlawful. Even if officers initially perceive a potential threat when Valdivia was discarding the gun, subsequent deadly force is unconstitutional after the subject no longer poses an immediate threat. As the Ninth Circuit held in *Zion*, 874 F.3d at 1076, where officer fired nine rounds after the subject was on the ground and because the subject was still moving, "terminating a threat doesn't necessarily mean terminating the suspect. If the suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting." "If a jury determines that Zion no longer posed an immediate threat any deadly force Higgins used after that time violated long-standing Fourth Amendment law." *Id*. As video evidence showed, Zion was lying on the ground, making no threatening gestures, was not in a position to harm anyone or flee, but was shot nine times anyway. *Id.* at 1075-76.

Similarly here, Valdivia dropped the gun, moved his hand away from the gun, and went face-down to the ground, did not reach for the gun, and had visibly empty hands at the time of all the shots. (AF 221.) Thereafter, Valdivia did not have the capability nor the opportunity to imminently cause death or serious bodily injury—he was unarmed on the ground. (AF 222.) Valdivia was not a threat (even if once a threat) for all twelve shots fired at him. Indeed, unlike *Zion*, Valdivia never harmed anyone, Valdivia never verbally threatened any officer and was not yelling at anyone. (AF 214-216.) Valdivia never attempted to harm anyone and never attempted to flee. (AF 217-218.) Instead, Valdivia was compliant with several commands showing his apparent intent to comply and to discard the gun, which is what he did, prior to the

shots being fired. (AF 219-220.) Nevertheless, by officer admission and taking all reasonable inferences in Plaintiffs' favor, Officers assessed in slow motion such that they could see exactly what Valdivia was doing, recognized several acts of compliance by Valdivia, saw Valdivia on the ground, drop the gun, move his empty hand away from the gun, put his head face-down on the ground, and lay motionless on the ground as Officers intentionally and without warning opened fire, continued to assess to see the same, and continued to fire. (AF 202-211, 223-225.)

In *Hunter v. City of Leeds*, 941 F.3d 1265, 1280 (11th Cir. 2019), the Eleventh Circuit affirmed denial of qualified immunity to a police officer who shot a suspect after the suspect dropped his gun and was no longer evading arrest. *Id*. at 1272. There, the police responded to a 911 call about a shooting, a car chase ensued, and once the suspect parked the officer ordered him to raise his hands. *Id*. at 1271-72. Instead, the suspect aimed a gun at the officer and the officer fired three shots at the suspect. *Id*. The suspect recoiled into his car and dropped his gun through the open car door, then the officer continued to fire. *Id*. at 1272. There, the court held that the officer had fair warning that his actions were unlawful because the use of deadly force against an initially dangerous but disarmed and now non-dangerous suspect is obviously the very core of what the Fourth Amendment prohibits. *Id*. at 1281.

Similarly, in *Harris*, 126 F.3d at 1203, defendant was not entitled to qualified immunity "even though the suspect had engaged in a shoot-out with law enforcement officers on the previous day and may have been the person responsible for the death of one of the officers." Also, in *Hopkins*, 958 F.2d at 886-87, an officer's second use of lethal force was excessive and unreasonable where the suspect was wounded and unarmed. In *Ting v. United States*, 927 F.2d 1504, 1510 (9th Cir. 1991), the use of lethal force against the suspect was unreasonable where the suspect, who was previously armed, was shot while he was unarmed. There, SWAT agents found the subject with a handgun aimed at them. After the subject complied with an order to drop the gun, another agent restrained the subject. *Id.*at 1507-08. As the agents

searched the room, the subject suddenly pulled his arm free, stood up, and lunged toward an unsecured dressing area, when an agent fired one round at the subject's back. *Id.* The Ninth Circuit again explained that a jury could find the agent's use of deadly force unreasonable because "he was shot at close range while in a prone position or on his hands and knees." *Id.* at 1510. It was also clearly established at the time of this incident that Officers could not justify shooting Valdivia when he was already shot and on the ground. *See, e.g., Tan Lam*, 976 F.3d at 998, 1001 (holding that it was clearly established in 2013 that shooting at an unarmed suspect who had previously stabbed the officer violates the Fourth Amendment).

