# EXHIBIT A

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

```
1                  UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3

4
    _____
5   E.V. and X.V., minors by and        )
    through their guardian ad litem,    )
6   Karla Juarez; D.V., a minor, by     )
    and through his guardian ad litem,  )
7   Elias Valdivia, individually and    )
    as successors-in-interest to        )
8   Daniel Luis Valdivia, deceased;     )
    Jessica Valdivia; Luis Valdivia     )
9   Jr., individually,                  )
                                        )
10      Plaintiffs,                     )
                                        ) CASE NO.
11      vs.                             ) 5:23-cv-01562-CBM-SHK
                                        )
12  CITY OF COVINA; VANESSA CARDOZA;    )
    DAVID MEADOWS; BILLY SUN; DOES      )
13  1-10, inclusive,                    )
                                        )
14      Defendants.                     )
                                        )
15  _____)

16

17                     VIDEOCONFERENCE

18       DEPOSITION OF OFFICER CHENG-WEI (BILLY) SUN

19

20
    Date:          Thursday, March 6, 2025
21  Time:          1:34 p.m. - 4:19 p.m.

22  Location:      MANNING KASS
                   801 S. Figueroa Street, 15th Floor
23                 Los Angeles, California 90017

24  Reporter:      Cynthia F. Zeller, CSR
                   Certified Shorthand Reporter #10834
25
```

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 3

```
 1                    A P P E A R A N C E S

 2

 3  For the Plaintiffs:     LAW OFFICES OF DALE K. GALIPO
                            Attorneys at Law
 4                          21800 Burbank Blvd., Suite 310
                            Woodland Hills, California 91367
 5

 6                          PHONE:  (818) 347-3333
                            FAX:    (818) 347-4118
 7                          EMAIL:  Msincich@galipolaw.com

 8
                            BY:  MARCEL F. SINCICH, ESQ.
 9

10

11  For the Defendants:     MANNING KASS
                            Attorneys at Law
12                          801 S. Figueroa Street, 15th Floor
                            Los Angeles, California 90017
13

14                          PHONE:  (213) 624-6900 ext. 2451

15                          EMAIL: Missy.olinn@manningkass.com

16                              Delia.Flores@manningkass.com

17
                            BY:  MILDRED K. O'LINN, ESQ.
18

19
    Also Present:           Officer David Meadows
20                          Officer Vanessa Cardoza

21                              --oOo--

22

23

24

25
```

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 8

1  give your best testimony today about the incident?

2      A.  No.

3      Q.  Do you recall the date of the incident?

4      A.  Yes.

5      Q.  What is it?

6      A.  April 9th, 2022.

7      Q.  Approximately what time did you receive the call

8  for this incident?

9      A.  It was 10:14 p.m.

10      Q.  And approximately what time did the

11  officer-involved shooting occur?

12      A.  10:17 p.m.

13      Q.  Approximately how long were you on scene prior

14  to the officer-involved shooting?

15      A.  45 seconds.

16      Q.  Did you use force during this incident?

17      A.  I did.

18      Q.  What type of force?

19      A.  Deadly force.

20      Q.  How many rounds did you fire?

21      A.  Six rounds.

22      Q.  Did you intentionally pull the trigger each time?

23      A.  I did.

24      Q.  Did you intend for each shot to strike

25  Mr. Valdivia?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 9

```
 1      A.  I did.
 2      Q.  Were you aiming during all of your shots?
 3      A.  I was.
 4      Q.  In what area were you aiming?
 5      A.  Center mass.
 6      Q.  And what was center mass from your observation
 7  on Mr. Valdivia when you were firing your rounds?
 8      A.  The area of the torso.
 9      Q.  After review of the video, it appears that
10  Mr. Valdivia was sort of in a prone position; is that
11  fair?
12          MS. O'LINN:  You can explain.
13          THE WITNESS:  He was leaning on his left side
14  with his torso facing down, but not in a full prone.
15  BY MR. SINCICH:
16      Q.  Was his body oriented east to west?
17      A.  As in his head pointing to the east?
18      Q.  At first was his body pointing east to west?
19          MS. O'LINN:  Do you not understand the question?
20          THE WITNESS:  Yes.  Can you rephrase that, sir.
21  BY MR. SINCICH:
22      Q.  So I'm wondering if his body was like my pen,
23  was it north to south or east to west?
24      A.  At what point?
25      Q.  When the officer-involved shooting occurred.
```

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 10

1    A.  His head was facing west and his feet were

2  facing east.

3    Q.  And were you to the west of Mr. Valdivia?

4    A.  I was.

5    Q.  And you would have been at a more elevated level

6  from him?

7    A.  Yes, sir.

8    Q.  Were you using an optic during your shots?

9    A.  I was.

10    Q.  What type?

11    A.  I'd say it's a pistol mounted optic.

12    Q.  Is it considered a red dot?

13    A.  Yes.

14    Q.  And you were a red dot instructor, right?

15    A.  Correct.

16    Q.  As a red dot instructor, what's the purpose of

17  that sight?

18    A.  It provides a better view of the totality of the

19  incident while in a high stress situation.

20    Q.  How so?

21    A.  Typically, or not typically, you can acquire

22  your sights while still maintaining focus on the target

23  with both eyes open, which gives you the ability to focus

24  on the target as well as the totality of the scene.

25    Q.  Is it easier to acquire the sights with a red

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 12

1    Mr. Valdivia?

2         A.  I don't know.

3         Q.  Do you know if from your shooting position and

4    knowing Mr. Valdivia's position, if your rounds would

5    have struck Mr. Valdivia in the head?

6         A.  I don't know.

7         Q.  What about to his shoulder?

8         A.  I don't know.

9         Q.  Did you assess in between each shot?

10        A.  Yes.

11        Q.  What's the importance of an assessment based on

12   the training?

13        A.  The importance of an assessment is to

14   continuously evaluate the threat.

15        Q.  And are officers required to do anything based

16   off that evaluation?

17        A.  Yes.

18        Q.  What is that?

19        A.  To continuously evaluate the threat.

20        Q.  Right.  So if you find out that the person is,

21   for instance a deadly threat, would that mean deadly

22   force would be authorized?

23        A.  Yes.

24        Q.  And if during the evaluation in between shots if

25   the officer observed that the person was not a deadly

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 13

1  threat, would that mean that deadly force would not be

2  authored?

3       A.  Could you rephrase that question.

4       Q.  Sure.  If during an assessment in between

5  rounds, if an officer perceives that the individual is

6  not a threat, does that mean based on the training that

7  deadly force would not be authorized?

8       A.  Correct.

9       Q.  Did you describe that the shooting incident

10  seemed to occur in slow motion?

11      A.  Yes.

12      Q.  And did that perception of time slowing down

13  allow you to analyze the situation better?

14          MS. O'LINN:  Objection; calls for speculation.

15      If you know.

16          THE WITNESS:  I don't know if that slow down of

17  time provided me the, I guess, ability to analyze it

18  better.  That's just how I perceived it.

19  BY MR. SINCICH:

20      Q.  But you were able to analyze it in your mind

21  kind of frame by frame?

22          MS. O'LINN:  Objection; argumentative.  Calls

23  for speculation.

24      If you know.

25          THE WITNESS:  Again, it's a slow down of time,

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 14

```
 1  not a frame by frame.

 2  BY MR. SINCICH:

 3      Q.  Do you recall saying frame by frame to the

 4  investigators?

 5      A.  I don't recall.

 6      Q.  Okay.  Did you have an understanding at the time

 7  of the incident that officers should consider their

 8  backdrop when using deadly force?

 9      A.  Yes.

10      Q.  And what's the importance of that?

11      A.  For the safety of the public and all involved

12  parties.

13      Q.  Was it your understanding that sometimes

14  officers can miss a round?

15      A.  Can you rephrase that.

16      Q.  Sure.  Is it your understanding, based off of

17  training and experience, that sometimes officers miss?

18      A.  Yes.

19      Q.  And with regard to the backdrop, those rounds

20  that could potentially miss, could potentially harm

21  innocent persons?

22      A.  Yes.

23      Q.  Were you trained that sometimes rounds ricochet?

24      A.  Yes.

25      Q.  Are you aware in this incident that two vehicles
```

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 15

```
 1  got struck by bullets?

 2       A.  Yes.

 3       Q.  And is it the red and black Honda that were in

 4  the parking lot?

 5       A.  I recall a red vehicle.

 6       Q.  Do you have an understanding now that one of the

 7  third-party witnesses believed that shrapnel from the

 8  bullets struck him?

 9            MS. O'LINN:  Objection; to the extent that calls

10  for attorney/client privilege communication.

11       If you have information of that nature, other than

12  an attorney/client privilege conversation, you can

13  answer.  And the answer is no.

14            THE WITNESS:  No.

15  BY MR. SINCICH:

16       Q.  You didn't read in any records or anything like

17  that, any witnesses' statements?

18            MS. O'LINN:  Other than in conversations with

19  Counsel, you can answer.

20            THE WITNESS:  I read it in an interview

21  conducted by a detective.

22  BY MR. SINCICH:

23       Q.  And what did you read in that interview with the

24  detective?

25       A.  One of the subjects stated that he may have been
```

