# EXHIBIT C

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4
    _____
 5  E.V. and X.V., minors by and     )
    through their guardian ad litem,  )
 6  Karla Juarez; D.V., a minor, by   )
    and through his guardian ad litem,)
 7  Elias Valdivia; individually and  )
    as successors-in-interest to      )
 8  Daniel Luis Valdivia, deceased;   )
    Jessica Valdivia; Luis Valdivia   )
 9  Jr., individually,                )
                                      )
10      Plaintiffs,                   )
                                      ) CASE NO.
11      vs.                           ) 5:23-cv-01562-CBM-SHK
                                      )
12  CITY OF COVINA; VANESSA CARDOZA;  )
    DAVID MEADOWS; BILLY SUN; DOES    )
13  1-10, inclusive,                  )
                                      )
14      Defendants.                   )
                                      )
15  _____  )

16

17
                    VIDEOCONFERENCE
18
          DEPOSITION OF OFFICER VANESSA CARDOZA
19

20

21  Date:          Thursday, March 6, 2025
    Time:          10:03 a.m. - 12:35 p.m.
22
    Location:      MANNING KASS
23                 801 S. Figueroa Street, 15th Floor
                   Los Angeles, California 90017
24
    Reporter:      Cynthia F. Zeller, CSR
25                 Certified Shorthand Reporter #10834
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

```
 1                    A P P E A R A N C E S

 2

 3   For the Plaintiffs:      LAW OFFICES OF DALE K. GALIPO
                              Attorneys at Law
 4                            21800 Burbank Blvd., Suite 310
                              Woodland Hills, California 91367
 5

 6                            PHONE:  (818) 347-3333
                              FAX:    (818) 347-4118
 7                            EMAIL:  Msincich@galipolaw.com

 8
                              BY:  MARCEL F. SINCICH, ESQ.
 9

10

11
     For the Defendants:      MANNING KASS
12                            Attorneys at Law
                              801 S. Figueroa Street, 15th Floor
13                            Los Angeles, California 90017

14
                              PHONE:  (213) 624-6900 ext. 2451
15
                              EMAIL: Missy.olinn@manningkass.com
16                                   Delia.Flores@manningkass.com

17
                              BY:  MILDRED K. O'LINN, ESQ.
18

19
     Also Present:            Officer Billy Sun
20                            Officer David Meadows

21                                 --oOo--

22

23

24

25
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 9

```
 1        Q.  Generally, were you and your partners going out
 2   to apprehend Mr. Valdivia?
 3        A.  Yes.
 4        Q.  Did you use force during the incident?
 5        A.  Yes.
 6        Q.  What type of force?
 7        A.  Deadly force.
 8        Q.  How many rounds did you fire?
 9        A.  Five.
10        Q.  Did you intend to pull the trigger each time you
11   did?
12        A.  Can you rephrase that question, please.
13        Q.  Yes.  Did you intentionally pull the trigger
14   when you fired each round?
15        A.  Yes.
16        Q.  And did you intend for each of those shots to
17   strike Mr. Valdivia?
18        A.  Yes.
19        Q.  Were you aiming for each shot?
20        A.  Yes.
21        Q.  Where were you aiming?
22        A.  Center mass.
23        Q.  Is that for all of your shots?
24        A.  Yes.
25        Q.  And what were you looking at in terms of his
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 10

```
 1   body that you would call center mass?
 2        A.  It's mostly the chest area.
 3        Q.  Were you able to see his chest when you pulled
 4   the trigger?
 5        A.  No, due to the angle I was in.
 6        Q.  So due to the angle that you were in, what were
 7   you able to see that you were aiming at?
 8        A.  It's the right side, right shoulder, right ribs,
 9   you would say.
10        Q.  Okay.  Were you using an optic at the time?
11        A.  Yes.
12        Q.  What type of optics were you using?
13        A.  It was a red dot.
14        Q.  Okay.  And do you know the purpose of that?
15        A.  In order to have better aim.
16        Q.  Does it essentially assist you in shooting
17   faster and more accurate?
18            MS. O'LINN:  Objection; compound.
19            THE WITNESS:  Can you rephrase the question, sir.
20   BY MR. SINCICH:
21        Q.  Yes.  Does the red-dot sight assist you in
22   shooting faster?
23        A.  No.
24        Q.  Does it assist you in shooting more accurately?
25        A.  Yes.
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 11

1      Q.  Are you able to shoot in part with the red dot

2   with both eyes open?

3      A.  Yes.

4      Q.  And did that assist you in helping to continue

5   to assess the situation while you're using force?

6      A.  Yes.

7      Q.  Did you fire with a one- or two-handed grip?

8      A.  Two.

9      Q.  And did you have a tactical light on your

10  weapon?

11     A.  Yes.

12     Q.  Did you utilize it at all?

13     A.  No.

14     Q.  Was the lighting sufficient on scene where you

15  didn't need to utilize it?

16     A.  Yes.

17     Q.  Do you know where your shots struck Mr. Valdivia?

18     A.  I don't.

19     Q.  Did you assess in between shots?

20     A.  Yes.

21     Q.  Do you know approximately how long it was from

22  the time that you fired your first shot to your fifth

23  shot?

24     A.  It was under a second.

25     Q.  Would you say you fired in rapid succession?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 12

```
 1            MS. O'LINN:  Objection; argumentative.

 2        You can explain.

 3            THE WITNESS:  I believe I did.

 4   BY MR. SINCICH:

 5        Q.  And were you trained to do an assessment between

 6   each shot?

 7        A.  Yes.

 8            MS. O'LINN:  Objection; argumentative.

 9   Give me a chance to object.  Objection; argumentative as

10   phrased as to "between."

11        You can answer.

12            THE WITNESS:  Yes, we are trained to assess

13   after each shot.

14   BY MR. SINCICH:

15        Q.  And what's the training in that regard?

16        A.  After each shot, you look to see whether the

17   subject is still a threat.

18        Q.  Okay.  Is it to determine whether or not you

19   should continue shooting or not?

20        A.  Yes.

21        Q.  Did you consider your background when you were

22   determining whether to use deadly force?

