# EXHIBIT E

1     UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3

4  E.V. and X.V., minors by and  )
   through their guardian ad   )
5  litem, Karla Juarez; D.V., a  ) Case No.
   minor, by and through his   ) 5:23-cv-01562-CBM-SHK
6  guardian ad litem, Elias    )
   Valdivia; individually and as  )
7  successors-in-interest to    )
   Daniel Luis Valdivia,      )
8  deceased; JESSICA VALDIVIA;   )
   LUIS VALDIVIA JR.,       )
9  individually,         )
                  )
10     Plaintiffs,    )
    vs.            )
11                )
   CITY OF COVINA; VANESSA    )
12  CARDOZA; DAVID MEADOWS; BILLY  )
   SUN; DOES 1-10, inclusive,   )
13                )
      Defendants.    )
14                )

15

16

17    REMOTE DEPOSITION OF DAVID MEADOWS

18      COVINA, CALIFORNIA

19      FRIDAY, MARCH 7, 2025

20

21

22

23  STENOGRAPHICALLY REPORTED BY:

24  Patricia L. Davis, RPR
   CSR No. 11521
25

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

```
 1    APPEARANCES (VIA VIDEOCONFERENCE):

 2

 3    FOR PLAINTIFFS:

 4            LAW OFFICES OF DALE K. GALIPO
              BY:  MARCEL F. SINCICH, ESQ.
 5            21800 BURBANK BOULEVARD
              SUITE 310
 6            WOODLAND HILLS, CA  91367
              818-347-3333
 7            MSINCICH@GALIPOLAW.COM

 8

 9    FOR DEFENDANTS:

10            MANNING & KASS, ELLROD, RAMIREZ, TRESTER, LLP
              BY:  MILDRED K. O'LINN, ESQ.
11                 ROSLYNN M. WILFERT, ESQ.
              801 S. FIGUEROA STREET
12            15TH FLOOR
              LOS ANGELES, CA  90017-3012
13            213-624-6900
              MISSY.OLINN@MANNINGKASS.COM
14

15    ALSO PRESENT:
16
              VANESSA CARDOZA
17            BILLY SUN

18

19

20

21

22

23

24

25
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 7

1          Because our court reporter is taking down
2    everything that we're saying, it's important that we
3    speak slow enough for her to type and also only speak
4    one at a time.
5          Okay?
6      A   Understood.
7      Q   All right.  Is there any reason why you
8    wouldn't be able to give your best testimony today?
9      A   No.
10     Q   All right.  You understand that you're here to
11   discuss the officer-involved shooting of Mr. Valdivia?
12     A   Yes.
13     Q   Did you use force during this incident?
14     A   Yes.
15     Q   What type of force?
16     A   I fired a round.
17     Q   Okay.  Is that considered deadly force?
18     A   Yes.
19     Q   What type of weapon did you use?
20     A   Handgun.
21     Q   Do you know the make and model?
22     A   Yes, it was a Glock Model 17 9mm.
23     Q   Did you intentionally pull the trigger when you
24   shot your one round?
25     A   Yes.

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 8

```
1        Q   Did you intend for that shot to strike
2    Mr. Valdivia?
3        A   Yes.
4        Q   Did you have an understanding at the time that
5    shooting even one round could cause death or serious
6    bodily injury?
7        A   Yes.
8        Q   Were you aiming when you fired your shot?
9        A   Yes.
10       Q   Where were you aiming?
11       A   Center mass of my target.
12       Q   And what was your specific target?
13       A   Mr. Valdivia.
14       Q   What portion of Mr. Valdivia were you aiming
15    for?
16       A   The center of his mass.
17       Q   Okay.  What specifically on his body would that
18    be?
19       A   The center of his torso.
20       Q   From your angle of fire, were you able to see
21    Mr. Valdivia's chest when you fired your shot?
22       A   I could see a portion of his chest.
23       Q   From that angle, were you able to see a portion
24    of his back as well?
25       A   Yes.
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 9

1      Q    How much time passed from the time that you

2    arrived on scene to the time of your shot?

3      A    I would say less than a minute.

4      Q    And when I say arrived on scene, I'm referring

5    to like when you parked your car.  Is that what you

6    understood?

7      A    Yes.

8      Q    Okay.  And then at some point in time did you

9    approach Mr. Valdivia and give him commands?

10     A    Yes.

11     Q    How much time passed from when you first made

12   contact with Mr. Valdivia to the time of your shot?

13     A    I would say approximately 30 seconds.

14     Q    Are you right-handed?

15     A    Yes.

16     Q    Did you fire in a two-handed grip?

17     A    Yes.

18     Q    Did you have any optic on your weapon when you

19   fired?

20     A    No.

21     Q    Were you focused on Mr. Valdivia when you

22   fired?

23     A    Can you rephrase your question.

24     Q    Sure.  Sometimes when people fire without an

25   optic, they focus on their front site post and other

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 10

```
 1   times people fire and they focus on their target.  So

 2   I'm wondering where was your focus?

 3       A   My focus was on my front site.

 4       Q   Okay.  And did you feel like you had a site

 5   picture and site alignment on Mr. Valdivia?

 6       A   Yes.

 7       Q   Did you assess the surrounding area, including

 8   the backdrop, before you fired?

 9       A   Yes.

10       Q   Did you see any civilians in the area other

11   than Mr. Valdivia?

12       A   Yes.

13       Q   Where were they?

14       A   They were off to my right-hand side.

15       Q   Approximately how many feet away from

16   Mr. Valdivia were they?

17           MS. O'LINN:  At the time he fired, Counsel?

18           MR. SINCICH:  Yes.

19           MS. O'LINN:  Thank you.

20           THE WITNESS:  I'd say approximately 15 feet.

21   BY MR. SINCICH:

22       Q   And how many people are you referring to?

23       A   Two.

24       Q   Okay.  Was there anybody else in the parking

25   lot that you saw during this incident prior to firing?
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 13

1      Q    Were you moving while you were firing?

2      A    Yes.

3      Q    Which direction?

4      A    To my right.

5      Q    Why were you moving?

6      A    I was moving towards a point of cover.

7      Q    What was the cover that you were moving behind?

8      A    There was an approximate 3-foot cinder block

9    wall and a vehicle on the other side of that.

10     Q    Between you and Mr. Valdivia?

11     A    Yes.

12     Q    Do you know if Officer Sun was also behind the

13   3-foot cinder block wall.

14          MS. O'LINN:  At which point, Counsel?

15   BY MR. SINCICH:

16     Q    During the officer-involved shooting.

17     A    No, he was not.

18     Q    Okay.  Were you moving immediately prior to

19   shooting?

20     A    Yes.

21     Q    Is there something that you saw that made you

22   want to move?

23     A    Yes.

24     Q    What did you see?

25     A    I saw Mr. Valdivia reaching towards his

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 14

