# EXHIBIT F

```
In the Matter of:              )
Officer-involved shooting      ) Case No.
Transcription of Tape-recorded ) 5:23-cv-01562
Interview of Officer David Meadows) -CBM-SHK
_____ )
```

<u>Transcriptions of tape-recorded interview of</u>

<u>Interview of Officer Meadows</u>

<u>by Special Agent. Zurawski.</u>

Transcribed by:
Gianna Pereria

Job Number:
TP11529C

1                        "Officer David Meadows"

2

3          SPECIAL AGENT ZURAWSKI:  The time is 12:36.  All

4    right, today's date is April 18th, 2022, and it is now

5    1236 hours.  I am audio recording.  This is Special

6    Agent Zurawski, Cal DOJ.  Also audio recording in this

7    room is Detective Oswaldo Preciado and Attorney Vanessa

8    Munos.

9          This interview is being monitored by the following

10   people in the next room as well, Special Agent

11   Supervisor Samuel Richardson, R-i-c-h-a-r-d-s-o-n,

12   Special Agent Allen Oratovsky, O-r-a-t-o-v-s-k-y.  And

13   Deputy Attorney General, Namita Patel, P-a-t-e-l.  We're

14   going to go around the room and we're going to identify

15   ourselves.  If you can say your first name, spell your

16   last.  Officer?

17         DETECTIVE PRECIADO:  Detective Oswaldo Preciado.

18   Last name is spelled P-r-e-c-i-a-d-o.  Badge number,

19   2243.

20         DAVID MEADOWS:  Officer David Meadows.  Last name

21   spelled, M-e-a-d-o-w-s.

22         ATTORNEY MUNOS:  And Vanessa Munos, with Mastagni

23   Holstedt representing Officer Meadows.  And my last name

24   is spelled M-u-n-o-s.

25            SPECIAL AGENT ZURAWSKI:  And my name is Special

                                                            2

1    subject was causing disturbance and making mention of a

2    firearm, which kind of heightened my level of

3    seriousness to the -- the call that we're responding to.

4    As we're driving to the location, Officer Sun was

5    setting up a containment on the location with the other

6    officers that were responding.

7        And I believe it was Officer Cardoza that was --

8    came on the radio and -- and asked -- either asked or

9    told Officer Sun that she was going to grab the less

10   lethal shotgun, which gave us another less lethal

11   option, should the opportunity arise.  Officer Sun and I

12   arrived at the location approximately the same time, he

13   was just in front of me.  At that time is when I

14   activated my body-worn camera.

15       We parked our vehicles west in the parking lot of

16   the Starbucks which is the business, just west of the

17   Country Liquor.  We parked on the west side of the

18   building, kind of out of -- to stay out of sight from

19   whoever was in the front of the Country Liquor.  After I

20   parked my vehicle, I exited it, again, because of the

21   call -- the nature of the call and the area, and the

22   mention of the firearm.  I unholstered my department-

23   issued firearm.

24       And as I -- as I exited the vehicle, I saw Officer

25   Sun ahead of me approaching the northwest corner of the

16

1    Starbucks building.  So I kind of -- I jogged to catch

2    up to him so that he wouldn't be approaching on his own.

3    As I got to the northwest corner, I could hear the

4    sounds of -- of people arguing.  I couldn't make out

5    what they were saying, but it was -- there was -- it

6    sounded like they were arguing.

7        As I rounded the corner, Officer Sun was still

8    slightly ahead of me, still approaching the Country

9    Liquor.  In front of me there was the driveway of the

10   Starbucks, which was on the east side of the location,

11   which on the east side of that driveway was about a

12   three-foot pony wall.  And then just on the other side

13   of that was a -- like a black four-door Sedan that was

14   parked in a parking stall just in front of the liquor

15   store.

16       Behind that vehicle, I could see the tops of three

17   heads and it -- it looked like the three subjects were

18   -- were arguing.  As we got closer, I could see that one

19   of the subjects matched the description that was given

20   to us, which was a -- a male wearing a black sweatshirt

21   with a beer and a -- and at that time it was with a gun.

22   But I saw one subject, he had the black sweatshirt and

23   he was holding a -- looked like a -- or appeared to be a

24   40 ounce bottle of beer in his left hand.

25       As I was scanning the location, I saw that there was

17

1    a couple other people further down in the parking lot,

2    and there were several people in the liquor store as

3    well.  However, I focused on that group due to the fact

4    that that one subject matched the description of -- that

5    was given to us of the subject that was causing the

6    disturbance.  Officer Sun continued to approach and I --

7    I did as well.

8        I kind of just hugged the north wall of the

9    Starbucks and kind of stayed closer to the drive --

10   drive-through area due to the fact that there was a wall

11   and a car.  But I still wanted to have a visual of the

12   person, the subject we were contacting.  And as we got a

13   little closer, I announced our presence.  I stated that

14   we were police by saying, "Police," and I ordered all

15   three subjects to put their hands up.

16       Two of the subjects did put their hands up, the

17   subject with the beer he started to reach towards his

18   waistband pocket area.  Oh, let me go back.  As we

19   arrived on scene too, dispatch also informed us that

20   another caller had called and stated that the subject

21   had put the firearm in his pocket.  And then as we

22   approached, that's when I saw that he had a beer, but I

23   didn't see a gun in his hand at that time.

24       So after I ordered them to -- announced our

25   presence, said, "Police," and then ordered them to put

18

1    I both gave him commands not to reach for it.  He

2    ignored those commands and I saw him remove the firearm

3    from his waistband.  And he started to bring it up in

4    our direction.

