**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
*dalekgalipo@yahoo.com*
Marcel F. Sincich, Esq (SBN 319508)
*msincich@galipolaw.com*
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

E.V. and X.V., minors by and through their guardian ad litem, Karla Juarez; D.V., a minor, by and through his guardian ad litem, Elias Valdivia; individually and as successors-in-interest to Daniel Luis Valdivia, deceased; JESSICA VALDIVIA; LUIS VALDIVIA JR., individually,

Plaintiffs,

vs.

CITY OF COVINA; VANESSA CARDOZA; DAVID MEADOWS; BILLY SUN; DOES 1-10, inclusive,

Defendants

Case No.: **5:23-cv-01562-CBM-SHK**

[*Honorable Consuelo B. Marshall*]
Magistrate Judge Shashi H. Kewalramani

**DECLARATION OF ROGER CLARK**

[*Filed concurrently with* Plaintiffs' Points and Authorities in Opposition to Summary Judgment; Separate Statement of Genuine Disputes and Additional Material Facts; Objections to Defendants Separate Statement]

Hearing: July 15, 2025
Time: 10:00 a.m.
Crtrm: 8D

Trial Date: October 21, 2025
Complaint Filed: August 4, 2023

# DECLARATION OF ROGER CLARK

I, Roger A. Clark, hereby declare as follows:

1. I am a police practices expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

## Qualifications

3. Attached hereto as "**Exhibit A**" is a true and correct copy of my Expert Report in this matter, including my Curriculum Vitae setting forth my qualifications to provide expert testimony, both of which I incorporate herein. A summary of those qualifications is also as follows:

a. My opinions are based in part on my training, professional experience and education. I am a twenty-seven-year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I hold a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5).

b. As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted investigation and apprehension methods.

c. During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation,

interview, and apprehension procedures. I also lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

d. During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993. The majority of our cases were homicide cases. Arrests frequently occurred in dynamic circumstances including crimes in progress.

e. As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer involved shootings.

f. Since my retirement, I have testified as an expert on jail procedures and jail administration, police procedures, police tactics, investigative procedures, shooting scene reconstruction, trajectory, bullet casings and police administration in Arizona State Courts, California Courts, Washington State Courts and Federal Courts in California, Texas, Colorado, Illinois, Indiana, Pennsylvania, and Washington.

g. I have consulted and/or testified as an expert in dozens of cases regarding law enforcement shootings and police practices and have been certified as an expert on these areas in both State and Federal Courts.

## Materials Reviewed

4. I have reviewed the following materials in this case: involved officer body-worn camera videos; deposition transcripts of Defendants; statements of the officers involved; investigative records; photographs of the scene and evidence; autopsy report; policies and training documents; POST Learning Domains; Plaintiffs' Complaint and the Protective Order.



**Methodology**

5. I make this declaration and my opinions based on my review of the above materials and also based on my experience and knowledge of law enforcement training and standards.

6. My general method is to: (1) review all of the relevant available material involved in the case to determine a factual understanding of the circumstances for which I have been asked to consult; (2) review all relevant POST Learning Domains, recent publications, recent case-law on point, pertinent training bulletins, and manuals to ensure that I apply the most modern and accurate law enforcement policies, practices, procedures, and standards to the case at issue; (3) rely on decades of experience, knowledge and training when evaluating and analyzing how the law enforcement training will be applied to real-world scenarios along with the risk involved with them; and (4) apply the discoverable facts to the standards that the law enforcement officers did or should have employed.

**Opinions**

*The Defendant Officers failed to develop and execute a plan.*

7. Based on the nature of the call, and in accordance with basic officer training, the officers involved should have but failed to execute a plan; should have but failed to communicate their locations and responsibilities with other officers; and should have but failed to meet, coordinate their movements, establish roles, and contingency plans. The Defendant Officers failed to maintain a covered position despite cover being available to them. There were two sergeants on scene who failed to contribute to any plan or execution thereof. There was no discussion of how or when to use the available K9 or less-lethal shotgun as options.

*The Defendant Officers did not give a warning and failed to give adequate commands prior to using force.*

8. It is clear from the video evidence and the officers' testimonies that no officer gave a deadly force warning to Mr. Valdivia prior to their use of deadly

force. A warning that deadly force will be used must be given when feasible according to basic officer training. Given Mr. Valdivia's willingness to comply with commands and the time available, it was feasible to give a warning. An officer's failure to take the time available to him and uses deadly force instead of issuing a warning does not mean that the officer did not have time. Additionally, the Defendant Officers did not give adequate commands, as they did not establish roles prior to their approach and ended up giving simultaneous and conflicting commands. This failure to adequately communicate with Mr. Valdivia also led to the inadequate announcement of themselves as police officers.

