# "EXHIBIT A"

# Roger A. Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  rclark9314@aol.com

April 11, 2025

Dale K. Galipo, Esq.
Marcel F. Sincich, Esq.
Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367

**Regarding:   *E.V., X.V., D.V., Jessica Valdivia, and Luis Valdivia v. City of Covina,
Vanessa Cardoza, David Meadows, and Billy Sun
USCD Case No. 5:23-cv-01562-CBM-SHK***

Dear Counsel:

Thank you for retaining me to analyze and render opinions regarding the April 9, 2022, officer involved shooting of Mr. Daniel Luis Valdivia (Mr. Valdivia) by City of Covina Police Department (CPD) Officers Vanessa Cardoza (Officer Cardoza), David Meadows (Officer Meadows), and Chen Wei (a.k.a., Billy) Sun (Officer Sun).  Pursuant to the requirements of Rule 26, I have studied the reports, video recordings, CPD policies and procedures, California POST training documents, photographs, and other materials (as listed below) provided to me thus far regarding this case.  Please be advised that if any additional data is provided for my review, a supplemental report may be necessary.

My opinions rest on the training given to every POST certified California Law Enforcement Officer and the reasonable professional standard of care as expressed and required pursuant to the training provided to every California certified Law Enforcement Officer, including Officers Cardoza, Meadows, and Sun by POST.

**Materials Reviewed Thus Far:**

1.      Stipulated Protective Order.

2.      Plaintiffs' Complaint for Damages.

3.      Video Recordings:
        a.      Officer Sun BWC Video (CPD 37).

     b.     Officer Statler BWC Videos (CPD 38-41).
     c.     Officer Rasmussen BWC Video (CPD 42).
     d.     Officer Ramos BWC Videos (CPD 43-44).
     e.     Officer Meadows BWC Video (CPD 45).
     f.     Officer Marquez BWC Videos (CPD 48-50).
     g.     Officer Lee BWC Video (CPD 51).
     h.     Officer Flores BWC Video (CPD 52).
     i.     Officer Dixon BWC Video (CPD 53).
     j.     Officer Cardoza BWC Video (CPD 54).
     k.     Officer Avila BWC Video (CPD 55).
     l.     Officer Sun BWC Video (CPD 953).
     m.     Officer Dixon BWC Video (CPD 954).
     n.     Officer Avila BWC Video (CPD 955).
     o.     Dashcam Video 1 (CPD 46).
     p.     Dashcam Video 2 (CPD 47).
     q.     Dashcam Video 9 (CPD 956).
     r.     Dashcam Video 3 (CPD 1070).
     s.     Dashcam Video 4 (CPD 1071).
     t.     Dashcam Video 5 (CPD 1072).
     u.     Dashcam Video 7 (CPD 1074).
     v.     Dashcam Video 8 (CPD 1075).
     w.     Covina Express Car Wash Chs 13 & 16.
     x.     Surveillance Video Ch 4.
     y.     Scott Holdaway Videos and Frame Images.

4.     Audio Recordings:
     a.     Interviews of Officer Cardoza (CPD 946-947).
     b.     Interviews of Officer Sun (CPD 948-949).
     c.     Interviews of Officer Meadows (CPD 950-951).
     d.     Interviews of Witness Jonathan Logan (CPD 952).
     e.     Radio Dispatch (CPD 5-36).

5.     Interview Transcripts:
     a.     Interview of Officer Cardoza.
     b.     Interview of Officer Sun.
     c.     Interview of Officer Meadows.
     d.     Interview of Witness Jonathan Logan.

6.     Photographs:
     a.     Scene & Aerial Photos.
     b.     Evidence Photos.

    c.      Officer Photos.
    d.      Autopsy Photos.
    e.      CPD 145-176 – Photos of Scene & Gun.
    f.      CPD 177-181 – Photos of Valdivia Hospital.

7.      Deposition Transcripts and Exhibits:
    a.      Officer Sun.
    b.      Officer Meadows.
    c.      Officer Cardoza.

8.      Department of Justice Documents:
    a.      Report on the Investigation into the Death of Daniel Luis Valdivia on April 9, 2022.  August 2024.
    b.      Autopsy Report.
    c.      Forensic Report re. BB Gun.
    d.      Forensic Report re. Officer Firearms.
    e.      Forensic Report re. Bullet Comparison.
    f.      Forensic Report re. Scene.
    g.      Bureau of Investigation Reports 1-33.
    h.      Physical Evidence Report.
    i.      Covina Call Detail Report.
    j.      Glendora Call Detail Report.
    k.      Covina Final Report.

9.      Investigative Records:
    a.      CPD 87-91 – Incident Report, O. PRECIADO.
    b.      CPD 92-93 – CAD Call.
    c.      CPD 99 – Supp Incident Report, M. FLORES.
    d.      CPD 100-101 – Supp Incident Report, C. AVILA.
    e.      CPD 102 – Supp Incident Report, R. RASMUSSEN.
    f.      CPD 103-104 – Supp Incident Report, D. DIXON.
    g.      CPD 105-106 – Supp Incident Report, S. LEE.
    h.      CPD 107 – Supp Incident Report, T. STATLER.
    i.      CPD 108-109 – Supp Incident Report, J. MARQUEZ.
    j.      CPD 110 – Supp Incident Report, J. ARDERY.
    k.      CPD 111-113 – Supp Incident Report, Det HUSLEY.
    l.      CPD 114 – Supp Incident Report, O. PRECIADO.
    m.      CPD 115 – Supp Incident Report, T. SLATLER.
    n.      CPD 116-117 – Use of Force Report, Lt Dan REGAN.
    o.      CPD 120-137 – Coroner Autopsy Report, J. CARRILLO.
    p.      CPD 912-915 – Watch Comm. Logs, Lt. ROBINSON.

q.   CPD 920 – CA DOJ Notice.
r.   CPD 923-925 – COC Inter-Office Memo. re Officers Cardoza, Sun, Meadows.
s.   CPD 943-944 – CPD IOM, TURNER.
t.   CPD 1076-1110 – DOJ Report re Policy and Practice Recommendations Aug 2024.

10.  Policies and Training:
a.   CPD 182-911 – CPD Policy Manual.
b.   CPD 962-971 – Policy 300 UOF.
c.   CPD 972-981 – Policy 300 UOF
d.   CPD 982-990 – Policy 304 OIS and Deaths.
e.   CPD 991-999 – Policy 304 OIS and Deaths.
f.   CPD 1000-1008 – Policy 305 Firearms.
g.   CPD 1009-1010 – Policy 305 Firearms.
h.   CPD 1011-1014 – Training Bulletin 17-022.
i.   CPD 1015-1025 – Training Bulletin 18-010.
j.   CPD 1026-1027 – DOJ Information Bulletin 'Deadly Weapon.'
k.   CPD 1036-1037 – DOJ Info Bulletin, AB 1506.
l.   CPD 1052-1059 – POST Training Officers CARDOZA, MEADOWS, and SUN.

11.  POST Basic Learning Domains:
a.   #00: "Becoming an Exemplary Peace Officer." Version 1.2
b.   #01. "Leadership, Professionalism and Ethics." Version 5.6
c.   #02: "Criminal Justice System." Version 6.4
d.   #03: "Principled Policing in the Community." Version 5.1
e.   #05: "Introduction to Criminal Law." Version 5.6
f.   #15: "Laws of Arrest." Version 4.16
g.   #16: "Search and Seizure." Version 4.8
h.   #20: "Use of Force/Deescalation." Version 5.4
i.   #21: "Patrol Techniques." Version 5.0
j.   #23: "Crimes in Progress." Version 4.1
k.   #30: "Crime Scene, Evidence, and Forensics." Version 5.0
l.   #33: "Arrest and Control." Version 5.1
m.   #34: "First Aid, CPR and AED." Version 6.1
n.   #35: "Firearms/Chemical Agents." Version 2.5
o.   #36: "Information Systems." Version 3.6

12.  Overview of the incident scene via the internet.

**Brief Overview of Events and Commentary:**

On April 9, 2022, Mr. Valdivia, a male, Hispanic, age 24, was in the parking lot of
Country Liquor, located at 124 East Arrow Highway in the City of Covina, County of
Los Angeles, California.  Mr. Valdivia was reported to be waving a handgun in the
parking lot.  Officers with the Covina Police Department, including Officers Sun,
Cardoza, and Meadows, arrived on scene and gave Mr. Valdivia commands to put his
hands up and to get on the ground.  Mr. Valdivia complied by putting his hands up then
assumed a partially prone position on the ground.  When in that position, Mr. Valdivia
discarded what appeared to be a gun.  After the gun was no longer in his hands, the
Officers began discharging their firearms at Mr. Valdivia without warning.  It was
subsequently determined that Mr. Valdivia was in possession of a BB gun.  In this set of
facts (including as confirmed by video evidence) Mr. Valdivia (as recorded) never
verbally threatened any Officer and at the time of the shots was not an immediate threat
of death or serious bodily injury to any Officer or person.  The following is a brief
overview of the incident, commentary, and opinions regarding the use of deadly force on
Mr. Valdivia by Officers Sun, Cardoza, and Meadows.

**Incident:**

Information known from CAD Call (CPD 92):

> 22:12:51 – 417 Hispanic male, 40 years-old, wearing a black sweater,
>          shorts, and with facial hair; holding a can of beer, black hand gun.
> 22:13:37 – Starbucks employee called to advise of same circumstances.
> 22:13:55 – Subject still near the front door.
> 22:15:09 – X3 calls received, subjects is 415 verbal with two other subjects
>          to the front.
> 22:15:31 – Starbucks employee advised group of 304 male subjects to the
>          front of the location.
> 22:15:37 – 415V with two other males.
> 22:16:21 – Subject with a gun placed the gun back into his front pocket.
> (22:17:33 – Shots fired.)

Information known from Dispatch:

> "The suspect is a male Hispanic in his 40's wearing a black sweater, shorts,
> and facial hair.  He's holding a beer and a black handgun in his hand."
> (CPD 6).

> "He's currently to the front, he's 415 verbal with multiple subjects.  Three
> calls received."  (CPD 9).

"Subject with a gun should have it in his back pocket." (CPD 17) (some words unclear).

Officer Sun testified that the information he received from this call included, "Dispatch advised of a 417 call, which is the penal code for brandishing a firearm, and that there were multiple calls received at Country Liquor, 24 East Arrow," and the description of the subject, "Male Hispanic in his 40s wearing a black sweater and shorts with a beer bottle." (Officer Sun deposition, page 40).

Nevertheless, Officer Sun communicated over the radio at 22:14:41, "We're getting dispatched to a man who pointed a gun at somebody. It's a 40-year-old male, Hispanic, black sweater with shorts." (CPD 37).

> The relevant portion of California Penal Code 417, which is (a)(2), states: "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel is punishable…." PC 417 is a misdemeanor.
>
> When receiving this call, every reasonable officer understands that the 417 needs to be investigated; that a person is innocent until proven guilty. It is clear not only from the code but also the call, that Officer Sun had no information that the subject ever pointed a gun at anyone. Officer Sun admits the same at deposition. (Officer Sun deposition, page 45).
>
> It is important to note that Officer Sun believes the nature of a 417 call is someone who is using a firearm being used "as a means of force, threat and imminent loss of life." (Officer Sun deposition, page 45). Officer Sun is not only wrong in his understanding of a clear penal code section, which is distinguished from PC 245, but also indicates that his lack of training and understanding of the law in this regard led to his tactical errors once arriving on scene and his unnecessary use of deadly force.

En route to the call, Officer Sun "learned that more people had called regarding the same circumstances, that he was actively 415 to the front with two other subjects, which to me means that he's argumentative, aggressive, trying to start a fight." And then I also had learned that he had placed the gun in his pocket." (Officer Sun deposition, page 41).

> Cal. Penal Code 415 states that, that it is a minor misdemeanor offense to (1) unlawfully fight in a public place or challenge another person in a public place to fight, (2) maliciously and willfully disturb another person by loud and unreasonable noise, or (3) to use offensive words in a public place which are inherently likely to provide an immediate violent reaction.

Page 6 of 47

When receiving this call, every reasonable officer understands that the 415 needs to be investigated (innocent until proven guilty). Prior to the investigation, an officer does not know if PC 415 was violated at all and does not now which enumerated offense was committed, if any. Nothing from the information known by Officer Sun prior to his use of deadly force would provide a reasonable officer with probable cause to believe that Mr. Valdivia fought or challenged another to a fight, that Mr. Valdivia maliciously disturbed another person with loud noise, or that Mr. Valdivia used offensive words likely to provide an immediate violent reaction.

Again, of note, Officer Sun appears to believe that 415 means, "argumentative, aggressive, trying to start a fight"; "combative or uncooperative, argumentative." (Officer Sun deposition, page 41). Officer Sun is again not only wrong in his understanding of a clear penal code section but also indicates that his lack of training and understanding of the law in this regard led to his tactical errors once arriving on scene and his unnecessary use of deadly force.

Officers arrived shortly after receiving the calls. Officers Sun and Meadows approached Mr. Valdivia from the drive-thru area of a Starbucks, located next door to the liquor store, approximately 5 yards away from Mr. Valdivia. Upon arrival, the officers knew from dispatch that the gun was in Mr. Valdivia's front pocket, not hand.

Prior to approaching Mr. Valdivia, knowing that the situation had de-escalated without an officer's presence, it was incumbent on the officers to take a moment to formulate a plan instead of rushing into the situation. It is clear from the record that the officers had no tactical plan.

Officer Sun approached Mr. Valdivia, closely followed by Officer Meadows, both pointing their firearms directly at Mr. Valdivia. At "a low ready," Officer Cardoza positioned herself near the sidewalk north of Mr. Valdivia. The officers observed two other individuals standing next to Mr. Valdivia. Officer Sun demanded to see Mr. Valdivia's hands and told him to put his hands up. Mr. Valdivia moved the bottle he held in his right hand to his left hand and then reached towards his waistband area near his right pocket with his right hand. Officer Sun again commanded Mr. Valdivia not to reach for his pockets. Mr. Valdivia complied and raised his hands. Officer Sun testified that Mr. Valdivia showed several signs of compliance including putting his hands up, moving his hands away from his pockets, and getting on the ground. (Officer Sun deposition, pages 59-61).



(Figure 1 from DOJ Report, page 4).



The above left image from Officer Sun's BWC video shows Mr. Valdivia complying with officer commands to put his hands in the air. Above right is approximately four (4) seconds later, clearly showing that Mr. Valdivia had his hands up in compliance for that time. Additionally, Mr. Valdivia only lowered his hands from the position above his head in order to further comply with Officer Meadows' command to get on the ground.

Mr. Valdivia began to go down to the ground as directed. As he bent to the ground, Mr. Valdivia removed the BB gun from his waistband, discarded it on the ground, and pulled his arm back toward his body—away from the BB gun. After discarding the gun, Mr. Valdivia's hand never moved toward the gun, a pocket, or any threatening object or area. Then, all three officers shot Mr. Valdivia while the gun was no longer in his hands, his hands were visibly empty, in compliance, non-resistant, and in submission.

The below image from Officer Sun's BWC video clearly showing Mr. Valdivia' apparent intent to discard the BB gun, and object and undisputable fact that Mr. Valdivia discarded the BB gun on his own (without a command to do so or physical prompting by any officer), prior to any shot being fired. It is clear that Mr. Valdivia was not pointing a gun at any officer when the use of deadly force occurred.





The above image from Officer Sun's BWC video clearly demonstrates how Mr. Valdivia's hand moved away from the BB gun after it was discarded.

<u>Key known facts for consideration of the Officers' use of deadly force include</u>:

- Mr. Valdivia was in a parking lot.
- Mr. Valdivia complied with several officer commands.
- Mr. Valdivia did not verbally threaten to harm an officer.
- Mr. Valdivia did not physically harm an officer.
- Mr. Valdivia did not physically harm a civilian.
- Mr. Valdivia did not attempt to resist arrest but surrendered.
- Mr. Valdivia did not attempt to evade arrest by flight.
- Mr. Valdivia did not threaten any civilians in the area at the time of the deadly force.
- Mr. Valdivia did not point a gun at an officer.
- Mr. Valdivia did not point a gun at a civilian.
- Mr. Valdivia did not fire a gun at anyone.
- Mr. Valdivia did not have a "pistol grip" on the firearm.
- Mr. Valdivia did not grab, touch, or "draw" the firearm in a threatening manner that would indicate an intention to use a weapon against anyone.
- Mr. Valdivia discarded the gun and laid himself on the ground unarmed and in compliance with commands.
- Mr. Valdivia's hands were visibly empty at the time of the deadly force.

- Several officers were on scene with superior training and skill.
- Officers stealthily approached Mr. Valdivia.
- Officers closed the distance on Mr. Valdivia.
- Officers did not formulate a plan.
- Officers had time to analyze and use the appropriate force option.
- Officers perceived the incident in slow motion.
- Officers had the option to use cover but chose not to utilize cover.
- Officers had the ability to maneuver.
- Officers had and did not attempt to use any of the several less lethal and less intrusive alternatives to the use of deadly force despite being safe and reasonably available.
- Officers did not give a verbal warning prior to the use of deadly force despite being safe and reasonably available.
- Officer Meadows left his K-9 in his vehicle.
- Officer Cardoza left her beanbag shotgun in her vehicle.

**Scene Description:**

The incident took place in a strip mall parking lot in front of Country Liquor, located at 124 E. Arrow Highway, Covina, California, in the nighttime hours of April 9, 2022.

**Evidence Recovery:**

Mr. Valdivia did not have a real firearm. However, it was a BB gun marked as a Glock 17, caliber 4.5 mm.

The officers discharged a total of 12 rounds during the incident. Officer Sun discharged six rounds. Officer Cardoza discharged five rounds. Officer Meadows discharged one round. Eleven cartridge cases were located at the scene. Three projectile fragments were found at the scene. An additional round fragment was found on the gurney used to transport Mr. Valdivia to the hospital. One round struck a black Honda Accord, parked on the south row of parking stalls in front of Country Liquor, for which the related round fragment was found near the driver-side tire. One round struck the rear bumper of a red Honda Accord, located in the fifth parking stall to the east, along the south row. The round or round fragments related to this vehicle were not located.