In *Curnow*, 952 F.2d at 325 , the defendants were not entitled to qualified immunity where, in one witness' version of the shooting, "Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time." In *Tubar v. Clift*, 453 F. Supp. 2d 1252, 1257 (W.D. Wash. 2006), there were triable disputes regarding whether the officer acted reasonably in firing his gun a third time where there was no longer an immediate threat to his safety after the second shot. Finally, in *Wilson v. City of Des Moines*, 160 F. Supp. 2d 1038, 1040 (S.D. Iowa 2001), the defendants were not entitled to qualified immunity where they shot an unarmed man because "they thought they saw a firearm."

Similarly in *Morris*, 736 F.3d at 832, the defendant deputies were responding to a domestic disturbance call in which they were informed the suspect had a gun. When deputies arrived, they found the suspect holding the gun and deputies testified that the suspect turned and pointed the gun at them. *Id.* at 832-33. But the suspect's wife disputed that he pointed the gun at deputies. *Id.* at 833. The Court recognized that even if there was a potential future threat, the use of deadly force is not reasonable without objective provocation and while the gun was trained on the ground. *Id.* at 838-39. Thus, the Court found that the deputies could not prevail on summary judgment because, when viewing the facts in favor of plaintiff, the suspect did not make any threatening movements, was not resisting arrest, nor committing a

crime. *Id. Morris* is sufficient alone to put Defendants on notice that even if a suspect has a gun but does not point it at an officer, responding with deadly force is excessive. Here, on Plaintiffs' facts, Valdivia was unarmed when shot.

Similarly, in *Figueroa*, the officer defendants argued that they were entitled to qualified immunity where the officers pursued armed robbery suspects and then shot the two, armed robbery suspects believing them to be armed. The *Figueroa* court denied qualified immunity, stating, that this was "not a case where the officers clearly saw that the suspect had a weapon." 207 F. Supp. 2d at 1042 (citing *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001)). All the extraneous "facts" that Defendants seek to admit for nothing other than a character assassination are "largely irrelevant" to this Court's analysis, which must focus on whether Plaintiffs posed an immediate threat of death or serious bodily injury at the "exact moment" of the shots. *Figueroa*, 207 F. Supp. 2d at 1093. Valdivia was not an immediate threat of death or serious bodily injury at the exact moment that he was shot, thus Officers were on notice that deadly force violated Valdivia's Fourth Amendment right to be free from excessive force.

Further, in *Longoria v. Pinal County*, the Ninth Circuit reiterated that "[w]here the facts are disputed, their resolution and determinations of credibility 'are manifestly the province of a jury.'" 873 F.3d 699, 710 (9th Cir. 2017) (quoting *Wall v. County of Orange*, 364 F.3d 1107, 1110 (9th Cir. 2004)). In *Longoria*, the Ninth Circuit denied qualified immunity to the defendant police officer because "a reasonable jury could also conclude that [the officer defendant] knew or should have known that [the subject] was not holding a gun and that he did not assume a "shooter's stance" and could find that [the officer defendant's] statements to the contrary were not credible." *Longoria*, 873 F.3d at 711; *see also Lopez*, 871 F.3d at 1018 (affirming denial of qualified immunity where officers gave differing accounts as to whether decedent turned towards them and holding that where the state of the law at the time of the incident provides fair warning, the level of specificity required by recent Supreme Court jurisprudence is satisfied).