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 16

```
 1  hit by shrapnel.
 2       Q.  Approximately how far were you from Mr. Valdivia
 3  when you fired your first round?
 4       A.  20 feet.
 5       Q.  Were you moving while you were firing your six
 6  rounds?
 7       A.  Yes.
 8       Q.  In which direction?
 9       A.  South.
10       Q.  Why were you moving south?
11       A.  We are trained to move as we shoot, because a
12  stationary target is easier to hit than a moving target.
13       Q.  Is there any other reason why you moved south?
14       A.  There's also an pony wall that could act as
15  cover.
16       Q.  How tall was that pony wall?
17       A.  Three to four feet.
18       Q.  Is that a brick wall?
19       A.  I don't know what it's composed of, sir.
20       Q.  Did it seem to be a solid wall of some sort?
21       A.  Yes.
22       Q.  Was Officer Meadows to your right?
23       A.  He was.
24       Q.  And that would have been south as well?
25       A.  Yes.
```

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 18

1      Q.  Other than continuously pointing the gun at you,

2  did he have any other movement while you were firing?

3      A.  Not that I perceived.

4      Q.  Approximately how long was it from the time of

5  your first shot to your last shot?

6      A.  I believe it to be less than a second and a half.

7      Q.  Okay.  Did you give a deadly force warning prior

8  to firing your first shot?

9      A.  No.

10      Q.  Did you hear anyone else give a warning prior to

11  firing any shots?

12          MS. O'LINN:  Objection; vague, ambiguous,

13  argumentative.

14      You can explain.

15          THE WITNESS:  In terms of a deadly force

16  warning, no.

17  BY MR. SINCICH:

18      Q.  At the time of the incident, were you aware that

19  other officers were using deadly force?

20          MS. O'LINN:  Simultaneously with him using

21  deadly force, is what you mean, Marcel?

22          MR. SINCICH:  No, that's not what I mean.  That

23  would assume facts and I'm going to get there.

24  BY MR. SINCICH:

25      Q.  My question is, at the time of the incident,

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 20

1  perception at the time of the incident, if officers were

2  firing simultaneously at the same time?

3      A.  At the time of the incident I don't remember

4  when they were firing exactly.  I just knew that I was

5  firing and at some point they were firing.

6      Q.  Okay.  Did you have an understanding at the time

7  of the incident that firing your weapon at a person could

8  cause death or serious bodily injury?

9      A.  I did.

10     Q.  In your law enforcement career, had you

11  encountered other people, besides Mr. Valdivia, with a

12  gun or something that you perceived to be a gun?

13     A.  I have.

14     Q.  Approximately how many times?

15     A.  20, 25.

16     Q.  Other than Mr. Valdivia, out of that 20 or 25

17  occurrences, did you use deadly force?

18     A.  No.

19     Q.  Is it fair to say, based on the training that

20  merely having a gun in a person's hand is not sufficient

21  to justify use of deadly force?

22     A.  Can you rephrase that, please.

23     Q.  Sure.  Did you ever receive any training, prior

24  to the incident, that the mere fact that a person has a

25  gun in their hand does not justify the use of deadly

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 21

1  force?

2      A.  Yes, I've received that training, sir.

3      Q.  And is that the same training that's taught

4  currently at Covina Police Department?

5      A.  Yes.

6      Q.  And you're a firearms instructor, right?

7      A.  I am.

8      Q.  Do you have SWAT training as well?

9      A.  I do, sir.

10     Q.  How long was the SWAT training?

11     A.  Two weeks, sir.

12     Q.  Was SWAT a collateral duty for you at the time?

13     A.  Yes.

14     Q.  Do you know if anyone else involved in this

15  incident also had SWAT training?

16     A.  Not at the time of the incident.

17     Q.  Do you know now if someone does?

18         MS. O'LINN:  Objection; vague, ambiguous,

19  overbroad, calls for speculation as to who was quote,

20  unquote "involved."

21     If you know.

22         THE WITNESS:  People that were involved in the

23  incident got on to SWAT after, at some point in time

24  after the incident.  However, no one on scene at that

25  time in point -- no one else except for me was a SWAT

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 22

 1  officer.

 2  BY MR. SINCICH:

 3      Q.  Okay.  How long had you been a SWAT officer

 4  prior to the incident?

 5      A.  Four years.

 6      Q.  Four years.  How long had you been a police

 7  officer prior to the incident?

 8      A.  Six years.

 9      Q.  Are there any special weapons that Covina Police

10  Department provides SWAT officers that's different than

11  regular patrol officers?

12          MS. O'LINN:  Counsel, I'm not sure whether you

13  mean that he was carrying that day or that if he was on a

14  SWAT call out he would have.  I'm sorry.  I'm just

15  confused.

16          MR. SINCICH:  The first question is in general

17  and then I'll narrow it down.

18          MS. O'LINN:  So the question --

19  BY MR. SINCICH:

20      Q.  At the time of the incident, did SWAT officers

21  have any special weapons?

22      A.  Not at the time of the incident.

23      Q.  Okay.  Do SWAT officers currently have special

24  weapons available to them?

25          MS. O'LINN:  Counsel, again, your first question

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 24

1  do have a sniper team as well.

2      Q.  What type of chemical agents are you referring

3  to?

4      A.  OC and PepperBall.

5      Q.  Now, as a SWAT officer if you're not on a SWAT

6  call but just on patrol prior to the incident, would you

7  have access to any of those special weapon systems?

8      A.  Not while responding to a call.

9      Q.  Okay.  Where do you keep those special weapon

10  systems at the time of the incident?

11      A.  They are stored in a container at our station.

12      Q.  Is it fair to say that while en route to this

13  incident, you kind of took charge with setting up the

14  containment?

15      A.  Yes.

16      Q.  Is that because you knew that you had that SWAT

17  training?

18      A.  I don't think independently that that's what

19  caused it, however it did help.

20      Q.  In terms of the officer-involved shooting, did

21  you consider yourself to be the officer in charge?

22      A.  Can you specify at what time?

23      Q.  At the time the shooting occurred.

24          MS. O'LINN:  Objection; argumentative as to

25  officer in charge.  Vague, ambiguous.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 25

```
 1        You can explain.
 2            THE WITNESS:  I think both Officer Meadows and I
 3    were maintaining control of the scene and there were also
 4    auxiliary officers.
 5    BY MR. SINCICH:
 6        Q.  So at the time of the officer-involved shooting,
 7    who would you consider to be the supervisor on scene?
 8        A.  From my recollection there was no supervisor on
 9    scene.
10        Q.  Based on your training, is it fair to say that
11    officers cannot use deadly force merely because a person
12    is not complying with commands?
13        A.  Could you rephrase that, sir.
14        Q.  Sure.  Did you receive training with Covina
15    Police Department that officers should not use deadly
16    force merely because a person is not complying with
17    commands?
18        A.  Yes.
19        Q.  Were you trained that officers cannot use deadly
20    force unless there is an immediate threat of death or
21    serious bodily injury?
22        A.  Yes.
23        Q.  Other than this incident have you been involved
24    in any other officer-involved shooting incidents?
25            MS. O'LINN:  Objection; asked and answered.
```

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 26

```
 1        You can answer again.

 2            THE WITNESS:  No.

 3   BY MR. SINCICH:

 4        Q.  Is it fair to say that you didn't know what

 5   Mr. Valdivia was thinking at the time of the incident?

 6        A.  I did not know what he was thinking.

 7        Q.  And did you review any documents in preparation

 8   for today?

 9        A.  I did, sir.

10        Q.  Can you tell me what you reviewed?

11        A.  I reviewed interviews prepared by the Covina

12   Police Department.  I reviewed the DOJ written report as

13   well.

14        Q.  Interviews of whom?

15        A.  Witnesses in the area.

16        Q.  Do you know the names of those witnesses?

17        A.  No.

18        Q.  Do you know if those witnesses saw the shooting?

19        A.  I know there were people present; however, I

20   don't have a specific recollection of who saw what.

21        Q.  Did you review a transcript of your interview

22   with investigators?

23        A.  I did, sir.

24        Q.  When did you give the interview to investigators?

25        A.  It was approximately two weeks after the
```

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 35

1   hip?

2        A.   Are you specifying the firearm?

3        **Q.   Yes, the firearm.**

4        A.   It was a Glock 17, sir.

5        **Q.   Is that also 9 millimeter?**

6        A.   It is, sir.

7        **Q.   What type of round were you firing?**

8        A.   The type of round is a hollow-point round, sir.

9        **Q.   As a firearms instructor, do you have any kind**

10   **of special knowledge or training on what hollow-point**

11   **rounds are?**

12        A.   Yes, sir.

13        **Q.   Can you describe what that is?**

14        A.   Hollow-point rounds are rounds that expand upon

15   impact.