23        A.  Yes.

24        Q.  Did you feel that your background was clear?

25        A.  Yes.
```

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 19

```
 1        A.   He dropped the firearm.
 2        Q.   Okay.  How many total officers were on scene at
 3   the time of your use of force, that you know of?
 4             MS. O'LINN:  Objection; vague as to "on scene."
 5   Counsel, could you be more specific.
 6             MR. SINCICH:  Sure.
 7   BY MR. SINCICH:
 8        Q.   How many officers first --
 9             MS. O'LINN:  I'm not trying to be difficult.  I
10   mean, it's a parking lot.
11   BY MR. SINCICH:
12        Q.   It's okay.  I'm asking it differently.
13             How many officers were in the parking lot at the
14   time of your use of force that you knew of?
15        A.   That I knew of including me, three.
16        Q.   And what officers were those?
17        A.   Me, Officer Sun and Officer Meadows.
18        Q.   Okay.  Were you aware at the time of the use of
19   force that there were other officers nearby?
20             MS. O'LINN:  At the time.
21             THE WITNESS:  At the time I was aware that they
22   were nearby, yes.
23   BY MR. SINCICH:
24        Q.   What other officers were you aware of that were
25   nearby?
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 20

```
 1       A.   Officer Dixon.

 2       Q.   Anyone else?

 3       A.   Not that I can remember.

 4       Q.   Where was Officer Dixon's general location at

 5   the time of use of force?

 6       A.   He was north of me.

 7       Q.   North of you would have been the street?

 8       A.   It would have been inside.  It would have been

 9   yes, north of the street, yes.

10       Q.   Was he across the street?

11       A.   Yes.

12       Q.   Okay.  Did you have a partner during the

13   incident?

14       A.   Not riding with me.

15       Q.   Who would you consider to be your partner?

16       A.   Officer Sun and Meadows.

17       Q.   Okay.  Officer Avila arrived on scene at some

18   point, right?

19       A.   Correct.

20       Q.   Do you know if Officer Avila was anywhere nearby

21   during the use of force?

22       A.   He was en route.

23       Q.   Okay.  And I believe there was two sergeants

24   that were also responding to the scene; is that correct?

25       A.   Yes.
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 21

```
 1      Q.  Which sergeants were responding?

 2      A.  Sergeant Statler and Sergeant Rasmussen.

 3      Q.  Did you know their approximate location when you

 4  were using force?

 5      A.  No.

 6      Q.  Did you know whether or not they were already,

 7  for instance, parking or if they were en route?

 8      A.  I knew they were en route.

 9      Q.  Are you aware of any other officers who used

10  force during this incident?

11      A.  Officers Sun and Meadows.

12      Q.  Do you know how many rounds they fired?

13          MS. O'LINN:  Objection to the extent that calls

14  for attorney/client privilege communication.

15      If you know that information, other than in that

16  context, you can answer.

17          THE WITNESS:  No, I don't.  Sorry, sir.

18  BY MR. SINICH:

19      Q.  Okay.  Did you hear any shots being fired prior

20  to you firing?

21      A.  No.

22      Q.  Was it your understanding that you were the

23  first officer to start shooting?

24      A.  Yes.

25      Q.  Did you hear any shots being fired after your
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 23

1  who told you about this psychological effect?

2      A.  The psychologist.

3          MS. O'LINN:  And again, objection beyond the

4  general answer, Counsel, as to any conversation with any

5  type of healthcare professionals.

6          MR. SINCICH:  Okay.

7  BY MR. SINCICH:

8      Q.  Did you have an understanding at the time that

9  you were firing your weapon that it could cause death or

10  serious bodily injury?

11      A.  Yes.

12      Q.  Is it fair to say that Mr. Valdivia didn't fire

13  any shots during this incident?

14          MS. O'LINN:  To your knowledge.

15          THE WITNESS:  To my knowledge, yes.

16  BY MR. SINCICH:

17      Q.  In your law enforcement career, have you

18  encountered subjects with a gun before?

19      A.  Yes.

20      Q.  Approximately how many times?

21      A.  Approximately five.

22      Q.  Okay.  Other than -- strike that.

23  Does that include this incident?

24      A.  No.

25      Q.  So five other times other than this incident?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 24

1    A.  Yes.

2    Q.  Of those five occurrences where you encountered

3  a subject with a gun, did you use deadly force against

4  any of them?

5    A.  No.

6    Q.  Is it fair to say that based on your training,

7  officers shouldn't use deadly force merely because a

8  person has a gun?

9    A.  Sorry.  Can you rephrase that one.

10    Q.  Sure.  Based on your training, is it fair to say

11  that officers can't use deadly force merely because a

12  person has a gun in their hand?

13       MS. O'LINN:  Just those facts alone.

14       THE WITNESS:  Yes.

15  BY MR. SINCICH:

16    Q.  Okay.  Based on your training, is it fair to say

17  that officers shouldn't use deadly force merely because a

18  person is not complying with commands?

19    A.  That's true.

20    Q.  Generally, would you agree that the training is

21  that officers should only use deadly force when there's

22  an immediate threat of death or serious bodily injury?

23    A.  Yes.

24    Q.  Other than this incident, have you had any other

25  officer involved shootings?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 25

```
 1       A.  No.
 2       Q.  Is it fair to say that you don't know what
 3   Mr. Valdivia was thinking during the incident?
 4       A.  Yes.
 5       Q.  Did you review any documents in preparation for
 6   today?
 7       A.  I did.
 8       Q.  What did you review?
 9       A.  I reviewed reports written by my partners, the
10   DOJ report and transcripts.
11       Q.  Which partner reports did you read?
12       A.  Officer Avila's, Detective Hulsey's,
13   Sergeant Statler's, Sergeant Rasmussen's and
14   Detective Ardery.  I believe that's it, sir.
15       Q.  Could you spell Pulsey for our court reporter.
16       A.  H-u-l-s-e-y, I believe.
17       Q.  And Sergeant Rasmussen can you spell that?
18           MS. O'LINN:  R-a-s-m-u-s-s-e-n, I believe,
19   Counsel.
20   BY MR. SINCICH:
21       Q.  Okay.  Is that close enough, Officer Cardoza?
22       A.  Sounds right.
23       Q.  Okay.  I have it in the records.  I just want it
24   for our court reporter really.
25           And then just to make sure that I heard you
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 34

```
 1       Q.  Okay.  Which country did you play for?