```
 1   waistband where I had seen the grip of a firearm.
 2        Q   When was the first time that you saw the grip
 3   of a firearm?
 4        A   After contacting him and giving him commands
 5   and once he complied and put his hands up, I could see
 6   the grip of a firearm protruding from his waistband.
 7        Q   Did you inform your team that you were able to
 8   identify the gun at that time?
 9        A   No.
10        Q   When you saw the gun grip in Mr. Valdivia's
11   waistband, what did you do?
12        A   I gave him commands to get on the ground.
13        Q   Why would you give him that command?
14        A   From my perspective, it gave us more control of
15   the situation and took his ability away to potentially
16   take hostages or flee the scene.
17        Q   Okay.  Had you ever been in an officer-involved
18   shooting other than this one?
19        A   No.
20        Q   How long have you been in law enforcement?
21            MS. O'LINN:  As of now, Counsel, or then?
22            MR. SINCICH:  Yes, total.
23            THE WITNESS:  Total, approximately 11 years.
24   BY MR. SINCICH:
25        Q   In your time in law enforcement, other than
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 15

1    this incident, have you encountered a subject with a gun

2    in their possession?

3        A    Yes.

4        Q    How many times?

5        A    I'd say approximately ten times.

6        Q    Did you hear any shots fired prior to your

7    shot?

8        A    Yes.

9        Q    Approximately how many shots did you hear?

10       A    Two.

11       Q    Did you hear any shots after you fired your

12   shot?

13       A    I don't recall hearing any shots after mine.

14       Q    Do you recall if you heard shots simultaneous

15   with your shot?

16       A    Yes.

17       Q    Approximately how many did you hear

18   simultaneous with your shot?

19           MS. O'LINN:  Objection.  Calls for speculation.

20           If you know.

21           THE WITNESS:  I don't recall how many.  I just

22   remember hearing a shot.

23   BY MR. SINCICH:

24       Q    Okay.  When you heard the two shots before you

25   fired, was it your understanding that those were fired

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 16

```
 1   by police officers?

 2        A    Yes.

 3        Q    Did you know based off of your position if that

 4   shot came from Officer Sun?

 5        A    Yes.

 6        Q    Prior to firing your shot, did you hear any

 7   shots coming from Officer Cardoza's position?

 8        A    I don't recall hearing shots from her position.

 9        Q    Is it fair to say that Mr. Valdivia didn't

10   shoot anyone in this incident?

11        A    Can you rephrase your question.

12        Q    Sure.  Is it fair to say that in this incident

13   Mr. Valdivia didn't shoot at anyone?

14        A    I don't know.

15        Q    Okay.  Did you ever see Mr. Valdivia shooting

16   at anyone?

17        A    Can you rephrase that, please.

18        Q    Did you ever see Mr. Valdivia pull the trigger

19   of the gun in his possession?

20        A    I didn't see that, no.

21        Q    Did you ever hear a bullet fired from

22   Mr. Valdivia's position?

23        A    I don't recall hearing one, no.

24        Q    Did you ever see a muzzle flash coming from

25   Mr. Valdivia's right-hand area?
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 17

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Did you ever see a casing being ejected from |
| 3 | | the gun that Mr. Valdivia had? |
| 4 | A | No. |
| 5 | Q | Were you injured at all during this incident? |
| 6 | A | No. |
| 7 | Q | Other than Mr. Valdivia, are you aware of |
| 8 | | anyone else that was injured? |
| 9 | A | No. |
| 10 | Q | Prior to joining Covina Police Department, did |
| 11 | | you have any other law enforcement experience? |
| 12 | A | Yes. |
| 13 | Q | Where was that? |
| 14 | A | The City of Montebello. |
| 15 | Q | How long were you there? |
| 16 | A | Approximately three months. |
| 17 | Q | Why did you leave Montebello after three |
| 18 | | months? |
| 19 | A | I left due to some family issues and personal |
| 20 | | problems. |
| 21 | Q | Okay.  Did you have to do another academy |
| 22 | | before going to Covina? |
| 23 | A | Yes. |
| 24 | Q | So you did two academies? |
| 25 | A | Yes. |

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 18

1      Q    Did you study from the POST learning domains at

2   both academies?

3      A    Yes.

4      Q    Do you know, if you recall, whether

5   Montebello's policies were generated by Lexipol?

6      A    I don't recall.

7      Q    Do you recall if their use of force policy was

8   similar to the Covina Police Department use of force

9   policy?

10      A    It was similar.

11      Q    What was your height and weight at the time of

12   the incident?

13      A    I was approximately 5-10, 220 pounds.

14      Q    I say at the time, but I take it you didn't

15   grow any in the last couple years.

16          Okay.  What was your first assignment after the

17   academy when you joined Covina Police Department?

18      A    I was a reserve police officer.

19      Q    How long were you reserve?

20      A    A little less than a year.

21      Q    While you were a reserve officer, what was your

22   duty assignments?

23      A    Patrol.

24      Q    How often did you work given that you were on

25   reserve?

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 20

1       A    We don't have anything like that.

2       Q    Okay.  And what's your current rank?

3       A    Police officer.

4       Q    Prior to this incident, did you have any

5   collateral duties?

6       A    Yes.

7       Q    What was that?

8       A    I was a part of our Area D team, which is a

9   mutual aid team, and I was a K-9 officer at the time.

10      Q    What was the duty assignment for being on a

11  mutual aid team?

12      A    If other cities required more officers or there

13  was some sort of a natural disaster that required

14  officers -- more officers, we would be sent to assist.

15      Q    Okay.  Are you still a K-9 officer?

16      A    Currently, yes.

17      Q    All right.  What is your current K-9's name?

18      A    My current K-9's name is Paco.  That's P-A-C-O.

19      Q    Did you have a different K-9 at the time of the

20  incident?

21      A    Yes.

22      Q    What was his name or her?

23      A    His name was Jarno.  That's J-A-R-N-O.

24      Q    Was Jarno a Belgian Malinois?

25      A    He was a mix:  a Belgian Malinois and German

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 21

```
 1   shepherd.