5        Like I remember time, kind of like slowing down at

6    that point, and I could see like exactly every step that

7    he was doing.  And the muzzle began to -- it kind of

8    flagged the ground and then started to raise up in our

9    direction.  And at that point I was just scared that he

10   was going to point the gun at us and -- and start

11   shooting at us.  And I was scared that he was going to

12   either kill me or I was going to watch my partner die

13   next to me.

14       So at that point I kind of sidestepped to get off of

15   line.  I -- I looked -- I acquired my sights and before

16   he was able to get a round off, I focused my sights into

17   the center mass of the target and I pulled the trigger.

18   After I pulled the trigger, I saw his body collapse and

19   I saw that the gun fell out of his hand.  So as I took

20   up the slack and reassessed the situation, I didn't -- I

21   felt he was no longer a threat, so I didn't take a

22   second shot.

23       I did also hear the volley of shots from the other

24   officers as well, but mainly I focused on the fact that

25   after I pulled the trigger, I saw him drop and the gun

21

1     SPECIAL AGENT ZURAWSKI:  Off to his right side?

2     DAVID MEADOWS:  Yes.

3     SPECIAL AGENT ZURAWSKI:  Okay.  What was going

4  through your mind as this was all unfolding?

5     DAVID MEADOWS:  It was like -- like this is a

6  legitimate call.  Like he has the firearm that was

7  described by multiple witnesses that called, and he was

8  in fact arguing with people as we arrived on scene and

9  he had the beer with him so.  And like I said, his

10  demeanor when we contacted him was that of someone that

11  I was not able to predict what his -- what his motions

12  were going to be.

13     And then the fact that he was only somewhat

14  compliant, but when he wanted to be and then I saw the

15  firearm with him.  So that told me that -- that this is

16  someone that's looking to either get in a confrontation

17  with somebody or to hurt someone.

18     SPECIAL AGENT ZURAWSKI:  Would you say that the

19  decedent's actions were -- were willful and deliberate?

20     DAVID MEADOWS:  Yes.

21     SPECIAL AGENT ZURAWSKI:  So how did you feel as this

22  was going down?  What -- what were your feelings?

23     DAVID MEADOWS:  I started getting scared.  I was

24  scared for my safety.  I was scared for my partner's

25  safety.  Just being in this profession, I know that one

32

1    gunshot could kill you.  And when he pulled that gun, I

2    felt like he intended to kill us.

3         SPECIAL AGENT ZURAWSKI:  So you answered the

4    question, but I'm going to ask it again.  Why did you

5    fire your weapon?

6         DAVID MEADOWS:  Because I thought he was going to

7    try and kill us.

8         SPECIAL AGENT ZURAWSKI:  You mentioned before that

9    you -- you gathered a good sight picture.  So he did not

10   point and shoot at you, you got a good sight picture on

11   center mass.  Is that correct?

12        DAVID MEADOWS:  Yes.

13        SPECIAL AGENT ZURAWSKI:  What shooting platform did

14   you take?  Single-handed, supported.

15        DAVID MEADOWS:  Supported, two hands.

16        SPECIAL AGENT ZURAWSKI:  Supported.  And I think you

17   stated that you moved off the X.

18        DAVID MEADOWS:  Yes.

19        SPECIAL AGENT ZURAWSKI:  When you saw him reaching

20   for the gun?

21        DAVID MEADOWS:  Yes.

22        SPECIAL AGENT ZURAWSKI:  Okay.  Any -- any visual

23   obstructions between you and the decedent?  I think you

24   stated once before, but how many rounds did you fire?

25        DAVID MEADOWS:  One.

                                                          33

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1       SPECIAL AGENT ZURAWSKI:  How many volleys of fire

2   did you fire?

3       DAVID MEADOWS:  One.

4       SPECIAL AGENT ZURAWSKI:  Why did you stop firing

5   your weapon?

6       DAVID MEADOWS:  I saw him collapse, and I saw that

7   the gun was no longer in his hand, so I didn't feel he

8   was a -- a threat any longer, so I didn't fire a second

9   round.

10      SPECIAL AGENT ZURAWSKI:  Were you aware of the

11  backdrop behind the decedent --

12      DAVID MEADOWS:  Yes.

13      SPECIAL AGENT ZURAWSKI:  -- when you guys were

14  contacting him?

15      DAVID MEADOWS:  Yes.

16      SPECIAL AGENT ZURAWSKI:  Was there any dangers to

17  the civilians, any crossfire, potential issues with

18  other law enforcement officers?

19      DAVID MEADOWS:  No.

20      SPECIAL AGENT ZURAWSKI:  What do you think would've

21  happened if you didn't fire your weapon?

22      DAVID MEADOWS:  He was going to shoot at us and that

23  he was going to try to kill one of us.

24      SPECIAL AGENT ZURAWSKI:  You already stated that you

25  rendered aid to the decedent directly after he was

                                                        34

```
1     STATE OF CALIFORNIA        )

2                                )     SS.

3     COUNTY OF LOS ANGELES      )

4

5              I, Gianna Pereira, a transcriber for

6     Lynden J. And Associates, Inc., do hereby certify:

7              That said proceedings were listened to by me

8     and were transcribed into typewriting under my direction

9     and supervision; and I hereby certify that the foregoing

10    transcript of the proceedings is a full, true, and

11    correct transcript to the best of my ability.

12              I further certify that I am neither

13     counsel for nor related to any party to said action,

14     not in anywise interested in the outcome

15     thereof.

16              In witness whereof, I have hereunto

17    subscribed my name this 1st day of October, 2024.

18

19

20

21

22                    Gianna Pereira

23

24

25
```

37