*The Defendant Officers had multiple options for cover at the time of their use of deadly force.*

9. The Defendant Officers had multiple options for cover at the time of the uses of deadly force including: the brick wall next to the drive-thru; the corner of the building; and the vehicles in the parking lot. The Defendant Officers also could have waited for sergeant arrival in order to utilize the ballistic shields and/or moved their vehicles up so that they could utilize their ballistic doors. The Defendant Officers also had space to maneuver and tactically reposition to create distance and time, if necessary. It is my opinion that the officers' failure to take cover is evident of their lack of situational awareness, self-control, inappropriate emotional response, and overreaction in using deadly force. It is tactically unacceptable to avoid cover when it is available under these circumstances. A reasonable officer should call their partner to a safer position instead of moving with their partner into a potentially unsafe area.

*The Defendant Officers had several alternatives to the use of deadly force.*

10. It is my opinion based on review of the record that the Defendant Officers had, but failed to use, several reasonable alternatives to the use of deadly force including: beanbag shotguns, Tasers, batons, OC/pepper spray, a K9, and the ability to de-escalate including with verbal communication and repositioning.

Officer Cardoza was supposed to be armed with the beanbag shotgun but failed to retrieve it. Officer Meadows was supposed to be armed with his K9 but also left it in the vehicle.

a. The California Commission on Peace Officer Standards and Training (POST) Learning Domain 20, Version 5.4, titled "Use of Force/Deescalation" specifically addresses and instructs law enforcement officers on de-escalation techniques (Charter 2). "Peace officers must understand that the principles of deescalation can provide effective tools during contacts with the public and may result in improved decision-making, reduction in situational intensity, and providing outcomes with greater voluntary compliance." (LD 20, 2-3.) Core concepts include self-control, effective communication, scene assessment and management, and force options. (LD 20, 2-5.) The Decision-Making Model includes Collecting Information: prior to arrival, use distance, use additional officers, and communication; Assessment: determine threat, situational awareness, request resources, cover and concealment, and distance; Law and Policy: legal reason or obligation, legal powers, and agency policy; Plan: identify roles and responsibilities, contingencies, options and resources, and utilization of time; Act, Review, Reassess: implement plan and prepare to adjust, assess, and review lessons learned. (LD 20 2-6 – 2-8.) De-escalation also includes tactical repositioning and strategic communication.

b. The Defendants Officers did not adequately attempt to de-escalate the situation as trained but instead escalated the situation. It appears from the record that the Defendant Officers did not follow the decision-making model, did not attempt to reduce the intensity of the situation, and did not employ tactics that would have provided greater voluntary compliance. The Defendant Officers did not adequately communicate with each other, did not control their emotions, and overreacted in their pre-shooting techniques

and in their use of deadly force. Further, the officers did not adequately plan for this situation, no roles and responsibilities were clearly established, no options or resources were requested, and the Defendant Officers did not utilize the time that they had to take Mr. Valdivia into custody without using unnecessary force.

c. Another option available to the Defendant Officers was to issue a command to the subject (here Mr. Valdivia) to turn away from the sound of the officer's voice. This trained procedure allows the officers to approach, maneuver, and communicate with each other blind to the subject, makes it more difficult for the subject to attempt to harm any officer if he were to choose to do so, and gives the officers more time to react if the subject does not comply with commands. As trained, Time = Options. Once the subject has turned around, as trained, officers should give the commands to get his hands on this head and go to his knees. Given that the area was contained, and that there were other civilian subjects that needed to be controlled and safeguarded, this technique would have been safer and more appropriate than having the subject go to the ground facing the officers in an exposed and uncovered position.

*Mr. Valdivia was not attempting to flee and was not resistive.*

11. It is apparent from the video evidence that Mr. Valdivia did not attempt to flee, and was not resistive, but showed acts of compliance. Mr. Valdivia was commanded to put his hands in the air and complied. Mr. Valdivia was commanded to move his hands from his waistband area and complied. Mr. Valdivia was commanded to get down on the ground and complied. These several acts of compliance, along with other factors, show Mr. Valdivia's apparent intent to comply, which would be known to a reasonable officer.