**Officer Processing:**

Officer Sun was 5'8" and weighed 175 pounds, equipped with a load-bearing vest, a Glock 17, 9 mm pistol, a Ruger LCP 380 Pistol as a backup weapon, a Taser model X26P on his Sam Browne duty belt on his left hip and a baton on his load-bearing vest in a pouch on his right side.

Officer Cardoza was 5'7" tall and weighed 170 pounds, equipped with a load-bearing vest, a Glock 17, 9 mm pistol, a Taser model X26P in the duty holster, an Albatross folding knife and a flashlight in her pants pocket and a hobble device on her right ankle.

Officer Meadows was 5'10" and weighed approximately 220 pounds, equipped with a load-bearing vest, a Glock 17, 9 mm pistol, a Ruger, LCR, .357 Magnum as a backup weapon, a special tactical folding blade knife, a Taser model X26, and a K9 in his vehicle.

**Autopsy:**

Dr. Juan M. Carrillo, M.D. conducted the autopsy of Mr. Valdivia. He concluded that Mr. Valdivia sustained eight total gunshots wounds on his body in the following locations:

- GS wound 1: right scalp, projectile recovered.

- GS wound 2: left parietal scalp, projectile recovered.

- GS wound 3: right shoulder, projectile recovered.

- GS wound 4: abdomen, projectile recovered.

- GS wound 5: right thigh, projectile recovered.

- GS wound 6: right upper back, projectile recovered.

- GS wound 7: left lower back, projectile recovered.

- GS wound 8: posterior right leg, no projectile recovered.

The coroner concluded that the cause of death was multiple gunshot wounds. Specifically, the coroner declared GS wounds 1 and 2 to the head, 3 to the right shoulder, and 4 to the abdomen were fatal.

**Officer Sun's Interview and Deposition Narrative:**

The interview took place on April 18, 2022 (nine days after the incident), at 1104 hours, by Special Agent Paul Zurawski and Detective Oswaldo Preciado, and monitored by Attorney Vanessa Munos, Special Agent Supervisor Samuel Richardson, Special Agent Allen Oratovski, and Deputy Attorney General Namita Patel. (Officer Sun interview, page 2). Officer Sun understood that the interview was part of a criminal investigation and would be submitted to the California Attorney General's Office. (Officer Sun interview, page 3).

In response to whether Officer Sun considered any other use of force option, Officer Sun stated that Officer Cardoza asked if she should get a less-lethal weapon, and Officer Sun

told her that it was her choice; knowing that he had a Taser and baton with him.  (Officer Sun interview, page 32).  Officer Sun had a less-lethal shotgun in the truck of his vehicle.  (Officer Sun interview, page 11).  There were lights in the street as well as in the plaza; it was very well lit; so, Officer Sun did not use his weapon-mountain light.  (Officer Sun interview, page 32).

Officer Sun understood, according to the training, that the mere fact that a person has a gun in their hand does not justify the use of deadly force (Officer Sun deposition, page 20-21), that an officer should not use deadly force merely because the person is not complying with commands, and that an officer cannot use deadly force unless there is an immediate threat of death or serious bodily injury.  (Officer Sun deposition, page 25).

Sergeant Statler was Officer Sun's direct supervisor on the day of the incident.  (Officer Sun interview, page 7).  Officer Sun believed there were at least five units (Officer Sun interview, page 17).  Officer Sun did not know that Officer Marquez was on the call but thought he heard Officer Marquez making contact with the subject, so Officer Sun approached the area out of concern for Officer Marquez.  (Officer Sun interview, pages 19-20).  As Officer Sun approaches with Officer Meadows behind him, Mr. Valdivia did not see the officers.  (Officer Sun interview, page 20).

Officer Sun knew the importance of maintaining distance from the subject.  (Officer Sun interview, pages 20, 30).  Officer Sun was using a "red dot" pistol mounted optic, which allows the shooter to acquire the sights while maintaining focus on the target with both eyes open as well as assessing the scene surroundings.  (Officer Sun deposition, page 10).  Officer Sun was trained to consider his backdrop when using deadly force, in consideration of the safety of the public and all individuals involved.  Officer Sun acknowledged that sometimes officers miss fired shots, and sometimes rounds ricochet, which could potentially harm innocent people.  In this incident, two civilian vehicles were struck by officer bullets and that one of the third-party subjects may have been hit by shrapnel. (Officer Sun deposition, pages 14-16).

Officer Sun did not see Mr. Valdivia attempt to flee, did not see him attempting to take a hostage, did not see him attempt to punch or kick anybody, and did not see him attempt to grab anybody.  (Officer Sun deposition, page 71).  Mr. Valdivia did not have a gun in his hand when Officer Sun arrived, was not brandishing a firearm, and did not point a firearm at anyone.  (Officer Sun deposition, page 47).  Prior to using deadly force, Officer Sun had no information about whether Mr. Valdivia had a criminal history, no information that Mr. Valdivia had ever physically harmed anyone, no information as to whether Mr. Valdivia was involved in a gang, no information that Mr. Valdivia had a history of drug or alcohol use, no information as to whether Mr. Valdivia was under the influence of

drugs or alcohol at the time, and had not information as to whether Mr. Valdivia had any experience handing a gun. (Officer Sun deposition, page 48).

Officer Sun did not give a deadly force warning prior to firing and did not hear any other officer give a warning prior to firing. (Officer Sun deposition, page 18). Officer Sun moved south while firing his six rounds, as trained, behind a three to four-foot solid pony wall, so that he would be more difficult to hit by gunfire. (Officer Sun deposition, page 16). Once Mr. Valdivia gets down on the ground; that is when everything for Officer Sun appears to go in slow motion. (Officer Sun interview, page 22). As the BB gun was going out, it was still in slow motion for Officer Sun. (Officer Sun interview, page 25). Officer Sun saw everything that Mr. Valdivia was doing "like frame by frame" and slowed down. (Officer Sun interview, page 39). Officer Sun assessed between shots and testified the importance of an assessment to continuously evaluate the threat according to the training. (Officer Sun deposition, page 12).

Officer Sun told investigators that he continued shooting at Mr. Valdivia even after he saw Mr. Valdivia drop the gun and continued shooting until Mr. Valdivia stopped moving. (Officer Sun interview, page 36). Of note, Officer Sun never said in his interview with detectives that Mr. Valdivia pointed the gun at him. (Officer Sun interview, pages 2-42). Officer Sun understands that if an officer perceives that the subject is no longer a threat during an assessment between rounds, according to the training, deadly force is not authorized. Officer Sun confirmed that his perception of the shooting incident was in slow motion. (Officer Sun deposition, page 13). Officer Sun testified that Mr. Valdivia was no longer a threat when he no longer pointed a gun at Officer Sun. (Officer Sun deposition, page 72).

Officer Sun did not render aid to Mr. Valdivia. (Officer Sun interview, page 38). Officer Sun was not injured at all in this incident. (Officer Sun interview, page 15).

> It is clear from Officer Sun's interview and testimony and upon review of his BWC video that Mr. Valdivia was not an immediate threat of death or serious bodily injury at the time of Officer Sun's use of deadly force, no warning was given, there were reasonable alternatives, Mr. Valdivia was not resisting or attempting to flee, and Officer Sun made several tactical errors that contributed to his use of unnecessary force.

**Officer Meadows Interview and Deposition Narrative:**

The interview took place on April 18, 2022 (nine days after the incident), at 1236 hours, by Special Agent Paul Zurawski and Detective Oswaldo Preciado, and monitored by Special Agent Supervisor Samuel Richardson, Special Agent Allen Oratovski, Deputy Attorney General Namita Patel, and Attorney Vanessa Munos. (Officer Meadows interview, page 2). Officer Meadows understood that the interview was part of a criminal

investigation and would be submitted to the California Attorney General's Office.
(Officer Meadows interview, page 3).

Officer Meadows was approximately five foot, ten inches tall, and weighed
approximately 220 pounds, with eight years of service as a police officer, including
assigned to the K-9 unit.  (Officer Meadows interview, page 4). (Officer Meadows
deposition, page 18).

Officer Meadows was equipped with a Taser and a Glock 17, 9 mm pistol.  (Officer
Meadows interview, page 8).  Officer Meadows was a K-9 officer and had his K-9
partner, Jarno, a Belgian Malinois and German Shepherd mix, as a less-lethal option with
him in his vehicle.  However, Officer Meadows did not take his K-9 out of his vehicle.
(Officer Meadows interview, page 10; Officer Meadows deposition, pages 20-22).
Officer Meadows trained his K-9 for apprehension and has utilized it as a show of force
to gain compliance with a subject.  Officer Meadows understood from his training and
experience that subjects are less likely to flee if they know a K-9 is there.  (Officer
Meadows deposition, pages 22-23).  Officer Meadows considered his K-9 to be a less-
lethal option knowing the nature of this call.  (Officer Meadows deposition, pages 26, 39-
40). Officer Meadows specifically responded to this call due to the nature of the call and
knowing that more officers is better, and because he knew that he had the K-9 option.
(Officer Meadows deposition, pages 42-43).  Considering the K-9 as a less-lethal option
knowing the nature of the call, Officer Meadows left the K-9 in the vehicle despite not
receiving any additional information that would cause him to not bring the K-9 with him.
(Officer Meadows deposition, page 43).

Officer Meadows did not equip himself with OC spray because it is not required by the
department.  However, Officer Meadows understood from his training and experience
that OC spray burns the eyes and nose of the subject and could cause disorientation.
(Officer Meadows deposition, pages 35-36).  Officer Meadows was equipped with a
Taser and understood that it could cause neuromuscular incapacitation and trained that
officers can take a person into custody while utilizing the Taser to incapacitate and
control the subject.  (Officer Meadows deposition, page 37).

Officer Meadows understood the call to be of a disturbance at Country Liquor, of a male
subject arguing with customers and brandishing a firearm.  (Officer Meadows interview,
page 15).  Officer Meadows knew from experience that brandishing is showing a firearm
to another person in a threatening manner and that it could be done without even touching
the gun, much less pointing it at another person.  (Officer Meadows deposition, pages 28-
29).  Officer Meadows decided to respond to the call due to the fact that he had a K-9
less-lethal option available to use if the opportunity arose.  (Officer Meadows interview,
page 15).  Officer Meadows understood that Officer Cardoza either asked or told Officer
Sun that she was going to grab the less-lethal shotgun, which would provide officers with

another less-lethal option if the opportunity arose. (Officer Meadows interview, page 16). Officer Meadows and Officer Sun did not have a discussion about this incident prior to responding to the call. (Officer Meadows deposition, page 27). Officer Meadows learned that the subject was threatening or arguing with other individuals, but did not know who started the argument and needed to investigate the matter. (Officer Meadows deposition, page 30). Officer Meadows also received an update around the time of his arrival that the gun was in the subject's (here Mr. Valdivia) right pocket. (Officer Meadows deposition, page 29; Officer Meadows interview, page 18).

Officer Meadows did not activate his lights because he did not want to alert Mr. Valdivia to the presence of officers as they were approaching. (Officer Meadows deposition, page 42). According to Officer Meadows, the plan was to set up containment in case the subject flees, for Officer Cardoza to bring the less-lethal shotgun, and for Officer Sun and Officer Meadows to be the primary officers. Further, to park out of sight and approach on foot. (Officer Meadows interview, page 27; Officer Meadows deposition, pages 46-47). Officer Meadows knew that Officer Sun was a SWAT officer and understood that he was the primary officer, and that Officer Meadows was there to assist him. (Officer Meadows deposition, page 64). Officer Meadows parked on the west side of Starbucks to stay out of sight from the front of the County Liquor. (Officer Meadows interview, page 16). Officer Meadows had to jog to catch up with Officer Sun because Officer Sun was ahead of him so that Officer Sun would not approach the subject on his own. (Officer Meadows deposition, page 50; Officer Meadows interview, page 17). Officer Meadows did not communicate to Officer Sun that he was not going to bring the K-9 with him. (Officer Meadows deposition, page 50).

Prior to his use of deadly force, Officer Meadows had no prior knowledge of Mr. Valdivia, did not have any information as to whether he had a criminal history, had no information as to whether he was involved in a gang, and did not have any information as to whether he had a history of drug or alcohol use. (Officer Meadows deposition, pages 30-31). Officer Meadows did not have any information that Mr. Valdivia had ever harmed anybody prior to his use of deadly force, did not see Mr. Valdiva physically harm anybody on scene, did not see Mr. Valdivia attempt to take a hostage, did not see Mr. Valdivia attempt to strike anyone, and did not see Mr. Valdivia attempt to grab anyone. (Officer Meadows deposition, page 32).

Officer Meadows saw that there were a couple of people in the parking lot and several people in the liquor store. (Officer Meadows interview, page 18). Officer Meadows stated, "Police" and ordered the three subjects to put their hands up. (Officer Meadows interview, page 18). Officers are trained that the contact officer typically takes charge of communication with the subject, and that officers should avoid giving simultaneous or conflicting commands to the subject because it could confuse the subject. (Officer Meadows deposition, page 49). Officer Meadows heard Officer Sun tell the subject to

Page 17 of 47

not reach for his pockets and to put his hands up, and the subject (Mr. Valdivia) moved his hands away and raised his hands up. When Mr. Valdivia's hands went up, his sweatshirt lifted and Officer Meadows saw the handle of a black handgun in his waistband. (Officer Meadows interview, page 19). Officer Meadows ordered Mr. Valdivia to get on the ground. (Officer Meadows interview, page 20). Officer Meadows contacted Mr. Valdivia and gave him commands to which Mr. Valdivia complied and put his hands up, which is when Officer Meadows saw the grip of a firearm protruding from his waistband. However, Officer Meadows did to inform his team that he identified a gun. After seeing the grip of a gun, Officer Meadows commanded Mr. Valdivia to get on the ground, in order to better control the situation and take away his ability to potentially take a hostage or flee the scene. (Officer Meadows deposition, page 14). After giving Mr. Valdivia the command to get on the ground, Mr. Valdivia started moving to the ground. (Officer Meadows deposition, pages 49-50). Officer Meadows wanted Mr. Valdivia to get on the ground to gain better control and prevent him from possibly fleeing or taking hostages, and because it would make it more difficult to reach for the firearm. (Officer Meadows deposition, page 52). Officer Meadows told investigators that Mr. Valdivia was somewhat compliant, in that he complied with the commands to put his hands up and to get on the ground. (Officer Meadows deposition, page 65-66).

Officer Meadows knew from his training and experience that if a person is facing away from them, it would make it more difficult for that person to use a firearm on officers and that it would give officers more time to react. (Officer Meadows deposition, pages 53-54). Officer Meadows was trained on the equation Distance + Cover = Time and Time = Options. (Officer Meadows deposition, pages 54-55).

Officer Meadows testified that he stopped shooting because during his assessment he perceived that the threat was done. Specifically, he saw the gun on the ground, and did not see an imminent threat also because Mr. Valdivia did not reach for the gun after it was on the ground. (Officer Meadows deposition, page 58). Officer Meadows admitted that if he saw Mr. Valdivia take the gun out and throw it down to the ground, then deadly force would not be authorized because there would be no immediate threat of death or serious bodily injury. (Officer Meadows deposition, page 58-59). Officer Meadows described the moments prior to his use of deadly force as slowing down, and that he could see exactly every step that Mr. Valdivia was taking. (Officer Meadows interview, page 21). Yet, Officer Meadows did not give a deadly force warning prior to his use of deadly force and did not hear any officer give a deadly force warning prior to any shot fired. (Officer Meadows deposition, page 64). Officer Meadows assessed the surroundings, including his backdrop, before he fired his round, and saw that there were two civilians to his right side. (Officer Meadows deposition, page 10). Officer Meadows sidestepped and using his sights fired a shot center mass at Mr. Valdivia. Officer Meadows stated that he saw the gun fall out of Mr. Valdivia's hand after he fired his shot.

Officer Meadows did not continue to fire because there was no threat when there was no gun in Mr. Valdivia's hand. (Officer Meadows interview, page 21-22, 34).

Prior to firing his round, Officer Meadows moved off the "X" intending to be a hard target and use cover. (Officer Meadows deposition, page 66). Officer Meadows used deadly force during the incident when he intentionally fired one round from his Glock 19, 9 mm pistol; intending to strike Mr. Valdivia, aiming center mass, and understanding that his use of deadly force could cause death or serious bodily injury. (Officer Meadows deposition, pages 7-8). Officer Meadows fired his shot approximately 30 seconds after making contact with Mr. Valdivia. (Officer Meadows deposition, page 9). Officer Meadows understood that the only shots he heard being fired during the incident came from officers. (Officer Meadows deposition, pages 15-16). Officer Meadows did not see Mr. Valdivia pull the trigger of the gun, did not hear a bullet fired from Mr. Valdivia's position, did not see a muzzle flash coming from Mr. Valdivia's right-hand area, and did not see a casing being ejected from the gun that Mr. Valdiva had. (Officer Meadows deposition, pages 16-17). Officer Meadows stated to investigators that he did not consider any other use of force options. (Officer Meadows interview, page 29).

Officer Meadows was not injured during the incident and was not aware of anyone else besides Mr. Valdivia who was injured. (Officer Meadows deposition, page 17). Officer Meadows did not know that there were two sergeants on scene until after the shooting as the sergeants did not communicate their arrival. (Officer Meadows deposition, page 60-61). Officer Meadows did not know specifically where Officers Avila, Dixon, or Marquez were at the time of his use of deadly force. (Officer Meadows deposition, page 61-62). Officer Meadows did not have to undergo any additional training, no retraining, and was not reprimanded as a result of this incident. (Officer Meadows deposition, page 62-63). Officer Meadows did not engage in a tactical debrief of the incident. (Officer Meadows deposition, page 63).

Covina Police Department Officers are required to know Covina Police Department policies and the law regarding the use of force. Pursuant to the policy, the totality of the circumstances includes the officer's conduct leading up to the use of force, that officers should only use force when it reasonably appears necessary under the totality of circumstances, that the ultimate objective of every law enforcement encounter is to avoid or minimize injury, and that officers should de-escalate the situation when safe to do so. (Officer Meadows deposition, page 80-81). The definition of "imminent' under the policy and the law is when person has the present ability, opportunity, and intent to cause death or serious bodily injury. Additionally, imminent means not merely fear of future harm no matter how great the fear and no matter how great the likelihood of the harm. (Officer Meadows deposition, page 82). Officer cannot use deadly force based on subjective fear alone. (Officer Meadows deposition, page 88-87).