Finally, *Landeros*, 837 F.3d at 1012, where officers had no information that the subject was known to carry a weapon, but was on parole and there was a warrant, put Officers on notice that his force was unconstitutional. There, the officer escalated to deadly force too quickly – the officer commanded the subject to take his hand out of his pocket immediately upon driving up to him. *Id.* Then, in less than one second, the officer shot the subject just as he was taking his hand out of his pocket. *Id.* The officer neither warned the subject that he was going to shoot him, nor waited to see if there was anything in the subject's hand. *Id.* Thus, viewing the evidence in the light most favorable to the plaintiff, the Court concluded that the officer violated clearly established Fourth Amendment law when he used deadly force. *Id.* at 1013.

In *Cruz v. City of Anaheim*, 765 F.3d 1076, 1077-78 (9th Cir. 2014), a confidential informant told the police that the subject was a gang member who sold methamphetamine, carried a gun, had a past felony conviction, and said that "he was not going back to prison." The officers surrounded the subject and he tried to escape by backing his SUV into a marked patrol car. *Id.* at 1078. The subject Cruz exited his car, ignored officer commands, and reached for the waistband of his pants, prompting all five officers to open fire. *Id.* The officers fired twenty shots in about two to three seconds, killing the subject. *Id.* The officers did not find a weapon on him but recovered a loaded gun from the passenger seat. *Id.* The Court reversed the grant of summary judgment because of multiple disputed facts and evidence undermining the officers' account, including the subject was unarmed when he died, and his body was tangled in the seat belt suggesting he could not have turned toward the officers. *Id.* at 1079-80. The Court further stated, "if the suspect doesn't reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him…. At that point, the suspect no longer poses an immediate threat to the police or the public, so deadly force is not justified." *Id.* at 1078-79.

Defendants admit knowing that the law was clearly established at the time of this incident, that under these circumstances, the use of deadly force was clearly a

Constitutional Violation. Even if a person points a gun, then drops the gun and does not make any movement towards the gun, then the subject is no longer an imminent threat because the subject lost the ability to cause death or serious bodily injury, and it would not be permissible to use deadly force against that person. (AF 226-232); *see Zion*, 874 F.3d at 1076 (law was clearly established that it was unconstitutional to use deadly force against a suspect who no longer posed an immediate threat).

This is an obvious case of excessive force under Plaintiffs' facts, nevertheless Ninth Circuit authority puts the Defendant Officers on notice that their conduct here was excessive and unreasonable. Thus, Defendants' Motion should be denied in full including denying Defendants qualified immunity.

## VI.    PLAINTIFFS' STATE LAW CLAIMS SURVIVE

Defendants' arguments related to Plaintiffs' state law claims mirror those regarding Plaintiffs' excessive force claim. Given that Plaintiffs' Fourth and Fourteenth Amendment claims survive, Plaintiffs' state law claims must survive. Regarding Plaintiffs' battery and Bane Act claims, the same facts and law would be considered as with the Fourth Amendment excessive force claim. But negligence claims apply a similar but more forgiving standard. *Hayes v. County of San Diego*, 57 Cal.4th 622, 639 (2013). Even if the Court determined that the shooting appears justified in isolation, "the totality of the circumstances, including the pre-shooting conduct of the officers, might persuade a jury to find the shooting negligent." *Id.* at 629-30; *see also Tabares*, 988 F.3d at 1125 ("the officer's pre-shooting decisions can render his behavior unreasonable").

Considering the disputed issues of material facts and the undisputed facts and considering that qualified immunity does not apply to state law claims, Plaintiffs are entitled to a jury trial on all state law claims for the reasons discussed above. *See Munoz v. City of Union City*, 120 Cal.App.4th 1077, 1121, fn.6 (2004); *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1171 (9th Cir. 2013); *see also Cousins v. Lockyer*, 568 F.3d 1063, 1072 (9th Cir. 2009). Additionally, the Officers' negligent

pre-shooting tactics, which can also be taken into consideration for Plaintiffs' Battery action (*see* CACI No. 1305B, "totality of the circumstances" includes the conduct of the defendant leading up to the use of deadly force), preclude summary judgment.