16        **Q.   Do you know what the purpose of the expansion**

17   **upon impact is?**

18        A.   The purpose of it, sir, is if it were to

19   inadvertently hit a wall, a drywall or a stud, it would

20   prevent it from further travelling through those objects

21   to prevent further casualties.

22             MR. SINCICH:  We just had a phone appear.

23             MS. O'LINN:  Yes.  We are on the same page.

24   Dave, is that you?  Oh, it's Vanessa.  It's

25   Officer Cardoza.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 37

```
 1      A.  Yes, sir.

 2      Q.  And what type of taser did you have?

 3      A.  It was an X26.  The brand is known as taser.

 4          (Reporter clarification.)

 5  BY MR. SINCICH:

 6      Q.  What was the maximum effective range of that

 7  taser?

 8      A.  In a perfect setting the maximum effective range

 9  of a taser is 27 feet.

10      Q.  Is there an ideal range of the taser based on

11  your training?

12      A.  It would depend on the totality of the

13  circumstances, sir.

14      Q.  Okay.  And I take it that you didn't have OC

15  spray, because you weren't on a SWAT call?

16      A.  No, I just don't carry OC spray, sir.

17      Q.  And oh, you have the option?

18      A.  Yes.

19      Q.  Does the department require officers on patrol

20  to have a certain number of less lethal options available

21  to them?

22      A.  No, sir.

23      Q.  Does the department require, at the time of the

24  incident, that patrol officers have even one less lethal

25  option available to them?
```

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 38

```
 1          MS. O'LINN:  Objection; argumentative.  Or
 2   intermediate force, I'm not sure if that's exclusive,
 3   Counsel, if you're looking for an actual response to
 4   that, so.
 5          THE WITNESS:  We are told to carry our batons
 6   and our tasers, but there's no minimum number requirement
 7   of options to have on us.
 8          MR. SINCICH:  All right.  Let's go off the
 9   record.
10          (Off the record.)
11   BY MR. SINCICH:
12      Q.  Officer Sun, I just wanted to pull up your
13   interview.  Do you have a copy of it?
14      A.  Not on hand, sir.
15      Q.  I'm going to show you page 39 here.
16   Can you see my screen?
17      A.  Now I can, yes, sir.
18      Q.  I just want to see if this refreshes your memory
19   as to the issue that we discussed earlier about the frame
20   by frame.  On this, are you able to see okay?
21      A.  Yes, I'm zooming in right now.
22      Q.  Let me see if I can make it bigger.
23      A.  There you go.  Perfect.
24      Q.  So starting on line 2, is it fair to say that
25   the agent asked you a question about psychological
```

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 39

```
 1  effects of the officer involved shooting?

 2      A.  Yes, he asked me that question.

 3      Q.  And then your response starts on line 10.

 4      A.  I did respond on line 10, sir.

 5      Q.  And you were saying that time was slowing down,

 6  right?

 7      A.  Yes.

 8      Q.  And on line 12 you were able to clearly think of

 9  everything that was going on?

10          MS. O'LINN:  Objection; document speaks for

11  itself.  Argumentative as phrased, incomplete, lack of

12  foundation.

13      You can explain.

14          THE WITNESS:  Yes, that's what I said, sir.

15  BY MR. SINCICH:

16      Q.  Okay.  And it was in this response that you said

17  that you were able to analyze Mr. Valdivia's actions and

18  what he was doing kind of frame by frame; is that fair?

19      A.  Can you scroll down so I can see the text you're

20  referencing, sir.

21      Q.  I can see it on my screen.  Oh, there it goes.

22  It wasn't scrolling for a second.  So for instance on

23  line 15 it says, frame by frame.  So if you read the

24  lines just several above and below that, that's your

25  response?
```

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 40

1    A.  It says I see everything frame by frame before
2  we had to act.
3    Q.  And you were referring to being able to see
4  Mr. Valdivia's actions before you used force?
5    A.  Yes.
6    Q.  What were you doing prior to getting this call?
7    A.  I was writing a report, sir.
8    Q.  And what was the information that you received
9  from this call?
10    A.  Dispatch advised of a 417 call, which is the
11  penal code for brandishing a firearm, and that there were
12  multiple calls received at Country Liquor, 124 East Arrow.
13    Q.  Did you have any other information besides 417
14  brandishing a firearm at that location?
15    A.  Description of the subject.
16    Q.  What was the description that you recall?
17    A.  Male Hispanic in his 40s wearing a black sweater
18  and shorts with a beer bottle.
19    Q.  Was there any other information from the initial
20  call?
21    A.  Not from the initial radio traffic that I
22  recollect, sir.
23    Q.  After receiving that call, how long did it take
24  before you started en route to the scene?
25    A.  Almost immediately, sir.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 41

```
 1      Q.  I think I asked you earlier, but it was a couple
 2  minute drive or so.
 3      A.  Approximately two, sir.
 4      Q.  Okay.  Did you receive any additional
 5  information related to this incident while en route?
 6      A.  Yes, sir.
 7      Q.  What information did you learn en route?
 8      A.  I learned that more people had called regarding
 9  the same circumstances, that he was actively 415 to the
10  front with two other subjects, which to me means that
11  he's argumentative, aggressive, trying to start a fight.
12  And then I also had learned that he had placed the gun in
13  his pocket.
14      Q.  What does 415 mean?
15      A.  It's the term that we use as combative or
16  uncooperative, argumentative.  It's kind of a reflection
17  of the Penal Code 415.
18      Q.  You said argumentive, aggressive and trying to
19  start a fight; do you recall that?
20      A.  Just now?
21      Q.  Yes, a moment ago.
22      A.  Yes.
23      Q.  Does every 415 call mean that a person is being
24  aggressive?
25      A.  Could you rephrase that question.
```

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 42

1     Q.  Right.  I'm trying to understand what a 415 call

2  means based on your training at Covina Police Department?

3          MS. O'LINN:  415 as put out on the radio,

4  Counsel?

5          MR. SINCICH:  I'm sorry.  Can you say that again?

6          MS. O'LINN:  You're referring to when it's put

7  out over the radio as 415?

8          MR. SINCICH:  Right, a 415 call.

9          THE WITNESS:  Yes.  In this case, yes.  The only

10  other difference is, if they say 415 party, which was a

11  party call; however, that was not what was said in this

12  instance.

13  BY MR. SINCICH:

14     Q.  Okay.  So this was just a 415 individual?

15     A.  Yes.

16     Q.  So when you receive a call for a 415 individual,

17  did that mean to you that by the nature of the training,

18  he was going to be aggressive?

19     A.  It led me to perceive that the reporting

20  parties, callers notified dispatch that he was aggressive

21  and that we were likely going to encounter someone who

22  was aggressive as well.

23     Q.  When you were en route, did you know what the

24  reporting parties said to dispatch?

25     A.  No.

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 43

1    Q.   What specifically did dispatch tell you with

2    regard to the 415?

3    A.   That there were multiple callers and the subject

4    of the initial call, was the subject that the causing the

5    415 with two others.

6    Q.   So dispatch didn't tell you that he was starting

7    a fight?

8    A.   No, not specifically those words.

9    Q.   And did dispatch tell you that he was being

10   aggressive?

11   A.   Not using those specific words.

12   Q.   Can a person be 415 and not be aggressive?

13   A.   Not in this instance.

14   Q.   Well, in this instance you received this

15   information while you were on the road, right?

16   A.   Yes, sir.

17   Q.   So you weren't there to see what was happening?

18   A.   No, but it was information provided to us by

19   multiple callers through dispatch.

20   Q.   So multiple callers said that he was 415?

21   A.   I don't know what the callers told dispatch

22   exactly.  They are trained to analyze that information

23   and disseminate it to us.

24   Q.   And the information that they disseminated to

25   you, was that multiple callers called in for a 415

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 44

1  individual with two subjects?

2      A.  Yes.

3      Q.  And no additional details?

4      A.  The initial call was 417 indicating that he had

5  a gun as well.

6      Q.  Right.  And then you also received information

7  that the gun was in his waistband or pocket?

8      A.  Yes, they stated at one point that the gun was

9  in his pocket.

10     Q.  Okay.  So from the time of the initial call, was

11  it your understanding that he went from brandishing the

12  firearm to then putting the firearm in his pocket?

13     A.  Based on the totality of the information, I knew

14  that there was a man with a gun, that there were multiple

15  callers, that he was actively arguing and at some point

16  he had placed the gun in his pocket.

17     However, I know also that there's a delay from phone

18  call to dispatch, to dispatch to us, which means that any

19  one of those situations could have been possible.  It

20  didn't necessarily mean that the gun was no longer in

21  play.

22     Q.  And you didn't know, for instance, who started

23  the argument based off of the call?