 2       A.  Austria.

 3       Q.  That must have been a very nice experience.

 4  That's pretty cool.

 5       A.  Yeah.

 6       Q.  What position did you play?

 7       A.  Third base.

 8       Q.  Okay.  Did you train on the post standards at

 9  the academy?

10       A.  Yes.

11       Q.  And what month and year did you graduate?

12       A.  I graduated in June 2019.

13       Q.  Okay.  So you had approximately three years of

14  experience by the time of this incident?

15       A.  Yes.  Three years and a couple of months on.

16       Q.  Was your first year a probationary year?

17       A.  Yes.

18       Q.  Were you on patrol for the first three years

19  prior to this incident?

20       A.  Yes.

21       Q.  Any other assignments besides patrol?

22           MS. O'LINN:  In the first three years or ever,

23  Counsel, sorry.

24           MR. SINCICH:  Yes, in the first three years.

25           THE WITNESS:  No.
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 36

1    Q.  All right.  And what was your height and weight

2  at the time of the incident?

3    A.  570 and I believe I was 170 at the time.

4      MS. O'LINN:  570?  Sorry, Counsel, I need

5  clarification on that.

6      THE WITNESS:  Sorry.  5'7" and 170 at the time.

7      MR. SINCICH:  I was like 70 inches.  That's

8  another five feet.

9  BY MR. SINCICH:

10    Q.  And were you in uniform during the incident?

11    A.  Yes.

12    Q.  And what kind of uniform were you wearing?

13    A.  It was our class B with a throw-over vest.

14    Q.  When you say throw-over vest, is that a tactical

15  vest?

16    A.  Yes.

17    Q.  Is it a bullet proof vest?

18    A.  Yes.

19    Q.  Is it external to your uniform?

20    A.  Yes.

21    Q.  And what type of firearm did you use?

22    A.  A Glock 17, 9 mill.

23    Q.  Is that the standard issue for the department to

24  your knowledge at the time?

25    A.  Yes.

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
Officer Vanessa Cardoza on 03/06/2025

Page 37

```
1       Q.  What other less lethal options did you have on
2   your person?
3       A.  On my person was a taser.
4       Q.  Anything else?
5       A.  Not at the time.
6       Q.  And is the type of taser that you used, or
7   rather the type of taser that you had, capable of being
8   fired in dark mode and also drive-stun mode?
9       A.  Sorry.  Can you rephrase that one.
10      Q.  Is the taser capable of being fired in a dark
11  mode or probe mode?
12      A.  Yes.
13      Q.  Okay.  And do you know the maximum effective
14  range of the taser?
15      A.  Effective, approximately five to seven feet.
16      Q.  And were you trained that the taser is capable
17  of causing neuromuscular incapacitation?
18      A.  Yes.
19      Q.  You didn't have pepper spray on you?
20      A.  No.
21      Q.  Do you know if the department issued pepper
22  spray at the time?
23      A.  Yes.
24      Q.  Is there a reason why you didn't have pepper
25  spray on your person?
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 38

1     A.  I don't carry it on my person, personally.

2         Q.  Does the department give officers at the time an

3    option of which less lethal options to carry?

4     A.  Just for the pepper spray.

5         Q.  Is there a mandate at the time that officers are

6    required to have a certain number of less lethal options?

7     A.  Not that I'm aware of.

8         **Q.  Did you have a baton with you?**

9         **A.  It was in my vehicle at the time.**

10        Q.  What type of baton?

11    A.  It's a wooden, straight stick.

12        Q.  Straight stick.  Did the department issue

13   collapsable batons at the time?

14    A.  Yes.  Well, they didn't issue.  Sorry.  If we

15   wanted them, we would personally buy them.

16        Q.  Okay.  And did you have one?

17    A.  No.

18        Q.  Was there any other less lethal options on your

19   person besides the taser then?

20        MS. O'LINN:  Objection; asked and answered.

21   You can answer again.

22        THE WITNESS:  Not on my person at the time.

23   BY MR. SINCICH:

24        Q.  What about in your vehicle?

25    A.  Yes.

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 39

1      Q.   What did you have in the vehicle?

2      A.   It was the beanbag shotgun.

3      Q.   Is that a 12-gauge shotgun?

4      A.   Yes.

5      Q.   Did you also have other lethal options in the

6   vehicle?

7      A.   Yes.

8      Q.   What else did you have in terms of lethal

9   options?

10      A.   We have an AR and a shotgun.

11      Q.   What types of rounds were loaded in your

12   9 millimeter?

13      A.   Sorry.  Are you asking like the brand?

14      Q.   No.  Well, for instance, some of them are called

15   ball rounds or hollow point rounds, something like that?

16      A.   For that time, it was hollow.

17      Q.   Do you know what the purpose of the hollow point

18   rounds are?

19      A.   It's in order for -- I don't know.  Sorry.

20      Q.   Okay.  Did you have any training as to how the

21   hollow point rounds are different than other rounds?

22      A.   Yes.  I know the ones we practice with are the

23   ones that kind of like explode more, if that makes sense.

24      Q.   The practice rounds explode more?

25      A.   It's not that they explode.  I don't know how to

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 41

```
 1       Q.  Did your department have those available at the
 2  time of the incident?
 3       A.  Not at the time of the incident.
 4       Q.  What about a pepper ball gun?
 5       A.  Not at the time of the incident.
 6       Q.  Does your department have pepper ball guns now?
 7       A.  Yes.
 8       Q.  And 40 millimeter launchers?
 9       A.  Yes.
10       Q.  I think I read in your statement that you didn't
11  have a ballistic shield with you?
12       A.  No.
13       Q.  Were ballistic shields available to the
14  department somehow at the time?
15           MS. O'LINN:  Available versus?
16       You can answer.  You can explain.
17           THE WITNESS:  We personally as officers don't
18  carry the rubber or the pepper ball guns or the ballistic
19  shields in our vehicles.  It's the sergeant's vehicle
20  that carries that.
21  BY MR. SINCICH:
22       Q.  Okay.  Was it your understanding that
23  Sergeant Slater (sic) and Sergeant Rasmussen had a shield
24  in their vehicles?
25       A.  Sergeant Statler, yes.
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 42

1     Q.   Sorry.  Statler.  Okay.  Do you know if the

2  department had a K-9 team available at the time?