 2        Q   How long did you have him?

 3        A   Can you be specific as to the time.

 4            MS. O'LINN:  How long did he work patrol with

 5   him?

 6   BY MR. SINCICH:

 7        Q   How long was he a K-9 -- are they called K-9

 8   officers?

 9        A   Yes.

10        Q   The dog's are K-9 officers?

11        A   Just K-9, yeah.

12        Q   Sometimes after the K-9 retires, they still

13   live with the officer; right?

14        A   Correct.

15        Q   Did that happen with you?

16        A   Yes.

17        Q   Okay.  So how long was he in active service

18   before he retired?

19        A   Approximately eight years.

20        Q   Okay.  Did you have your K-9 with you during

21   the incident?

22            MS. O'LINN:  You can explain.

23            THE WITNESS:  I had him with me in the vehicle.

24   BY MR. SINCICH:

25        Q   I take it you didn't take him out of the
```

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

```
 1    vehicle?

 2         A    No.

 3         Q    Why not?

 4         A    Due to the nature of the call, the man with a

 5    firearm, I did not believe it was safe or feasible at

 6    that time.

 7         Q    Have you ever utilized any of your K-9s to

 8    apprehend a person who was potentially armed with a

 9    firearm?

10         A    No.

11         Q    Have you ever utilized your K-9 to apprehend a

12    person who was armed with a knife?

13         A    No.

14         Q    Was your K-9 trained for apprehension?

15         A    Yes.

16         Q    Is there a difference between apprehension and

17    like a search K-9?

18         A    Can you rephrase your question.

19         Q    Yeah.  I'm wondering if based on your knowledge

20    of the K-9s if there's a difference between the training

21    when a K-9 trains to apprehend an individual or, for

22    instance, runs search operations?

23         A    There's different things that you can search

24    for, so if you can be a little more specific.

25              MS. O'LINN:  You can explain.
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 23

1          THE WITNESS:  Yeah, so typically our K-9s are

2     trained to search for and apprehend persons.  They're

3     also trained to search for discarded evidence, and

4     there's also training in narcotics detection, bomb

5     detection, and gun detection.

6     BY MR. SINCICH:

7          Q    Have you ever utilized your K-9 as a show of

8     force to gain compliance with a subject?

9          A    Yes.

10          Q    And how would you do that?

11          A    Can you rephrase your question, please.

12          Q    How would you utilize your K-9 as a show of

13     force to gain compliance?

14          A    Can I give you an example?

15          Q    Please.

16          A    So, for instance, if we have a felony traffic

17     stop on a stolen vehicle and we have other officers

18     present, there's times I would take him out of the car

19     and have him bark to let them know that a K-9 was

20     present.

21          Q    Have you found in your training and experience

22     that a subject is less likely to flee if they know a K-9

23     is there?

24          A    Yes.

25          Q    Have you found in your training and experience

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 26

1      Q    What's the suit called?

2      A    A bite suit.

3      Q    A bite suit.

4           In the videos I've seen the dog always bites

5    the subject's arm, like their forearm area.  So I'm

6    wondering if that's what they're specifically trained to

7    do is bite the forearm of the subject?

8      A    No.

9      Q    Okay.  Is there a way that you can command the

10   K-9, for instance, to bite the forearm specifically?

11     A    No.

12     Q    If the K-9 sees something in the subject's

13   hands, are they trained to bite that hand or arm in

14   order to disarm the subject?

15     A    No.

16     Q    Okay.  How much did that K-9 weigh, Jarno?

17     A    Approximately 70 pounds.

18     Q    And how old was it at the time of the incident?

19     A    Approximately six years old.

20     Q    Did you consider your K-9 partner a less lethal

21   option?

22     A    Yes.

23     Q    Did you have any other less lethal options on

24   your person when you engaged with Mr. Valdivia?

25     A    Yes.

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 27

1      Q    What did you have?

2      A    I had a taser.

3      Q    Anything else?

4      A    No.

5      Q    How far were you from Mr. Valdivia when you

6   fired your shot?

7      A    Approximately 30 feet.

8      Q    Prior to this call, I understand you were

9   writing reports with Officer Sun?

10     A    I was with Officer Sun, yes.

11     Q    Okay.  Approximately what time did you receive

12   the call for this incident?

13     A    Approximately 10:13 p.m.

14     Q    And what time did you make your way to the

15   scene location?

16     A    After receiving the radio call.

17     Q    Was it pretty much immediately?

18     A    Yes.

19     Q    Did you and Officer Sun have a discussion prior

20   to getting in your respective vehicles?

21     A    Can you rephrase your question.

22     Q    Did you and Officer Sun talk about this radio

23   call prior to getting in your vehicles?

24     A    I just believe I informed him that I was going

25   to respond to it.

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 30

```
 1      A   Not at the time I initially saw him.

 2      Q   While you were en route, did you receive any

 3   additional information about the incident?

 4      A   Our dispatch had told us that they had received

 5   multiple calls.

 6      Q   Was there any specific details that you

 7   considered in your analysis for using deadly force?

 8      A   I'm sorry, can you rephrase your question.

 9      Q   Yeah.  Was there any additional details from

10   the information you received from dispatch that you

11   considered in your analysis on whether to use deadly

12   force or not?

13      A   Other than he had been threatening other

14   individuals or in an argument with other individuals.

15      Q   Okay.  Is it fair to say that officers didn't

16   know who started the argument?

17      A   Yes.

18      Q   And you and your team were there to investigate

19   to see what was actually happening; is that fair?

20      A   Yes.

21      Q   Had you ever met Mr. Valdivia prior to this

22   incident personally?

23      A   I don't believe so.

24      Q   Did you have any knowledge of Mr. Valdivia

25   prior to your use of force?
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 31

1        A   I don't believe so.

2        Q   Did you have any specific information as to

3    whether he had a criminal history or not?

4        A   No.

5        Q   Any information as to whether he was involved

6    in a gang or not?

7        A   No.

8        Q   Did you have any information as to whether he

9    had a history of drug or alcohol use?

10       A   No.

11       Q   Did you have any specific information as to

12   whether he was under the influence of drugs or alcohol?

13       A   I believe there was mention on the radio that

14   he may have been consuming alcohol.

15       Q   Did you have any specific information that he

16   had ever consumed drugs?

17       A   Yes.

18       Q   What information did you have?

19       A   It was dispatched over the radio that he may

20   have consumed drugs and alcohol.

21       Q   Dispatch said that he may have consumed?

22       A   I don't remember specifically their exact

23   words, but it was to that effect.

24       Q   Okay.  With regards to drugs and alcohol, is it

25   fair to say that you didn't use deadly force because you

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 32

```
 1    thought that he had consumed drugs or alcohol?