///

*Mr. Valdivia was not an immediate threat of death or serious bodily injury at the time of the use of deadly force.*

12. It is my opinion that any reasonable officer under these circumstances would *not* consider Mr. Valdivia to be an immediate threat of death or serious bodily injury at the time, as defined by basic officer training; that the use of deadly force against Mr. Valdivia by the Defendant Officers was inappropriate and unnecessary under the circumstances of this case, violated the standard of care, violated basic law enforcement training, and violated POST standards. Relevant to my analysis in this matter is what was known to the Defendant Officers at the time they used deadly force.

a. Pursuant to POST basic training and under the law, a peace officer is only justified in using deadly force if under the totality of the circumstances, the force is necessary to defend against an imminent threat of death or serious bodily injury. A threat of death or serious bodily injury is "imminent" only if the subject has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury. An imminent threat is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm but is one that must be instantly confronted and addressed. The totality of the circumstances includes the conduct of the officer leading up to the use of deadly force.

b. The Defendant Officers had Mr. Valdivia contained. Prior to his use of deadly force, officers had no information that Mr. Valdivia had ever physically injured anybody in the past; never saw Mr. Valdivia physically injure anybody; and never heard Mr. Valdivia verbally threaten anybody. There were civilians nearby and it is apparent from the evidence that the biggest threat to them were the shots fired by the Defendant Officers. The Defendant Officers claimed to have assessed between rounds. However, prior to officers firing any shots, Mr. Valdivia did not point the gun at anyone;

never attempted to punch, kick, or grab anyone; and was not running or moving towards any officer or person. Mr. Valdivia was lying on the ground when the shots were fired.

c. Based on my review of the video evidence, Mr. Valdivia does not appear to point the gun at the officers. It appears as though he is dropping the gun to the ground in front of him prior to any shot being fired. The motion Mr. Valdivia makes to drop the gun is clear and occurs fluidly. Even viewing the video evidence frame by frame, Mr. Valdivia does not appear to ever point the gun at anyone.

d. Based on the video evidence, Mr. Valdivia did not have a weapon in his hand at the time of the shots. Mr. Valdivia's hands were visibly empty. Mr. Valdivia tossed and/or discarded the gun before any shot was fired, then moved his right hand away from the discarded gun and put it next to his head, which was facing the ground as Mr. Valdivia lay flat on the ground at the time of the shots.

e. It is my opinion, based on review of the Defendant Officers' testimonies, statements, and video evidence, that at the time of their use of deadly force, Mr. Valdivia did not have the apparent intent, opportunity or present ability to immediately causing death or serious bodily injury. Further, based on Mr. Valdivia's prior acts of compliance, and dropping the gun prior to the shot, Mr. Valdivia's apparent intent appears to be to comply with officer commands and to discard the gun based on officer presence alone.

13. Hypothetically, if an officer is confronting a person based on a call that the person has a gun, and upon arrival sees in the person's waistband what appears to be a gun, and the complies with officer commands to put his hands up and to get on the ground, with officers having the ability to reposition and use cover, and without providing a warning or attempting less-intrusive options, and while the subject is on the ground and after having tossed the apparent gun to the side and

moved his hands away from it, it would be a clear violation of basic police training, violation of the POST standards, and clearly inappropriate to use deadly force, namely because the subject would not be an immediate risk of death or serious bodily injury at the time. Additionally, the subject under this hypothetical would not have the opportunity to be a death threat based on his grounded position and would not have the capability to be a deadly threat based on his hands being visibly empty, and is not showing an apparent intent to cause a death or serious bodily injury by complying with officer commands and then discarding his gun to the ground.

*A reasonable officer would know that the law was clearly established at the time of the incident that officers could not use deadly force under these circumstances.*

14. It is my opinion that any reasonable officer would know that the law was clearly established at the time of the incident that law enforcement officers could not use deadly force under these circumstances. POST training is designed to provide officers with information to use their police powers within the law, which includes the use of deadly force. As stated above, pursuant to POST basic training and under the law, deadly force is only justified if necessary to defend against an imminent threat of death or serious bodily injury, meaning the subject has the present ability, opportunity, and apparent intent to immediately cause death or serous bodily injury. Any reasonable officer would know that when confronted with a man armed with an apparent gun, there are four important details, more than anything else, that weigh in the decision to use deadly force: (1) where is the gun with respect to the subject's hands, (2) what is the subject doing with his hands in relation to the location of the gun, (3) if the gun is in the hand, how is the subject holding the gun, and (4) if in the gun is in the hand, in what direction is the gun pointed. It is obvious to any reasonable officer, if a subject is not holding the gun in an aggressive manner, does not point the gun at any person, but tosses the gun away from him as a universal sign communicating to officers the subject's willingness to

comply, and showing that the subject is unarmed and not a threat, the use of deadly force is absolutely not allowed. Based on the video evidence, not only was the gun not pointed at any officer at any time, but the gun was also out of Mr. Valdivia's hands at the time of all the shots.

I declare under penalty of perjury that the foregoing is true and correct. Executed June 17, 2025, at Santee, CA

Roger A. Clark