It is clear from Officer Meadows' interview and testimony and upon review of the BWC video evidence that Mr. Valdivia was not an immediate threat of death or serious bodily injury at the time of Officer Meadows use of deadly force, no warning was given, there were reasonable alternatives, Mr. Valdivia was not resisting or attempting to flee, and Officer Meadows made several tactical errors that contributed to his use of unnecessary force.

**Officer Cardoza's Interview and Deposition Narrative:**

The interview took place on April 18, 2022 (nine days after the incident), at 0917 hours, by Special Agent Paul Zurawski, Detective Oswaldo Preciado, and Attorney Vanessa Munos, and monitored by Special Agent Supervisor Samuel Richardson, Special Agent Allen Oratovski, and Deputy Attorney General Namita Patel. (Officer Cardoza interview, page 2). Officer Cardoza understood that the interview was part of a criminal investigation and would be submitted to the California Attorney General's Office. (Officer Cardoza interview, page 3).

Officer Cardoza was approximately five foot seven inches tall, and 170 pounds, with over three years of experience as a police officer. (Officer Cardoza interview, page 4-5; Officer Cardoza deposition, page 36). Officer Cardoza was equipped with a Taser and a Glock 17, 9 mm pistol during the incident. (Officer Cardoza interview, page 8, 15). Officer Cardoza was equipped with a bullet proof vest. (Officer Cardoza deposition, page 36). Officer Cardoza had a less-lethal shotgun in the trunk of her vehicle. (Officer Cardoza interview, page 11). The only less-lethal option Officer Cardoza had on her person at the time was a Taser, which according to the training is capable of causing neuromuscular incapacitation. (Officer Cardoza deposition, page 37). Officer Cardoza left her wooden baton in her vehicle, and the department did not issue collapsible batons. (Officer Cardoza deposition, page 38). Officer Cardoza understood that Sergeants Statler and Rasmusson had a shield in their vehicles. (Officer Cardoza deposition, page 41). Officer Cardoza understood that there was a K-9 team, an air unit, and a SWAT team available at the time of the incident. (Officer Cardoza deposition, page 42). Officer Cardoza did not activate her body worn camera because she did not think to do it. (Officer Cardoza interview, page 13). Officer Cardoza was not injured at all during the incident. (Officer Cardoza interview, page 17).

The incident occurred on April 9, 2022, at approximately 2217 hours. (Officer Cardoza deposition, page 8). Officer Cardoza understood the call to be at Country Liquor for a man with a gun. (Officer Cardoza interview, page 18). The initial call stated that there was a Hispanic man in his 40s, wearing a black sweater and shorts with facial hair, waiving a firearm. (Officer Cardoza deposition, page 43). In the two to three minutes driving to the scene, Officer Cardoza learned that the subject was in a verbal argument with two other subjects. (Officer Cardoza deposition, page 44). Officer Cardoza did not

know what the altercation was about but understood that it was only a verbal altercation, not physical. (Officer Cardoza deposition, pages 45-46). Officer Cardoza asked Officer Sun, understanding that he was handling the situation, if he wanted her to grab the less-lethal shotgun and he said if she had time yes. (Officer Cardoza interview, page 18-19).

Officer Cardoza did not use lights and sirens en route to the scene because there was no information that anyone was injured. (Officer Cardoza deposition, pages 50-51). While en route the only discussion of a tactical plan, according to Officer Cardoza, was that Officer Sun set up a containment and that Officer Sun wanted Officer Cardoza to grab the less-lethal shotgun. Officer Cardoza understood that she would be the less-lethal option for this incident. There was no specific tactical plan on how to approach Mr. Valdivia. (Officer Cardoza deposition, pages 47-49). No officer checked with Officer Cardoza to make sure she had the beanbag shotgun prior to approaching the subject. (Officer Cardoza deposition, page 56). Officer Cardoza understood that the plan was for her to grab the less-lethal shotgun and for the officers to approach from two different directions. (Officer Cardoza interview, page 25-26). Officer Cardoza did not receive any communication from other officers that they were going to make a stealth approach. (Officer Cardoza deposition, page 53). There was no plan for officers to meet an approach together and there was no communication with Officer Cardoza to coordinate movements between the officers. (Officer Cardoza deposition, page 56). Officer Cardoza parked her vehicle behind a big truck to remain hidden and saw the male matching the description of the call with two other people. (Officer Cardoza interview, page 19). When Officer Cardoza arrived on scene, she put gloves on. (Officer Cardoza deposition, page 86).

Officer Cardoza did not advise her partners of her location when she was observing the three subjects. (Officer Cardoza deposition, pages 55-56). Officer Cardoza did not hear any yelling or anything like that. Officer Cardoza did not see Mr. Valdivia attempt to grab or strike anyone. (Officer Cardoza deposition, page 54). Officer Cardoza observed Mr. Valdivia for a couple of seconds before she saw Officer Sun making his approach. (Officer Cardoza deposition, page 55). Officer Cardoza heard partner officers giving commands and started running to help them, so she did not grab the less-lethal shotgun. (Officer Cardoza interview, page 19). Officer Cardoza did not have her beanbag shotgun because she saw Officer Sun approaching the subject and giving commands and ran in that direction to help, knowing that due to the nature of the call, they needed an extra person. The beanbag shotgun was in Officer Cardoza's vehicle's trunk five to ten feet away from her. (Officer Cardoza deposition, pages 56-57). If her partners were not already communicating with and walking towards Mr. Valdivia, Officer Cardoza would have retrieved the beanbag shotgun. (Officer Cardoza deposition, page 67).

Officer Cardoza estimated Mr. Valdivia to be five foot nine inches tall and approximately 200-250 pounds. (Officer Cardoza deposition, page 50). Officer Cardoza had never met

Mr. Valdivia before, had no information about his person life, no information as to whether he had a criminal history, no information as to whether he was involved in a gang, and no information as to whether Mr. Valdivia had a history of drug or alcohol use. (Officer Cardoza deposition, page 46). Officer Cardoza had no specific information as to whether Mr. Valdivia was under the influence of drugs prior to the use of force. (Officer Cardoza deposition, page 47). Officer Cardoza did not have any specific information as to whether Mr. Valdivia had a history of violence. (Officer Cardoza deposition, page 47). Officer Cardoza understood that the allegations of the call needed to be investigated. (Officer Cardoza deposition, page 47). Officer Cardoza had no information that Mr. Valdivia every physically harmed anyone. (Officer Cardoza deposition, page 49). Officer Cardoza was not physically harmed during this incident. (Officer Cardoza deposition, page 49). Officer Cardoza had no specific information that Mr. Valdivia every verbally threatened anybody. (Officer Cardoza deposition, page 49). Officer Cardoza never heard Mr. Valdivia verbally threaten anybody. (Officer Cardoza deposition, pages 49-50). Officer Cardoza did not see Mr. Valdivia attempt to flee and did not see him attempt to run or lunge at anyone. (Officer Cardoza deposition, page 68). Officer Cardoza did not see Mr. Valdivia attempt to take a hostage and did not see him harm anyone. (Officer Cardoza deposition, pages 70-71). Officer Cardoza did not see Mr. Valdivia attempt to enter any nearby businesses or vehicles prior to the use of force. (Officer Cardoza deposition, page 71).

Officer Cardoza did not know what Mr. Valdivia was thinking during the incident. (Officer Cardoza deposition, page 25). Officer Cardoza saw Mr. Valdivia starting to lie down and did not see anything in his hands prior to that. When he started to lay down Officer Cardoza saw Mr. Valdivia lift his sweater with his right hand. (Officer Cardoza interview, page 20). Officer Cardoza described the situation as moving in slow motion. (Officer Cardoza interview, page 30). Officer Cardoza used deadly force during the incident by intentionally firing five rounds, intending to strike Mr. Valdivia, aiming center mass for each shot. (Officer Cardoza deposition, page 9). Officer Cardoza assessed between shots, pursuant to the training, to determine whether the subject is still a threat and whether to continue shooting or not. (Officer Cardoza deposition, pages 11-12). According to Officer Cardoza, Mr. Valdivia was going to the ground when she fired her shots. (Officer Cardoza deposition, pages 17-18).

Officer Cardoza understood that she fired the first shot and did not hear any rounds being fired after her last shot. (Officer Cardoza deposition, pages 21-22). Officer Cardoza understood that firing her weapon could cause death or serious bodily injury. (Officer Cardoza deposition, page 23). Officer Cardoza believed she fired two rounds initially and found out through the investigation that she fired four or five rounds. Officer Cardoza stated that she stopped firing when she saw that the gun was no longer in Mr. Valdivia's hands, and he was no longer a threat. (Officer Cardoza interview, pages 21, 30, 32; Officer Cardoza deposition, page 62). Officer Cardoza testified that she stopped

shooting because there was no longer a threat and that there was no longer a threat because the gun was no longer in Mr. Valdivia's hand.  (Officer Cardoza deposition, page 62).  Based on the training, if a person is no longer a deadly threat, officers should stop using deadly force (stop firing if they were already firing their weapon).  (Officer Cardoza deposition, page 63).  Based on the training, if the officer does not objectively perceive a deadly threat, officers should not use deadly force.  (Officer Cardoza deposition, page 63).

Officer Cardoza confirmed that she saw Mr. Valdivia drop the gun.  Additionally, Officer Cardoza confirmed that after Mr. Valdivia dropped the gun, he did not reach for the gun but instead his right hand went to the ground.  (Officer Cardoza deposition, page 63).  Based on the training, if a person has a gun in their hand and points it at somebody but then discards the gun or drops it, then it would not be appropriate to use deadly force after the subject drops the gun, because the gun is not in the subject's hands.  (Officer Cardoza deposition, pages 64-65).  Based on the training, if a person drops the gun and is no longer reaching for the gun or anything else, then they would not be a threat.  (Officer Cardoza deposition, page 66).

Based on the training, officers are supposed to attempt to de-escalate the situation as much as possible.  (Officer Cardoza deposition, page 76).  Based on the training, officers should only use deadly force when necessary.  (Officer Cardoza deposition, page 76).  Based on the training, when using deadly force officers should have reverence for human life.  (Officer Cardoza deposition, page 77).  Based on the training, officers need to justify every shot that they fire and that officers should control their fear and stress level.  (Officer Cardoza deposition, page 77).  Based on the training, officers are exposed to high stress situations so that they can learn to control their emotions in those situations.  Officers are training that they should not use deadly force based on subjective fear alone.  (Officer Cardoza deposition, page 78).  Based on the training, officers cannot use deadly force merely because a person has a gun in their hand.  (Officer Cardoza deposition, page 24).  Based on the training, officers should not use deadly force merely because a person is not complying with commands.  (Officer Cardoza deposition, page 24).  Based on the training, officers should only use deadly force if there is an immediate threat of death or serious bodily injury.  (Officer Cardoza deposition, page 24).

Officer Cardoza did not have cover when using force but had cover nearby.  (Officer Cardoza deposition, pages 66-67).  Officer Cardoza did not give any commands.  (Officer Cardoza interview, page 24).  Officer Cardoza did not give a deadly force warning prior to using deadly force and did not hear any officer give a warning.  Officer Cardoza also did not announce herself as a police officer.  (Officer Cardoza deposition, page 68).

Officer Cardoza only knew that Officers Sun and Meadows were in the parking lot at the time of the use of force.  (Officer Cardoza deposition, page 19).  Officer Cardoza knew

that two sergeants were responding to the scene but did not know their location at the time of the use of force.  (Officer Cardoza deposition, pages 20-21).

Officer Cardoza was not involved in a tactical debrief related to this incident.  (Officer Cardoza deposition, page 29).  Officer Cardoza was informed by the City that her force was within policy, and she did not undergo any retraining or receive any additional training as a result of the incident.  Officer Cardoza was only verbally counselled for not turning on her body-worn camera.  (Officer Cardoza deposition, page 79).

> It is clear from Officer Cardoza's interview and testimony and upon review of the BWC video evidence that Mr. Valdivia was not an immediate threat of death or serious bodily injury at the time of Officer Cardoza use of deadly force, no warning was given, there were reasonable alternatives, Mr. Valdivia was not resisting or attempting to flee, and Officer Cardoza made several tactical errors that contributed to his use of unnecessary force.

**Force Options (POST):**

Law enforcement officers are trained by POST that a subjects' resistance/actions to an arrest will determine the type of force used by peace officers.  The following illustrates how a subject's resistance/actions can correlate to the force applied by an officer:

*Compliant* - Subject offers no resistance:
- Mere professional appearance
- Nonverbal actions
- Verbal requests and commands
- Handcuffing and control holds

*Passive non-compliant* - Does not respond to verbal commands but also offers no physical form of resistance:
- Officer's strength to take physical control, including lifting/carrying
- Pain compliance control holds, takedowns and techniques to direct movement or immobilize a subject

*Actively resistant* - Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally or physically signaling an intention to avoid or prevent being taken into or retained in custody:
- Control holds and techniques to control the subject and situation
- Use of personal body weapons to gain advantage over the subject

*Assaultive* - Aggressive or combative; attempting to assault the officer or another person, verbally or physically displays an intention to assault the officer or another person:

- Use of devices and/or techniques to secure compliance and ultimately gain control of the situation
- Use of personal body weapons in self-defense and to gain advantage over the subject

*Life-threatening* - Any action likely to result in serious bodily injury or death of the officer or others:

- Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat

*Constant reevaluation:* Peace officers must continually reevaluate the subject's action and must be prepared to transition as needed to the appropriate force options.

Under the facts cited above, Mr. Valdivia never harmed any person, and Mr. Valdivia's conduct was not life-threatening. Accordingly, methods to deal with Mr. Valdivia given the totality of the circumstances of this incident (a single, non-life threatening, non-fleeing man) include verbal de-escalation (as trained) and control holds. The Officers overreacted in the use of deadly force in violation of basic officer training and department policy.

**Professional Standards and Considerations Regarding the Use of Deadly Force:**

Law enforcement officers in California are trained that:

- The use of deadly force is the most serious decision a peace officer may ever have to make. Such a decision should be guided by the reverence for all human life (including the officer's life and others that may be in imminent danger) and, used only when other means of control are unreasonable or have been exhausted. (POST Learning Domain #20: "Use of Force.")
- Deadly force applied by a peace officer is force that creates a substantial risk of causing death or serious bodily injury. (POST Learning Domain #20: "Use of Force.")
- Reverence for all life is the foundation on which the use of deadly force rests. The authority to use deadly force is a tremendous responsibility given to peace officers by the people who expect them to exercise that authority judiciously. In the law enforcement/community partnership, peace officers are expected to

be self-disciplined and accountable, which helps build community trust and respect.  (POST Learning Domain #20: "Use of Force.")

- An officer may use deadly force to protect oneself or others when the officer has the objective and reasonable belief that his/her life, or the life of another, is in imminent danger of death or serious physical injury based upon the totality of the facts known to the officer at the time.  (POST Learning Domain #20: "Use of Force.")

The decision of whether or not to use deadly force may be influenced by, but not limited to, the officer's:

- training and experience
- judgment
- mental alertness
- existing facts and circumstances
- understanding of state law, case law, and agency policy
- (emotional maturity)

(POST Learning Domain # 20: "Use of Force.")

A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary… to defend against an imminent threat of death or serious bodily injury to the officer or to another person. *(Penal Code Section 835a(c)(1)(A))*

(POST Learning Domain # 20, page 4-4.)

**Imminent** means: a threat of death or serious injury is "imminent" when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. *(Penal Code Section 835a(e)(2))*

**Totality of the Circumstances** means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force. *(Penal Code Section 835a(e)(3))*

NOTE:     *Penal Code Section 835a* prescribes the circumstances under which a peace officer is authorized to use deadly force to effect an arrest, to precent escape, or to overcome resistance. In determining whether deadly

force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case and shall use other available resources and techniques if reasonably safe and feasible to an objectively reasonable officer. *(Penal Code Section 835a(a)(2))*.
(POST Learning Domain # 20, page 4-7.)

According to *Penal Code Section 835a*, **fear** alone does not justify the use of deadly force. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that from appearances, must be instantly confronted and addressed.

Tactical repositioning or other de-escalation tactics is not "retreat."
(POST Learning Domain # 20, page 4-8.)

**POST Re-evaluation of Force Requirement:**

"Peace officers must use the force option(s) appropriate for the situation as conditions may change rapidly.  Officers must continually reevaluate the subject's actions and the practical considerations involved in the situation and must be prepared to transition as needed to the appropriate force options (deescalate or escalate), so as to always remain within the bounds of conduct which is objectively reasonable under the circumstances."
(POST Learning Domain 20, page 3-7.)

In my opinion, especially when considering the video evidence that is documented related to the shooting, the Officers could not have reasonably believed that Mr. Valdivia was an imminent threat of death of serious bodily injury at the time of the force.

**The Required (and Trained) Tactical Response to this Incident:**

A seminal aspect of this incident was the gross departure from required tactics, which resulted in the unjustified use of deadly force against Mr. Valdivia.  These tactics are so fundamental that absent highly unusual and rare instances, failures to adhere to them are not excused or forgiven.  In this regard, it is helpful to compare what occurred during this incident in view of the basic tactical steps expected from trained law enforcement officers.  However, trained and expressed, the basic tactical steps understood and required are briefly stated as follows:

*Containment:*

This phase includes getting the subject (Mr. Valdivia) under control by restricting any opportunity to flee or change position so that a safe

Page 27 of 47

apprehension can occur. Initially, this can be a difficult problem if the subject is in flight. The professional wisdom (as taught by POST) is to create a containment zone, remain at a safe distance to relieve the emotional pressure on the target, and await sufficient assisting units and coordinate them into a team effort.