Officer Cardoza failed to arm herself with a less-lethal shotgun option despite it being her plan, despite Officer Sun telling her he wanted her to grab it, despite it being an option based on the nature of this call, and despite having over 30 seconds to retrieve the less-lethal shotgun out of her vehicle's trunk. (AF 167-168, 173, 186-187.) Officer Meadows failed to arm himself with the less-lethal K9 option despite it being an option based on the nature of the call, despite it being part of his plan for responding to this call, and despite having his K9 right in his vehicle. (AF 188-190.) The Taser was an option, which can cause neuromuscular incapacitation (AF 184, 191), but Defendants never attempted to use it; OC spray was an option, which can cause disorientation and a blinding effect on the subject (AF 185), but Defendants never attempted to use it; and simple communication with a then compliant subject for instance telling him to turn away from the officers was an option that Defendants also failed to consider (AF 179, 194). Defendants failed to have situational awareness and failed to communicate with each other, including failing to recognize that there were two sergeants present, in part because the sergeants failed to announce themselves and take charge, failing to communicate about role and responsibilities, failed to communicate observations of the subjects with partners, no communication about how to make an approach, no communication about remaining behind cover, no coordination of movement, and no tactical plan. (AF 166-171.) Officers' negligent tactics caused them rush into and escalate the situation (AF 172-173). Defendants also failed to communicate with Valdivia appropriately, no officer gave a warning, and because of the Officers simultaneous and conflicting commands, which cause confusion and hinders the lister's ability to hear and/or understand commands, also caused a failed announcement of police presence (AF 175-178, 201). Defendants also failed to consider their backdrop prior to opening fire on the unarmed Valdivia,

knowing that it included occupied businesses and civilians, which caused two civilian vehicles to be struck and a civilian to be struck by shrapnel from officer bullets (AF 196-200). Officers were trained that Distance + Cover = Time, and Time = Options (AF 180). Yet, Defendants failed to use the available cover (AF 195), chose to close the distance in a stealth manner, failed to bring their less-lethal options, and used deadly force in haste, choosing to eliminate the time they had. Defendants' negligent conduct contributed to their use of excessive and unreasonable deadly force.

Finally, section 820.2 "does not confer immunity on peace officers for discretionary acts involving unreasonable use of force." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1168 (N.D. Cal. 2009) (*citing Megargee v. Wittman*, 550 F.Supp.2d 1190, 1208 (E.D. Cal. 2008)). "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment," and "a public employee is liable for injury caused by his act or omission to the same extent as a private person." Cal. Gov't Code §815.1, 820. Thus, Plaintiffs' state law claims should nevertheless survive.

## VII.    **CONCLUSION**

Assuming Plaintiffs' facts, Valdivia was not an immediate threat of death or serious bodily injury, and the law was obviously that officers may not kill a compliant subject after discarding a firearm. Defendants' credibility is strained by their erroneous insistence that Valdivia was pointing the gun at officers during all their shots making their credibility ripe for jury determination. It is undisputable that the gun was out of Valdivia's hand for all the shots. For the foregoing reasons, Plaintiffs respectfully request that this Court DENY Defendants' Motion for Summary Judgment in full and DENY qualified immunity.

DATED:  June 17, 2025         **LAW OFFICES OF DALE K. GALIPO**

By:  */s/     Marcel F. Sincich*
Dale K. Galipo, Esq.
Marcel F. Sincich, Esq.
*Attorney for Plaintiffs*

1  **CERTIFICATE OF COMPLIANCE PURSUANT TO LOCAL RULE 11-6.2**

2        The undersigned, counsel of record for Plaintiffs, certifies that this brief

3  contains 25 pages, which complies with the page limit set by this Court's Standing

4  Order on August 11, 2023 (Dkt. No. 13).

5

6  DATED:  June 17, 2025          **LAW OFFICES OF DALE K. GALIPO**

7                                     By:   _/s/     Marcel F. Sincich_
                                          Dale K. Galipo, Esq.
8                                         Marcel F. Sincich, Esq.
                                          *Attorney for Plaintiffs*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28