24     A.  That information was not provided to me, sir.

25     Q.  Prior to your use of deadly force, did you

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 45

1  receive any information from dispatch that Mr. Valdivia

2  pointed the gun at anybody?

3      A.  Yes.  The initial call was multiple callers of a

4  417, which is the penal code for brandishing a firearm.

5      Q.  The brandishing of a firearm can be done without

6  even touching a firearm; isn't that fair to say?

7      A.  Could you clarify, sir.  I don't understand.

8      Q.  I'm wondering based off your understanding of

9  what brandishing is, that's showing a weapon, correct?

10     A.  Yes.

11     Q.  It's not necessarily pointing a weapon; is that

12  fair?

13     A.  It's displaying the firearm in a threatening

14  manner.

15     Q.  And that doesn't necessarily mean that it was

16  being pointed, right?

17         MS. O'LINN:  Objection; argumentive as phrased.

18     You can explain.

19         THE WITNESS:  Even though it doesn't necessarily

20  mean that it was being pointed, I think the nature of a

21  417 is someone brandishing a firearm, which it tells that

22  they are using it as a means of force, threat and imminent

23  loss of life.

24  BY MR. SINCICH:

25     Q.  Do you think that a brandishing is an imminent

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 46

1  loss of life?

2      A.  Yes.

3      Q.  How is brandishing an imminent loss of life?

4      A.  If someone is pointing a gun at you, sir, it

5  only takes milliseconds to pull the trigger and end

6  someone's life.

7      Q.  Okay.  And it was almost four minutes from the

8  initial call to your use of force, right?

9      A.  I don't know when the initial call came in.  I

10  just know that from the radio call to when I got there,

11  was approximately two minutes and then probably another

12  minute from contact to the use of force.  So

13  approximately three, sir.

14      Q.  So in that entire time frame, is it fair to say

15  that Mr. Valdivia never shot anybody?

16      A.  He did not shoot anybody.

17      Q.  And when you were en route to the scene, was it

18  your understanding that you and your team were there to

19  investigate the call?

20      A.  Yes, every call is an investigation, sir.

21      Q.  Have you been on calls where after the

22  investigation, you found out that things didn't happen

23  exactly the way that the caller described it?

24      A.  Yes.

25      Q.  Did that go through your mind in this instance

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 47

1    that it was possible that Mr. Valdivia didn't point the

2    gun at anybody?

3        A.  In this instance there were multiple callers

4    alleging similar facts or similar observations which was

5    related to me, and upon my arrival and assessment of the

6    scene, it was consistent with his actions.

7        Q.  When you arrived, did he have a gun in his hand?

8        A.  No.

9        Q.  Was he brandishing a firearm when you arrived?

10       A.  No, sir.

11       Q.  Was he pointing a gun when you arrived?

12       A.  At one point he did, yes.

13       Q.  When you first arrived and saw Mr. Valdivia, did

14   he point a gun?

15       A.  No, sir.

16       Q.  Do you know how old Mr. Valdivia was?

17       A.  He appeared to be in his late 30s.

18       Q.  And when you saw Mr. Valdivia, was he wearing

19   black shorts?

20       A.  No.

21       Q.  Had you ever met Mr. Valdivia before?

22       A.  No.

23       Q.  Prior to your use of deadly force, did you have

24   any information about Mr. Valdivia's personal or family

25   history?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 48

```
 1       A.  No, sir.

 2       Q.  Prior to your use of force, did you have any

 3  information about whether he had a criminal history?

 4       A.  No, sir.

 5       Q.  Did you have any specific information as to

 6  whether or not he ever physically harmed anyone?

 7       A.  I did not have that information, sir.

 8       Q.  Did you have any information as to whether or

 9  not Mr. Valdivia was involved in a gang?

10       A.  No, sir.

11       Q.  Prior to your use of force, did you have any

12  information that Mr. Valdivia had a history of drug or

13  alcohol use?

14       A.  I did not know, sir.

15       Q.  Did you know, prior to your use of force,

16  whether or not Mr. Valdivia was under the influence of

17  any drugs?

18       A.  I did not know, sir.

19       Q.  Did you know whether he was under the influence

20  of alcohol?

21       A.  I didn't know, sir.

22       Q.  Prior to your use of force, did you know whether

23  Mr. Valdivia had any experience handling weapons, like a

24  gun?

25       A.  I didn't know, sir.
```

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 49

1    Q.  When you first saw Mr. Valdivia, what was he

2    doing?

3    A.  He was arguing, sir.

4    Q.  What was he saying?

5    A.  I was too far away to hear, sir.

6    Q.  Who was he arguing with?

7    A.  There were two other subjects to the front of

8    the liquor store with him.

9    Q.  Were they arguing as well?

10   A.  No.  It looked like they were trying to get him

11   to stop.

12   Q.  When you first saw the three men in front of the

13   liquor store, was it your impression that, who you know

14   now to be Mr. Valdivia, matched the description of the

15   initial call?

16   A.  Yes.

17   Q.  Was there anything about the other gentlemen

18   that led you to believe that they did not match the

19   description?

20   A.  Yes.

21   Q.  What was that?

22   A.  The other two gentlemen, one was wearing a gray

23   hoodie and they were both male blacks or African American

24   descent.  And they did not appear to be the primary

25   aggressors in this situation.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 50

1    Q.  Prior to your use of deadly force, did you have

2  any information that Mr. Valdivia verbally threatened

3  anybody?

4    A.  Based on the radio call that was provided to me,

5  that was what I was led to believe.

6    Q.  What about the radio call led you to believe

7  that there was a verbal threat?

8    A.  Dispatch said that there was a 415, and then a

9  verbal argument between the subject of the 417 and two

10  other people.

11    Q.  So what verbal threat did you understand to have

12  occurred?

13    A.  I understood that there was a threat, but they

14  didn't specify the specific words.

15    Q.  Okay.  Did you hear Mr. Valdivia verbally

16  threaten anyone?

17    MS. O'LINN:  Objection; argumentative.  Vague,

18  ambiguous.

19    You can explain.

20    THE WITNESS:  What I perceived was an argument

21  when I initially had saw him; however, I could not make

22  out what he was saying, but his intonations and tones

23  provided that.  It appeared that he was the one doing the

24  arguing, sir.

25  BY MR. SINCICH:

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 51

1     Q.   Right.  And I'm not talking about arguing.  I'm

2    more interested right now in whether or not you heard a

3    verbal threat.

4           MS. O'LINN:  Objection; asked and answered

5    multiple times.

6           MR. SINCICH:  You can answer.

7           MS. O'LINN:  Do you know what the question is?

8           THE WITNESS:  Yes.  The answer is no.

9    BY MR. SINCICH:

10     Q.   From your perspective what was Mr. Valdivia's

11    height and weight?

12     A.   He appeared to be approximately 5' 11", 230 to

13    250 pounds.

14     Q.   What was your height and weight at the time of

15    the incident?

16     A.   Five feet eight inches and 175 pounds, sir.

17     Q.   When you were en route to the scene, which

18    direction were you driving?

19     A.   I was driving north.

20     Q.   On what?

21     A.   On Citrus, sir.

22     Q.   And then where did you go?

23     A.   And then I pulled into the driveway of

24    Starbucks, which is in the same shopping center as the

25    radio call.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 52

1    Q.  Was it your plan to do a stealth approach on

2   Mr. Valdivia?

3    A.  That was part of my plan, sir.

4    Q.  Is that why you parked on the other side of

5   Starbucks?

6    A.  Yes.

7    Q.  What was the other part of your plan, other than

8   a stealth approach?

9    A.  To arrive and assess the location before further

10  determining my actions.

11   Q.  And did you have any other plan in mind?

12   A.  I set up a containment as well, sir.

13   Q.  Anything else?

14   A.  Not in the planning phase of it, sir.

15   Q.  Okay.  Did you inform any other officers that

16  there was going to be a stealth approach?

17   A.  I informed Officer Meadows that we would

18  approach on foot from Starbucks.

19   Q.  Did you tell Officer Meadows that it was going

20  to be a stealth approach, though?

21       MS. O'LINN:  Objection; argumentative.

22       You can explain.

23       THE WITNESS:  No, I didn't need to.

24  Officer Meadows and I work very closely together, and a

25  lot of our communication and tactics are aligned and are

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 53

1  not -- our communication a lot of times is nonverbal.

2  BY MR. SINCICH:

3      Q.  What nonverbal communication did you provide to

4  Officer Meadows to inform him that it was going to be a

5  stealth approach?

6      A.  He walked up behind me and we arrived at the

7  same time, approximately.  And I was under the impression

8  that he would understand that the speed that I was moving

9  and how I was moving, that he would understand my

10  intention.

11      Q.  Did you know that other officers were also en

12  route?

13      A.  I did.

14      Q.  How many officers did you believe were en route

15  to this incident?

16          MS. O'LINN:  Prior to the shooting, right?

17          MR. SINCICH:  Yes, prior to the shooting.

18          THE WITNESS:  At least four other officers,

19  aside from Meadows and I.