3         A.   We had an officer, yes.

4     Q.   And that officer had a trained K-9 for

5  apprehension?

6         A.   Yes.

7         Q.   And do you know if the department had an air

8  unit available to be called at the time?

9         A.   I believe so.

10        Q.   And what about a SWAT team?

11        A.   We have a Special Response Team.

12        Q.   Okay.  Do you have an understanding of what type

13  of situations that the Special Response Team would be

14  called for?

15        A.   Yes.

16        Q.   What is your understanding?

17        A.   If there is a barricaded subject.  If there is a

18  felon on the run and is hiding out, they will respond and

19  try and apprehend.  Any type of situation that requires

20  -- that has more time in order to make a plan.

21        MR. SINCICH:  Okay.  All right.  I think now is

22  a good time to take a break.  Let's go ahead and take --

23  I have 57 so let's just take eight minutes if that's okay

24  with everybody and come back at 11:05.

25        MS. O'LINN:  Works for us.

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 46

```
 1   and not physical?

 2        A.   We were advised it was a verbal altercation.

 3        Q.   Okay.  Prior to the incident, had you ever met

 4   Mr. Valdivia before?

 5        A.   No.

 6        Q.   Did you have any information about his personal

 7   or family life?

 8        A.   No.

 9        Q.   Prior to your use of force, did you have any

10   information about whether he had a criminal history?

11        A.   No.

12        Q.   Any specific information as to whether he was

13   involved in a gang?

14        A.   No.

15        Q.   Did you have any information as to whether

16   Mr. Valdivia had a history of drug or alcohol use?

17        A.   No.

18        Q.   And I understand that you said that the

19   information was that he was holding a beer?

20        A.   Correct.

21        Q.   Did you have any specific information that he

22   had actually consumed any alcohol prior to your use of

23   force?

24             MS. O'LINN:  Prior to arriving at the scene or

25   prior to the use of force, Counsel?
```

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 47

1          MR. SINCICH:  My question was prior to your use

2    of force.

3          MS. O'LINN:  Okay.

4          THE WITNESS:  I was not aware specifically that

5    he was consuming that alcohol.  But from my

6    understanding, it was advised that he was possibly under

7    the influence of alcohol or drugs.

8    BY MR. SINCICH:

9          Q.  Who advised you of that?

10         A.  Dispatch.

11         Q.  Did dispatch say possibly under the influence of

12   alcohol or drugs?

13         A.  Yes.

14         Q.  And did you have any specific information as to

15   whether he was under the influence of drugs prior to your

16   use of force?

17         A.  I was not aware.

18         Q.  Did you have any specific information as to

19   whether or not he had a history of violence?

20         A.  No, I did not know.

21         Q.  Is it fair to say that the allegations in the

22   call needed to be investigated?

23         A.  Yes.

24         Q.  While you were en route, was there any

25   discussion of a tactical plan?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 48

1    A.  Officer Sun did set up a containment.

2    Q.  What was your understanding of the containment

3    set up by Officer Sun?

4    A.  In order to be -- plan ahead in case the subject

5    Mr. Valdivia decided to run or flee in a vehicle.

6    Q.  Okay.  That would be the purpose of the

7    containment?

8    A.  Correct.

9    Q.  What was your understanding of how the scene was

10   actually being contained?

11   A.  Sorry.  Can you rephrase that one.

12   Q.  Yeah.  While you were -- strike that.

13   Say by the time that you arrived on scene, what was

14   your understanding of the actual containment of the scene

15   location?

16   A.  Sorry.  I'm not understanding.  Can you rephrase.

17   Q.  When you first arrived on scene, did you have

18   the belief that the scene was contained?

19   A.  Not at that time, no.

20   Q.  Okay.  So other than Officer Sun attempting to

21   set up a containment, was there any discussion of a

22   tactical plan while you were en route?

23   A.  I did ask Officer Sun if he wanted me to grab

24   the less lethal while en route.

25   Q.  And what did he let you know?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 49

1      A.  He said yes.

2      Q.  Okay.  Was it your understanding that you would

3  be the less lethal option for this incident?

4      A.  Yes.

5      Q.  So other than containment and you being the less

6  lethal option, was there any other discussion of a

7  tactical plan?

8      A.  Not that I'm aware of, no.

9      Q.  Was there a specific tactical plan of how to

10  approach Mr. Valdivia?

11      A.  No.

12      Q.  I'm sorry.  I can't remember if I asked you

13  already, but did you have any information prior to your

14  use of force, that Mr. Valdivia ever physically harmed

15  anyone?

16          MS. O'LINN:  Objection; asked and answered.

17      You can answer him.

18          THE WITNESS:  We were not aware, sir.

19  BY MR. SINCICH:

20      Q.  Were you physically harmed during this incident?

21      A.  No.

22      Q.  Did you have any specific information that

23  Mr. Valdivia ever verbally threatened anybody?

24      A.  We were not sure at that time.

25      Q.  Prior to your use of force, did you hear

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 50

1    Mr. Valdivia verbally threaten anybody?

2        A.  No.

3        Q.  When you arrived on scene, were you able to see

4    Mr. Valdivia?

5        A.  Yes.

6        Q.  Can you describe what he was wearing?

7        A.  He was wearing a black sweater, black hat, black

8    shorts.

9        Q.  Did you see him in black shorts?

10       A.  Yes.

11       Q.  Did you see facial hair on Mr. Valdivia when you

12   first saw him?

13       A.  Not immediately, sir.

14       Q.  When were you able to see facial hair on him?

15       A.  When I approached.

16       Q.  Was that after the shooting?

17       A.  Prior to the shooting.

18       Q.  Okay.  What was his approximate age from your

19   perspective, when you first saw him?