 2        A   Not for merely consuming drugs or alcohol, no.

 3        Q   Did you have any information prior to your use

 4    of force that Mr. Valdivia had ever harmed anybody?

 5        A   No.

 6        Q   From your observations, did you see

 7    Mr. Valdivia harm anybody?

 8        A   Can you rephrase that question, please.

 9        Q   From the time that you arrived on scene to the

10    time that you fired your shot, did you see Mr. Valdivia

11    physically harm anybody?

12        A   No.

13        Q   Did you see Mr. Valdivia attempt to take a

14    hostage during that time frame?

15        A   No.

16        Q   Did you see Mr. Valdivia attempt to strike

17    anybody?

18        A   No.

19        Q   Did you see Mr. Valdivia attempt to grab

20    anybody?

21        A   No.

22        Q   Did you ever see Mr. Valdivia attempt to flee?

23            MS. O'LINN:  Excuse me, Counsel.

24            Do you need a break?

25            THE WITNESS:  Yeah.  Can I take like two
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 35

1   BY MR. SINCICH:

2        Q   On the day of the incident.

3            MS. O'LINN:  You can explain.

4            THE WITNESS:  That is how my firearm was

5   loaded, yes.

6   BY MR. SINCICH:

7        Q   Okay.  Do you know if Covina Police Department

8   at the time instructed officers to do that?

9        A   They left it up to the discretion of the

10  officer.

11       Q   Okay.  Did you find that to be the common

12  practice?

13       A   Yes.

14       Q   And you didn't have OC spray with you during

15  the incident; right?

16       A   It was in my patrol vehicle.

17       Q   Why didn't you have it on your person?

18       A   It's not required.

19       Q   During your training, did you have to get

20  sprayed with OC spray?

21       A   Can you rephrase your question, please.

22       Q   In order to equip yourself with OC spray, was

23  it a requirement to be OC sprayed yourself?