Important to this incident is that Mr. Valdivia did not attempt to flee. The training is that once the subject is located and/or contained, the objective is to keep the subject contained - preferably within an isolated area away from the public (or to evacuate bystanders from the containment area) - while they are dealt with by law enforcement officers who remain in positions of safety. POST training in this regard is extensive and precise. Further, during containment, law enforcement officers are taught that leaving the safety of cover and exposing themselves is a forbidden tactic. The Officers' conduct was counter to training and the tactical plan of action.

In this incident, there were at least five officers on scene and more en route or in the area. All that was necessary at this point in the incident was to re-enforce the containment of Mr. Valdivia and position officers at strategic locations behind cover to maintain the containment and implement the remaining proper tactical steps (as outlined below). This did not occur in this case. Instead, the officers (namely Officer Sun) took it upon himself to override the tactical plan and handle the situation by himself, and ultimately used deadly force against Mr. Valdivia.

A primary purpose of establishing a containment includes providing the apprehending law enforcement officers with a safe and realistic assessment of the credible risks to be tactically resolved. Sound tactics accommodate the opportunity for such a safe assessment. In this case, the Officers squandered the tactical advantage by reacting too quickly and not giving sufficient time for Mr. Valdivia to understand the circumstances and comply with instructions and for the less-lethal force to be attempted. It cannot be overstated that according to the POST standards (and training and policies), the law enforcement officers involved in this incident were required to take a position of safety - "cover" - and take sufficient time as events unfolded for the next expected step in the process - "decompression."

*Decompression:*

All living creatures, including human beings, have instinctive protective reflexes that will take control of the body during extreme stress, especially without any training to overcome or override these reflexes. If exposed to

extreme stress without any training in how to handle such stress, people may invariably flee or, when there is no other option, they will fight to either ward off danger or to create an avenue of escape. Trained and experienced law enforcement officers have both seen and experienced this human response. It is a basic fact of life in the business of law enforcement work, and something every experienced law enforcement officer is trained to cope with.

Law enforcement officers are trained that there is always a point during any sudden demand upon a subject when it becomes counterproductive and can only be expected to drive the subject into a state of incoherent dread and terror rather than compliance. As stress and/or anxiety increase, the ability for the contained subject to comply decreases. Thus, a decompression pause is necessary, at which time, a rational activity (such as meaningful communication), can take place. This did not occur in this case. The Officers did not follow the basic tactical training and did not attempt to decompress/de-escalate the situation. In my opinion, the Officers did not decompress the situation but instead escalated the situation and failed to control the situation with proper tactics. Thus, the actions of the Officers were logically unnecessarily escalated and exacerbated the situation.

*Communication:*

In this phase, a law enforcement officer establishes contact with the subject (in this case Mr. Valdivia) from a position of advantage/safety. During this time, unknown issues such as language problems, impairments caused by intoxication, mental illness, emotional anxieties, and other issues that may interfere with safe apprehension become known and are dealt with. The involved officers failed to maintain a position of safety nevertheless had the time to give instructions to Mr. Valdivia to take him into custody.

Ignoring this key phase of contact often leads to a situation that deteriorates into confusion, and in which law enforcement officers take their own independent actions (as occurred in this incident), rather than working together in a coordinated plan. The necessity for a calm and skilled law enforcement officer-subject communication cannot be overstated. When this does not occur, law enforcement officers and civilians alike can be needlessly and avoidably injured or killed.

*Instruction:*

Once the communication link has been established, a clear set of instructions, which contains enough detail to avoid surprises and assures

understanding, is conveyed to the subject.  In this incident, a contact officer on scene would have explained to Mr. Valdivia how to assume a position that would have facilitated a safe apprehension, and what he was not to do.

*Compliance:*

In this phase, the subject (in this case Mr. Valdivia) states/expresses his understanding of the instructions that were given to him by the communicating officer/negotiator.  Mr. Valdivia would have had an opportunity to ask questions for clarification and would have demonstrated his understanding of the instructions to the arrest team.

*Surrender:*

This phase requires the subject (in this case Mr. Valdivia) to physically perform the acts that were communicated to him by the communicating officer.  Mr. Valdivia would have been instructed and then taken the steps to move into a place and position for officers to approach and take him into custody without the use of any force.  This would have included Mr. Valdivia voluntarily placing himself in an apprehension position with his hands empty and at his back for handcuffing.

*Detention/ Apprehension:*

This final phase includes the actual proper reasonable physical restraint of the subject (if necessary), a search for any weapons, and his safe transport to a facility for booking.


**Additional Opinions Thus Far:**

1.      Based on the nature of the call, the Officers should have, but failed to, develop and execute a plan.  Under these circumstances, and in accordance with basic officer training, the containment officers should have communicated their locations, and that containment was set on each respective side.  The contact team should have assembled (i.e., wait for backup and appropriate resources) to communicate the direction, nature and order of the approach, establish contact and cover officer roles, establish lethal and less-lethal cover and options, and quickly plan a contingency for the most likely outcomes.  Officers should have attempted to move from one covered position to another on their approach and have only one officer make verbal contact with the subject, first announcing the presence of police officers, and then attempting to de-escalate the situation with verbal

communication and commands. Knowing that there were two civilians in the area who were also subject to the call, there should have been a second team of officers prepared to communicate with, control, and safeguard the non-primary subjects.

Important to the analysis is that there were two sergeants on scene who seemingly made no effort to communicate their presence, coordinate with officers, or contribute to the plan or execution thereof. Additionally, I am highly critical of Officer Meadows failing to bring his K-9 on approach of the subject. It is apparent from the record that Officer Sun rushed into the situation based on a lack of communication and plan, incorrectly believing that Officer Marquez was engaging with the subject despite Officer Marquez not even being on scene at the time. Officer Sun's rushing into the situation without a plan, coordination, or communication with his team, led to Officer Meadows rushing after Officer Sun, leaving his less-lethal K-9 option in the vehicle because he did not want Officer Sun to approach alone. The two officers rushed approach then led to Officer Cardoza rushing into to assist the officers, leaving her less-lethal beanbag shotgun option in her vehicle.

In my opinion, there were fundamental tactical errors in this incident. The involved officers' lack of a plan and failure to comply with basic officer training in his regard, caused a cascading effect of serious tactical errors leading up to their use of inappropriate force. In my experience, a significant number of civilian deaths involving police result from a series of cascading departures from expected and required tactics and deliberate departures from training. This appears as a key factor in the downward spiral of events resulting in the shooting of Mr. Valdivia. Officers are trained that they are responsible for their tactics when they use lethal force and that their conduct leading up to their use of deadly force will be taken into account under the totality of the circumstances. The involved officers' actions here demonstrate inappropriate tactics that appear to be directly connected to their inappropriate and unnecessary infliction of lethal force on Mr. Valdivia.

As it appears from the video evidence, the involved officers did not follow the tactical guidelines required of every Basic POST certified law enforcement officer in this incident. Each officer had obvious reasonable alternatives that included (but are not limited to) not approaching Mr. Valdivia in an unorganized and unplanned manner and in the open (absent cover), use of verbal commands and warning. Their collective failures to follow the "high-risk" tactical method to take persons into custody was a

gross departure from the required tactics which led to the shooting and for which they cannot be reasonably excused or forgiven. In my professional training and experience – having personally supervised and accomplished more than 1,500 high-risk apprehensions of extremely dangerous and often armed felony suspects without firing a shot; it is my opinion that Mr. Valdivia would not have been shot to death in this incident had the involved officers followed the obvious and required tactics.

The involved officers failed to establish an incident specific tactical plan and failed to follow the trained default tactical plan for containing and communicating with a subject. The involved officers failed to de-escalate the situation, and instead inappropriately escalated the situation leading to his use of inappropriate and unnecessary force as defined by POST. Pursuant to basic officer training, tactical de-escalation involves the use of techniques to reduce the intensity of an encounter with a subject and enable an officer to have additional options to gain voluntary compliance or mitigate the need to use a higher level of force while maintaining control of the situation. The involved officers failed to de-escalate and failed to attempt to de-escalate the situation. De-escalation techniques require planning, assessment, time, containment, use of resources, and communication.

Officers should coordinate their approach to a subject – this did not occur here. Officers should use (as trained) the equation *Distance + Cover = Time*, which allows officers to communicate with the subject, refine tactical plans, and call for additional resources – this did not occur here. Officers should make an effort to contain the subject to create more time and opportunity to de-escalate the situation – this did not occur here.

Officers should call for and utilize additional resources with specialized expertise and tools to assist in control and containment of the situation – this did not occur here. Officers should maintain communication between officers and communicate effectively with the subject (critically important as trained) including giving verbal warnings, use of persuasion, defusing, empathy, redirecting, and building a rapport – this did not occur here.

The video evidence in this regard reflects an unacceptable disregard for Mr. Valdivia's life and safety. The video evidence, coupled with each officers' specific statements that they assessed and were able to see Mr. Valdivia's actions in slow motion or frame by frame, clearly indicates that the involved officers saw Mr. Valdivia's hands were visibly empty after he discarded the BB gun (apparent gun) on the ground, after showing several

acts of compliance with officer commands.  There is no objective basis to believe that anything Mr. Valdivia was doing justified deadly force.

The tactical decisions made by the involved officers demonstrate unnecessary recklessness that led to the shooting.  As stated above, there were obvious reasonable alternatives to the use of lethal force.  There was also ample room to tactically move about, maintain cover, and give commands and warnings, rather than shoot Mr. Valdivia.  Rather, the involved officers rushed in the open towards Mr. Valdivia and made no effort toward de-escalation or utilization of less-lethal alternatives.  Accordingly, the involved officers' deliberate departure from the tactical guidelines and standard are per se unnecessarily reckless and dangerous and directly connected to the shooting that occurred.  The tactics are specifically identified by POST include.

"The criminal justice system gives law enforcement two extraordinary powers:

- the power of arrest
- the power to use deadly force"

"The authority to do so does not come from the rule of an authoritarian dictator. Rather it comes from the will and consent of the people who put their trust in law enforcement to use that power with the utmost of care and restraint. This is why it is important to emphasize that peace officers do not confer "police powers" on themselves. These powers come to the criminal justice system from the people they serve."  (Learning Domain #2: "Criminal Justice System," Page 1-4. (Emphasis added.)).

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force:"

"An officer will be found to have used unreasonable force when the type, degree, or duration of the force which was used is found to have been greater than that which was objectively reasonable under the totality of the circumstances confronting the officer at the time that the force was used."

"An officer who uses more force than is objectively reasonable faces the possibility of criminal prosecution, civil liability, and/or agency administrative sanctions."  (Learning Domain #20, page 7-5.)

2.      A warning that deadly force will be used must be given when feasible. The involved Officers failed to give a warning that deadly force was going to be used. In fact, the involved officers drew their weapons and fired within approximately thirty seconds of their contact with Mr. Valdivia. Nevertheless, it was feasible to give a warning based on the time available and Mr. Valdivia's apparent compliance with commands. Further, based on my review of the video evidence, it was feasible for the Officers to issue a verbal deadly force warning prior to his use of deadly force. An officer's (here the Officers) failure to take the time available to him and uses deadly force instead of issuing a warning does not mean that the officer did not have time. It is my opinion that the Officers had time (it was feasible) to give a warning and chose not to.

3.      Reasonable alternatives must be used when feasible. Based on my review of the video evidence and the Officers' statements and testimony, reasonable alternatives were available and feasible. The Officers had reasonable, less-intrusive, alternatives to the use of deadly force including but are not limited to achieving cover, communicating and planning with other officers, coordinating resources such as air support, K-9, beanbag shotgun, Tasers, SWAT, waiting for additional officers and resources to arrive, communicating with the subject (here Mr. Valdivia), containment, tactical repositioning, and other less-lethal force options if necessary. Further, based on my review of the video evidence it was feasible for the Officers to utilize any one or combination of the reasonable available less-intrusive alternatives to the use of deadly force. An officer's (here the involved Officers) failure to take the time available to them and instead used deadly force instead of attempting reasonable alternatives does not mean that the officer did not have time, or it was not feasible. It is my opinion that the Officers had time (it was feasible) to use less-intrusive means and chose not to.

4.      Mr. Valdivia did not attempt to flee. Mr. Valdivia was not resistive or assaultive during this incident. Mr. Valdivia showed several acts of compliance.

5.      The Officers' use of deadly force was inappropriate and unnecessary under the totality of the circumstances, was inconsistent with basic

law enforcement training and violated basic POST standards and the standard of care pursuant to POST and officer training.

Officers in California (including the involved officers) and throughout the nation are trained that the right to life is a constitutional right. Accordingly, Officers are to use lethal force always with a reverence for life and only in the direst of circumstances and only absent an obvious reasonable alternative. In the case of deadly force, an officer may not use deadly force if there is not an immediate threat of death or serious bodily harm.

The training and the law as known to officers through the training is clear, an officer's use deadly force shall be evaluated based on the totality of circumstances known to the officer at the time and includes the officer's conduct leading up the use of force. Officers shall only use that amount of force that reasonably appears necessary to accomplish a legitimate law enforcement purpose. That the ultimate objective of every law enforcement encounter is to avoid or minimize injury. That officers should de-escalate the situation to increase officer safety and decrease the need for using force, including summoning additional resources, formulating a plan, and employing other tactics. Importantly, officers must evaluate and use reasonably available resources and techniques when determining whether to use deadly force, should consider their surrounding and any potential risks to bystanders, and only use deadly force to protect from an imminent threat of death or serious bodily injury. An "imminent" threat of death or serious bodily injury only exists when the subject has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury, and that an officer's subjective fear of future harm alone is insufficient as an imminent threat, no matter how great the fear and no matter how great the likelihood of the harm.

Here, Mr. Valdivia was not an immediate threat of death or serious bodily injury to anyone at the time of the Officers' use of deadly force. The video recordings are the best physical and objective evidence in this case. Physical/objective evidence takes no side, does not lose its memory, and documents the true facts. Based on my review of the materials, no reasonable officer would have perceived that Mr. Valdivia was an immediate risk of death or serious bodily injury and would not have perceived that Mr. Valdivia pointed a gun at anyone. Importantly, objectively, and it cannot be

disputed that, no gun was in Mr. Valdivia's hands at the time of the use of deadly force. Further, Mr. Valdivia did not attempt to point a firearm at any officer or person at the time. The record shows that Mr. Valdivia discarded the gun. Important to the analysis is that each officer states that they assessed between shots, that the incident seems to go in slow motion (or saw things frame by frame), saw the gun leave Mr. Valdivia's hand, and did not see Mr. Valdivia reach for the gun after it was dropped. Therefore, at the time of each Officers' use of deadly force, they saw that Mr. Valdivia did not have a gun in his hand. At the time of every shot fired by the Officers here, Mr. Valdivia did not have the present ability to immediately cause death or serious bodily injury (he was unarmed), did not have the opportunity to immediately cause death or serious bodily injury (he was unarmed), and did not demonstrate the apparent intent to immediately cause death or serious bodily injury (he discarded the gun on his own and moved his hand away from the gun thereafter).

Even if Mr. Valdivia had a gun in his hand at the time of the shots, which he did not, officers, including the involved Officers, are trained and know that they cannot shoot a person merely for having a gun in their hand, as the person may be discarding the gun. As training, people often discard or drop a gun or weapon when they recognize police presence. To do so would constitute inappropriate, unnecessary, and unjustifiable force, which is what we have here. Considering the absence of concrete evidence to validate the Officers' assertion that they fired at Mr. Valdivia due to a credible threat to themselves or others by Mr. Valdivia, it is more likely that this incident is a result of the Officers overreacting and using unnecessary force (including contagious fire) rather than reacting to an actual perceived threat.

Deadly force is only authorized if the subject's conduct is life-threatening resistance. Important to my review is that Mr. Valdivia was not being aggressive or combative with any person at the time of the use of deadly force or prior to the use of deadly force. In fact, Mr. Valdivia showed several acts of compliance in response to officer commands including moving his hands, raising his hands, and going to the ground. Mr. Valdivia did not verbally threaten to harm any officer, and Mr. Valdivia did not verbally or physically display and intention to assault any officer or person.

Page 36 of 47

This was not a situation that constituted requiring split-second judgments by the Officers. My review of the objective facts of this case (as shown in the video evidence) are that the Officers had time and opportunity to utilize cover but failed to do so, had time and opportunity to utilize space and distance to create even more time but failed to do so, had time and opportunity to communicate with Mr. Valdivia to de-escalate the situation but failed to do so, and had time and opportunity to communicate with the Officers and other officers to create a safe apprehension and containment plan for Mr. Valdivia but failed to do so. For a reasonable officer to be in a situation to make a split-second judgment (as it relates to the use of deadly force) there must be a triggering event that is reasonably perceived by the officer which the officer is reacting to and reasonably believes requires an immediate response. One of the reasons that the Officers' use of deadly force was inappropriate is because it was an overreaction to the situation, and he fired too quickly without a proper assessment of the need to do so.

The Officers conduct here showed a lack of reverence for human life, and that the use of deadly force here was not a last resort or in the direst of circumstances. The Officers' conduct did not minimize injury, they did not attempt to de-escalate the situation pursuant to the training, and they did not consider the potential risks to bystanders.

The Officers appear to have deliberately ignored POST and CPD training leading to the unnecessary shooting death of Mr. Valdivia. As such, the Officers' decisions and actions fell below the expected and required professional standard of care and reflected deliberate indifference (as trained) to the life and safety of Mr. Valdivia.

6. In my opinion, the Officers exhibited a gross departure from nationally accepted required tactics to minimize the use of lethal force during a high-risk operation as outlined above. Trained and experienced officers know that failure to follow them violates professional standards and training. This flawed form of the tactics causes unnecessary injuries and death.

Here, in my opinion, the sudden shooting at Mr. Valdivia after Mr. Valdivia discarded the gun and had visibly empty hands and in a universal act of surrender, was reckless and out of policy. In this regard, it is helpful to compare what occurred during this incident in

view of the basic tactical steps expected. However trained and expressed, the basic tactical steps understood and required during deployment of high-risk apprehension of suspects are briefly stated above.

As stated above, the Officers' actions are indicative of a failure to follow policy and procedures taught by POST. As a result of failing to follow POST policy and training, the Officers are directly connected to the preventable, unnecessary, and excessive shooting that occurred. His actions fall below the established professional standards, and they can only be viewed as reckless and dangerous. As such, his actions constituted unreasonable and inappropriate force.