20  BY MR. SINCICH:

21      Q.  And which officers were those, to your

22  knowledge, at the time?

23      A.  On the east side would be Cardoza and

24  Officer Dixon.  On the northwest would be Officer Avila

25  and I had observed a unit driving up behind me and

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 54

1  Meadows, and I designated that officer to take the south
2  alley of the location.
3      Q.  And did you instruct Officers Cardoza and Dixon
4  to set up containment on the east side?
5      A.  I did.
6      Q.  And did you do that while you were en route?
7      A.  Yes, sir.
8      Q.  And did you tell the unit that was behind you to
9  set up on the south alley while you were en route as well?
10     A.  Yes, sir.
11     Q.  Did you communicate to any of those officers how
12  they were to approach?
13     A.  No.
14     Q.  Was it your understanding that all of the
15  officers would approach Mr. Valdivia in order to take him
16  into custody?
17     A.  No.
18     Q.  What was your understanding of who was going to
19  actually approach to assist in taking Mr. Valdivia into
20  custody upon arrival?
21     A.  It was my understanding that it would be
22  Officer Meadows and I.
23     Q.  Based on your training and experience with
24  Officer Meadows, did you feel that the two of you would
25  be able to handle the situation alone?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 55

 1          MS. O'LINN:  Objection; argumentative.

 2      You can explain.

 3          THE WITNESS:  Yes, but I also knew that more

 4  units were coming due to the nature of the call and the

 5  understanding and work ethic of my partners, and so that

 6  we were likely to have officers showing up as the scene

 7  evolved.

 8  BY MR. SINCICH:

 9      Q.  And was it your understanding upon arrival, that

10  Officer Cardoza would be the less lethal option?

11      A.  No, that was her discretion.

12      Q.  Was it your understanding that of all the

13  officers that arrived, they all could potentially have

14  their lethal weapons out?

15      A.  Could you rephrase that, sir.

16      Q.  Did you have understanding, prior to use of

17  force, whether any officer was designated as a less

18  lethal option?

19      A.  I leave that discretion to each officer, since

20  we carry lethal and less lethal options.  And there was a

21  man with a gun, which would prompt us to not use a less

22  lethal option as the first resource.

23      Q.  Do you know which officer was in the south alley

24  containment?

25      A.  I don't.

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 56

1      Q.  Did you know that there were two sergeants also

2  en route at some point?

3      A.  I didn't learn that until after the incident.

4      Q.  So you parked on the west side of Starbucks,

5  right?

6      A.  Yes, sir.

7      Q.  And then you traveled along the north side of

8  Starbucks towards the parking lot?

9      A.  Yes, sir.

10     Q.  Where were you along that path when you first

11  saw Mr. Valdivia?

12     A.  I was in the northwest corner of Starbucks.

13     Q.  And did you maintain sight on him as you

14  approached?

15     A.  Yes, sir.

16     Q.  From the time you first saw him -- strike that.

17     At some point you gave him a command, right?

18     A.  Yes, sir.

19     Q.  And you were closer when you gave him the

20  command?

21     A.  I was, sir.

22     Q.  From the time that you first saw him to the time

23  of your first command, did you see a gun in his hand?

24     A.  No, sir.

25     Q.  Did you see anything in his hand?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 57

```
 1      A.  A beer bottle, sir.

 2          Q.  Did you see a gun anywhere on his person during

 3   that time?

 4          A.  Can you specify the time, sir.

 5          Q.  When you were, from the time that you first saw

 6   him to the time of your first command?

 7          A.  I did not.

 8          Q.  Did you know where Officer Cardoza was from the

 9   time that you first saw him to the time of your first

10   command?

11          MS. O'LINN:  Generally or specifically?

12          THE WITNESS:  It was my impression that she was

13   set up in the northeast corner, but not specifically

14   exactly where she was, but she was in that northeast area

15   of the parking lot.

16   BY MR. SINCICH:

17          Q.  When you instructed Officers Cardoza and Dixon

18   to do containment on the east side, what was your

19   impression of what they would be doing?

20          A.  So I had instructed Officer Dixon to take a

21   containment position and Officer Cardoza had responded as

22   an additional.  So I had designated Dixon to actually

23   take that containment position.

24          Q.  And what did you expect him to do as being in a

25   containment position?
```

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 58

1      A.  Hold the spot to prevent escape of a possible

2  violent suspect.

3      Q.  But since Officer Cardoza asked about the

4  beanbag shotgun, were you under the impression that she

5  was going to join you and Officer Meadows?

6      A.  I did not make any assumptions based off that

7  statement, sir.

8      Q.  Did you believe that she was going to remain in

9  position at the northeast corner on containment?

10      A.  I didn't make any assumptions of what she was

11  going to do.

12      Q.  What was the first command that you gave

13  Mr. Valdivia?

14      A.  I said, hey, let me see your hands.

15      Q.  Did he respond to your first command?

16      A.  I believe he looked in my direction.

17      Q.  What was the next thing you said?

18      A.  Put your hands up.

19      Q.  After you gave him the command, "put your hands

20  up," did he put his hands up?

21      A.  No, sir.

22      Q.  At some point in time during this incident did

23  he put his hands up?

24      A.  Yes, sir.

25      Q.  Was it after your command to put your hands up?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 59

1    A.  Yes, sir.

2        Q.  Approximately how long after?

3    A.  Five to ten seconds, sir.

4        Q.  Did you view him putting his hands up after your

5    command as a sign of compliance?

6    A.  No, because he put his hands down again right

7    after.

8        Q.  When he first put them up, did you see that as a

9    sign of compliance?

10   A.  At that time, yes.

11       Q.  What did you say after that?

12   A.  After he put his hands up?

13       Q.  After "show me your hands."

14       MS. O'LINN:  Counsel, I'm confused as to where

15   you are, because you asked him to put his hands back

16   down.  So where are you in the sequence?  It's kind of

17   confusing.

18   BY MR. SINCICH:

19       Q.  Yes.  I'm wondering what your next command was.

20   A.  My next command was in response to him putting

21   his hands down, and I told him to "show me your fucking

22   hands."

23       Q.  Okay.  What did he do after that?

24   A.  He said, "whatever."

25       Q.  And then what did he do?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 60

1    A.  He had the beer bottle in his right hand and

2  began moving it to his left hand.

3    **Q.  And then what did he do?**

4    A.  And then he put his hands near his waistband

5  again.

6    **Q.  What did you do when you saw him put his hands**

7  **next to his waistband?**

8    A.  I told him to get his hands out of his pockets.

9    **Q.  Was his hand in his pocket?**

10    A.  No, but it was reaching towards there.

11    **Q.  After you told him to get his hands out of his**

12  **pockets, did he stop reaching towards his pocket?**

13    A.  At that time, yes.

14    **Q.  Did you see that as an act of compliance?**

15    A.  At that time, yes.

16    **Q.  What did he do after that?**

17    A.  He was ordered to get on the ground by

18  Officer Meadows.

19    **Q.  Did he start to lay on the ground after that**

20  **order?**

21    A.  He began getting on the ground; however, he did

22  not.  He started leaning to his left and getting in a

23  modified -- what I perceived to be a modified prone

24  shooting position.

25    **Q.  When he first started going down to the ground**

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 61

1  after Officer Meadows instructed him to do so, did you

2  see that as an act of compliance?

3      A.  When he first started getting on the ground?

4      Q.  Yes.

5      A.  At that time, yes.

6      Q.  Did you hear Mr. Valdivia say anything except

7  for "whatever"?

8      A.  Not that I recall.

9      Q.  Knowing everything you knew about the nature of

10  the call, when you first were giving commands to

11  Mr. Valdivia based on your training, would it have been

12  appropriate to use deadly force?

13      MS. O'LINN:  Objection; vague, ambiguous, calls

14  for speculation.

15      THE WITNESS:  Could you rephrase that, sir.

16  BY MR. SINCICH:

17      Q.  Sure.  At the time that you got into a position

18  where you gave your first command to Mr. Valdivia and you

19  saw him in the parking lot, based on your training would

20  it have been appropriate to use deadly force against him

21  at that time?

22      A.  At that specific time, I didn't think so.

23      Q.  Why not?

24      A.  At that time our job as officers was an attempt

25  to get his compliance in order to investigate the

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 62

1  situation.  And even though he had demonstrated to the

2  public that there was some propensity for violence and an

3  immediate threat to others, I felt that we were

4  conducting an investigation as well as attempting to

5  deescalate him to get his compliance at the time.

6      Q.  What were you doing to attempt to deescalate the

7  situation?

8      A.  Firstly, we saw him in an argument with these

9  two other people who he allegedly threatened with a

10  firearm at some point reported by multiple witnesses.

11      We attempted to draw his attention towards

12  Officer Meadows and I, away from the incident victims and

13  have him divert his attention to us, and then we would

14  have tried to investigate it, if he was complying.