20       A.  Late thirties.

21       Q.  What was his approximate height and weight from

22   your perspective?

23       A.  5'9" approximately 200 to 250.

24       Q.  When you were driving to the scene, were you

25   utilizing lights and sirens?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 51

```
 1      A.  No.
 2      Q.  Why not?
 3      A.  Because at that time we did not use lights and
 4  sirens unless there was -- because there's no actual --
 5  nobody was injured at the time.
 6      Q.  Was that your understanding of department policy?
 7      A.  Yes.
 8      Q.  Could you describe what the department policy
 9  was at the time for when officers should utilize their
10  lights and sirens?
11      A.  If there's somebody injured at the scene, if we
12  are cleared by sergeant or dispatch to drive with our
13  lights and sirens.
14      Q.  I take it in this incident, dispatch or a
15  sergeant didn't clear you to drive with lights and sirens?
16      A.  Correct.
17      Q.  Which direction did you drive in order to get to
18  the scene?
19      A.  I drove north on Barranca and then westbound on
20  Arrow Highway.
21      Q.  Can you say that again.  It broke up a little
22  bit.
23      A.  I drove north on Barranca and then westbound on
24  Arrow Highway.
25      Q.  Okay.  Do you recall when you gave your
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 53

1   to park?

2        A.  No.

3        Q.  Did you receive any communication from any of

4   the other officers that you were going to make a stealth

5   approach?

6        A.  No.

7        Q.  After you parked your vehicle, what did you do?

8        A.  I got out of my vehicle and I looked to see in

9   the parking lot if I could see Mr. Valdivia.

10       Q.  And were you able to see him?

11       A.  I was.

12       Q.  What was he doing?

13       A.  He appeared to be talking to the two other

14   subjects, and appeared to be some type of, I would

15   consider, verbal altercation occurring.

16       Q.  What made it a verbal altercation in your eyes?

17       A.  The other two subjects appeared to be kind of

18   like backing away, kind of had their hands up and

19   Mr. Valdivia continued to kind of walk towards them in an

20   aggressive manner.

21       Q.  Approximately how far was Mr. Valdivia from the

22   other two individuals when you first saw them?

23       A.  I would say approximately five feet.

24       Q.  Okay.  Were you able to hear them say anything?

25       A.  No.

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 54

1     Q.  Were they yelling or anything like that?

2     A.  Not that I could hear.

3     Q.  Did you see Mr. Valdivia attempt to like grab or

4  strike any of those people?

5     A.  Not at that time.

6     Q.  Did you ever see Mr. Valdivia attempt to grab or

7  strike anybody?

8     A.  No.

9     Q.  When you were first observing Mr. Valdivia, did

10  you know where Officer Sun was?

11     A.  I heard him over the radio saying he was going

12  97, which states he was arriving on scene.

13     Q.  Is that what going 97 means?

14     A.  Yes.

15     Q.  Did you know where he was physically?

16     A.  He had put out that he was going to park behind

17  the Starbucks.

18     Q.  Did you know where Officer Meadows was at the

19  time?

20         MS. O'LINN:  That she arrived?

21  BY MR. SINCICH:

22     Q.  At the time that you first saw Mr. Valdivia with

23  the two men.

24     A.  I knew he was with Officer Sun because he put

25  them both arriving at the scene at the same time.

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 55

1     Q.  Okay.  Can you describe the two men that you saw

2  with Mr. Valdivia?

3     A.  Both were male blacks.  One was wearing a dark

4  green sweater and the other one was wearing a black

5  sweater.

6     Q.  And how long were you able to observe them

7  before you first saw Officer Sun?

8     A.  I would say within a couple of seconds.

9     Q.  Okay.  After observing them for a couple of

10  seconds, did you also hear Officer Sun starting to give

11  commands?

12     A.  Yes.

13     Q.  Did you ever communicate to your partners where

14  you parked?

15         MS. O'LINN:  Objection to the extent that calls

16  for attorney/client privilege communications.

17         Other than that, you can answer.

18         THE WITNESS:  I advised them I was going to be

19  north of the scene.

20  BY MR. SINCICH:

21     Q.  When did you tell them you would be north of the

22  scene?

23     A.  When I advised Officer Sun I was coming from

24  westbound Arrow.

25     Q.  Did you advise your partners of your location

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 56

1  when you were observing the three subjects?

2      A.  No.  I only put out I was at the scene.

3      Q.  Was there a plan for the officers to meet in any

4  particular area and approach together?

5      A.  No.

6      Q.  Was there any kind of communication to

7  coordinate movements between the officers?

8          MS. O'LINN:  Objection; asked and answered,

9  argumentive as phrased.

10         You can explain.

11         THE WITNESS:  Not with me.

12  BY MR. SINCICH:

13     Q.  Okay.  Did anyone check with you to make sure

14  that you had the beanbag shotgun before they approached?

15     A.  No.

16     Q.  Did you have the beanbag shotgun?

17     A.  No.

18     Q.  Why not?

19     A.  When I arrived on scene, like I said, I was

20  watching the subject for a couple of seconds trying to

21  see if I could see a firearm or anything like that.  And

22  that's when I heard Officer Sun giving commands and I ran

23  to help.

24     Q.  Were you able to see a firearm when you first

25  saw Mr. Valdivia?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 57

```
 1      A.  Not when I first saw him.
 2      Q.  Why did you feel it necessary to run to help?
 3      A.  Because when a call came out with a male with a
 4  gun, and there's only two of my partners I knew at the
 5  time that were there contacting him, and I knew that they
 6  needed an extra person.
 7      Q.  How far were you from your vehicle when you were
 8  observing Mr. Valdivia for that couple of seconds?
 9      A.  Five to ten feet.
10      Q.  Where is the beanbag shotgun located in your
11  vehicle at the time?
12      A.  In the trunk.
13      Q.  The AR and the lethal shotgun, were they in the
14  front seat area?
15      A.  Yes, they are in between the driver and the
16  passenger.
17      Q.  Is there a reason why the beanbag shotgun wasn't
18  located there as well?
19      A.  I don't know, sir.
20      Q.  Was there a protocol from the department as to
21  where those weapon systems were required to be stored?
22      A.  I believe so.
23      Q.  Was the protocol to have the lethal weapons up
24  front and the less lethal in the back?
25      A.  I'm assuming, yes.
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 60

1   your first shot?