24       A   It was not a requirement.

25       Q   Okay.  During your training, did you go through

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 36

```
 1    some form of OC spray obstacle course or something to
 2    that effect?
 3         A    Yes.
 4         Q    What was the effects of the OC spray on you?
 5         A    Burning to the eyes, burning to the nose and
 6    just general facial area.
 7         Q    Were you trained that OC spray could cause the
 8    subject to be disoriented?
 9         A    Yes.
10         Q    And generally from your training and
11    experience, does OC spray cause the subject to close
12    their eyes?
13         A    Not everyone is affected the same way.
14         Q    Okay.  If the OC spray makes contact with the
15    person's face, generally does it cause the subjects to
16    close their eyes?
17         A    Can you rephrase your question, please.
18         Q    Yeah.  I'm just wondering if generally in your
19    training and experience if OC spray makes contact with
20    the subject's face, if it causes the subject to close
21    their eyes?
22              MS. O'LINN:  Objection.  Asked and answered.
23              You can answer again.
24              THE WITNESS:  It really depends on the person.
25    BY MR. SINCICH:
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 37

1    Q    Okay.  And the taser that you had, it was X26;

2    right?

3    A    Yes.

4    Q    Were you trained that the taser could cause

5    neuromuscular incapacitation?

6    A    Yes.

7    Q    Did you receive training prior to this incident

8    on the concept of -- well, some departments call it

9    taking custody under power.  Do you know what I'm

10    talking about?

11    A    No.

12    Q    Were you ever trained that officers could take

13    custody of an individual while the tasing is taking

14    effect?

15    A    Yes.

16    Q    Could you explain that training.

17    A    Basically when we utilize the taser, while the

18    person is incapacitated we're trained to physically gain

19    control of the subject.

20    Q    Is that because during the period of

21    incapacitation the subject doesn't have the ability to

22    resist?

23    A    No.

24    Q    Why is it then?

25    A    It's because they have the potential to be less

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 38

1   resistive I guess you could say.

2        Q   At the time of the incident when you discharged

3   your taser in probe mode, how long does it cycle through

4   that tasing?

5        A   I'm sorry, I didn't understand your question.

6        Q   Yeah, sometimes there's tasers that have

7   different settings for the cycle.  I'm wondering how

8   long was the cycle for your taser at the time of the

9   incident?

10       A   Five seconds.

11       Q   And do officers have the option to continually

12   depress the trigger in order to elongate the cycle

13   period?

14       A   Can you rephrase your question, please.

15       Q   The taser that you were equipped with at the

16   time of the incident, was there an option to hold the

17   trigger down for longer than five seconds in order to

18   continue the cycling process?

19       A   No.  With each depression of the trigger it's a

20   five-second cycle.

21       Q   Right.  That's if you depress the trigger and

22   let go immediately, it will continue for five seconds;

23   right?

24       A   No.

25       Q   If you depress the trigger and let go

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 42

1    Q    Okay.

2    A    Or you can activate your overhead red and blue

3    lights.  It will activate it.

4    Q    When you were en route to this incident, did

5    you activate your lights?

6    A    No.

7    Q    Why not?

8    A    Based on the nature of the call, I did not want

9    to alert Mr. Valdivia or the subject in question to our

10   presence immediately or as we were approaching.

11   Q    Okay.  Did you essentially follow Officer Sun's

12   vehicle to the Starbucks parking lot?

13   A    Yes.

14   Q    Why did you specifically want to respond to

15   this call?

16   A    Due to the nature of the call, knowing that

17   there's a potential of an imminent threat to officers

18   and to the general public.  I knew more officers was

19   better to have than not.

20   Q    Was one of the reasons why you wanted to

21   respond to this call is you knew you had the K-9 option?

22   A    Yes.

23   Q    And that was knowing that there was a potential

24   gun involved and a potential brandishing of the gun;

25   right?

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 43

1        A    Yes.

2        Q    So when you were responding to the call knowing

3    the information of the call, did you consider utilizing

4    your K-9?

5        A    I considered that there may be a potential to

6    use him, yes.

7        Q    Okay.  Is there anything that changed from the

8    time that you were receiving this information en route

9    to the time that you got out of your vehicle that caused

10   you to not bring your K-9 with you?

11       A    No.

12            (Simultaneous speaking.)

13            (Reporter clarification.)

14            MS. O'LINN:  I just said change, question mark,

15   as in -- but he continued.  Counsel finished his

16   question.

17   BY MR. SINCICH:

18       Q    You worked with Officer Sun for a significant

19   period of time prior to this incident; right?

20       A    Yes.

21       Q    Is it fair to say that he knew you were a K-9

22   officer?

23       A    Yes.

24       Q    Had you utilized your K-9 on calls where

25   Officer Sun was your partner before?

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 44

1      A   I believe so.

2      Q   And was it your understanding upon arrival to

3   the scene that Officer Cardoza would have an additional

4   less lethal option in the beanbag shotgun?

5      A   No.

6      Q   What was your understanding of the beanbag

7   shotgun in this incident?

8          MS. O'LINN:  Objection.  Vague.  Ambiguous.  I

9   have no idea what you're asking.

10         Do you understand?

11         THE WITNESS:  I don't understand your question.

12  BY MR. SINCICH:

13     Q   Did you have an understanding that there was

14  going to be a less lethal shotgun involved in this

15  incident at all?

16     A   No.

17     Q   I'll let you see the non-suggested one.

18         (Reporter clarification.)

19         MR. SINCICH:  This is not an exhibit.  If I can

20  pull it up.

21  BY MR. SINCICH:

22     Q   Okay.  Can you see my screen again?

23     A   Yes.

24     Q   All right.  And this is on page 16.  And I'm

25  just going to go up to page 14 where you can see that on

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 46

1    option?  Did you say that to the investigators?

2         A   Yes.

3         Q   Was it your understanding that the shotgun was

4    going to be a less lethal option during this incident?

5         A   It's a potential option because most of the

6    patrol vehicles have them in them.

7         Q   Okay.  But it was your understanding that she

8    was going to grab the less lethal shotgun; right?

9         A   I knew it was an option for her.

10        Q   Okay.  And when you say, It was going to give

11   us another less lethal option, other than the beanbag

12   shotgun, what was the other less lethal options that you

13   were considering for this specific incident?

14        A   We had taser, my K-9.

15        Q   Okay.  And are those the less lethal options

16   that you considered knowing the information related to

17   this call?

18        A   Yes.

19        Q   Did you communicate with any of the other

20   officers to coordinate how you were going to make the

21   approach on to the subject?

22        A   Can you rephrase your question, please.

23        Q   Yeah.  Was there a plan communicated to the

24   team as to how the officers were going to approach

25   Mr. Valdivia?

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 47

1      A   Yes.  Officer Sun was setting up a containment.

2      Q   Right.  So Officer Sun communicated over the

3   radio that he wanted certain vehicles in certain

4   locations; is that fair?

5      A   Yes.

6      Q   Did anyone communicate to the team how the

7   officers were going to approach Mr. Valdivia?

8      A   Yes.

9      Q   Who communicated that to the team?

10     A   Officer Sun.

11     Q   And what did Officer Sun say to the team?

12     A   I recall Officer Sun specifically stating to me

13   that I was going to be with him.

14     Q   Okay.  Other than you being with him, was there

15   any communication as to how you would approach

16   Mr. Valdivia?

17     A   I'm not quite understanding your question.

18     Q   For instance, was there any communication that

19   you guys would approach in a stealth manner?

20     A   It was understood to me that we were going to

21   approach in a stealth manner.

22     Q   Okay.  And how did that understanding come

23   about?

24     A   First, the way he mentioned that we were going

25   to park on the west side of Starbucks led me to

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 49

1    question before that was based on your training, does

2    the contact officer typically take charge of the

3    communication with the subject?

4        A    Generally.

5        Q    Okay.  And were you trained that officers

6    should avoid giving simultaneous commands to a subject?

7        A    Generally.

8        Q    Is part of that training that you want to avoid

9    giving conflicting commands?

10       A    Yes.

11       Q    And when there's more than one officer giving

12   commands to a subject, were you trained that it could

13   confuse the subject?

14       A    That's not what happened in this instance, but

15   it could.

16       Q    Is that part of the training?

17       A    That it could, yes.

18       Q    Yeah.  I mean, in this instance it didn't

19   happen because you gave him the command to get on the

20   ground; right?

21       A    Yes.

22       Q    And then he immediately complied and started

23   going down to the ground?

24       A    Can you rephrase that question, I'm sorry.

25       Q    Within a second of your command to get on the

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 50

```
 1   ground, is it fair to say that Mr. Valdivia started

 2   going down to the ground?

 3       A   He started to move in that direction.

 4       Q   And did you have to jog to catch up with

 5   Officer Sun?

 6       A   Yes.

 7       Q   Why is that?

 8       A   Well, upon arrival he was slightly ahead of me,

 9   so I jogged just to catch up to him.

10       Q   Did you communicate with Officer Sun whether or

11   not you were going to grab your K-9?

12       A   No.

13       Q   After you got to the parking lot --

14           (Audio distortion.)

15           (Reporter clarification.)

16           MR. SINCICH:  Sorry, I had to mute because I

17   coughed myself.  I'll repeat it.

18   BY MR. SINCICH:

19       Q   After you got to the parking lot where the

20   shooting occurred, did you scan the location to see if

21   there were any other civilians around?