Based on my review of the record, the Officers violated CPD training and policies and violated POST standards, which reflects his lack of adequate training, and a direct reflection of CPD's inadequate supervision, and training policies. I also noted that CPD officials, ignoring the objective evidence as I have described above, approved of the Officers' use of inappropriate and unnecessary deadly force. The Officers' use of deadly force against Mr. Valdivia, when Mr. Valdivia did not point a gun at any person, was not moving towards the gun, but had discarded the gun, demonstrates his complete lack of situational awareness, lack of control over his emotions and fears, and his completely inadequate training and understanding of basic use of force principles.

The CPD, through its chain of command, appears to have endorsed the dangerous and out of policy tactics that are connected to this incident. As such, their collective approval of these tactics puts the communities they serve at unnecessary future risk of death and/or injury from the officers involved in this case. Further it places the community at risk of serious injury/death by other officers in the department, who have been or are now, similarly trained and/or supervised.

Based on my review of this matter, the Officers' failures in this matter are not from a lack of opportunity to train, but more so a lack of following the training provided. This indicates to me, and would indicate to a reasonable law enforcement officer, that the CPD's custom and practice is to fail to enforce their training and policies by approving inappropriate force.

**My Qualifications for Reviewing this Case:**

My opinions are based in part on my training, professional experience and education. I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988). The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 2,400 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension. This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin. I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury. I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New

York, Oregon, Kentucky, and Wyoming Federal and State Courts.  I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California.  I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana.  I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons."  On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert."  On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons.  I was selected (January 24, 2020) to present on the topic of: "Use of force litigation under California's negligence standard and the impact of AB 392" at the National Police Accountability Project held at Loyola Law, Los Angeles, California.  On February 18, 2020, and on March 10, 2021, and on October 27, 2023.  I lectured (at request) at the University of California - Irvine, School of Law, Civil Rights Litigation Clinic.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas).  As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden.  The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp.2d.1047.  I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007).  The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008).  The *Torres* case was appealed to the U.S. Supreme Court and returned for trial.  I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.*  (E.D. Wis Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD.  My opinions supported argument in the

Ninth Circuit case: *A. D., a Minor; J. E., a Minor; Sue Casey, Plaintiffs-Appellees, v. State of California Highway Patrol, Defendant, and Stephen Markgraf.*, No. 09-16460, D.C. No. 3:07-cv-05483-SI (9th Circuit, Published Opinion).  My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014).  The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *(Baton use) Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011).  The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011).  The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013).  The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012).  The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012).  I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014).  Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014).  I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644.  My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184.  My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.*  No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.*  No. 14-15098 (for publication).  My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication).  My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.,* Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches.  My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force.  My opinions supported argument in the

Sixth Circuit opinion, Case No. 16-5322, *Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons. My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit. My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity. My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force. I participated as a retained expert in the USDC Fifth District case, *Stephen McCollum et al., v. Texas Department of Criminal Justice, et al.,* Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al,* D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit Case *Richard Vos; Jenelle Bernacchi, v City of Newport Beach, et al.,* Nos. 16-56791 (for publication) and which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force and mental illness. My opinions (and quoted by name) supported argument in the Ninth Circuit Case *S.R. Nehad, et al. v. Browder, et al.*, No. 18-55035 (for publication) regarding the use of lethal force and custom and practice. My opinions supported argument in the Ninth Circuit opinion, Case No. 17-55930 (not for publication), *Estate of Kevin Brown, et al. v. Michael Lambert, et al.*, D.C. No. 3:15-cv-01583-DMS-WVG, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit opinion, Case No. 15-56339 (for publication), *Shane Horton, by his Guardian Ad, Litem Yvonne Horton, v. City of Santa Maria; Santa Maria Police Department; Andrew Brice*, D.C. Case No. 2:14-cv-06135- SJO-PJW, and *Jonathan Michael Castro v. County of Los Angeles, et al,* D.C. Case No. CV 10-5425 DSF (JEMx), 833 F.3d 1060 (9th Cir. 2016) (en banc), regarding jail standards, in-custody suicidal prisoners and qualified immunity. My opinions supported argument in the Ninth Circuit opinion, Case No. 17-56270 (not for publication), *James Soler v. County of San Diego, et al.,* D.C. No. 3:14-cv-02470-MMA-RBB, regarding required verification of persons taken into custody pursuant to a warrant of arrest. My opinions supported argument in the Ninth Circuit opinion, Case No. 18-17404 (for publication) *Tan Lam, v. City of Los Banos, et al.* D.C. No. 2:15-cv-00531-MCE-KJN, regarding the use of lethal force. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 19-56035 (for publication), *Tiffany Tabares, et al v. City of Huntington Beach, et al,* D.C. Case No. 8:18-cv-00821, JLS-JDE, regarding use of

force and subjects suffering mental illness. I was retained as consultant regarding the October 15, 2019 Law Enforcement Activity Related Death (including positional asphyxia) of Mr. Angel Zapata-Hernandez by San Diego Metropolitan Transit System (MTS) Code Compliance Officers. My consultations included recommendations and resulted in significant changes in policy and training by the MTS. I was a retained expert in the Temporary Restraining Order restricting the use of kinetic weapons during demonstrations issued April 19, 2021 in *Black Lives Matter v. City of Los Angeles, et al*, Case No.: CV 20-5027 CBM (Asx).. My opinions supported argument in the Ninth Circuit opinion, Case No. 20-16351 (not for publication), *Terrance Amons, et al., v. Dillon Tindall et al.* D.C. No. 4:19-cv-00301 KAW regarding use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. 20-56254, D.C. No.2:19-cv-05370-CAS-JC (for publication), *Paulette Smith, individually and as Successor in Interest to Albert Dorsey, deceased, v. Edward Agdeppa, and City of Los Angeles, et al.*, regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. 21-16709 (for publication), *Jose Murguia for himself and for the Estates of Mason and Maddox Murguia, v. Heather Langdon, et al.* D.C. No. 4:19-cv-00942 DAD-RAM regarding "State-created danger." My opinions supported argument in the Ninth Circuit opinion, Case No. 20-15651, D.C. No.2: 17-cv-02776 - JCM-NJK (for publication), *Rudy Rivera, v. Corrections Corporation of America*, regarding false imprisonment and callous disregard. My opinions supported argument in the Ninth Circuit opinion, Case No. 19-56462, D.C. No.5: 18-cv-00762 - DMG-SP (for publication - Declined Review by the Supreme Court), *Estate of Clemente Najera Aguirre; J.S.;Y.S., v. County of Riverside; Dan Ponder* regarding the inflection of lethal force.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013). I was quoted by the California Appellate Court (Second Appellate District, Division Three) and the California Supreme Court in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect. California Penal Code Section 311.11 is required training

for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children," pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers.  In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole.  The AG report was published May 12, 2016.  I provided a written Opinion for New Mexico AG regarding the shooting Death of Teresa Anaya that included requested training opinions.  I have also consulted with, and provided written opinions at the request of the U.S. Attorney (New York), the Santa Clara County District Attorney, and the San Francisco District Attorney.  On June 16, 2021, I was selected by the Los Angeles County District Attorney as a member of FACCT - an independent team assigned to re-examine fatal use of force incidents by law enforcement officers and recommend further action when appropriate.  On November 7, 2021, I was an Honoree of the 2021 National Lawyers Guild of Los Angeles at their annual Awards Gala as a recognized defender of Constitutional Rights.  I was the retained Use of Force consultant regarding the May 28, 2010 homicide of Mr. Anastacio Rojas (USDC Case No. 11-CV-0522-L NLS) and which was taken under formal consideration by the Inter-American Commission on Human Rights (an international human rights tribunal) on November 2022.

My most recent trial testimony regarding the Americans With Disabilities (ADA) rights and requirements (as trained by POST) was *Marina Borawick, v. City of  Los Angeles, et al.  Case No. 2:17-cv-02036 BRO-JC*, on March 30, 2023.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case.  Additionally, a number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs.  I own each, along with the download software.  I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices.  I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage.  Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007).  My most recent

Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on November 1, 2018 in *Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS.*  There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 11, 2025 at Santee, CA.


Roger A. Clark

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  rclark9314@aol.com

**UPDATED LIST OF SWORN TESTIMONY FOR RULE 26**

**April 9, 2021 to April 10, 2025**
(Revised April 10, 2025

**Deposition:**  April 9, 2021 (continued from December 4, 2020)  Melanie Dunne, et al, v. City of Las Cruces (New Mexico), et al. Case No. D-307-CV-2018-02315.

**Deposition:**  April 13, 2021.  Villegas v. City of Los Angeles – C.D. Cal. Case No. 20-cv-07469-SB-JC.

**Deposition:**  April 14, 2021.  Songhai Smith, v. City and County of Los Angeles, et al. Case No. 2:20-cv-03118-RGK.

**Deposition:**  April 15, 2021.  James B. Shelton v. John Brandon et. al.,  Case No. 4:19-cv-00023 (Tennessee).

**Deposition:**  April 23, 2021.  M.A., et al. v. County of San Bernardino, et al.  Case No. 8:20-cv-00567-and Z.M.A. v. County of San Bernardino, et al. Case No. 5:20-cv-00589-JFW-SHK

**Deposition:**  May 3, 2021.  Jeremy Holloway, Plaintiff, vs. County of Orange, Deputy Chad Renegar, individually and as a peace officer, et. al, Case Number: 8:19-cv-01514-DOC-DFM.

**Deposition:**  May 10, 2021.  David Andrews, Plaintiff, vs. County of Orange; Robert Seamans; Stephen Harder, et al., Case No.: 8:20-cv-00925-JLS-ADS.

**Trial:**  May 12, 2021.  Araceli Flores (Juan Barillas), v. City of Los Angeles, et al.  Case No. 2:18-cv-09936 .

**Deposition:**  May 18, 2021.  Sophia Larios, v. City of Long Beach, et al.  Case No.: 2:18‑cv‑10486 PSG (PJWx)

**Deposition:**  May 19, 2021.  Shellie Cooke, v. City ot Los Angeles, et al.  Case No. 18STCV00882.

**Deposition:**  May 21, 2021.  Bellagio Brown, Vs. City of Ontario; Gabriel Gutierrez, et al., Case No.: 5:20-cv-00476-DMG-SHK.

**Deposition:**  May 24, 2021.  Kenneth Chamberlain, Jr. v. City of White Plains (New York), et al.  Case No. 12-CV-5142 (CS).

**Deposition:**  June 2, 2021.  J.A.J., et al., vs. Efrain Jimenez, et al., Case No.: 1:18-cv-01138 DAD-SKO.

**Trial:**  June 11, 2021.   Richard Donastorg, vs. City of Ontario, et al.  Case No.: 5:18-cv-00992-JGB-SP.

**Trial:**  June 11, 2021.  Harry Donald Lemly, Jr., v. California Department of Parks and Recreation, et al.  Case No. 8:19-CV-01603 DOC DFM.

**Deposition:**  June 14, 2021.  Paul R. Conforti, and Humana Caresource, vs. City of Franklin, Officer Christopher Rydelski, Officer Gary Wallace, et al., Case No.: 2020CV000758.

**Deposition:**  June 15, 2021, Rosa "Patti" Andrade, et al., vs. City of Tucson, et al.  Case No. C20194291.

**Deposition:**  June 16, 2021.  Barry John Montgomery, Jr. v. County of Los Angeles, et al.  Case No. BC692204.

**Trial:**  June 23, 2021.  People v. Richard Lechuga, Superior Court(San Diego County), Case No. CE395395, DA No. NIBT461.

**Trial:**  July 6 & 7, 2021.  Jose Gomez, v. City of Houston, et al.  Case No. 18-cv-1224.

**Deposition:**  July 13, 2021.  Nicholas Robinson v. City of San Jose, et al.  Case No.: 5:19-CV-06768NC.

**Deposition:**  July 15, 2021.  Michael Moore vs. City of Los Angeles, et al.  Case No.: -cv-03053-AB-AGR..

**Trial:**  July 19, 2021 and July 20, 2021.  Villegas v. City of Los Angeles – C.D. Cal. Case No. 20-cv-07469-SB-JC.

**Trial:**  July 22, 2021.  The Estate of Vu Anh Ngo, et al. v. County of Riverside, et al.  Superior Court Case, RIC 1902381.

**Deposition:**  July 30, 2021.  Donnie Woodral v. County of Stanislaus, et al.  Case No.: 1:20-cv-00372

**Deposition:**  August 2, 2021.  Darryl Speer v. County of San Bernardino USDC Case No. 5:20-

Page 2 of  23

cv-00044-JGB-SPx.

**Deposition:**  August 5, 2021.  Juan Jose Bermudez, v.  County of San Bernardino, et al.  Case No. 5:20-CV-438 JGB (SHKx).

**Depostion:**  August 9, 2021.  Marco Ortiz, v. San Joaquin County, et al.  Case No.. 2:20-cv-00217-JAM-CKD.

**Trial:**  August 12, 2021  Darryl Speer v. County of San Bernardino USDC Case No. 5:20-cv-00044-JGB-SPx.

**Deposition:**  August 16, 2021.  Cynthia Heffner Roberts, et al v. Manuel Cruz, Individually. Case No. 3:19-CV-186 RGJ-RSE (Kentucky).

**Deposition:**  August 17, 2021.  Gerardo Wence, v. Rayann Cruz.  Contra Costa County Superior Court  Case No.: CIVMSC18-02060.

**Deposition:**  August 20, 2021.  B.P., et al. v. County of San Bernardino, et al.  Case No.: 5:19-cv-01243.  JGB-SP.

**Deposition:**  August 24, 2021.  Rosa Ester Brizuela, et al,  v. City of Sparks; et al.  Case No.3:19-CV-00692-MMD-WGC.

**Deposition:**  August 25, 2021.  Robin Leeann Moore-Brown, et al, v. ·City of North Las Vegas, et al.  Case No. 2:20-CV-01649-GMN-DJA.

**Trial:**  August 26, 2021.  Jeremy Holloway, Plaintiff, vs. County of Orange, Deputy Chad Renegar, individually and as a peace officer, et. al, Case Number: 8:19-cv-01514-DOC-DFM.

**Deposition:**  September 8, 2021.  Lisa Novak and Patrick Novak, et al, v. City of Madera, et al.. Case No.: 1:20-cv-00301-DAD-SKO.

**Deposition:**  September 10, 2021 & October 19, 2021.  Joseph Lopeteguy, v. Kern High School District, et al.  Superior Court Case No. BCV-17-100576, and Gilbert Valdez, Jr., and Jarald Wyatt v. Kern High School District, et al.  Superior Curt Case No. BCV-17-102617.

**Deposition:**  September 13, 2021.  Delon Thurston, vs. City of Vallejo, et al. , Case No.: 2:19-cv-01902-KJM-CK.

**Deposition**:  September 16, 2021.  Estate of Angela M. Zuniga et al, v. San Bernardino County, et al.  Superior Court Case No CIVDS1620852

**Deposition:**  September 20, 2021.  Xavier Hermosillo, an individual; Olga Hermosillo, an

individual and as successor in interest for Decedent, Luis Hermosillo, vs. County of Orange, et al.  Case No. 8:20-cv-01387-JVS-(ADSx).

**Deposition:**  September 24, 2021.  Diane Lang (Donnell Lang) v. City of Redding, et al, Superior Court (Shasta County) Case No.  193947.

**Deposition:**  October 8, 2021.  Patrick Pursley, v. City of Rockford, Illinois, et al. Case No. 3:18-cv-50040.

**Deposition:**  October 18, 2021.  Estate of Toby Diller, et al. v. City of San Diego, et al.  Case No.: 20CV1003

**Deposition:**  October 21, 2021.   Cherish Thomas, v. City of Rio Vista, et al.  Case No.: 2:20-cv-00899 KJM-DB.
Client Attorney:

**Deposition:**  November 3, 2021.  Brejanea Burley, et al., v. County of Los Angeles, et al., State of California Superior Court (Los Angeles County),  Case No. TC027341.,

**Deposition:**  November 17, 2021.  Elijah McKnight vs. Sheriff Tyler Brown, et al.  Case No.: 1:20-cv-03678-PAB-SKC.

**Deposition:**  November 18, 2021.  People v. Douglas Alan Bohren, Superior Court, San Diego County (California), Case No.: CT No. M264544.

**Deposition:**  November 19, 2021.  Dione Mendoza, et al. v. County of San Bernardino, et al. Case No. 5:19-cv-01056 JGB-SHK.

**Deposition:**  November 22, 2021.  R.H., A minor (Eric Jay Hames Deceased), v. City of Redding, et al., Case No.: 2:20-cv-01435-WBS-DMC.

**Deposition:**  November 29, 2021.  R.A., and M.A., (Randolph Aguirre Deceased), et al. v. City of La Habra, et al. Case No. 8:20-cv-01829 CJC (ADSx)

**Deposition:**  November 30, 2021.  Brent Gustine, v. County of San Diego, et al., Case No.: 3:19-cv-00903-LAB-NLS.

**Deposition:**  December 2, 2021.  Adeline Lorraine Herrera, et al, v. City of Montebello, et al. Case No.: 2:20-cv-00590-MWF-SK

**Deposition:**  December 8, 2021.  Jorge Enrique Serrano Robles Senior, and Yuridia Dolores Miranda, et al. vs. County of Los Angeles, et al, Case No.: 2:20-CV-6648-ODW-PLA.

**Deposition.** December 9, 2021.  Jeffrey Drevdahl v. City of Fairfield, et al. Case No.: 2:20-cv-00859-WBS-DB.

**Deposition:** December 13, 2021.  Darla Drinan, vs. United States of America, Joshua Bisch, Douglas Christner, et al., Case No.: CV 20-1634-GW-SHKx

**Deposition:** December 14, 2021.  Alexandrew Orellana v. County of Riverside, et al.  USCD Case No. 5:19-CV-01263-JGB-SHK

**Deposition:** December 14, 2021.  Luke Carlson, et al v. City of Redondo Beach, et al.  Case No. 2:20-cv-00259-ODW (AFMx).

**Deposition:** December 29, 2021.  Kevin Howard v. City of West Covina, Officer Matthew Munoz, Officer Joshua Brenes, Officer Doug Weischedel and Officer C. Gonzalez, Case No.: 2:19-cv-08281-CMB-MRW.