15      Q.  Prior to Officer Meadows' command to go down to

16  the ground, based on your training would it have been

17  appropriate to use deadly force against him?

18      MS. O'LINN:  Objection.  Vague, ambiguous, calls

19  for speculation.

20      If you understand.

21      THE WITNESS:  Could you rephrase it, sir.

22  BY MR. SINCICH:

23      Q.  Sure.  I want to take you to the time frame of

24  you giving commands, you've made your approach, he's

25  already put his hands up and then put his hands down, but

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 63

1  just before Officer Meadows gives his command to go down

2  to the ground; based on your training, would it be

3  appropriate to use deadly force at the time?

4      A.  Given the totality of the circumstances I would

5  not have.

6      Q.  And why is that?

7      A.  He was not posing an imminent threat towards me.

8      Q.  And based on the training in order to use deadly

9  force, it has to be an imminent threat of death or

10  serious bodily injury; right?

11      A.  Yes, sir.

12      Q.  Is it fair to say that any person that you meet

13  on patrol is a potential threat?

14      A.  Yes, sir.

15      Q.  But to use deadly force it has to be a deadly

16  threat in order to respond in deadly force; is that fair?

17      MS. O'LINN:  Objection; argumentative as phrased.

18  You can answer.

19      THE WITNESS:  An imminent threat with the

20  likelihood of death or serious bodily injury.

21  BY MR. SINCICH:

22      Q.  Did you ever announce yourself as a police

23  officer prior to your use of deadly force?

24      A.  No, but my partner did.

25      Q.  What did you hear Officer Meadows say?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 64

1    A.  I heard Officer Meadows very loudly he said,

2  "police, put your hands up."

3         (Reporter clarification.)

4  BY MR. SINCICH:

5    Q.  **Did Officer Meadows say that at around the same**

6  **time that you were giving commands?**

7    A.  Around that time.

8    Q.  **Is it fair to say that if a person discards a**

9  **gun, they wouldn't have the ability to use the gun**

10  **imminently?**

11         MS. O'LINN:  Objection; incomplete hypothetical,

12  calls for speculation, vague, ambiguous and overbroad.

13         You can answer, if you understand.

14         THE WITNESS:  They can still retrieve it, so

15  they can still be perceived as a threat, sir.

16  BY MR. SINCICH:

17    Q.  Right.  Is it fair to say based on your training

18  if a person discards the gun, but doesn't make a movement

19  to retrieve the gun, that they wouldn't be an immediate

20  threat of death or serious bodily injury?

21    A.  Can you rephrase that, sir.

22    Q.  **Sure.  Based on your training is it fair to say**

23  **that a person would not be an immediate threat of death**

24  **or serious bodily injury if they discard the gun and then**

25  **don't make any movement to retrieve the gun?**

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 65

1      MS. O'LINN:  Objection; incomplete hypothetical.

2      Assuming no other facts.  You can answer, if you

3  understand.

4      THE WITNESS:  If they make no other movements

5  and the gun is not within arm's reach, and they have no

6  other weapons on them, then I agree with that.

7  BY MR. SINCICH:

8      Q.  Were you trained that officers can use deadly

9  force if there is a weapon within arm's reach of the

10  subject?

11      MS. O'LINN:  Objection; incomplete hypothetical.

12  Calls for speculation, vague.

13      If you understand.

14      THE WITNESS:  Sir, can you repeat the question.

15  BY MR. SINCICH:

16      Q.  Sure.  Were you trained that officers could use

17  deadly force merely because there is a gun within arm's

18  reach of the subject?

19      MS. O'LINN:  Same objections.

20      THE WITNESS:  They could if it possessed an

21  imminent threat to life or serious bodily injury and had

22  the ability to do so.

23  BY MR. SINCICH:

24      Q.  What do you mean by that?

25      A.  It takes a split second for someone to reach for

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 67

1    Q.  I don't know what you mean by frozen.

2        But in this hypothetical based on the training, if a

3    person is within arm's reach of a gun, but is not

4    reaching for it, based on your training would it be

5    permissible to use deadly force against that person?

6            MS. O'LINN:  With no other facts.

7            THE WITNESS:  No.

8    BY MR. SINCICH:

9        Q.  Based on your training, if a person might have

10   another weapon on them after they discard one weapon,

11   would it be permissible to use deadly force against that

12   person?

13           MS. O'LINN:  Objection; calls for speculation,

14   incomplete hypothetical, vague, ambiguous and overbroad.

15       Can you answer that question?

16           THE WITNESS:  Can you repeat it one more time,

17   sir.

18   BY MR. SINCICH:

19       Q.  Sure.  In this hypothetical if a person has a

20   gun and then discards it, but they might have another

21   weapon but you don't know because they haven't been

22   searched, they don't make any movement towards a

23   potential weapon or the discarded weapon; based on the

24   training, would it be permissible to use deadly force?

25       A.  Barring no other factors, no.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 68

1    Q.  Based on your training, an imminent threat

2  requires that the person have the apparent ability,

3  opportunity and apparent intent to cause death or serious

4  bodily injury, right?

5    A.  Yes, sir.

6    Q.  Is it fair to say that if a person drops the

7  gun, they are losing the capability of causing death or

8  serious bodily injury?

9      MS. O'LINN:  Objection; incomplete hypothetical,

10  argumentative, vague.

11    You can answer.

12      THE WITNESS:  No, they are still able to.

13  BY MR. SINCICH:

14    Q.  How are they able to imminently cause death or

15  serious bodily injury after dropping a gun, based on your

16  training?

17    A.  They could pick it up, sir.

18    Q.  Okay.  Are you saying that based on your

19  training, you're allowed to shoot somebody because they

20  might have the capability of picking up a gun that they

21  once discarded?

22    A.  That's not what I'm saying, sir.

23    Q.  Okay.  And I'm just trying to understand your

24  training through these questions, so I appreciate your

25  patience.

---

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

1    If a person is in the act of discarding a gun, is

2  that showing an apparent intent to surrender?

3       MS. O'LINN:  Objection; argumentative as phrased,

4  overbroad, calls for speculation, "in the act of

5  discarding a gun."

6       You can explain.

7       THE WITNESS:  Can you rephrase that, sir.

8  BY MR. SINCICH:

9       Q.  Sure.  As a patrol officer is one of the things

10  you're doing is analyzing the apparent intent of a person?

11       A.  Yes, sir.

12       Q.  Because you don't know what they are thinking,

13  right?

14       A.  I don't, no, sir.

15       Q.  So what you have to do as a patrol officer is

16  look at their conduct and try to determine what you

17  believe they are trying to do; is that fair to say?

18       A.  Yes, their conduct and the totality of the

19  circumstances including radio calls and prior information.

20       Q.  Right.  And so if a person is pointing a gun at

21  you, that's showing an apparent intent that could be an

22  immediate threat of death or serious bodily injury, right?

23       A.  Yes.

24       Q.  What if a person points a gun at you, but

25  doesn't shoot at you and then he immediately drops the

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 70

```
 1   gun and then doesn't reach for the gun again.

 2        After they drop the gun, are they an immediate

 3   threat of death or serious bodily injury?

 4        A.  They could still retrieve it, sir.

 5        Q.  Right.  In this hypothetical the person doesn't

 6   do anything to attempt to retrieve it.

 7        MS. O'LINN:  Counsel, you've asked him that

 8   question probably at least six times.

 9        Objection; asked and answered over and over again.

10        MR. SINCICH:  You can answer, Officer.

11        MS. O'LINN:  Can we move on?

12   BY MR. SINCICH:

13        Q.  You can answer, Officer.

14        A.  My answer is the same.  I'm not trying to be

15   disrespectful, sir.  I feel like I've answered this

16   question already and I don't have a different answer.

17        Q.  Okay.  Can you answer it, please.

18        A.  Could you rephrase it, sir.

19        Q.  Sure.  If a person points a gun at you and then

20   drops the gun, and then doesn't make any movement towards

21   picking up the gun again; is it fair to say that that

22   person is no longer an imminent threat of death or

23   serious bodily injury?

24        MS. O'LINN:  Objection; asked and answered.

25        You can answer again.
```

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 71

1          THE WITNESS:  If that person -- if I know for a

2    fact that that person is not going to move whatsoever,

3    then yes, the ability would not be there.

4          MR. SINCICH:  What time did we take a break?

5          MS. O'LINN:  About an hour and five minutes ago.

6          MR. SINCICH:  Let's take a break.  Off the

7    record.

8          (Off the record.)

9    BY MR. SINCICH:

10         Q.  Officer Sun, did you ever see Mr. Valdivia

11    attempt to flee?

12         A.  No.

13         Q.  Did you ever see him attempt to take a hostage?

14         A.  No.

15         Q.  Did you ever see him attempt to punch or kick

16    anybody?