2       A.  Again, probably a couple of seconds.

3       Q.  Okay.  In that couple second timeframe prior to

4   taking your first shot, did you hear any other commands?

5       A.  Again, just don't reach for it.

6       Q.  Prior to taking your first shot, did you hear

7   Mr. Valdivia say anything?

8       A.  I knew he was saying something back to them, but

9   I couldn't hear what it was.

10      Q.  Was he speaking too low for you to hear him?

11      A.  I believe so.

12      Q.  Do you know now that Mr. Valdivia had a BB gun

13  or an airsoft gun on his person?

14      A.  After the incident, yes.

15      Q.  Did you ever hear the command to go down to the

16  ground?

17      A.  Yes.

18      Q.  Did you hear both Officer Sun and

19  Officer Meadows giving commands?

20      A.  Yes.

21      Q.  Could you tell who was giving which commands?

22      A.  Yes.

23      Q.  Okay.  Who was telling Mr. Valdivia to put his

24  hands up?

25      A.  Both were.

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 61

```
 1        Q.   And who told Mr. Valdivia to go to the ground?

 2        A.   Officer Meadows.

 3        Q.   Did you hear Officer Meadows tell Mr. Valdivia

 4   go to the ground in that couple second timeframe prior to

 5   your first shot?

 6        A.   Yes, he advised him to go on his stomach.

 7        Q.   And did you see Mr. Valdivia attempt to go down

 8   to the ground?

 9             MS. O'LINN:  Objection; argumentative "attempt."

10        You can answer.

11             THE WITNESS:  I saw him get on the ground

12   partially.

13   BY MR. SINCICH:

14        Q.   In that position that you were describing

15   earlier where he was on his stomach?

16             MS. O'LINN:  Objection; argumentative.

17   Misstates the testimony of the witness.

18        You can explain.

19             THE WITNESS:  He wasn't completely on his

20   stomach.  He was on his left forearm and had weight on

21   his left forearm and was -- had his both legs on the

22   ground.

23   BY MR. SINCICH:

24        Q.   Okay.  Is it fair to say he started going down

25   to the ground after he was instructed to do so?
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 62

```
 1      A.  Yes.

 2      Q.  At the time of the incident, did you think that

 3  you fired only two rounds?

 4      A.  Yes.

 5      Q.  Why did you think you only fired two rounds?

 6          MS. O'LINN:  Objection; calls for speculation on

 7  the part of the witness.

 8      If you know.

 9          THE WITNESS:  I don't know.  At the time, I

10  thought I fired two rounds.

11  BY MR. SINCICH:

12      Q.  And why did you stop shooting?

13      A.  He was no longer a threat.

14      Q.  And why was he no longer a threat?

15      A.  I didn't see the gun in his hand.

16      Q.  Was that based on your training?

17      A.  At the time it was based on my observation.

18      Q.  What did you observe that made him not a threat?

19      A.  The gun was no longer in his hand.

20      Q.  Okay.  And that's why you stopped shooting?

21      A.  Correct.

22      Q.  Is it fair to say based on your training if a

23  person is no longer a threat, officers should stop using

24  deadly force if they already chose to do so?

25      A.  Sorry.  Can you rephrase that one.
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 63

1    Q.  Is it fair to say based on your training that if

2    a person is no longer a deadly threat, officers should

3    stop using deadly force if they already chose to do so?

4    A.  Based on our training and experience, each

5    person has their own observation of when they consider a

6    person a threat and not a threat.

7    So from my observation, I stopped shooting because

8    he was no longer a threat in my eyes.

9    Q.  Right.  And would you agree that the training is

10   that, if the officer doesn't objectively perceive a

11   deadly threat, that the officer shouldn't use deadly

12   force?

13   A.  That is correct.

14   Q.  Did you see Mr. Valdivia drop the gun?

15   A.  Yes.

16   Q.  Did you ever see him reach for the gun after he

17   dropped the gun?

18   A.  I don't recall.

19   Q.  What did you see him doing with his right hand

20   after he dropped the gun?

21   A.  It went to the ground.

22   Q.  Was it out in front of him or more towards his

23   face area, if you recall?

24   A.  It was completely straight out in front of him.

25   Q.  Approximately how far was the gun after he

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 64

1  dropped it from Mr. Valdivia's hand?

2     A.  It wasn't very far.  I would say put it less

3  than a foot.

4     Q.  When you first arrived, I think you described it

5  as like peeking through the vehicles; based on your

6  training, would it have been appropriate to use deadly

7  force at the time?

8        MS. O'LINN:  Based on her observations.

9        THE WITNESS:  Like while I was at my vehicle?

10 BY MR. SINCICH:

11    Q.  Right.  When you were peeking between the cars

12 at Mr. Valdivia, based on your training, would it have

13 been appropriate to use deadly force at that time?

14    A.  No.

15    Q.  And why is that?

16    A.  He wasn't a threat to anybody at that time.

17    Q.  And based on your training, if a person has a

18 gun and then points the gun, but then drops it, would it

19 be appropriate to use deadly force after they dropped the

20 gun?

21       MS. O'LINN:  Objection; incomplete hypothetical.

22    You can answer.

23       THE WITNESS:  Sorry.  Can you rephrase that one.

24 BY MR. SINCICH:

25    Q.  Based on your training, if a person has a gun in

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 65

1   their hand and then points it at somebody but then

2   discards the gun or drops it, would it be appropriate

3   under the training to use deadly force after they drop it?

4        MS. O'LINN:  No other facts.  Just that.

5        THE WITNESS:  No.

6   BY MR. SINCICH:

7        Q.  And why is that?

8        A.  Because technically the gun is no longer in

9   their hands.

10       Q.  Would it be fair to say that if a person

11  discards the gun, they would no longer have the

12  capability of utilizing the gun?