22       A   Yes.

23       Q   And what did you see?

24       A   Well, the Starbucks was heavily populated with

25   customers, there were subjects in the liquor store, and
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 53

```
 1   BY MR. SINCICH:

 2        Q    Yeah.  Would that make it more difficult for

 3   him to actually use the firearm if he chose to do so?

 4        A    No.

 5        Q    Based on your training and experience, would it

 6   be more difficult for a person to use a firearm if they

 7   were faced away from you?

 8        A    Yes.

 9        Q    And if you had the person facing away from you,

10   would that give you slightly more time to assess what

11   they were doing?

12             MS. O'LINN:  Objection.  Incomplete

13   hypothetical.  Calls for speculation.  Vague, ambiguous,

14   and overbroad.

15             You can answer if you understand.

16             THE WITNESS:  Can you repeat your question,

17   please.

18   BY MR. SINCICH:

19        Q    Sure.  If a person is faced away from you, does

20   that give officers, based on your training and

21   experience, more time to assess?

22             MS. O'LINN:  Same objections.

23             THE WITNESS:  No.

24   BY MR. SINCICH:

25        Q    Okay.  Does it generally take more time to fire
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 54

1    a weapon if you have to turn around first in order to

2    fire it as opposed to if you're already facing the

3    target?

4        A    Can you rephrase your question, please.

5        Q    Do you ever do any training as a police officer

6    where you're facing away from the target and then you

7    have to turn around and then acquire the target and then

8    engage the target?

9        A    Yes.

10        Q    And you also do training where you're already

11    facing the target, already have your eyes on the target,

12    and then you engage the target?

13        A    Yes.

14        Q    Based on your training and experience, which

15    one is faster?

16        A    When you're facing the target.

17        Q    Would it be fair to say if you wanted to give

18    yourself more time, one reasonable option would be to

19    have the subject face away from you if you believed that

20    they had a gun?

21            MS. O'LINN:  Objection.  Argumentative.

22    Incomplete hypothetical.

23            THE WITNESS:  No.

24    BY MR. SINCICH:

25        Q    Okay.  Were you ever trained on the equation

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 55

1   distance plus cover equals time?

2       A   Yes.

3       Q   And then time equals options?

4       A   Yes.

5       Q   Was there any discussion as to whether there

6   was a better route to get to the liquor store parking

7   lot where officers could maintain cover?

8       A   No.

9       Q   Prior to this incident, had you been to that

10  liquor store parking lot before?

11      A   Yes.

12      Q   Were you generally familiar with the area?

13      A   Yes.

14      Q   Why did you use deadly force in this incident?

15      A   Because I perceived an imminent threat of death

16  or great bodily injury.

17      Q   What did you perceive that led you to believe

18  Mr. Valdivia was an imminent threat of death or great

19  bodily injury?

20      A   He was pointing a gun at us.

21      Q   When you say us, who are you referring to?

22      A   Officer Sun and myself.

23      Q   Did you believe that he was pointing a gun at

24  both of you simultaneously?

25      A   In our direction, yes.

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 56

1     Q   Well, based on your assessment, where was the
2  gun actually pointed?

3         MS. O'LINN:  Objection.  Argumentative as
4  phrased.  Calls for speculation.

5         You can answer.

6         THE WITNESS:  In both of our direction.

7  BY MR. SINCICH:

8     Q   Okay.  I'm wondering if he -- well, strike
9  that.

10        You know now that it was a BB gun or an airsoft
11  gun; right?

12    A   Yes.

13    Q   If it was a real gun or even if it had a BB
14  loaded into it and he pulled the trigger, would you feel
15  like you were going to be hit by that BB?

16    A   Yes.

17    Q   Did you feel like if he pulled the trigger,
18  Officer Sun would have been hit by the same BB?

19    A   I don't understand your question.

20    Q   I'm trying to figure out where the gun was
21  actually pointed at the time of your use of deadly
22  force.

23    A   It was pointed in our direction.

24    Q   Right.  So were you ever trained on the phrase
25  "point aim, point impact"?

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 58

1   half an hour ago, maybe 40 minutes ago.  I wasn't

2   planning on going too much longer.

3              (Simultaneous speaking.)

4              (Reporter clarification.)

5              MS. O'LINN:  He was coughing his head off

6   during that break, so I just want to make sure he has an

7   opportunity to have a personal break, but I'm just

8   asking whenever.

9              MR. SINCICH:  Yeah.  And, Officer, when you

10   need a break, would you let me know?

11              THE WITNESS:  Yes.

12              MR. SINCICH:  Okay.

13   BY MR. SINCICH:

14        Q   Why did you only shoot one round?

15        A   During my assessment, I stopped shooting when I

16   perceived the threat was done.

17        Q   And what did you perceive that led you to

18   believe that the threat was done?

19        A   I saw the gun on the ground, and I didn't see

20   any imminent threat at that point.

21        Q   Is that because the gun was on the ground and

22   not in his hand?

23        A   Also, I didn't see him reach for the gun after

24   the gun was on the ground.

25        Q   Okay.  If you had saw Mr. Valdivia take the gun

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 59

1    out and then throw it down to the ground, would you have

2    used deadly force?

3              MS. O'LINN:  Objection.  Calls for speculation.

4              THE WITNESS:  No.

5    BY MR. SINCICH:

6         Q    Why not?

7         A    If he threw the gun to the ground, I wouldn't

8    have perceived an immediate imminent threat.

9         Q    And is the training that it has to be more than

10   just any imminent threat in order to use deadly force?

11        A    Can you rephrase your question, please.

12        Q    Yeah.  In other words, is the training that it

13   has to be more than just any threat?  It has to be

14   specifically an immediate threat of death or serious

15   bodily injury in order for officers to use deadly force?

16        A    Yes.

17        Q    When you arrived on scene, did you believe that

18   the scene location was contained?

19        A    Can you rephrase that question, please.

20        Q    Yes.  You had mentioned earlier that Officer

21   Sun had coordinated a containment of the location; is

22   that right?

23        A    Yes.

24        Q    So did you have an understanding that there was

25   two vehicles on the east side of the parking lot?

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 60

1      A   My understanding was that there was a

2   containment that was setting up and officers arriving on

3   the scene.

4      Q   Okay.  So by the time that you engaged verbally

5   with Mr. Valdivia, did you believe that the containment

6   had been set?

7      A   I don't quite understand your question.  I'm

8   sorry.

9      Q   Did you believe that the parking lot where the

10   shooting incident occurred was contained by the time

11   that you gave your commands to Mr. Valdivia?

12      A   I knew that containment had been communicated,

13   and that the officers were arriving on scene during that

14   time.

15      Q   Okay.  Other than Officer Cardoza and Officer

16   Sun, how many other officers did you believe were en

17   route to the scene?

18      A   To my understanding, three other officers.

19      Q   Which officers?

20      A   Officer Avila, Officer Dixon, and Officer

21   Marquez.

22      Q   Did you know before your use of force that

23   there were two sergeants on scene?

24      A   No.

25      Q   When you used force, did you know that anybody

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 61

 1    was behind you?

 2         A    I knew that there were several people in the

 3    Starbucks behind us.

 4         Q    Did you review Sergeant Statler's body-worn

 5    camera at all?

 6         A    Yes.

 7         Q    Upon review of that camera, were you able to

 8    see yourself during the shooting incident?

 9         A    Yes.

10         Q    And were you able to tell that both Sergeant

11    Statler and Sergeant Rasmussen were behind you?

12         A    Yes.

13         Q    Did they ever communicate to officers that they

14    arrived on scene?

15         A    I don't recall.

16         Q    Did you know where Officer Avila was at the

17    time of your use of force?

18         A    I knew he was driving from east of the

19    location.

20         Q    Did you know where Officer Dixon was at the

21    time?

22         A    Specifically, no.

23         Q    Generally, where did you believe he was?

24         A    I knew he was arriving on scene.  I don't

25    recall specifically where.

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 64

```
 1        Q   Did you know that Officer Sun was a SWAT

 2    officer when you arrived on scene?