**Deposition**:  January 6, 2022.  Donelle Wear (Blanchard), v.United States of America , et al. Case No.: 8:20-cv-02438-JVS-DFM, consolidated with Case No.: 8:20-cv-00459-JVS-DFM.

**Deposition:**  January 17, 2022.  Angela Hernandez, (Steven Schiltz, deceased), v. City of Huntington Beach, et al.  Orange County Superior Court Case No. 30-2020-01137606 CU-CR-CJC

**Deposition:**  January 21, 2022.  CJ Montano vs. City of Los Angeles Chief Michael Moore, et al., Case No.: 2:20-cv-07241.

**Deposition:**  January 28, 2022.  Kelly Lynch vs. City of Los Angeles, Sergeant Lankford, Officer Wall, Officer Brandt, et al., Case No.: 2:20-cv-07931.

**Trial:**  February 15, 2022Susan Huntzinger, et al, v, Toby Coyle, et al.USDC (Kentucky) Case No. 5:17-cv-00184 KKC

**Trial:**  February 17, 2022.  People v. Terrance Stangle, Superior Court (San Francisco County), Case No 20013301, IIB #A 2019.10.07, ISD #2019-0045.

**Trial:**  February 22, 2022.  Angela Hernandez, (Steven Schiltz, deceased), v. City of Huntington Beach, et al.  Superior Court (Orange County) Case No. Case No. 30-2020-01137606, CU-CR-CJC.

**Deposition:**  February 25, 2022.  Tracy Garrett, v. Lieutenant Eric Nipper, et al.  USDC (Kentucky) Case No:  5:20-CV-64 KKC-MAS.

**Trial:**  March 1, 2022.  Lydia Vasquez-Brenes and Ricardo Brenes, v Las Vegas Metropolitan

Police Department.  USDC Case No.: 2:12cv1635-JCM-VCF.

**Deposition:**  March 15, 2022.  Brian Joshua Cook, vs. County of Los Angeles, et al., Case No.: 2:19-cv-02417-JVS-KS:

**Deposition:**  March 16, 2022.  Elena Mondragon v. City of Fremont, et al.; Case No.: 5:18-cv-01605-NC.

**Deposition:**  March 21, 2022.  Lisa Marie Close vs. City of Vacaville and Stuart K. Tan, Case No.: 2:17-cv-01313-WBS-DB.

**Trial:**  March 30, 2022.  Curtis Jacob Davis, v. Wakulla County, et al.  Superior Court  (Wakulla County, Florida) Case N. 15-ca-FLA BAR NO.: 0739685.

**Deposition:** April 4, 2022.  Rosalinda Ibarra v. Lee, et al.; (Oklahoma) Case No. 20-cv-00598-TCK-SH

**Deposition:**  April 4, 2022.  Rex G. Smith v. Shaun Parsley, City of Concord, et al.  Superior Court, (Contra Costa County) Case No.: MSC20-01316

**Trial:**  April 6, 2022.  Rosa "Patti" Andrade, et al., vs. City of Tucson, et al.  Case No. C20194291.

**Deposition:**  April 7, 2022  Jeanne Llera (Gomez), et al. v. Las Vegas Metropolitan Police Department, et al. Nevada Case No. 2:20-cv-01589 RFB-BNW.

**Deposition**:  April 8, 2022  V.V., et al.  v. City of Los Angeles, et al.; Case No. 2:21-cv-01889-MCS-PD

**Deposition:**  April 11, 2022.  Edgar Sanchez vs. City of San Jose, Christopher Weber, Melissa Villasenor, et al., Case No.: 20-CV-05919-JD.-cv-10758

**Deposition:**  April 11, 2022.  Clark, et. al. v. City of Sacramento, et al.  Case No: 2:19-cv-00171-JAM (JDP).

**Deposition:**  April 12, 2022.  Annie Lee Oliver, Jeremy Wright, and Jeremy Wright as Personal Representative of the Estate of Michael Benford v. Pemiscot County; Tommy Greenwell, Individually and in His Official Capacity; et al. Case No. 19-CV-00137 (SNLJ).

**Deposition:**  April 13, 2022.  March 1, 2022.  Lourdes Vaughan (Richard Posadas Deceased) et al.  v. City of Arvin, et al.  Case No.: 1:20-CV-00473-NONE-JLT

**Trial:**  April 15, 2022.  Rex G. Smith v. Shaun Parsley, City of Concord, et al.  Superior Court,

(Contra Costa County) Case No.: MSC20-01316.

**Deposition:**  April 19, 2022.  Estate of Eric Esteban Briceno, Deceased, et al, v. County of Los Angeles, et al. Case No.: 2:21-cv-01388-SB-E

**Deposition:**  April 20, 2022.  Breya A Barello, vs. County of Los Angeles, Alex Saldana, Edward Gonsalves, et al., Case No.: 2:21-cv-01909-FMO-AGR.

**Deposition:**  April 22, 2022.  Nathan Schneider v. County of Sacramento, et al.  Case No.: 2:20-cv-00383 TLN-EFB.

**Deposition:**  April 28, 2022.  2318.  Anthony Echevarria, v. City of Santa Monica, et al.  Case No.: 2:21-CV-05603 SVW-AGR.

**Deposition:**  April 29, 2022.  Jose Luis Rodriguez, Jr. v. City of Salinas, Et Al. (Kile, Pritt, Neff).  Case #: Monterey County Superior Court 20CV001293.

**Deposition:**  May 2, 2022. Deandre Bolden, v. Contra Costa County, et al.  Case No.: 3:20-CV-04254 SK.

**Deposition:**  May 9, 2022.  William Wynne, Administrator of the Estate of Andrew Lenetis, vs. Town of East Hartford, Officer Kevin Beeman, and Officer Kwanza Clayton, Case No.: 3:20-cv-01834.

**Deposition:**  May 17, 2022.  Cindy Wagner vs. Shasta County, Shasta County Sheriff's Department, et al., Case No.: 2:20-CV-000403-JAM-DMC.

**Deposition:**  May 24, 2022  Maria Elena Vazquez, et al. v. City of San Jose, et al.  Case No.: 5:19-cv-08441-EJD.

**Trial:**  May 25, 2022.  Araceli Flores (Juan Barillas), v. City of Los Angeles, et al.  Case No. 2:18-cv-09936.

**Trial:**  June 1 & 2, 2022.  The Estate of Cecil Elkins, Jr., et al., v. California Highway Patrol, et al., Case No.: 1:13-CV-01483-AWI-SAB.

**Deposition:**  June 3, 2022.  Rosalina Calonge vs. City of San Jose, a Municipal Public Entity; Edward Carboni, et al., Case No.: 20-CV-07429 NC.

**Deposition:**  June 9, 2022.  R.E., et al.  v. State of California, et al.; Case No. 2:21-cv-06072-SB-KS.

**Deposition:**  June 14, 2022.  Charles Hayes v. Las Vegas Metropolitan Police Department, Case

No.:. 2:20-cv-02048-KJD-BNW.

**Trial:** June 16 &17, 2022.  Mondragon v. City of Fremont, et al.; Case No.: 5:18-cv-01605-NC.

**Deposition:**  June 20, 2022.  Greg Banks, and Alexis Avalos, vs. Michael Mortimer; Ryan White; City of Antioch; Dawnmarie Delucchi, et al, Case No.: 4:18-cv-07931-HSG.

**Trial:** July 14, 2022. V.V., et al. v. City of Los Angeles, et al.; Case No. 2:21-cv-01889-MCS-PD

**Deposition:** July 19, 2022: Israel Hernandez and Jully Romero, vs. City of Los Angeles, OfficerJames Welch, Detective Jose Chavez, el al., Case No.: 2:19-cv-00441.

**Trial:** July 28, & 29, 2022: Jennifer Landeros, Individually and as Successor in Interest to Daniel Landeros, et al., v. City of Elk Grove, et al. Case No.: 2:17-cv-02598-KJM-CKD.

**Trial:** August 4, 2022. State of Texas v. Russell Butler, Burnet County, (Texas) District Court Case No.: DA-19-0029

**Deposition:** August 8, 2022. Candido Sesma, et al. v. State of California (CHP), et al. Case No. 5:21-cv-01694 JWH-KK.

**Deposition:** August 17, 2022. John Hermann v. County of San Bernardino, et al. Case No.: 5:20-cv-01682-JAK-SP.

**Deposition:** August 18, 2022. I.C.E. Agent Demetrik Herd, v. County of San Bernardino, et al. Case No. 5:20-CV-02335-JWH-KKX.

**Deposition:** August 19, 2022. Deposition #2335. Benjamin Montemayor, v. City of Los Angeles, et al. Case No.: 2:21-cv-03124 CBM (ASx) (Related to Case No. 2:20-cv-05027-CBM (Asx).

**Deposition:** August 22, 2022. Cole Wilkins v. Wesley VanDiver and Joseph Morrison.; Case No. 8:20-cv-02417-JSL (DFMx)

**Deposition:** August 23, 2022. Mario Carrasco, v. Glendora Police Department, et al. Case No.: 2:21-cv-05965-MWF-AS.

**Deposition:** August 25, 2022. Vega-Colon v. City of Wethersfield, et al. Case No: 3:21-cv-00175 (KAD).

**Disciplinary** Hearing: September 7, 2022.  Hillsborough County (Florida) Sheriff's Department v. Deputy Kirby Lavallee Case No.: 1208-036

**Deposition:** September 15, 2022. Kinberly Perez, et al. v. County of Sacramento, et al. Case No.:

2:21-cv-00356-TLN-JDP

**Deposition:** September 20, 2022. S.C.D.P.,(Brian Statler, Jr. Deceased), et all. v. City of Inglewood, et al. Case No.: 2:19-cv-10712-DMG-MRW.

**Deposition:** September 21, 2022. Vangv. City of Sacramento, et al.;Case No.:2:19-cv-00374-JAM-JDP

**Deposition:** September 22, 2022. Kelly Lorenz and Alykhan Popat v. Superior Court of San Bernardino, et al. Case No. 5:22-cv-00143-PA-JPR

**Deposition**: September 23, 2022. Gary Salzman, et al., vs. County of Los Angeles, et al., Case No.: 21-CV-4604-PA-SK.

**Trial:** October 12, 2022. Kimberly Marroquin, vs. Unidentified LAPD Officer (Dimaggio Rico); Captain Richard Paul Stabile; City of Los Angeles, et al., Case No.: 2:21-cv-07607-RGK-JEM.

**Trial:** October 14, 2022, and October 19, 2022. Vangv. City of Sacramento, et al.;Case No.:2:19-cv-00374-JAM-JDP

**Trial:** October 18, 2022. Diane Lang (Donnell Lang) v. City of Redding, et al, Superior Court (Shasta County) Case No. 193947.

**Deposition:** October 20, 2022. Michael George Tater and Kyla Skye Staniskis (Shannon Michelle Tater deceased), v. City of Huntington Beach, et al. , et al. Case No.: 8:20-cv-01772 Case No. 8:20-cv-01772-MEMF-JDEx.

**Deposition:** October 26, 2022. Cyrus Greene, vs. Bay Area Rapid Transit, a Municipal Corporation; P. Chehal (#684), Individually; T. Matthews (#716) Individually, et al., Case No.: 4:21-cv-00113-DMR.

**Deposition:** October 28, 2022. Nicholas Ramirez, v. City of San Jose, et al., Case No.:5:21-CV-08127-VKD

**Deposition:** November 3, 2022. Akaysia Pearson, et al. v. Otto Aragon, et al., Case No. 3:20-05726-CRB

**Deposition:** November 9, 2022. John Bien, Vs. City of Fresno, Brad Oliver, et al., Case No.:1:20-CV-01159-AWI-BAM.

**Deposition:** November 11, 2022. Hector Hernandez, et al. v. City of Fullerton, et al. Case No.: 8:20-cv-01747-CJC-JDE

**Trial:** November30, 2022 and December 1, 2022. People v. Ricky Butler, 2022. San

Bernardino County (California) Superior Court DA Case No. 2017-00-0042929.

**Deposition:**  December 19, 2022.  Angelina Smalls (Branch) , et al, v. City of Tacoma, et al., Case No.: 3:22-cv-05013.

**Deposition:**  December 22, 2022.  Joseph L. Garces vs. City of Santa Paula, a municipal entity, Officer Chris Rivera; Case No.: 2:21-cv-06730.

**Deposition:**  December 23, 2022.  City of Santa Ana, et al. v. Orange County Association for Mental Health DBA Mental Health Association of Orange County, et al., Case No. 30-2020-01124174-CU-MC-CJC.

**Deposition:**  December 28, 2022.  Scottlynn Moorman, (Minor), v. City of San Bernardino, et al. Case No. CIVDS1818724

**Deposition:**  December 30, 2022.  Bryanna Berry v City of San Jose Officer Lindsay Parodi (4426), CASE NO.: 5:21-cv-8436

**Deposition:**  January 4, 2023.  Cecilia Vargas, et al. v. County of San Bernardino, et al. Case No.: 5:20-cv-02646-JGB-KK.

**Deposition:** January 10, 2023. Estate of Oral W. Nunis, et al v. City of Chula Vista, et al. Case No.: 3:21-cv-01627-AJB-DEB

**Deposition:**  January 12, 2023.  Estate of Nicholas Burgos, et al. v. County of Los Angels, et al. Case No. : 2:21-cv-05566.

**Deposition:**  January 19, 2023.  Myles Ramsey, v. City of Santa Ana, Peter Beaumarchais, Jeremy Reguerin, Ronald Sandoval, Christopher; Shynn, and Peter Thai.  Case N.: 8:21-cv-00825-JLS-KES.

**Deposition:**  January 20, 2023.  Abbie Gray, v. City of Los Angeles, et al.  Superior Court (Los Angeles County) Case No. BC6869939

**Deposition:**  February 1 2023.  Ayana Maroney, vs. County of Riverside, Deputy Mark Rodriguez, Deputy David Ruiz; et al., Case No: 5:21-cv-00497-JGB (SPx).

**Deposition:**  February 6, 2023.  Irina Rusanovskaya, et al, v. City of Los Angeles, et al.  Superior Court (Los Angeles County) Case No. 20STCV33203

**Deposition:**  February 9, 2023,  David Cordero, v. City and County of San Francisco, et al.  Case No.: 3;19-cv-01834.

**Deposition:**  February 13, 2023.  Ignacio Escalante, v. County of Los Angeles, et al.  Superior

Court (Los Angeles County) Case No.: 19STCV29783.

**Deposition**: February 15, 2023.  Edwin Williams, v. County of San Bernardino, et al.  Superior Court (San Bernardino County), Case No. CIVDS1600447

**Deposition:**  February 16, 2023.  Julie Fernandez, v. City of Los Angeles; et al., Case No.: 2:20-cv-07306.

**Deposition:**  February 17, 2023.  David Baxter, v. City of Hemet, et al..  Case No.: 5:21-cv-01331-JWH(SPx)

**Deposition:**  February 22, 2023.  Kyle Peterson v. County of Los Angeles, et al.  Case no: 2:21-cv-05510-JAK-ADS.

**Deposition:**  February 23, 2023.  Jarett Jakarr Waddell v. City of Burbank, et al.  Superior Court (Los Angeles County) Case No.: 21STCV4560.

**Deposition:**  February 24, 2023.  Maria Teresa Gonzalez, (Eloy Maris Gonzalez Jr., Deceased) v. County of Stanislaus, et al.    Case No: 1:21-cv-01091 DAD-HBK

**Deposition:**  March 9, 2023.  Eric Reason, et al v. Sergeant Virgal Thomas, and City of Richmond, et al.  Case No.: 2:20-cv-1900 WBS-JDP

**Deposition:**  March 14, 2023.  Charles Hayes v. Kern County et al.  Case No.: 1:19-cv-01722 BAK

**Trial:**  March 22, 2023 and March 23, 2023,  Irina Rusanovskaya, et al, v. City of Los Angeles, et al.  Superior Court (Los Angeles County) Case No. 20STCV33203.

**Trial:**  March 30, 2023.  Marina Borawick, v. City of  Los Angeles, et al.  Case No. 2:17-cv-02036 BRO-JC

**Trial:**  April 19, 2023.  D.T., a Minor by and Through His Guardian Tanika Tyler  vs. San Diego Metropolitan Transit Services, et al., Case No.: 3:19-cv-1523-LAB-AHG.

**Trial:**  April 21, 2023 & April 24, 2023.  The Estate of Clemente Najera-Aguirre, et al, vs. County of Riverside, et al.  Case No.: 5:18-cv-00762-DMG-SP.

**Trial**:  April 24, 2023.  Christian Pineda, vs. City of Los Angeles; Chief Michel Moore; Colton Haney, and Stephen McClean, Case No.: 2:21-cv-06470-CBM-ASx.

**Deposition:**  May 3, 2023.  The Estate of Jose Alfredo Castro Gutierrez, et al.  v. The City of San

Page 11 of  23

Diego, et al.  Case No:. 21-cv-01292  H-BGS

**Deposition:**  May 9, 2023.  Jeremy James Cotten, et al, v. City of Los Angeles et al. Superior Court Case No.: Case No.: 19STCV40052

**Deposition:**  May 11, 2023.  Nicole Hook, and Jonson Tyler Hook, v. City of Redding, et al. Case No.: 2:20-cv-02365- MCE-DMC.

**Deposition:**  May 15, 2023: Gabrielle Bynum, v. Cit of Los Angeles, et al., Case No.: 2:21-cv-4453 JPR

**Trial:**  May 16, 2023 Angelina Smalls (Branch) , et al, v. City of Tacoma, et al., Case No.: 3:22-cv-05013.

**Deposition:**  May 17, 2023 Ashley Blackmon, v. City of Beverly Hills, et al.  Case No.: 2:21-CV-08381

**Deposition:**  June 8, 2023, Audery G., et al, v. City of Lafayette, et al.  Case No.: 3:21-cv-03545 WHO.

**Deposition:**  June 8, 2023 Jolie Savage v. City of Whittier, et al.  USDC CASE NO. CV21-08067 VAP (PD).

**Deposition:**  June 9, 2023.  Alma L. Figueroa De Magdaleno, et al., vs. County of Riverside, et al., Case No.: 5:21-cv-02027-JGB-SHK

**Deposition:**  June 14, 2023.  Alexandria Garcia, et al., vs. County of Los Angeles, et al., Case No.: 20STCV39464.

**Deposition:**  June 19, 2023.  2464.  Ernest Simon, Jr., an Individual,v. City of Los Angeles, et al.Case No.: 2:22-cv-01775 SSS-GJS.