17         A.  No.

18         Q.  Did you ever see him attempt to grab anybody?

19         A.  No.

20         Q.  So my understanding from your testimony today

21    was that you started to shoot because you saw

22    Mr. Valdivia point the gun at you; is that fair to say?

23         A.  Yes.

24         Q.  And you fired six rounds?

25         A.  Yes.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 72

1    Q.  Why did you stop shooting?

2    A.  I stopped shooting because I no longer perceived

3  a threat.

4    Q.  What was it about Mr. Valdivia that you

5  perceived such that he was no longer a threat?

6    A.  The entire time I was shooting, I perceived him

7  as pointing the firearm at me.

8    Q.  And what did you perceive that made you believe

9  that he was no longer a threat?

10    A.  When the firearm was no longer pointed at me.

11    Q.  How far was the gun from Mr. Valdivia after it

12  hit the ground?

13    A.  Several inches away.

14    Q.  Several inches away from what part of his body?

15    A.  His right hand.

16    Q.  Where was his right hand after he had dropped

17  the gun?

18    A.  On the ground.

19    Q.  His right hand was on the ground?

20    A.  Yes.

21    Q.  Can you describe his arm position in relation to

22  his body after he dropped the gun?

23    A.  It was like -- can I just show you?  Can I

24  demonstrate it?

25    Q.  Please.

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 73

1        MS. O'LINN:  There's no recording, so you'll

2   have to explain it.

3        THE WITNESS:  I guess I'll explain it, since

4   it's not video recorded.

5        It was like extended forward, but it was bent.

6   BY MR. SINCICH:

7        Q.  Okay.  And you were just demonstrating with your

8   right arm that it was extended forward in kind of a bent

9   position?

10       A.  Yes.

11       Q.  Okay.  And you're saying his hand was on the

12   ground when it was like that?

13       A.  Yes, towards the gun, yes, on the ground.

14       Q.  Okay.  Do you recall in your statement saying

15   that people don't go down all the time after one round?

16       A.  Yes.

17       Q.  What did you mean by that?

18       A.  I was referring to my training and experience,

19   knowing that suspects often, or it's possible that one

20   bullet may not stop a suspect and they can continue to

21   pose a threat even after being shot once.

22       Q.  And that's why there's a need for a constant

23   assessment, right?

24       A.  Correct.

25       Q.  When you were using deadly force, did you know

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 74

1  where the other two gentlemen were?

2       A.  Could you specify which gentlemen?

3       Q.  **The other two men that were involved in the**

4  **argument or I can't remember how you described it.**

5       A.  The non cops.

6       Q.  **Correct.**

7       A.  They were south of him.

8       Q.  **Do you know if they were standing or laying down?**

9            MS. O'LINN:  At the time of the shooting,

10  correct, Counsel?

11            MR. SINCICH:  Right.  At the time of the

12  shooting.

13            THE WITNESS:  At the time of the shooting, I

14  know they had backed up.  I don't know if they were

15  laying down or standing up.

16  BY MR. SINCICH:

17       Q.  **So they would have been -- if you were directly**

18  **facing Mr. Valdivia, they would have been slightly to**

19  **your right?**

20       A.  They would have been to his right, yes.  The

21  right side of me, but to his left.

22       Q.  **To his left.  They weren't in your line of fire,**

23  **right?**

24       A.  They were not.

25       Q.  **And did you see anybody else in the parking lot**

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 75

1  besides those three civilians, other than officers?

2       A.  No.

3       Q.  When you were using force, did you have cover?

4       A.  No.

5       Q.  When you were first approaching Mr. Valdivia,

6  could you have directed those two civilians to move away?

7       A.  They did move away, sir.

8       Q.  How far away did they move?

9       A.  Five to ten feet.

10      Q.  Was one of the things you were thinking about

11 when you were approaching Mr. Valdivia was to ensure that

12 you protected their lives?

13      A.  Yes, sir.

14      Q.  Are officers trained to attempt to remove

15 unnecessary people from a scene in order to control it?

16      A.  Yes, sir.

17      Q.  Did you attempt to do that with those other two

18 civilians?

19      A.  It was done.  They did back up, sir.

20      Q.  Was that in response to any officer command?

21      A.  I believe our presence and the redirection of

22 Mr. Valdivia's attention to us, gave the opportunity for

23 the other two bystanders to try to distance themselves

24 from the active violent scene.

25      Q.  When you say "violent scene," what was happening

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

1  that was violent when you first approached?

2          MS. O'LINN:  Objection; asked and answered.

3       You can answer, Mr. Sun.

4          THE WITNESS:  My assessment of this violent

5  scene is based off of the radio calls from multiple

6  subjects that observed the actions.

7  BY MR. SINCICH:

8       Q.  Okay.  Could you have told Mr. Valdivia, for

9  instance, after you told him to put his hands in the air,

10  to turn around and face away from the sound of your voice?

11          MS. O'LINN:  Objection; calls for speculation,

12  incomplete hypothetical.

13       You can explain.

14          THE WITNESS:  No, I did not believe that would

15  be a feasible or safe option.

16  BY MR. SINCICH:

17       Q.  Is that a common police tactic is to have a

18  person turn around and face away from the officers?

19          MS. O'LINN:  Objection; argumentative,

20  incomplete hypothetical, calls for speculation, vague and

21  overbroad.

22       You can answer.

23          THE WITNESS:  Is there a specific police tactic

24  you're trying to allude to, sir?

25  BY MR. SINCICH:

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 77

1    Q.   That's what I'm asking you, Officer, if there is

2    one?

3        A.   Could you repeat the question, sir.

4        Q.   Yes.  Were you ever trained to instruct a

5    subject to turn away from the sound of your voice?

6        A.   Yes; however, this situation did not call for

7    such a tactic.

8        Q.   Based on your training, when is that tactic

9    utilized?

10       A.   The tactic of having them turn around?

11       Q.   Correct.

12       A.   It's usually during a high-risk vehicle stop, in

13   which the area is contained, and we want to prone them

14   out without a view of any additional subjects that could

15   potentially be harmed.

16       Q.   Okay.  Is one of the reasons to have a subject

17   to turn away is for officer safety?

18           MS. O'LINN:  Objection; argumentative.

19       You can explain.

20           THE WITNESS:  That could be a reason; however, I

21   believe we felt that we had more control by him facing us

22   and keeping his attention on us versus possible

23   bystanders or people that he was in an argument with

24   already.

25   BY MR. SINCICH:

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 78

1    Q.   When Mr. Valdivia was in a standing position,

2    did you consider transitioning to your taser and tasing

3    him?

4    A.   Given the circumstances, I did not think that

5    was a feasible option at this time, sir.

6    Q.   Why not?

7    A.   Because he still had the present ability to

8    present a firearm.

9    Q.   When was the first time that you saw the gun?

10    A.   When he got on the ground into what I perceived

11    to be a modified prone shooting position.

12    Q.   Is it fair to say then when he was in a standing

13    position, you weren't sure that he still even had the gun

14    on his person?

15    A.   Could you rephrase that, sir.

16    Q.   Is it fair to say that when he was in a standing

17    position, you weren't sure that he still had the gun on

18    his person?

19    A.   Yeah, I didn't know if he had or he didn't have

20    the gun.

21    Q.   When you saw -- well, I'm not sure if I asked it

22    in this manner.

23    When he was in the standing position and he was

24    lowering his hands and put his hand near his pocket; do

25    you remember that testimony?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 79

```
 1      A.  Yes.
 2      Q.  Did you see that as noncompliance?
 3      A.  Yes.
 4      Q.  Based on the nature of the call and then that
 5  noncompliance, did you consider utilizing the taser
 6  against him at that time?
 7      A.  No.  Based on the nature of the call and the
 8  totality of the circumstances, that option wasn't a
 9  feasible option, sir, or safe option.
10      Q.  You knew you had Officer Meadows as lethal
11  cover, right?
12      A.  I did not know that, sir.
13      Q.  You didn't know where Officer Meadows was?
14      A.  I knew where he was.
15      Q.  Where was he?
16      A.  To my rear right.
17      Q.  Did you not know which weapon system he had
18  drawn?
19      A.  I didn't know, sir.
20      Q.  Did you guys communicate who was going to be the
21  contact officer and who was going to be the cover officer?
22      A.  Again, Officer Meadows and I work very closely
23  and a lot of our communication is nonverbal.  Many times
24  we investigate crimes or I guess, solve radio calls by
25  filling in the gaps for each other.  So I didn't feel
```

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 83

1      This is Exhibit 1.  The video is two minutes and

2   nine seconds, and the timestamp is 22:16 and 30 seconds.

3   I'm just going to play a couple of seconds.

4      (Video played.)

5   BY MR. SINCICH:

6      Q.  Okay.  I stopped it at two minutes and 20

7   seconds of the video.  Is this your video?

8      A.  It is, sir.

9      Q.  And you were walking after you left your car,

10  right?