13       MS. O'LINN:  Objection; incomplete hypothetical,

14  argumentative as phrased.

15       You can explain.

16       THE WITNESS:  No, because they can always either

17  have another weapon on them, or they can always go for

18  that weapon again.

19  BY MR. SINCICH:

20       Q.  Right.  So if a person isn't reaching for any

21  other weapons after they discard the weapon, would it be

22  fair to say that the person wouldn't have the capability

23  of causing death or serious bodily injury at that moment?

24       MS. O'LINN:  Objection; incomplete hypothetical,

25  argumentative as phrased.

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 66

1        You can answer.

2              THE WITNESS:  I would say no.  They can always

3   reach for the weapon or firearm again.

4              MR. SINCICH:  Right.  And under this

5   hypothetical they are not actually reaching for it; do

6   you understand that?

7              MS. O'LINN:  So they no longer constitute a

8   threat, is what you're saying, Counsel?

9              MR. SINCICH:  I'm not going to put words inside

10  of the officer's mouth.

11             MS. O'LINN:  Sorry.  Your hypothetical is the

12  issue here.  Are you saying they drop the weapon and they

13  no longer pose a threat and then you shoot them or are

14  you leaving it open to interpretation?

15             MR. SINCICH:  Counsel, it's framing what a

16  threat is, so that's the point of the hypothetical.

17  BY MR. SINCICH:

18        Q.  So I'll rephrase it for you, Officer.

19        If a person drops the gun and is no longer reaching

20  for the gun or in their waistband or anything else; would

21  they be a threat under the training?

22        A.  No.

23        Q.  Did you have cover when you were firing your

24  rounds?

25        A.  No.

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 67

1      Q.  Was there an opportunity for cover nearby?

2      A.  Possibly if I backtracked.

3      Q.  Were there cars in the parking lot, for instance?

4      A.  Yes.

5      Q.  On the north side of the parking lot, was there

6  a wall?

7      A.  On the north side?

8      Q.  Correct.

9      A.  No.

10     Q.  Okay.  If your partners weren't already

11  communicating with Mr. Valdivia, would you believe that

12  you had time to go to the trunk and get your beanbag

13  shotgun?

14          MS. O'LINN:  Just time is what he's asking.

15          THE WITNESS:  I believe if there's more time

16  possibly.

17  BY MR. SINCICH:

18     Q.  Just to be clear, if your partners weren't

19  already communicating and walking towards Mr. Valdivia,

20  instead of running towards them, would you have gone and

21  gotten the beanbag shotgun?

22          MS. O'LINN:  Call for speculation; incomplete

23  hypothetical.

24      You can answer.

25          THE WITNESS:  Yes.

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
Officer Vanessa Cardoza on 03/06/2025

Page 68

```
 1  BY MR. SINCICH:
 2       Q.  Did you give a deadly force warning prior to
 3  firing your shots?
 4       A.  I did not.
 5       Q.  Did you hear any of your partners give a deadly
 6  force warning prior to firing any shots?
 7       A.  I don't recall, no.
 8       Q.  Did you announce yourself as a police officer at
 9  all?
10       A.  No.
11       Q.  Did you hear anyone announce themselves as a
12  police officer?
13       A.  I believe Officer Sun and Meadows did.
14       Q.  What did they say to your belief?
15       A.  Police.
16       Q.  Was that before or after they gave the commands
17  that you heard?
18       A.  Prior.
19       Q.  Did you ever see Mr. Valdivia attempt to flee?
20       A.  No.
21       Q.  Did you ever see him attempt to run or lunge at
22  anybody?
23       A.  No.
24       Q.  I think you said earlier that you fired because
25  you saw him point the gun at your partners?
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 70

```
 1      Q.   Were you inferring that by those statements to

 2   the investigators, that from your perspective he was in

 3   the process of pointing it but he didn't actually point

 4   the gun?

 5      A.   During my observation, I saw him going --

 6   pulling the firearm out and going to point it in the

 7   direction of my partners.

 8      Q.   Okay.  That was your belief?

 9      A.   That was my observation, yes.

10      Q.   Did you ever see Mr. Valdivia attempt to take a

11   hostage at any point?

12      A.   No.

13      Q.   Other than your observations of Mr. Valdivia in

14   the motion of pointing the gun at your partners, did you

15   see him doing anything that was threatening to harm

16   anybody?

17      A.   He was, from my observation, he was in a verbal

18   altercation with the other two subjects.

19      Q.   Did you see him threaten to harm those subjects?

20           MS. O'LINN:  Objection.  Asked and answered.

21      You can answer again.

22           THE WITNESS:  I couldn't hear, but the verbal

23   altercation obviously could have stemmed into more.

24   BY MR. SINCICH:

25      Q.   Did you ever see Mr. Valdivia physically harm
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 71

1  anybody?

2            MS. O'LINN:  Objection; asked and answered.

3       You can answer again.

4            THE WITNESS:  No.

5  BY MR. SINCICH:

6       Q.  Did you ever see him attempt to enter any of the

7  nearby businesses prior to your use of force?

8       A.  No.

9       Q.  Did you see him attempt to enter any of the

10  nearby vehicles prior to your use of force?

11      A.  No.

12      Q.  Prior to Mr. Valdivia reaching for the gun, did

13  you view his acts as being compliant or noncompliant?

14      A.  Noncompliant.

15      Q.  What did he do that was noncompliant in your

16  observation?

17      A.  He had reached for something prior to -- when

18  officers told him not to reach for anything.

19      Q.  Did you see him reach for anything --

20      A.  He reached --

21      Q.  Sorry.  Go ahead.

22      A.  Sorry.  Go ahead.

23      Q.  Let me clarify.  When you're saying he reached

24  for something, was that in a standing position?

25      A.  Yes.

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 76

1  BY MR. SINCICH:

2      Q.  Based on your training, are officers supposed to

3  attempt to deescalate the situation as much as possible?

4          MS. O'LINN:  Objection; argumentative as to "as

5  much as possible."

6      You can answer.

7          THE WITNESS:  We are trained to deescalate

8  situations, yes.