 3        A   Yes.

 4        Q   Did you essentially follow his lead during this

 5    incident?

 6            MS. O'LINN:  Objection.  Argumentative.  Vague,

 7    ambiguous, and overbroad.

 8            You could explain.

 9            THE WITNESS:  My understanding was he was the

10    primary officer and I was there to assist him.

11    BY MR. SINCICH:

12        Q   Okay.  Just give me a second here.  I want to

13    make sure I don't ask you a question twice if I can

14    avoid it.

15            Did you give a deadly force warning prior to

16    your use of deadly force?

17            MS. O'LINN:  Go ahead.  You can answer.

18            THE WITNESS:  No.

19    BY MR. SINCICH:

20        Q   Did you hear any of the other officers giving a

21    deadly force warning prior to any shots fired?

22        A   No.

23        Q   Prior to Mr. Valdivia retrieving the gun from

24    his waistband, did you believe that he was somewhat

25    compliant?
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 65

1          MS. O'LINN:  Objection.  Argumentative as

2    phrased.

3          You can answer.

4          THE WITNESS:  Can you rephrase that question,

5    please.

6    BY MR. SINCICH:

7      Q   Yeah.  Prior to Mr. Valdivia retrieving the gun

8    from his waistband, based on your perception of his

9    conduct in response to officer commands, did you

10   perceive him to be somewhat compliant?

11         MS. O'LINN:  Objection.  Argumentative.  Vague,

12   ambiguous, and overbroad.

13         You can answer.

14         THE WITNESS:  Based on the totality of

15   circumstances in my interaction with him, I would not

16   consider him compliant.

17   BY MR. SINCICH:

18     Q   Okay.  Do you recall telling the investigators

19   that he was only somewhat compliant?

20     A   Yes.

21     Q   Is it fair to say then that Mr. Valdivia was

22   somewhat compliant during this incident?

23         MS. O'LINN:  Objection.  Argumentative.

24         You can answer.

25         THE WITNESS:  He complied with some of our

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 66

1    commands and some of them he did not, so I would

2    consider him not compliant.

3    BY MR. SINCICH:

4         Q    Which commands did he comply with?

5         A    He complied at one point when he put his hands

6    up and at one point as he began to get on the ground.

7         Q    Okay.  And those were both in response to

8    officer commands based on your perception?

9         A    Yes.

10        Q    And when you were moving south along that pony

11   wall, was it your intent, in addition to being behind

12   cover, to get off the X?

13        A    Yes.

14        Q    And what's the training with that regard?

15        A    A moving target is harder to hit, and I was

16   moving towards a point of cover.

17        Q    Was Mr. Valdivia's body generally stationary

18   during the shooting?

19        A    I don't understand your question.  I'm sorry.

20        Q    Was Mr. Valdivia moving at all during the

21   shooting?

22        A    Yes.

23        Q    How was he moving --

24        A    He was --

25        Q    -- while shots were fired?  Sorry.

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 69

```
 1          MR. SINCICH:  Okay.

 2     BY MR. SINCICH:

 3          Q    And then after you shot, did you believe that

 4     your round impacted Mr. Valdivia?

 5          A    Yes.

 6          Q    What led you to believe that your round

 7     impacted him?

 8          A    Based on my site picture at the time.

 9          Q    Where did you believe your round impacted him?

10          A    Center mass.

11          Q    Center mass of what part of his body?

12          A    His torso.

13          Q    Could you be more specific because earlier you

14     said you could see portions of his chest and portions of

15     his back.

16          A    Center mass of his torso is the best way to

17     explain.

18          Q    Could you point on your body where you believe

19     his round impacted?

20          MS. O'LINN:  Objection.  Counsel, that's

21     argumentative to point to a specific point as opposed to

22     him saying center mass.

23          But you can explain.

24          THE WITNESS:  It was pointed towards center

25     mass when I fired my shot.  I really can't explain
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 76

1       A    She was in that general area.

2       Q    Okay.  Now, looking at the -- actually, I'll

3   just press play.  I'll show you a different photo later.

4            (Video played.)

5            MR. SINCICH:  All right.  I stopped at 58

6   seconds.  I had to adjust it.

7   BY MR. SINCICH:

8       Q    Can you see Mr. Valdivia on this frame?

9       A    Yes.

10      Q    Is this the position that Mr. Valdivia was in

11  after you fired your round?

12      A    I don't understand your question.

13      Q    Do you recall seeing Mr. Valdivia in this

14  position during the incident?

15      A    Yes.

16      Q    And was he in this position after he had

17  dropped the gun?

18           MS. O'LINN:  Objection.  Argumentative.  Scope.

19  Time.

20           You can answer.

21           THE WITNESS:  At some point after he dropped

22  the firearm, he was in that pose, yes.

23  BY MR. SINCICH:

24      Q    Okay.  And you said that after he had dropped

25  the firearm, he didn't reach for it; is that fair?

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 77

```
 1       A   I did not see him reach for it.

 2       Q   Because the perspective is a little bit

 3   different, from your perspective having been there, how

 4   far, approximately, was the gun from Mr. Valdivia as

 5   depicted at 58 seconds of Exhibit 7?

 6           MS. O'LINN:  At this point in the video?

 7           MR. SINCICH:  Yes.

 8           THE WITNESS:  Within approximately 1 foot.

 9   BY MR. SINCICH:

10       Q   Okay.  And can you tell which way Mr. Valdivia

11   is facing?

12           MS. O'LINN:  Objection.  Argumentative.  You

13   mean -- I don't understand your question.