**Trial:**  June 22, 2023.  A.G.1., a Minor (Raymond, Gonzalez) et al. v. City of Fresno, et al.  Case No. 1:16-CV-01914 JO-SAB

**Deposition:**  June 26, 2023.  Matthew Wilson and L.M., individually and as a successor-interest to Decedent, Joshua Barnes, by and through her Guardian ad Litem Tilde Barnes vs. California Highway Patrol Officers Kevin Domby; Sean Deise and Jose Ortega, et al., Case No.: 21-CV-03824-M.C.

**Deposition:**  June 27, 2023.  Kyle Johnson vs. City of San Jose; San Jose Police Department Officer James Adgar, et al., Case No. 5:21-cv-01849-BLF.

**Deposition:**  June 30, 2023.  Robert W. Hirsh v. California Commerce Club, Inc., et al. U.S.D.C.

Case No. 2:22-cv-05701-MCS-AS.

**Deposition:**  July 6, 2023.  Calvin Rush Annd Jayme Rush, v. City of Fairfield, Officers Zachary Sandoval and Dustin Joseph.  Case No.: 2:20-CV-01966-WBS-KJN.

**Deposition:**  July 11, 2023.  Bashar Zeidan vs. City of Richmond; Case No. 3:21-cv-04010-TLT.

**Deposition:**  July 17, 2023.  Tracy Pachote, et al., vs. County of Contra Costa, et al. 3:21-cv-04097-SK.

**Deposition:**  July 19, 2023.  Gloria Black-Meadows, (Lashanda Anderson Deceased) et al, vs. Deptford Township, et al.  Case No.: 1:20-cv-06951.

**Deposition:**  July 21, 2023.  Angelina Atabekova-Michaelidis and Vardoui Michaelidou; (Melkon Michaelidis deceased), vs. City of Los Angeles, et al.  Case No.: 2:22-cv-05620  - MCS-MAAx.

**Deposition:**  July 22, 2023.  Pamela Reny Monk, v.  Matthew Diller, Amal Pal,·Brad Gorby, Shawn Murphy,·Matthew Mcnulty, Los Angeles·Police Department, et al.  Case No. BC660220

**Deposition:**  July 26, 2023.  Jeanette Ayala-Rios, vs. California Highway Patrol, Officers Jordan W. Richardson, Michael W. Richardson, Ubaldo Ferreira, Matthew Barawed, Brent R. Logar, et al., Case No.: 4:22-cv-02550HSG.

**Deposition:**  July 27, 2023.  Maria Elena Garcia, et al. vs. City of Farmersville, et al. Case No. 1:21-cv-00482-JLT-EPG

**Deposition:**  August 1, 2023.  Mary Ellen Lennox, (Jordan Zenka, deceases(, v. City of Sacramento, et al,  Case No.: 2:21-CV-02075-TLN-KJN

**Trial:**  August 3 & 4, 2023.  Jeremy Holloway, Plaintiff, vs. County of Orange, Deputy Chad Renegar, individually and as a peace officer, et. al, Case Number: 8:19-cv-01514-DOC-DFM.

**Trial:**  August 9 & 10, 2023.  Desabian Wilson, Edwin (Edwin Williams deceased). v. San Bernardino County, et al.  Superior Court Case No.: CIVDS1600447.

**Deposition:**  August 14, 2023.  Foucha Coner, v. City of Sacramento, et al.  Superior Court Case No.: 34-2020-00285118

**Deposition:**  August 18, 2023.  Braydon Lee Esqueda, vs. County of San Bernardino; Wynn Srisutasanavong and Cory Vigil, et al., Case No.: 5:20-cv-01743-MWF-SHK

**Deposition:** August 22, 2023.  Deovante L. Guy, by and through the Guardian Ad Litem for Deovante L. Guy, Quintasia Walker vs. Matthew Lorenzen; Annie Brady, et al., Case No.

**Deposition:** August 25, 2023.  Nathan Rocky Glover, v. City of Los Angeles, et al.  Case No.: CV21-09915 FWS (ASx).

**Deposition:** August 29, 2023.  Bradley Steyn, v. City of Los Angeles, et al.  Case No.: - 20STCV34657.

**Trial:** August 30, 2023.  Winston Durrell Settrini, v. City of San Diego, et al.  Case No.: 20-cv-02273 CAB-BGS.

**Deposition:** September 11, 2023.  Richard Payne, Janchai Payne, K.P. a minor, v, City of Los Angeles, et al.  Case No.: 2:17-cv-09044 (Ksx)

**Deposition:** September 12, 2023.  Ellen Williams, also known as Ellen Girma, an individual, v. City of Pleasanton, et al.  Case No.: 3:20-cv-08720 WHO

**Deposition:** September 13, 2023.  Art Hernandez, Alfred Gonzalez, Benjamin Zaredini, David Casas, Louis Granados, Mario Contreras, Oscar Escobedo, Ariela Lemus, et al. v. County of Loa Angeles, Los Angeles County Sheriff's Department (LASD), et al. Case No.: 19STCV33158.

**Deposition:** September 18, 2023.  Emily Garcia and C.G. et al. vs. City of Tustin, Estella Silva, et al., Case No.: 8:22-cv-00131.

**Trial:** September 19, 2023.  Bradley Steyn, v. City of Los Angeles, et al.  Case No.: - 20STCV34657.

**Deposition:** October 2, 2023.  Estate of David Angel Villalobos Valdovinos,  by its successor in interest Eve Samantha Arriaga, et al., vs. Ryan Gonsalves, the United States of America, et al., Case No.: 22-cv-0315-L-AHG.

**Deposition:** October 5, 2023.  Arnold Day, v. Kenneth Boudreau, William Foley, Jude Evans, Michael Kill, Dan Mcweeny, James Brennan, Anthony Watson, Marty Radtke, City of Chicago, and Unidentified Employees of the City of Chicago . Case No.: 19-cv-07286.

**Deposition:** October 11, 2023.  Matthew D. Rifat, and Tracy M. Rifat, v. Dave Jones; David Steele; et al.  Case No.: 21-CV-1667-L-KSC.

**Deposition**: October 18, 2023.  Brenda Allen vs. State of California, Department of Corrections and Rehabilitation, Corrections Officer O. Barraza, Corrections Officer V. Veloz, Corrections Officer M. Roque, Sergeant Amaya, et al., Case No.: 5:22-CV-01288-RGK-PLA.

**Trial:**  October 20, 2023.  Jarett Jakarr Waddell v. City of Burbank, et al.  Superior Court (Los Angeles County) Case No.: 21STCV4560.

**Deposition**:  October 23, 2023.  Deshawn M. Wright, v. City of San Bernardino, et al  Case No.: 5:22-cv-001327-GW-(JCx).

**Trial:**  October 27, 2023.  John Hermann v. County of San Bernardino, et al. Case No.: 5:20-cv-01682-JAK-SP.

**Trial:**  November 1, 2023.  Alexandria Garcia, et al., vs. County of Los Angeles, et al., Case No.: 20STCV39464.

**Deposition:**  November 3, 2023.  Jose Gutierrez, v. County of Los Angeles, et al.  Case No.: 2:21-cv-08223 FMO-PLKA

**Trial:**  November 6, 2023.  Francisco Rodriguez, v. Los Angeles Dodgers, et al.  Superior Court, (Los Angeles County) BC714498

**Deposition:**  November 7, 2023.  Jimmy Southern, (Jeremy Southern deceased), v. City of Sacramento, et al.  Case No.: 2:20-CV-01765 - MCE-AC

**Deposition:**  November 14, 2023.  Blanca & Brian Mendoza v. City of Hanford, et al.  Case No.: 1:21-cv-00721 JLT-BAM

**Deposition:**  November 15, 2023.  Ricardo Martinez, v. County of Orange, et al.  Superior Court Case No.: 30-2021-01208196 CU-NP- NJC.

**Deposition:** November 30, 2023.  Dora Galinda, et al., vs. City and County of San Francisco, et al., Case No.: 3:21-cv-08133-JSC.

**Deposition:**  December 5, 2023.  Deonta Jackson, Plaintiff, vs. City of Los Angeles; Victor Morales #96038, individually, and as a Peace Officer; et al., Case No.: 2:22-cv-06523.

**Deposition:**  December 8, 2023.  Maria Segura, et al. v. City of San Bernardino, et al.  Case No.: 5:22-cv-00277-JGB-SP.

**Deposition:**  December 11, 2023.  Kendrick Sampson v. City of Los Angeles, et al. Case No.: 2:22-cv-03346 JAK-ADS

**Deposition:**  December 22, 2023.  Carlos Towns, & Barsha Knox, v. County of Los Angeles, rt al. Case No.: 2:23-cv-01635-MEMF-PD.

**Deposition:**  January 2, 2024.  Daniel Cohen vs. Los Angeles County, et al., Case No.: CV15-3376 RSWL AGR.

**Deposition:**  January 3, 2024.  Xavier Lopez, v. City of Riverside, et al.  Case No.: 5:21-cv-02140 ODW.

**Deposition:**  January 5, 2024.  Maribel Murillo v. City of Los Angeles, et al., USCD Case No. 2:22-cv-03188 DMG (Skx).

**Deposition:**  January 9, 2024.  Ronnie Parham v. City of West Covina, Officer N. Robles, Officer C. Gonzalez, Officer A. Hernandez and Officer M. Munoz.  Case No.: 2:21-cv-09114.

**Deposition:**  January 11, 2024.  Slade Douglas, v. City of Las Angeles, et al.  Case No. 2:20-cv-07439-FMO(PDx.

**Deposition:**  January 12, 2024.  Jessica Romero and Brian Roserio, v. Los Angeles County, et al. Case No.: 2:21-cv-03972-FLA-JEM.

**Deposition**:  January 15, 2024.  Jessica Woodward, Vishal Singh, Scott Taylor, and Erik Boyd,, et al. vs. City of Los Angeles, et al. USDC C.D. Cal., Case No. 2:22-cv-01306 GW-JEM.

**Deposition:**  January 16, 2024.  Edwin Vasquez, v. City of Los Angeles, et al.  Case No.: 2:22-cv-04661 DSF-MRW.

**Deposition:**  January 19, 2024.  Daniel Antunez v. LA Dodgers, LLC, et al.  Case No.: 19STCV13057.

**Hearing:**  January 22, 2024 and January 22, 2024.  Douglas Ray Stankewitz, Petitioner, On Habeas Corpus, Fresno County Superior Court Case No.: 21CRWR685993.

**Deposition:**  January 29, 2024.  Matthew Stewart, v. City of Los Angeles, et al.  Case No.: 2:22-cv-04922.

**Deposition:**  January 31, 2024.  Ricardo Dennis Cordova v. Deputy Sheriff Aaron Clark, Lake County, et al; Case No.: 4:18-cv-00367-JSW.

**Deposition:**  February 2, 2024.  Anastasia Martinez v. County of Los Angeles, et al. USDC CASE NO. CV22-06589 DSF (MAR).

**Deposition**:  February 8, 2024.  Estate of Rosendo Olivio vs. City of Los Angeles, USDC Case Number: 2:23-cv-01516-FMO-E.

**Deposition:**  February 13, 2024.  Michael Deleon, v. City of ;Los Angeles, Detective Jose

Martinez, et al.  Case No.: 2:22-cv-06315 AB-MA.

**Deposition:**  February 15, 2024.  Adrian Abelar, v. County of Los Angeles, Los Angeles County Sheriffs Department, Deputy Yen Liu, et al.  Case No.: 2:23-cv-01606R GK (MRWx).

**Trial:**  February 21, 2024.  Daniel Antunez v. LA Dodgers, LLC, et al.  Case No.: 19STCV13057.

**Trial:** March 1, 2024.  The State of Texas v, Deputy James Johnson and Deputy Zachary Camden Judicial District Court Travis County (Texas) Case No.: DPS 09990017

**Trial:**  March 13, 2024.  Daniel Cohen, v. Los Angeles County, et al.  Case No: 2:15-CV-03576 JAK

**Deposition:**  March 14, 2024.   Frank Benavente and Nicole Ventress v. City of Ontario and Albert Alvarado, Case No.: 5:23-cv-00266-SSS-KK.

**Deposition:**  March 25, 2024.  Cristina Ramirez Fonua; B.E.R., et al. v.  City of Hayward, Kyle Martinez, et al.  Case No.: 3:21-cv-03644 RS.

**Trial**:  April 22, 2024. Scottlynn Moorman, (Minor), v. City of San Bernardino, et al.  Case No. CIVDS1818724.

**Trial:**  April 24, 2024.  Estate of Oral W. Nunis, et al v. City of Chula Vista, et al.  Case 3:21-cv-01627-AJB-DEB.

**Deposition:**  April 25, 2024.  Melina Abdullah v. City of Los Angeles, et al.  Superior Court Case No.: 21STCV34800.

**Trial**:  April 30, 2024.  DeShaun Johnson. v.  Officer Ryan Morning.  Case No: 21-cv-00879.

**Trial:**  May 1, 2024.  Kelly Jones (Michael Townsend Deceased), v. City of Portland.  Case No.: 22CV05575 (Oregon).

**Deposition**:  May 9, 2024.  Frances Enyart, (William Enyart, Deceased), v. County of San Bernardino, et al., Case No.: 5:23-cv-00540-RGK-KK.

**Deposition:**  May 10, 2024.  Sergeant Frederick Villalpando,v. State of California, et. al.. Superior Court Case No.: CVDS2018655.

**Deposition:**  May 13, 2024.  Juvenal Nunez, v. County of Los Angeles, et al.  Case No.: 2:23-cv-04409- MCS (PVCx).

**Trial:**  May 17, 2024.  Melina Abdullah v. City of Los Angeles, et al.  Superior Court Case No.:

21STCV34800

**Deposition:**  May 20, 2024.  Esteban Hernandez, v, City of Rialto, et al.  Case No. 5:22-cv-01807

**Deposition:**  May 21, 2024.  Christina Cardenas, v. California Department of Corrections, et al. Case No.: BCV-20-101420.

**Trial**: May 22, 2024.  Frances Enyart, (William Enyart, Deceased), v. County of San Bernardino, et al., Case No.: 5:23-cv-00540-RGK-KK.

**Hearing:**  May 28, 2024.  Sergeant Frederick Villalpando, v. State of California, et. al.  Case No.: CVDS2018655.  (San Bernardino County)

**Trial:**  May 29, 2024. .  Shana Anglin; Christopher Dean Ebersole, and minors Elijiah Makar and Rozlynn Makar, through their Guardian Ad Litem Shana Anglin, vs. Patrice Loraine Burton; Alex Villanueva, in his official capacity as Sheriff of Los Angeles County, et al., Case No.: 21STCV17381.

**Deposition:** May 31, 2024.  Mari Ann Sartor and Roy Eugene Jackson, individually, and as successors in interest to Jay J. Jackson, vs. County of Riverside; Robert Carrasco; et al., Case No.: 5:22-cv 01410 JGB (Spx).

**Deposition:**  June 3, 2024.  Jonathan Peltz and Kathleen Gallagher, v. City of Los Angeles, et al. Case No.: 2:22-cv-03106-MWF-AGR

**Deposition:**  June 4, 2024.  McKinley Kekona, Jr. v. City of San Diego, Officer Allen (#7372), and DOES 1 through 10, inclusive, Case No. 3:22-cv-00745-MMA-WVG

**Deposition:**  June 7, 2024Phillip Brooks, v. City of Palm Phillip Brooks,  Case No.: 5:12-cv-00745 JGB-SP:

**Deposition**: June 14, 2024.  Vincent Bryant, et al. v. City of Berkeley, et al.; Case No.: 3:21-cv-08169-AGT.

**Trial:** June 18, 2024,.  Lawrence, et al. v. Las Vegas Metropolitan Police Department, et al. (USDC Case No. 2:16-cv-03039-JCM-NJK)

**Deposition:**  June 24, 2024.  Joseph Frias vs. County of San Diego, et al., Case No: 3:22-cv-00675-JO-AHG.

**Deposition:**  June 25, 2024.  Danielle Houston, v, City of Fairfield, et. al,.  Case No.: 2:22-cv-01045 JAM DB.

**Deposition:**  July 1, 2024.  Adrian Aldaco, v. Los Angeles Police Department, et al. Case No.: 2:23-cv-03585 HDV-AGR.

**Deposition:**  July 5, 2024.  Alexander Torres, v. County of Los Angeles, et al.  Case No.: 2:22-cv-07450 MWF-MAR.

**Trial:**  July 15, 2024.  Jessica Romero and Brian Roserio, v. Los Angeles County, et al., Case No.: 2:21-cv-03972-FLA-JEM.

**Deposition:**  July 19, 2024.  Edgar Solis, v. County of Riverside; State of California, et al. Case No.: 23-cv-00515 HDV-JPR

**Deposition:**  July 21, 2024,  Maritza Padilla, et al, v. California Highway Patrol et al.  Case No.: 22STCV00661.

**Deposition:**  July 24, 2024.  David Zuniga, v. City of Los Angeles, et al., Case No.: 2:22-cv-03665-CBM-AS.

**Deposition:**  July 30, 2024.  Michael Shoar and Cindy Shoar, v. Orange County, et al.  Superior Court (Orange County) Case No.:·30-2019-01061107.

**Deposition:**  July 31, 2024.  Gerald LaMont Pitts, v California Highway Patrol (CHP), et al. Case No: 2:20-cv-01243 WBS-JDP

**Deposition:**  August 2, 2024  Therese l. Lesher, v. City of Anderson, et al.  Case No.: 2:21-cv-00386-WBS-DMC

**Deposition:**  August 19, 2024.  Ricky Butler vs. County of San Bernardino, et al.  Case No.: 5:23-cv-02147RGK-E

**Deposition:**  August 20, 2024,  Arash Eteghaei and Mitra Zade, v, County of Almeda, et al. Case No.: 4:22-cv-04298 KAW

**Deposition:**  August 21, 2024.  A.H. and H.H, (Shane Holland, deceased), et al. v. County of San Bernardino, et al.  Case No.: 5:23-cv-01028 JGB-SHK.