11     A.  Yes.

12     Q.  You weren't running to the parking lot where

13  Mr. Valdivia was; is that fair?

14     A.  That's fair.

15     Q.  And from this position where I paused it at two

16  minutes and 20 seconds; is it fair to say that you

17  weren't able to see Mr. Valdivia?

18     A.  Correct.

19     Q.  Did you know where Officer Meadows was at this

20  time?

21     A.  I knew that he had arrived right behind me, so I

22  knew that he was in close proximity to me.

23     Q.  Could you have waited for Officer Meadows to

24  meet you by your vehicle before making the approach at

25  this time?

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 84

1    MS. O'LINN:  Counsel, you just asked him that

2  question moments before you started this video and he

3  answered you.

4    MR. SINCICH:  And every single response he

5  talked about seeing him in an argument.  So I'm making it

6  very clear for the record.

7  BY MR. SINCICH:

8    Q.  So my question is, as we look at the video, you

9  just got out of your car and you were walking, and you

10  knew Officer Meadows had just pulled in behind you; is

11  that fair?

12    A.  Yes.

13    Q.  Could you have waited for Officer Meadows to

14  physically join you before approaching Mr. Valdivia?

15    MS. O'LINN:  Asked and answered.

16  You can answer again.

17    THE WITNESS:  He was within close enough

18  proximity where I felt like he was with me at the time.

19    MR. SINCICH:  Okay.

20    (Video played.)

21  BY MR. SINCICH:

22    Q.  I stopped it at two minutes and 29 seconds of

23  Exhibit 1.

24    Can you see Mr. Valdivia and the two other subjects

25  at the time?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 85

1      A.   From the body cam, yes.

2      Q.   And when you were walking along the north side

3   of Starbucks, you were able to see him, right?

4      A.   Yes.

5           MR. SINCICH:   I'll continue to play.

6           (Video played.)

7   BY MR. SINCICH:

8      Q.   I stopped it at 2:35 of the video.

9           Did you just instruct Mr. Valdivia, "let me see your

10   hands"?

11      A.   Yes, sir.

12      Q.   And as you watched the video, did you hear any

13   argument between the three males in the parking lot?

14      A.   You're asking me if the audio from the video, I

15   can hear it from the audio?

16      Q.   Correct.

17      A.   Not from the audio of the video.

18           MR. SINCICH:   Okay.   I'm going to press play.

19           (Video played.)

20   BY MR. SINCICH:

21      Q.   I stopped it at 2:39.   As I stopped it, is

22   Mr. Valdivia's hands up in the air?

23      A.   Yes, at this time stamp, yes.

24      Q.   And just before then did you tell him, "put your

25   hands up"?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 86

```
 1      A.  Yes.

 2      Q.  And you told him to "get your hands out of your

 3  pockets"?

 4      A.  Yes.

 5      Q.  And then the other two gentlemen, they put their

 6  hands up also, right?

 7      A.  Yes.

 8      Q.  I'll continue.  I stopped it at 2:44.

 9      Did you hear Officer Meadows say, "get on the

10  ground"?

11      A.  Yes.

12      Q.  And about how long after he said, "get on the

13  ground," did Mr. Valdivia start to go down to the ground?

14      A.  Approximately two or three seconds.

15      Q.  And you still see the two other gentlemen?

16      A.  I do see them in the video, yes.

17      MR. SINCICH:  I will press play.

18      (Video played.)

19  BY MR. SINCICH:

20      Q.  I stopped it at 2:55.

21      Can you see Mr. Valdivia and the gun in the video?

22      A.  I see Mr. Valdivia, but I think your video

23  player cuts off right where his sweater ends, so I cannot

24  --

25      MS. O'LINN:  It may be expanded too big on your
```

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 87

 1   screen.

 2          THE WITNESS:  There we go.  Okay.

 3       Yes, I do, sir.

 4   BY MR. SINCICH:

 5       Q.  Can you describe Mr. Valdivia's position of his

 6   right arm?

 7       A.  It is out in front of him and it is bent.

 8       Q.  Is it extended out in front of him as you

 9   described earlier?

10       A.  Are you asking me what I see in the video or

11   what I perceive?

12       Q.  I'm asking you what you see in the video right

13   now.

14       A.  What I see in the video in this current frame is

15   his arm bent with -- kind of bent inwards.

16       Q.  And his right hand is almost touching, if not

17   touching his head?

18       A.  Correct.

19       Q.  Does this kind of look like a sleeping position,

20   so to speak?

21          MS. O'LINN:  Objection; argumentative.

22       You can answer.

23          THE WITNESS:  It looks like he's laying there.

24   I haven't heard it referred to as a sleeping position,

25   sir.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 88

```
 1  BY MR. SINCICH:

 2      Q.  Sometimes people sleep like with hands almost

 3  underneath their head and their elbows out.  That's what

 4  I kind of have a visual of.  Do you understand what I'm

 5  saying?

 6          MS. O'LINN:  That's your visual.  Argumentative

 7  as phrased.

 8      You can answer.

 9          THE WITNESS:  Yes, what I see is he has his hand

10  out, his arm out with it bent and his actual hand -- his

11  elbow is bent and his hand is towards his head.

12  BY MR. SINCICH:

13      Q.  Okay.  And you picked up the gun off the ground,

14  right?

15      A.  Yes.

16      Q.  How far was the gun from Mr. Valdivia when you

17  picked it up off the ground?

18      A.  Within a foot, sir.

19      Q.  Okay.  As you watched the video, did you see

20  that shots were fired after Mr. Valdivia dropped the gun?

21          MS. O'LINN:  Objection; argumentative as

22  phrased, "as you watched the video."

23      You can answer.

24          THE WITNESS:  Can you rephrase that question,

25  sir.
```

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 91

1  video when you saw it before giving your statement to DOJ

2  investigators?

3      A.  No.

4      Q.  Was there any issue with watching the video when

5  you watched it in preparation for today?

6      A.  No, sir.

7      Q.  From all of those times that you watched the

8  video, would you agree that shots were fired at

9  Mr. Valdivia after he discarded the gun?

10         MS. O'LINN:  Objection; asked and answered.

11      You can answer again.

12         THE WITNESS:  Based on my perception, the

13  firearm was still pointing to me as I was firing.

14  BY MR. SINCICH:

15      Q.  Okay.  Are you going to answer my question

16  related to your review of the video?

17         MS. O'LINN:  He just did.  Asked and answered.

18         MR. SINCICH:  No, he didn't, Counsel.

19         MS. O'LINN:  I understand your position,

20  Counsel.  But he's telling you that when he watches it,

21  that's what he sees, so that's his answer.

22  BY MR. SINCICH:

23      Q.  Officer, are you saying that your perception of

24  watching the video, is that he's still pointing it when

25  all the shots were fired?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 92

1      A.  My perception of the incident is he's still

2  pointing the firearm as I am firing -- he's still

3  pointing the firearm at me, which prompts me to fire.

4      Q.  Is that your recollection of the incident or is

5  that based on your review of the video?

6          MS. O'LINN:  Or both.

7          THE WITNESS:  It's both.  It's what I remember.

8          MR. SINCICH:  Okay.  All right, Officer.  I have

9  no further questions for you at this time.

10     Counsel, do you have anything?

11

12              EXAMINATION BY MS. O'LINN, ESQ.

13  BY MS. O'LINN:

14     Q.  Officer Sun, were you concerned at any point

15  during this incident that Mr. Valdivia would attempt to

16  flee?

17     A.  Yes.

18     Q.  Were you concerned that he would take a hostage?

19     A.  Yes.

20     Q.  Were you concerned that he would hurt someone?

21     A.  Yes.

22     Q.  Were you concerned that he would grab someone?

23     A.  Yes.

24     Q.  Were you concerned that if you delayed

25  contacting him, that there would be harm to members of

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 95

1  UNITED STATES DISTRICT COURT      )
                                     )
2  CENTRAL DISTRICT OF CALIFORNIA    )

3

4
        The witness, Officer Cheng-Wei (Billy) Sun, in the
5  foregoing deposition appeared before me, Cynthia F.
   Zeller, a Certified Shorthand Reporter, in and for the
6  State of California.

7       Said witness was then and there at the time and
   place previously stated, by me placed under oath to tell
8  the truth, the whole truth and nothing but the truth in
   the testimony given on the date of the within deposition.
9
        The testimony of the witness and all questions and
10 remarks requested by Counsel and reported thereafter,
   under my direction and control, caused to be transcribed
11 into typewritten form by means of Computer-Aided
   Transcription.
12
        I am a Certified Shorthand Reporter licensed by the
13 State of California.  I further certify that I am not of
   counsel or attorney for either or any of the parties to
14 the case named in the within caption, and that I am not
   related to any party thereto.
15
        IN WITNESS WHEREOF, I have hereunto affixed my
16 signature this 18th day of March 2025.

17

18

19 _____
20 CYNTHIA F. ZELLER, CSR
   Certified Shorthand Reporter #10834
21

22

23

24

25