9  BY MR. SINCICH:

10     Q.  Okay.  And would you agree that based on the

11  training, officers should only use deadly force when it's

12  necessary?

13     A.  Yes.  Objectively reasonable, yes.

14     Q.  Was the training that officers should only use

15  deadly force as a last resort?

16         MS. O'LINN:  Objection; argumentative as phrased.

17     You can answer.

18         THE WITNESS:  Sorry.  Can you rephrase that one.

19  BY MR. SINCICH:

20     Q.  Did you ever receive training from the

21  department that officers should only use deadly force as

22  a last resort?

23     A.  Not as a last resort.  It's when it's

24  objectionably reasonable under the totality of

25  circumstances.

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 77

1        Q.  Okay.  Did the department provide you with

2    training that when using deadly force, officers should

3    have reverence for human life?

4        A.  Yes.

5        Q.  Did the department also provide training that

6    officers need to justify every shot that they fire?

7        A.  Yes.

8        Q.  Did you receive training that officers should

9    control their fear or stress level?

10        A.  Yes.

11        Q.  How would you describe that training?

12        A.  You go through the basic academy of being put

13    under a lot of pressure.  They treat you to -- sorry.

14    They teach you to compose your emotions while being

15    screamed at, while under tough situations, scenarios and

16    in-service training, briefing trainings.  You know, you

17    go through briefing trainings of different videos,

18    in-service training of just going through different calls

19    of high stress emotions.

20        Q.  Have you ever heard of the phrase stress

21    inoculation?

22        A.  No.

23        Q.  Okay.  Is it your understanding that the purpose

24    of that training is to provide the officers with the

25    opportunity to learn how to control their emotions in a

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 78

1  high stress situation?

2         MS. O'LINN:  You mean, stress inoculation

3  training that she said she wasn't familiar with or

4  something else?

5         MR. SINCICH:  No.  Your training, Officer.

6         THE WITNESS:  Sorry.  Can you restate your

7  question again.

8  BY MR. SINCICH:

9         Q.  Yeah.  Based on your training that you received

10  as described, is part of the purpose for officers to be

11  exposed to high stress situations so that they can learn

12  how to control their emotions in those situations?

13         A.  Yes.

14         Q.  Were you trained that officers should not use

15  deadly force based off of their subjective fear alone?

16         A.  Yes.

17         Q.  Do you have an understanding as to whether or

18  not the City found your use of deadly force to be within

19  policy?

20         A.  Sorry.  Can you restate that one again.

21         Q.  Were you informed by the City or the Department

22  whether or not your use of force was found to be within

23  policy?

24         A.  Yes.

25         Q.  Did they tell you it was within policy?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 81

1  post or on Mr. Valdivia?

2      A.  Well, the front sight.

3      Q.  Okay.  And then with regard to the beanbag

4  shotgun, was it your plan to get the beanbag shotgun?

5      A.  Yes.  I asked if he wanted me to gather it and

6  he said if I wanted to.  So it was initially my plan to

7  get it.

8      Q.  Right.  So you wanted to?

9      A.  Yes.

10      Q.  Okay.  All right.  Thank you for clarifying

11  that.  I appreciate that.

12      A.  Sorry.

13      Q.  Oh no, that's perfectly fine.

14          MR. SINCICH:  I would like to mark as Exhibit 1

15  what is a portion of Officer Sun's body-worn camera.

16  It's three minutes and 22 seconds.  It's not perfectly

17  the first three minutes and 22 seconds, because for some

18  reason the first approximate ten seconds in the clip was

19  taken out.  I don't know why technologically, but that's

20  approximately what we're looking at.

21          MS. O'LINN:  Well, I'm just going to object,

22  because I have no idea what you just said.

23      Whatever you mark as an exhibit, we understand it's

24  marked as an exhibit.  There are no exhibits marked yet

25  in this matter, I believe, correct?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 86

```
 1   approximately around the timeframe that the shots were

 2   fired?

 3        A.  Yes.

 4            MR. SINCICH:  Okay.  I'm just going to continue

 5   for the next 30 seconds of this video.

 6            (Video played.)

 7   BY MR. SINCICH:

 8        Q.  I stopped at 1:31.  Did you see that you had

 9   gloves on?

10        A.  Yes.

11        Q.  When did you put the gloves on?

12        A.  When I arrived at the scene.

13        Q.  Is that before you saw Mr. Valdivia for the

14   first time?

15        A.  Yes, it was when I arrived at the scene.

16            MR. SINCICH:  I'm going to finish playing this

17   one.

18            (Video playing.)

19            MR. SINCICH:  I'm going to mark as Exhibit 3 a

20   map.  Can you see my screen?

21            MS. O'LINN:  It's getting there, it's loading.

22            MR. SINCICH:  Are you able to see it now,

23   Officer?

24            THE WITNESS:  Yes.

25   //
```

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 94

```
 1   UNITED STATES DISTRICT COURT      )
                                       )
 2   CENTRAL DISTRICT OF CALIFORNIA    )

 3
         The witness, Officer Vanessa Cardoza, in the
 4   foregoing deposition appeared before me, Cynthia F.
     Zeller, a Certified Shorthand Reporter, in and for the
 5   State of California.

 6       Said witness was then and there at the time and
     place previously stated, by me placed under oath to tell
 7   the truth, the whole truth and nothing but the truth in
     the testimony given on the date of the within deposition.
 8
         The testimony of the witness and all questions and
 9   remarks requested by Counsel and reported thereafter,
     under my direction and control, caused to be transcribed
10   into typewritten form by means of Computer-Aided
     Transcription.
11
         I am a Certified Shorthand Reporter licensed by the
12   State of California.  I further certify that I am not of
     counsel or attorney for either or any of the parties to
13   the case named in the within caption, and that I am not
     related to any party thereto.
14
         IN WITNESS WHEREOF, I have hereunto affixed my
15   signature this 17th day of March 2025.

16

17

18      Cynthia F. Zeller

19   CYNTHIA F. ZELLER, CSR
     Certified Shorthand Reporter #10834
20

21

22

23

24

25
```