14           But go ahead.  If you understand, you can

15   answer.

16           THE WITNESS:  I'm not understanding your

17   question.  I'm sorry.

18   BY MR. SINCICH:

19       Q   After the officer-involved shooting, which way

20   was Mr. Valdivia facing?  His face.

21       A   Face down.

22       Q   Okay.  And was he facing face down with his

23   head slightly to his left?

24       A   In this specific frame is what you're asking?

25       Q   Well, it could be depicted in this frame, but
```

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 78

```
 1   I'm asking what you recall during the incident.

 2           MS. O'LINN:  Thank you for that clarification,

 3   Counsel.

 4           THE WITNESS:  I just recall him being face

 5   down.

 6   BY MR. SINCICH:

 7       Q   Okay.  And do you recall his right hand being

 8   near the top of his head?

 9           MS. O'LINN:  Objection, Counsel.  Vague as to

10   time.

11   BY MR. SINCICH:

12       Q   And that's fair.  After you fired your shot.

13       A   I don't understand the question.

14       Q   Okay.  When you perceived Mr. Valdivia dropping

15   the gun and then you decided not to shoot a second shot,

16   was Mr. Valdivia in the position depicted at 58 seconds

17   of Exhibit 7?

18       A   No.

19       Q   How was he different?

20       A   His arm was still slightly extended.

21       Q   And was his arm in the process of moving back

22   towards this position with his hand next to his head?

23       A   At some point after he dropped the firearm, it

24   did.

25       Q   Okay.  I'll just continue to play this.
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 81

1    respect to the use of force?

2        A    Yes.

3        Q    Is it fair to say that the totality of

4    circumstances according to the policy includes the

5    officer's conduct leading up to the use of force?

6        A    Yes.

7        Q    And according to the policy, is it fair to say

8    that officers should only use force when it reasonably

9    appears necessary under the totality of circumstances?

10       A    Yes.

11       Q    And that's for any type of force; right?

12       A    Yes.

13       Q    And with regard to the use of force, is it fair

14   to say that the ultimate objective is for a law

15   enforcement encounter to avoid or minimize injury?

16       A    I'm sorry, can you rephrase that question.

17       Q    Sure.  Is it fair to say according to the

18   policy that the ultimate objective of every law

19   enforcement encounter is to avoid or minimize injury?

20       A    Yes.

21       Q    And are officers trained to attempt to

22   de-escalate the situation when it's safe to do so?

23       A    Yes.

24            MS. O'LINN:  Counsel, a bathroom break when you

25   get a chance.  Unless you're done.

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 82

```
 1          MR. SINCICH:  I'm almost there.

 2    BY MR. SINCICH:

 3          Q    Do you understand the definition of imminent

 4    according to the policy?

 5          A    Yes.

 6          Q    Can you describe what that is?

 7          A    When someone has the present ability,

 8    opportunity, and intent to cause death or serious bodily

 9    injury.

10          Q    Okay.  And do you have an understanding as to

11    whether or not that is meant to align with Penal

12    Code 835a?

13          A    Yes.

14          Q    Are you familiar with Penal Code 835a?

15          A    Yes.

16          Q    As part of the definition of imminent, are you

17    familiar -- or was it your understanding at the time of

18    the incident that imminent meant not merely a fear of

19    future harm?

20          A    Yes.

21          Q    No matter how great the fear?

22          A    Yes.

23          Q    And no matter how great the likelihood of the

24    harm?

25          A    Yes.
```

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 86

1   the commands by yourself and Officer Sun at any point?

2        A   He said, Whatever.

3        Q   That's one word, whatever, quote?

4        A   Yes.

5        Q   What did you take that to mean?

6        A   I took that to mean he wasn't taking the

7   situation seriously, and that he could be unpredictable.

8        Q   Did that indicate to you that he knew you were

9   a police officer?

10       A   Yes.

11           MR. SINCICH:  Calls for speculation.  Lacks

12   foundation.

13           MS. O'LINN:  One moment, Counsel.

14           MR. SINCICH:  I'm sorry, I couldn't hear you.

15           MS. O'LINN:  I said one moment.  Just let me --

16           MR. SINCICH:  Oh.

17           MS. O'LINN:  -- I think I'm done.

18           I have nothing further.

19           MR. SINCICH:  Okay.  Just maybe -- when an

20   attorney says he's got one question, he might have more

21   than one.

22                    -o0o-

23           FURTHER EXAMINATION BY MR. SINCICH

24       Q   Based on your training, is it fair to say that

25   officers cannot use deadly force based on subjective

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 87

1    fear alone?

2         A    Yes.

3         Q    Okay.

4              MR. SINCICH:  No further questions.

5              MS. O'LINN:  Madam Court Reporter, as we

6    discussed prior to the deposition commencing, we'll take

7    a copy with a condensed and a Word version.

8              Please contact my assistant, Delia Flores, as I

9    provided you with her email for all communications with

10   regard to the transcript.  You can include me on that

11   email as well, but she needs to be on it.

12             Thank you very much for your assistance today.

13   Do you need any spellings?

14             THE REPORTER:  Are we off the record now?

15             MR. SINCICH:  Yeah, we're off the record.

16   Thanks.

17             MS. O'LINN:  Yes.

18             (End of record, 12:07 p.m.)

19

20

21

22

23

24

25

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 89

1                          REPORTER'S CERTIFICATE

2

3            I, Patricia L. Davis, a Certified Shorthand

4    Reporter for the State of California, do hereby certify:

5            That said proceedings were taken before me at

6    the time and place set forth herein and was

7    stenographically reported by me in shorthand, and I

8    hereby certify that said proceedings are a full, true,

9    and correct transcript of my shorthand notes so taken;

10   that the dismantling, unsealing, or unbinding of the

11   original transcript will render the reporter's

12   certificate null and void.

13           Further, that if the foregoing pertains to the

14   Original transcript of a deposition in a federal case,

15   pursuant to F.R.C.P. 30(e)(2) before completion of the

16   proceedings, review of the transcript was not requested.

17           I further certify that I am neither counsel

18   for, nor related to any party to said action, nor in any

19   way interested in the outcome thereof.

20           IN WITNESS WHEREOF, I have subscribed my name

21   this 18th day of March, 2025.

22

23                          *Patricia L. Davis*

                            PATRICIA L. DAVIS
24                          CSR No. 11521

25