**Deposition:**  August 23, 2024, and August 28, 2024.  Christina Astorga (Khan, et al.) v. City of Los Angeles, et al.,  C.D. Cal. Case No. 21-CV-03289-CAS (MARx)

**Deposition:**  August 26, 2024.  Bruno Mattar Lima, v. City of Los Angeles, et al.  Case No.: 21STCV26150.

**Deposition:**  August 30, 2024, Juan Oseguera, v. City of Hayward, Officer J. Lutzinger et al.

Case No.: Case No;: 3:23-cv-00621 - SK

**Deposition:**  September 3, 2024.  The Estate of Omar Moreno Arroyo, et al. v. The County of San Diego, et al. Case No: 21-cv-01956-RBM-SBC.

**Deposition**: September 5, 2024.  Derek Stenson (Joshua Sarrett deceased) v. Jacob Leenstra and King County et al.  Case No.:  2:23-cv-01316 (Washington).

**Deposition:**  September 6, 2024.  Salvador Garcia, et al. v. County of Los Angeles, et al.  Los Angeles County Superior Court Case No 20STCV00967.

**Trial:**  September 11, 2024.  Anyka Harris, et al. v. City of Tulare, et al.  Superior Court Case No.: VCU299232.

**Deposition:**  September 13, 2024.  William Schell Morton v. County of San Bernardino, et al. Case No.: 5:21-cv-00052 JGB-SHK.

**Deposition:**  September 16, 2024.  Juan Laspada and Rebecca Rodriguez, v. City of Antioch and Antioch Police Officers, et al.  Case No.23-cv-01955-JSC.

**Trial:**  September 18, 2024.  2632.  People v. Alfredo Armando Morales.  Superior Court, (San Bernardino County).  Case No.:16CR-004762.

**Deposition:**  September 25, 2024.  Samuel D. Castro, v. City of Whittier, et al.  Case No.: Case No.: 2:2023-cv-03424-DSF-RAO.

**Trial:**  October 7, 2024.  David Zuniga, v. City of Los Angeles, et al., Case No.: 2:22-cv-03665-CBM-AS.

**Trial**: October 10, 2024.  Estate of Tyler S. Rushing, Scott K. Rushing, and Paula L. Rushing, vs. AG Private Protection, Inc.; Edgar Sanchez, City of Chico Police Department, et al., Case No. 2:18-cv-01692-MCE-AC

**Deposition:**  October 14, 2024.  William Martin and Michael Martin, vs. Miami-Dade County (Florida), et al.  Case No.: 20-CV-22107-MGC

**Deposition:**  October 15, 2024.  Mariela Valadez, (Cristopher Valadez deceased), et al. v. City of Rialto, et al.  Case No.: CIVSB2200927.

**Trial:**  October 17, 2024.  Michael Shoar and Cindy Shoar, v. Orange County, et al.  Superior Court (Orange County)  Case No.:·30-2019-01061107.

**Deposition:**  October 18, 2024.  Shawn Brye, v. City of Stockton, et al.  Case No.: 2:23-CV-00343 KJM-KJN

**Trial:**  October 22, 2024:  Paxton Williams, v. Des Moines, et al.  USDC Case No. 4:22-cv-240 SBJ.

**Deposition:**  October 28, 2024. Julio Jimenez Lopez and Yesenia Cruz Cruz vs. City of San Rafael; San Rafael Police Department; Daisy Mazariegos; and Brandon Nail.  Case No. 3:23-cv-03652-VC.

**Deposition:**  October 29, 2024.  Sarah Aragon, v. City of Los Angeles, et al.  Case No.: 2:23-cv-09522 DDP (JPRx).

**Trial:**  November 7, 2024.  Gerald LaMont Pitts, v California Highway Patrol (CHP), et al. Case No: 2:20-cv-01243 WBS-JDP

**Deposition:**  November 14, 2024.  Michael Goulding, (Jana Goulding, Deceased), et al, v. City of Placentia, Officer Larrissa Perez, et al. Case No.: 8:23-cv-02332-JWH-KES

**Deposition:**  November 15, 2024,  Helen Abascal vs. County of Los Angeles, et al.  Case No.: 2:23-cv-05246 HDV (Jcx).

**Deposition:**  November 19, 2024.  Jay Campos (Joshua Campos, deceased), et al. v. , County of Orange, et al.  Case No.: 8:23-cv-00072 JVS (JDEx).

**Deposition:**  November 20, 2024. Estate of Richard Ward, and Kristy Ward Stamp, v. Pueblo County, et al. (Colorado).  Case No.: 23-cv-00473-CNS-MBD

**Trial:**  December 4, 2024.  Candido Sesma, et al. v. State of California (CHP), et al. Case No. 5:21-cv-01694 JWH-KK

**Deposition:**  December 7, 2024.  Felix Tellez, v. County of Riverside, et al.  Case No. 5:23-CV-00755-WLH-SHK

**Deposition:**  December 9, 2024.  Bueno-Zaragoza et al. v. Lynch et al.  Case No. 2:21-CV-02294-TLN-JDP

**Deposition:**  December 10, 2024.  Veronica Gonzalez and Juan Luis Duran v. City of Tustin, et. al. Case No;: 8:23:-cv-01274 FWS (ADSX)

**Deposition:**  December 11, 2024.  Therese l. Lesher, v. City of Anderson, et al. Case No.: 2:21-cv-00386-WBS-DMC.

**Deposition:**  December 17, 2024.  The Estate of Richard Risher, Jr., et al. v. City of Los Angeles, et al. Court Case No. 5:17-cv-00995-MWF-KK

**Deposition:**  January 6, 2025.  Monica Valdez, vs. City of Whittier; Officer Gamino; Officer Corona; Officer Baltazar; Officer Estrada, et al., Case No.: 2:23-cv-04668-SPG-KS.

**Deposition:**  January 7, 2025.  D.E., a Minor, by and through his Guardian Ad Litem, Brittany Dominguez, v. Los Angeles Police Department, et al.

**Trial:**  January 10, 2025.  Kyle Johnson vs. City of San Jose; San Jose Police Department Officer James Adgar, et al., Case No. 5:21-cv-01849-BLF.

**Deposition:**  January 16, 2025.  Jacy Houseton and Damon Barnes, v. County of Los Angeles, Deputy Trevor Kirk.  Case No.: 2:23-cv-06887-SVW-MRW

**Deposition**:  January 20, 2025,  Todderick Randall, v. County of San Bernardino, et al.  Case No. 5:24-cv-00086-SSS-SP

**Deposition:**  January 23, 2025.  Allen Dekeyser vs. Milwaukee Police Officer Leon Burns, et al, Case No.: 2:24-cv-00231.

**Deposition:**  February 1, 2025.  Brian Howell v. County of Kern, et al.  Superior Court (Kern County) Case No. BCV-20-103043.

**Trial:**  February 5, 2025.  United States of America, v. Trevor James Kirk.  Case No.: 2:24-CR-527-SVW

**Trial:**  February 6, 2025.  The Estate of Richard Risher, Jr., et al. v. City of Los Angeles, et al. Court Case No. 5:17-cv-00995-MWF-KK

**Deposition:**  February 13, 2025, Nicholas Schwab (Alivia Schwab, deceased), v. Morris Police Officer Nicholas Pampinella, et al., Case No.: 1:23-cv-16607.

**Deposition:**  February 14, 2025.  Armando Munoz v. City of Costa Mesa, et al. Case No. 8:23-cv-01959-JWH-ADS

**Trial:** February 20, 2025 & February 24, 2025.  Edgar Solis, v. County of Riverside; State of California, et al. Case No.: 23-cv-00515 HDV-JPR

**Trial:**  February 21, 2025.  Maritza Padilla, et al, v. California Highway Patrol et al.  Case No.: 22STCV00661.

**Deposition:**  February 25, 2025.  Leonides Enriquez, v. City of Long Beach, et al.  Case No.: 2:23-cv-06464-ODW-AJR

**Deposition:** March 11, 2025, and March 14, 2025.  L.C., et al. v. State of California, et al., case No. 5:22-cv-00949-KK-SHK, & Botten, et al. v. State of California, et al., case no.5:23-cv-00257-KK-SHK

**Trial:** March 12, 2025.   Jay Campos, et al. County of Orange, et al.  Case No.: 8:23-cv-00072-WLH-JDE

**Deposition:** March 27, 2025.  Jaylen Fisher vs. Officer Grady Kissee #3102 Individually and in the capacity as a Columbus Police Officer, The City of Columbus, Ohio, Columbus Police Department, et al. Case No.: 2:24-cv-00906.

**Deposition:** Rosalina Calonge vs. City of San Jose, a Municipal Public Entity; Edward Carboni, et al., Case No.: 20-CV-07429 NC.

**Deposition**:  April 10, 2025.  Johnathan Cain, v. County of San Bernardino, et al.  Case No.: 5:24-cv-01682-KK-SHK.

**ROGER A. CLARK**

*10207 Molino Road • Santee CA 92071 • Telephone: (208) 351-2458.  Fax: (619) 258-0045.*

EXPERIENCE

**Police Procedures Consultant (self employed)**
April 1, 1993 to Present.................................................................. **31 years**

I have been certified by Federal and State courts as expert in jail and police procedures in Federal and State Courts.  I select my cases carefully and have consulted in approximately 2650 cases thus far since my retirement from the Los Angeles County Sheriff's Department.

**Substitute Teacher, Madison School District**
August 1994 to 2003......................................................................... **9 years**

I substitute teach at all levels in the school district (elementary to high school).  As a volunteer, I wrote and managed a $85,000.00 federal grant for our Central High School.  This grant is in its sixth year and has generated $510,000.00 for the school.

**District Liaison, State of Idaho Department of Juvenile Corrections**
August 1, 1995 to March 1, 1997.........................................**1 year, 7 months**

I represented the new Department of Juvenile Corrections to the ten counties in the Seventh Judicial District.  As such, I worked closely with Probation Officers, County Commissioners, Judges, other state agencies, private care providers, etc. in the implementation of the new Idaho Juvenile Corrections Act of 1995.  I wrote or participated in the writing of several federal grants for the District.  I conducted training - both formal and informal - and developed a series of new therapy programs for juveniles with private care providers.  I also served as the Director of the Detention Center and the State Placement Coordinator during this time.

-1-

**Los Angeles County Sheriff's Department**
December 1, 1965 to March 31, 1993................................**27 years 4 months**

**Note:**  In 1993 the Los Angeles County Sheriff's Department had 7,000 sworn and 3,000 civilian personnel and a daily County Jail inmate population of 23,000.

**Service as a Lieutenant (15 Years, 0 Months):**

1.  **Field Operations Region I**
    **NORSAT**                          11/15/87 to 3/31/93   **64 months**

I commanded a specialized unit created to investigate, locate, observe and arrest major (career) criminal offenders.  This unit was designed as a multijurisdictional effort for the cities in the northern region of Los Angeles County.  The command consisted of four (4) Sergeants, seventeen (17) Deputies, four (4) Police Officers, twenty five (25) Reserves, and three (3) civilian employees.  The 1992 budget set at $1.5 million.  The arrest rate averaged 500 career criminal arrests per year with a 97% conviction rate and no shots fired (on either side) for 61 consecutive months.

Significant contributions while assigned at this Bureau were:

- •        Increase in participating police agencies.
- •        Direct participation with corporate (private) agencies.
- •        Formation of a reserve and volunteer unit.
- •        Establishment of NORSAT Foundation private funding.
- •        Computerization of the unit.
- •        Promotion of fourteen personnel.
- •        Fleet expansion from 13 to 28 vehicles (donated).
- •        Formation of the DEA Valley Task Force.
- •        Field Operations Directive 89-3.

2.      **Executive Offices**
        **Reserve Forces Bureau**      05/01/84 to 11/15/87 **42 months**

I was the administrative officer to a specialized bureau responsible for coordinating the activities of 1,000 sworn reserve personnel, 900 civilian

-2-

volunteers, and 450 law enforcement explorer scouts.  The Bureau identifies programs for their effective utilization throughout the Department; develops and tracks training programs; sponsors activities designed to promote growth and keep morale at high levels.

Significant contributions while assigned at this bureau are:

*   Total restructure of the Academy training process for reserve Deputies.
*   Implementation of upgrade programs to move lower level reserves to level I status.
*   Departmental Reserve Certification procedures.
*   Annual leadership seminar.
*   The Reserve News, a nationally recognized police magazine.
*   Computerization of the Bureau.


**3.      Field Operations Region I**
         **Crescenta Valley Station      04/01/80 to 05/01/84  49 months**

Crescenta Valley Station is a full service police facility of 100 personnel serving a population of 50,000 (including the Contract City of La Canada-Flintridge) and a total area of 250 square miles. During my four years service at this facility I served in every management role:

*   **Nine months** as the Station Commander during an extended absence by the Captain (08/01/83 TO 05/01/84).
*   **Sixteen months** as the Operations Lieutenant (03/01/82 TO 08/01/83).
*   **Twelve months** as the station Detective Bureau Commander (03/01/81 to 01/01/82).
*   **Twelve months** as a Watch Commander (04/01/80 to 03/01/81).

Significant contributions while assigned at this command are:

*   Negotiation of an enhanced city contract (at a savings to the City).
*   Formation of a volunteer community support group.
*   Development and implementation of an integrated community emergency response plan.
*   High School undercover narcotics operation.
*   Restructure of the Station Detective Bureau.
*   The annual station picnic, which was effective in boosting station morale.

4.    **Custody Division**
      **Central Jail**              04/01/78 to 04/01/80  **24 months**

The Los Angeles County Central Jail is the largest jail facility in the State of California, with a daily inmate population of seven thousand (7,000), an assigned staff of six hundred (600), and two hundred (200) civilian personnel. My service at this command was equally divided into two major assignments:

•      Training and Logistics Lieutenant (04/01/79 to 04/01/8).
•      Watch Commander (04/01/78 to 04/01/79).

Significant contributions while assigned at this command are:

•      "Hot Fire" Training program, which is now a State (POST) mandated training module for all custody personnel throughout California.
•      The "Defend in Place" fire safety operational plan for jail facilities.
•      New fire safety specifications for jail bedding and mattresses.
•      The development of fire safe jail mattress material.
•      The development of a facility emergency response plan.
•      The computerization of training, timekeeping, and scheduling for the facility (800 sworn and 200 civilian personnel).
•      "Spouse day at CJ"--A program for spouses of employees.

**Service as a Sergeant (6 Years, 4 Months):**

5.    **Administrative Division**
      **Federal Surplus Property**    01/12/76 to 04/01/78  **27 months**

This program was entirely my idea and developed while I was assigned at my previous assignment (Emergency Operations Bureau). The unit provides millions of dollars in free federal excess and surplus food and property from clothing to heavy equipment and aircraft to the department each year. I am very proud of this contribution to the Department.

During this time I remained staff (Personnel Sergeant) of the Emergency Operations Bureau. This was simply a technical (paper) transfer.

6.    **Patrol Division**
      **Emergency Operations**    02/01/74 to 01/12/76  **23 months**

I was among the original personnel that formed this unit which blended the

-4-

activities of the Department's planning   unit with emergency operations planning and preparation.  I was assigned as the Personnel and Logistics Sergeant.

Significant contributions while assigned at this command are:

•      Formation of a new County Emergency Operations Center.
•      Participation in the 1974 Federal earthquake studies of Los Angeles County.
•      Development of the Department's specialized Field Command Post equipment.
•      Development of the Department's Field Booking Team.
•      Collateral assignment to the Patrol School


**7.**    **Patrol Division**
       **Civil Defense Bureau**     12/01/73 to 02/01/74  **02 months**

I was assigned to this unit to facilitate the orderly transition into the new Emergency Operations Bureau.


**8.**    **Patrol Division**
       **San Dimas Station**     12/12/72 to 12/01/73  **12 months**

I performed all the duties of a Watch and Patrol Sergeant.  I also frequently served as the Watch Commander.


**9.**    **Technical Serviced Division**
       **Communications Bureau**   12/01/71 to 12/12/72  **12 months**


I served as the Watch Commander in The Sheriff's Department's old radio room located at the Hall of Justice, and assisted in the transition to the existing communications facility.


**Service as a Deputy (6 Years, 0 Months):**


**10.**    **Patrol Division**
       **San Dimas Station**
       **Detective Bureau**     01/01/70 to 12/01/71  **23 months**

I served as a Station Detective assigned to the evening watch. I handled the first response to all crimes requiring investigations. I processed all evening juvenile matters, prepared criminal complaints and juvenile petitions.

11. **Patrol Division**
   **San Dimas Station Patrol**    01/29/68 to 01/01/70  **24 months**

I performed all duties assigned to Station Patrol:  Jailer, Desk, Watch Deputy, Patrol, and Traffic.

12. **Technical Services Division**
   **Transportation Bureau**    11/01/67 to 01/29/68  **02 months**

I was temporarily assigned to the Beverly Hills Municipal Court pending my assignment to a Patrol Station.

13. **Custody Division**
   **Central Jail**    05/06/66 to 11/01/67  **18 months**

I returned to my previous assignment at the Central Jail after graduation from the Academy. I performed all aspects of a Custody Deputy i.e. Module Officer, Prowler, Control Booth, High Power, etc.

14. **Administrative Division**
   **Academy**    01/17/66 to 05/06/66  **04 months**

I was a Sheriff's trainee assigned to Class #110.

15. **Custody Division**
   **Central Jail**    12/01/65 to 01/17/66  **01 month**

I was a pre-academy Custody Deputy assigned to the Central Jail as an "off the street" Deputy Sheriff.

## DEGREES AND CERTIFICATION

-6-

| | | |
|---|---|---|
| P.O.S.T. Command College (Class #5) | POST | 1988 |
| Management Certification | POST | 1980 |
| Advanced Certification | POST | 1975 |
| Associate of Science Degree | Chaffey College | 1971 |