# EXHIBIT A

**RJF & Associates Inc.**
**Robert Fonzi**
*Training and Consulting*
robert.fonzi@yahoo.com

**P.O. Box 1154**
**Yucaipa, CA  92399**
**951-312-9679**

**April 10, 2025**

Manning & Kass
15th Floor at 801 Tower 801 South Figueroa Street
Los Angeles, California 90017-3012

Attention: Roslynn Wilfert
Re: ***E.V. and X.V. et al. vs. City of Covina et al*. or *Valdivia vs. City of Covina et al.***
Case No. 5:23-cv-05162-CBM-SHK

Dear Ms. Wilfert,

In accordance with the Federal Rules of Civil Procedure 26(a)(1)(B), this report sets forth my opinions regarding police procedures, specifically the issues related to the police response, de-escalation efforts, and use of force involving Covina Police Officers Sun, Meadows, and Cardoza.

It is my understanding that additional discovery materials may still be pending. I reserve the right to obtain additional discovery that may assist in further evaluating this matter. Additionally, I reserve the right to add, change, or delete any of my opinions based on further discovery, should a supplemental report be submitted. I will be available for deposition upon reasonable request before the discovery cut-off date at a mutually agreeable date and time.

I.    **Summary of Qualifications:**

Specifically, my responsibilities included directing and supervising subordinate executive and command staff; coordinating and commanding subordinate personnel in the management of administrative support services and criminal operations; interpreting and anticipating implications of proposed legislative/regulatory changes regarding correctional facilities; developing, directing, and implementing policy and procedural changes resulting from legislative changes, procedures, or departmental philosophy.

Before my position as Undersheriff, I was an Assistant Sheriff with the San Bernardino County Sheriff's Department.  As the Assistant Sheriff, I was responsible for all support operations within the organization.  My administrative duties included directing, planning, coordinating, and managing all functions within a major area of assigned responsibility for the Sheriff's Department.

1

Before I was appointed Assistant Sheriff, I served as a Deputy Chief with the San Bernardino County Sheriff's Department. I was responsible for several bureaus: Administrative Services, Court Security, Training Division, Detentions, and Corrections.

Before my promotion to Deputy Chief, I served as the commanding officer of the Sheriff's Employee Resources Division, which provides a wide range of services to the Sheriff's Department. Under my command, this division conducted background investigations, participated in state-wide recruiting, was responsible for the department's payroll and benefits, coordinated hiring through County Human Resources, and provided services for department personnel through the Sheriff's Employee Assistance Team (SEAT).

Before I was appointed Deputy Chief, I served as the commanding officer of the West Valley Detention Center, where I was responsible for various personnel matters, disciplinary actions, and policies and procedures that adhered to applicable state and federal laws.

I served as the Chief of Police for the City of Yucaipa (a contract city with the San Bernardino County Sheriff's Department). My responsibilities included station operations, personnel management, conducting criminal investigations, providing use-of-force training, and overseeing the management of support staff. I also served on multiple community projects and committees and participated in city events.

I am a 32-year veteran with the San Bernardino County Sheriff's Department and the San Diego Police Department. I have several years of experience in patrol work in San Bernardino and San Diego counties. My expertise includes patrol operations, criminal investigations, internal affairs, civil liabilities, training, canine coordinator, and corrections.

I am most recognized in the realm of peace officer training. With over 19 years of experience, I have trained approximately 10,000 law enforcement officers across the nation. My expertise is extensive in the use of force and police procedures. I have testified as an expert witness in numerous civil and criminal trials in state and federal courts.

II. **Curriculum Vitae and Court Testimony:** I have attached my curriculum vitae, which outlines my training, knowledge, and experience. Additionally, I have attached a list of court testimony within the past five years.

III. **Compensation:** A copy of my fee schedule, which outlines my compensation for professional services, is attached:

IV. **Charts / Exhibits**: I have attached charts/exhibits that I may use for testimony and/or trial proceedings pursuant to the Federal Rules of Civil Procedure.

**V.    Materials Reviewed:**  As of the date of this report, I have reviewed the following reports, materials, and documents.

1.      Civil Complaint 08/04/23
2.      Claim for Damages for Valdivia, Daniel L by Galipo, D  09/08/22
3.      Claim for Damages for Valdivia, Luis Jr by Galipo, D  09/08/22
4.      Claim for Damages for Valdivia, Jessica M  by Galipo, D  09/08/22
5.      Claim for Damages for EV by Galipo, D  09/08/22
6.      Claim Rejection  Suzanne Stone 02/08/23
7.      Incident Report  04/09/22
8.      Report by Detective Preciado 04/09/22
9.      Supplemental Report by Officer M Flores 04/10/22
10.     Supplemental Report by Officer Avila 04/09/22
11.     Supplemental Report by Officer Rasmussen 04/09/22
12.     Supplemental Report by Officer  Dixon 04/09/22
13.     Supplemental Report by Detective S Lee 04/09/22
14.     CAD Log Report 04/09/22
15.     Supplemental Report by Officer T Statler 04/09/22
16.     Supplemental Report by Officer Marquez  04/09/22
17.     Supplemental Report by Officer Ardery 04/09/22
18.     Supplemental Report by Detective Husley 04/09/22
19.     Supplemental Report by Detective Reciado 04/18/22
20.     Supplemental Report by Officer Statler 04/09/22
21.     Property Report 04/09/22
22.     Witnesses Report 04/09/22
23.     Property Report by Detective Hulsey 04/10/22
24.     Use of Force Report by Captain D Regan 04/09/22
25.     Major Crime Scene Checklist 04/09/22
26.     CLETS 04/11/22
27.     DMV Image Record for Valdivia 041122
28.     Vehicle Report for Valdivia 04/09/22
29.     Glendora PD CAD Report 04/09/22
30.     Watch Commander Logs by Lieutenant Robison 04/09/22
31.     CPD IOM re Officer Involved Shooting by Sgt. Turner 04/12/21
32.     CPD OIS Press Release re Officer  Involved Shooting Investigation
33.     CPD Letter to DOJ re Dept Policy Captain D Regan 01/22/24
34.     COC Inter-Office Memo Request Indemnification Ofcrs Cardoza, Sun, Meadows
35.     LA Coroner Homicide Case Report by Investigator Kim 04/11/22
36.     LA Coroner Autopsy Report by Carrillo, MD 04/14/22
37.     LA Coroner Care Facility Report by Murillo, MD 04/09/22
38.     CPD CAD Printout 04/11/22 Redacted
39.     LA Coroner Investigation Narrative by Lieutenant  Kim 05/12/22
40.     LA Coroner Toxicology Lab by Buxton de Quintana 09/25/22
41.     DOJ Confidentiality Notice 10/24/24
42.     DOJ Report Death Investigation 04/09/22

43.    DOJ Confidentiality Notice 10/24/24
44.    DOJ Notice by CA DOJ 09/22/22
45.    DOJ Autopsy Report Confidential 04/14/22
46.    DOJ Bureau of Forensic Services re Physical Examination Report re BB gun
47.    DOJ Report 02 re Investigation Report re Death Notification  07/07/22 Redacted
48.    DOJ Report 03 re OIS Scene Report Confidential 04/10/22 Redacted
49.    DOJ Report 04 re Firearms Processing Confidential 07/07/22 Redacted
50.    DOJ Report 05 re CPD Digital Media Confidential 07/07/22 Redacted
51.    DOJ Report 06 re Officer Processing Confidential 04/12/22 Redacted
52.    DOJ Report 07 re Pomona Valley Hospital Medical Records 05/20/22 Redacted
53.    DOJ Report 08 re CPD Digital Media 07/07/22 Redacted
54.    DOJ Report 09 re BFS SB Evidence Pick Up 09/21/22
55.    DOJ Report 10 re Autopsy l 07/07/22 Redacted
56.    DOJ Report 11 re Additional Family Death Notification Attempt in Victorville
57.    DOJ Report 12 re Witness 1 04/22/22 Redacted
58.    DOJ Report 13 re Surveillance 1 Video 05/16/22 Redacted
59.    DOJ Report 14 re Witness 2 04/20/22 Redacted
60.    DOJ Report 15 re Witness 3 05/16/22 Redacted
61.    DOJ Report 16 re Witness 4 08/08/22 Redacted
62.    DOJ Report 17 re Witness 5 05/16/22 Redacted
63.    DOJ Report 18 re Valdivia Family Interview 07/07/22
64.    DOJ Report 18 re Valdivia Family Interview 07/07/22 Redacted
65.    DOJ Report 19 re Witness 6 08/16/22 Redacted
66.    DOJ Report 20 re Employee Interviews 05/20/22 Redacted
67.    DOJ Report 21 re Involved Officer Interviews 07/31/22 Redacted
68.    DOJ Report 22 re Glendora PD Digital Media 07/31/22 Redacted
69.    DOJ Report 23 re Care Ambulance 08/04/22 Redacted
70.    DOJ Report 24 re LACFD Report 08/04/22 Redacted
71.    DOJ Report 25 re Covina PD OIS Reports 08/04/22 Redacted
72.    DOJ Report 26 re Aerial Photos 08/18/22 Redacted
73.    DOJ Report 27 re Witness 7 08/04/22 Redacted
74.    DOJ Report 28 re Autopsy Evidence 08/05/22 Redacted
75.    DOJ Report 29 re BFS Digital Media Pick Up 09/21/22 Redacted
76.    DOJ Report 30 re CPD Sgt  Rasmussen Interview 08/13/22 Redacted
77.    DOJ Report 31 re Closing Report 08/26/22
78.    DOJ Report 32 re Photographs from the Medical Examiner's Office 10/07/24 DOJ
79.    Declaration of Custodian of Records Duces Tecum 10/29/24
80.    LACME-C Autopsy Evidence Log 07/20/22
81.    DOJ Physical Evidence Submission Form for LACME-C Autopsy Evidence
82.    DOJ Witness Interview Transcription 04/20/22 Redacted
83.    DOJ Bureau of Forensic Svs re Physical Examination Report re Officers Firearms
84.    DOJ Interview Transcripts of Officer Cardoza Pt 1 04/18/22 Redacted
85.    DOJ Interview Transcripts of Officer Cardoza Pt 2 04/18/22 Redacted
86.    DOJ Bureau of Forensic Svs re Physical Examination Report re Bullet Comparison
87.    DOJ Interview Transcripts of Officer Meadows Pt 1 04/18/22 Redacted
88.    DOJ Interview Transcripts of Officer Meadows Pt 2 04/18/22

4

89.   DOJ Bureau of Forensic Services re Scene Evidence 06/03/22

90.   DOJ Interview Transcripts of Officer  Sun Pt 1 04/18/22 Redacted

91.   DOJ Interview Transcripts of Officer Sun Pt 2 04/18/22

92.   DOJ Interview Transcription of Sgt Rasmussen  8/05/22 Redacted

93.   DOJ Report 01 re Introduction 07/13/22 Redacted

94.   CLETS CII Valdivia, Daniel 04/10/22

95.   OIS Covina Final Report Combined NO HYPERLINKS

96.   OIS Covina Final Report Combined NO HYPERLINKS_Redacted

97.   911 Calls  (#200-#203)

98.   Transcripts  911 Calls (#200A-#203A)

99.   Radio Traffic  04/09/22 (#204-#235)

100.   CA DOJ  OIS Interview Officer Cardoza by Special Agt  Zurawski  04/18/22

101.   CA DOJ  OIS Interview 2  Officer Cardoza by Special Agt  Zurawski  04/18/22

102.   CA DOJ  OIS Interview Officer Sun by Special Agt  Zurawski  04/18/22

103.   CA DOJ  OIS Interview 2 Officer Sun by Special Agt  Zurawski  04/18/22

104.   CA DOJ  OIS Interview Officer Meadows  by Special Agt  Zurawski  04/18/22

105.   CA DOJ  OIS Interview 2 Officer Meadows by Special Agt  Zurawski  04/18/22

106.   Witness Statement Logan, Jonathan by Detective Hulsey 04/09/22

107.   Witness Statement Logan, Jonathan by Detective Hulsey 01/09/25

108.   CA DOJ  Witness Interview  001 15 min 13 sec 04/10/22

109.   CA DOJ  Witness Interview  001 010925

110.   CA DOJ  Witness Interview  002 29 min 30 sec  04/10/22

111.   CA DOJ  Witness Interview  002  01/09/25

112.   CA DOJ  Witness Interview  003 6 min  21 sec  05/17/22

113.   CA DOJ  Witness Interview 01/09/25

114.   CA DOJ  Witness Interview  004  4 min 1 sec  05/17/22

115.   CA DOJ  Witness Interview 01/09/25

116.   CA DOJ  Witness Interview  005 3 min 3 sec 05/17/22

117.   CA DOJ  Witness Interview  01/09/25

118.   CA DOJ  Witness Interview  006 18 min 37 sec 05/19/22

119.   CA DOJ  Witness Interview  01/09/25

120.   CA DOJ  Glendora PD  Officer Rojas, Anthony 4 min 6 sec 04/09/22

121.   CA DOJ  Glendora PD  Officer Rojas, Anthony  01/09/25

122.   CA DOJ  Glendora PD  Officer Rojas, Anthony  4 min 55 sec  04/09/22

123.   CA DOJ  Glendora PD  Officer Rojas, Anthony  1 min  9 sec  04/09/22

124.   CA DOJ  Valdivia Family Interview 1 hr 37 min 4 sec  04/25/22

125.   CA DOJ  Valdivia Family Interview 01/09/25

126.   BWC of Officer  Sun  55 min  57 sec [CPD 000037]

127.   BWC of Officer  Sun  3 min  30 sec [CPD 000037]

128.   BWC of Officer  Sun  01/09/25

129.   BWC of Officer  Sun 1 min  52 sec [CPD 000953]

130.   Transcript of BWC of Officer Sun Interview Witness  01/09/25

131.   BWC of Officer Statler 22 min 11 sec  [CPD 000038]

132.   Transcript of BWC of Officer Statler  01/09/25

133.   BWC of Officer Statler 11 min 8 sec  [CPD 000039]

134.   Transcript of BWC of Officer Statler 01/09/25

135. BWC of Officer Statler 5 min  15 sec  [CPD 000040]
136. Transcript of BWC of Officer  Statler  01/09/25
137. BWC of Officer Statler  2 min  11 sec  [CPD 000041]
138. Transcript of BWC of Officer Statler 01/09/25
139. BWC of Officer Rasmussen  45 min  1 sec  [CPD 000042]
140. Transcript of BWC of Officer  Rasmussen  01/09/25
141. BWC of Officer Ramos 8 min  1 sec  [CPD 000043]
142. Transcript of BWC of Officer Ramos  01/09/25
143. BWC of Officer Ramos  11 min 1 sec  [CPD 000044]
144. Transcript of BWC  01/09/25
145. BWC of Officer Meadows  39 min  30 sec  [CPD 000045]
146. Transcript of BWC of Officer Meadows  01/09/25
147. BWC of Officer Marquez  5 min  22 sec  [CPD 000048]
148. BWC of Officer Marquez  01/09/25
149. BWC of Officer Marquez  21 min  22 sec  [CPD 000049]
150. BWC of Officer Marquez  01/09/25
151. BWC of Officer Marquez  11 min  56 sec  [CPD 000050]
152. BWC of Officer Marquez  01/09/25
153. BWC of Officer Lee  9 min  56 sec  [CPD 000051]
154. BWC of Officer Lee  01/09/25
155. BWC of Officer Flores  5 min  43 sec  [CPD 000052]
156. BWC of Officer Flores  01/09/25
157. BWC of Officer Dixon  23 min  5 sec  [CPD 000053]
158. BWC of Officer Dixon  01/09/25
159. BWC of Officer Dixon  15 min  50 sec  [CPD 000954]
160. BWC of Officer Dixon  01/09/25
161. BWC of Officer Cardoza  1 hr  5 min  3 sec  [CPD 000054]
162. BWC of Officer Cardoza  01/09/25
163. BWC of Officer Avila  1 hr  29 min  44 sec  [CPD 000055]
164. BWC of Officer Avila  01/09/25
165. BWC of Officer Avila  1 hr  45 min  17 sec  [CPD 000955]
166. BWC of Officer Avila  01/09/25
167. Covina PD  Critical Incident Report  Final 1  7 min  11 sec  [CPD 000056]
168. Transcript Covina PD  Critical Incident Report  01/09/25
169. Dashcam Footage (#321-#329)
170. Transcipt of Dashcam  (#325A)
171. CA DOJ  Surveillance  Covina Express Car Wash
172. CA DOJ  BWC  Duplicates of CD BWC
173. CA DOJ  BWC  Glendora PD  040922  8 min  59 sec
174. CA DOJ  BWC  Glendora PD  040922  5  min  4 sec
175. CA DOJ  Country Liquor Surveillance  (#359-374)
176. Photos of Scene & Gun
177. Photos of Valdivia in Hospital
178. Photos Produced by Plaintiffs of Family
179. Photos CA DOJ  Property Receipt with Handguns 04/13/22
180. Photos Autopsy of Valdivia, Daniel by Dr. Carrillo 04/14/22

6

181. Photographs Obtained from CPD on 04/11/22
182. Photos Aerial View of Location DOJ
183. Photos Officers Sun, Cardoza, Meadows and their Patrol Weapons
184. Photos On Scene Post Incident DOJ
185. Photos On Scene Post Incident Evidence DOJ
186. Policy Manual 03/17/22
187. Policy 300 re Use of Force 01/03/24
188. Policy 300 re Use of Force 03/17/22
189. Policy 304 re OIS 01/03/24
190. Policy 304 re OIS 03/17/22
191. Policy 305 re Firearms 01/03/24
192. Policy 305 re Firearms 03/17/22
193. Training Bulletin re 17-022 05/22/17
194. Training Bulletin re 18-010 01/23/18
195. CA DOJ re Information Bulletin 03/30/22
196. OIS Investigation BI-LA2022-00013
197. CA DOJ re Information Bulletin 2021-DLE-03 06/24/21
198. POST Training re Officer Cardoza 03/05/24
199. POST Training re Officer Meadows 03/05/24
200. POST Training re Officer Sun 03/05/24
201. Plaintiff Produced Death Certificate re Valdivia, Daniel [PLAINTIFF 000020]
202. Plaintiff Produced Statement of Funeral Costs 04/22/22 [PLAINTIFF 000021-24]
203. Plaintiff Produced Birth Certificate re Valdivia, Daniel Jr [PLAINTIFF 000025-26]
204. Plaintiff Produced Birth Certificate re Valdivia, Daniel [PLAINTIFF 000027]
205. Plaintiff Produced Birth Certificate re Valdivia, Xander [PLAINTIFF 000028]
206. Plaintiff Produced Sibling DNA Test 03/28/23 [PLAINTIFF 000029-30]
207. Plaintiff Produced Birth Certificate re Valdivia, Eva 10/11/23 [PLAINTIFF 000031]
208. Plaintiffs Subpoenaed Records re Glendora Police Department
209. LA County Fire Department SDT Records
210. Prior Incident Assault w Firearm 09/23/17
211. Prior Incident Battery Serious Injury 07/27/21
212. Prior Incident Suspended License 03/21/22
213. DOJ Report Death Investigation 04/09/22
214. DOJ Confidentiality Notice 10/24/24
215. DOJ Notice by CA DOJ 09/22/22
216. DOJ Autopsy Report 04/14/22
217. DOJ Bureau of Forensic Services re Scene Evidence 06/03/22
218. DOJ Bureau of Forensic Services re Physical Examination Report re BB gun
219. DOJ Bureau of Forensic Svs re Physical Exam Report re Ofcrs Firearms
220. DOJ Bureau of Forensic Svs re Physical Exam Report re Bullet Comparison
221. DOJ Report 01 re Introduction 07/13/22
222. DOJ Report 02 re Investigation Report re Death Notification 07/07/22
223. DOJ Report 03 re OIS Scene Report 04/10/22
224. DOJ Report 04 re Firearms Processing 07/07/22
225. DOJ Report 05 re CPD Digital Media 070722
226. DOJ Report 06 re Officer Processing 041222

7

227. DOJ Report 07 re Pomona Valley Hospital Medical Records 05/20/22
228. DOJ Report 08 re CPD Digital Media 07/07/22
229. DOJ Report 09 re BFS SB Evidence Pick Up 09/21/22
230. DOJ Report 10 re Autopsy 07/07/22
231. DOJ Report 11 re Additional Family Death Notification Attempt in Victorville
232. DOJ Report 12 re Witness 1 04/22/22
233. DOJ Report 13 re Covina Express Car Wash Surveillance 1 Video 05/16/22
234. DOJ Report 14 re Witness 2 04/20/22
235. DOJ Report 15 re Witness 3 05/16/22
236. DOJ Report 16 re Witness 4 08/08/22
237. DOJ Report 17 re Witness 5 05/16/22
238. DOJ Report 18 re Valdivia Family Interview 07/07/22
239. DOJ Report 19 re Witness 6 08/16/22
240. DOJ Report 20 re Employee Interviews 05/20/22
241. DOJ Report 21 re Involved Officer Interviews 07/31/22
242. DOJ Report 22 re Glendora PD Digital Media 07/31/22
243. DOJ Report 23 re Care Ambulance 08/04/22
244. DOJ Report 24 re LACFD Report 08/042/24
245. DOJ Report 25 re Covina PD OIS Reports 08/04/22
246. DOJ Report 26 re Aerial Photos 08/18/22
247. DOJ Report 27 re Witness 7 08/04/22
248. DOJ Report 28 re Autopsy Evidence 08/05/22
249. DOJ Report 29 re BFS Digital Media Pick Up 092122 Redacted
250. DOJ Report 30 re BFS Scene Report
251. DOJ Report 31 re CPD Sgt.  Rasmussen Interview 08/13/22
252. DOJ Report 32 re Closing Report 08/26/22
253. DOJ Report 33 re Photographs from the Medical Examiner's Office
254. DOJ Interview Transcripts re Officer  Cardoza  Pt  1 1 04/18/22 Redacted
255. DOJ Interview Transcripts re Officer  Cardoza  Pt  2 041822 Redacted
256. DOJ Interview Transcripts re Officer  Meadows Pt  1 04/18/22 Redacted
257. DOJ Interview Transcripts re Officer  Meadows Pt  2 04/18/22
258. DOJ Interview Transcripts re Officer  Sun Pt  1 04/18/22 Redacted
259. DOJ Interview Transcripts re Officer  Sun Pt  2  04/18/22
260. DOJ Interview Transcription re Sgt. Rasmussen 08/05/22 Redacted
261. DOJ Witness Interview Transcription 04/20/22 Redacted
262. CLETS Valdivia, Daniel 04/10/22
263. DOJ Covina OIS Final Report Combined NO HYPERLINKS 09/15/22
264. DOJ Covina OIS Final Report Combined NO HYPERLINKS_Redacted
265. DOJ Declaration of Custodian of Records Duces Tecum 10/29/24
266. Pomona Valley Hospital SDT Billing Records
267. Pomona Valley Hospital SDT Medical Records
268. Incident Report re Prior Rialto Incident 09/23/17
269. Incident Report re Prior Covina Aggravated Battery Incident 07/27/21
270. Prior Incident DUI re Covina 03/21/22
271. Defendants' Initial Disclosures 12/01/23
272. Defendants' Supplemental Disclosures  08/30/24

273. Plaintiff D.V.  RRFP Set One 12/17/24
274. Plaintiff D.V.  RRogs Set One 12/17/24
275. Plaintiff E.V.  RRFP Set One 12/17/24
276. Plaintiff E.V.  RRrogs Set One 12/17/24
277. Plaintiff Elias Valdivia Verification (D.V.) to RRogs 12/17/24
278. Plaintiffs' Initial Disclosures 12/01/23 PLAINTIFF 00001-000031
279. Plaintiff J. Valdivia RRFA Set One 12/17/24
280. Plaintiff J. Valdivia RRFP Set One 12/17/24
281. Plaintiff J. Valdivia RRogs Set One 12/17/24
282. Plaintiff Jessica Validivia Verification RRogs 12/17/24
283. Plaintiff Karla Juarez Verification (E.V.) to RRogs 12/17/24
284. Plaintiff Karla Juarez Verification (X.V.) to Rrogs 12/17/24
285. Plaintiff L. Valdivia RRFA Set One 12/17/24
286. Plaintiff L. Valdivia RRFP Set One 12/17/24
287. Plaintiff L. Valdivia RRogs Set One 12/17/24
288. Plaintiff Luis Validiva Verification to RRogs 12/17/24
289. Plaintiffs' POS to Discovery Responses 12/17/24
290. Plaintiffs' RFP to City Covina Set One 01/22/24
291. Plaintiffs' RRFP re Pomona Valley Hospital Med Center Records 12/17/24
292. Plaintiff X.V.  RRFP Set One 12/17/24
293. Plaintiff X.V.  RRogs Set One 12/17/24
294. Defendants RRFP to Plaintiff Set One
295. Responses of Defendant City of Covina To First Set of Requests For Production
296. Officer Vanessa Cardoza 03-06-2025 Full Depo Transcripts with Exhibits
297. Cardoza Depo Exhibits
298. Officer Cheng-Wei (Billy) Sun 03-06-2025_Full Depo Transcripts with Exhibits
299. Sun Depo Exhibits
300. David Meadows 03-07-2025 Full Depo Transcripts w Exhibits
301. Meadows Depo Exhibits
302. Valdivia, Luis 03-20-2025 Full Depo Transcripts with Exhibits
303. Juarez Karla 03 25 25 Full Depo Transcripts with Exhibits
304. Valdivia, Elias 03-26-2025 Full Depo Transcripts with Exhibits
305. Valdivia, Daniel 03-26-2025 Full Depo Transcripts with Exhibits
306. Applicable P.O.S.T. training
307. Applicable policies and procedures


Note: I am informed and believe that I have received all Disclosures and Discovery Responses produced in this case, as well as all deposition transcripts completed before the date of this report. The foregoing list underscores those records to which I devoted substantial consideration. If any items were inadvertently omitted from the foregoing list, this expert will gladly supplement it upon questioning under oath and reserve the right to supplement the list in a supplemental report.

**VI.    Summary of Opinions:** The following opinions are based on my review of the materials listed as well as my training, knowledge, and experience.  I am prepared to testify and/or explain my opinions regarding the police procedures giving rise to this litigation.  I do not intend to offer my opinions on the ultimate issues in this action. However, I reserve the right to offer opinions based on my areas of expertise, even if such opinions embrace the ultimate issues in the incident.  Additionally, I reserve the right to amend these opinions based on additional testimony and/or discovery documents.

*Police practices and procedures* encompass the application of training that covers a range of topics, including police response, communication, resources, use of force, and tactics, all based on the totality of the circumstances.  The application of police practices and procedures may vary depending on the information known or unknown by the officer(s) at the time of the incident.

Note: None of my opinions are intended to usurp the jury's province and are not stated as ultimate issues. Instead, my opinions involve the consistency of the officers' actions with standard police practices.

**NOTE: The text in this report in italics is taken verbatim from the discovery materials and has not been edited for spelling, grammar, content, and/or context.**

1.  Based on my review of the listed materials, a police officer acting consistently with standard police practices and training would conclude that there was *reasonable suspicion[1]* for Officers Sun, Meadows, and Cardoza to initiate contact and *detain (detention)[2]* Daniel Valdivia (hereinafter referred to as Valdivia).  The officers were dispatched to a report of a man with a gun at Country Liquor.  The initial information included but was not limited to the following:

    - At approximately 2212 hours, Covina Police Dispatch received two reports of a Hispanic male adult, approximately 40 years old with facial hair, wearing a black sweater and shorts, holding a can of beer and a black gun at Country Liquor Market on 124 E. Arrow Highway.
    - At approximately 2215 hours, three additional calls were received regarding a verbal altercation with two other subjects in front of the liquor store.
    - A Starbucks employee reported that there was a group of three to four male subjects in front of the location and that a subject with a gun had placed the gun back into his front pocket.

---

[1] **Reasonable Suspicion:**  The suspicion necessary to make an investigative stop or detention.  For it to be valid an officer must articulate certain facts justifying a stop for investigative purposes.  First, the officer must be able to identify the criminal activity and/or the suspicious circumstances.  Secondly, the person to be detained is reasonably suspected by the officer to be connected to the criminal activity.  Finally, articulate those specific facts that exist under the totality of the circumstances at the time.

[2] **Detain or detention** is an act that empowers a police officer to stop a person for the limited purpose of investigating if, a crime/violation of the law is about to take place, is in progress, or has taken place.

10

- While en route to the call, Police Dispatch received three additional calls regarding the same incident.
- It indicated that the suspect, Valdivia, was now arguing with two other males, who were later identified as Jonathan Logan and Willie Mendoza.
- At approximately 2216 hours, as officers arrived on scene, dispatch further advised that another caller had reported the subject (Valdivia) had a gun in his front pocket.
- Officer Sun approached Valdivia, closely followed by Officer Meadows, with their weapons drawn.
- Officer Cardoza positioned herself near the sidewalk north of Valdivia, approximately 15 yards from him, facing southbound; she had her firearm drawn in a low ready.
- The officers saw two other individuals standing next to Mr. Valdivia, later identified as Jonathan Logan and Willie Mendoza.
- When the officers arrived, they located Valdivia, who was suspected of possessing a firearm, in front of the Country Liquor Market.

2. Based on my review of the listed materials, it is my opinion that a police officer acting consistently with standard police practices and training would conclude that Officers Sun, Meadows, and Cardoza had ***probable cause[3]*** to place Valdivia under arrest for brandishing a firearm in a threatening manner in violation of ***California Penal Code section 417[4]***, interfering, delaying, and obstructing a police officer in violation of ***California Penal Code section 148(a)[5]*** and shortly thereafter, for drawing and/or exhibiting a firearm in a rude manner in the presence of a police officer, which is a violation of ***California Penal Code section 417(c)[6]***. The officers had a reasonable belief that the BB gun was a real Glock 17 firearm. Thus, the applicable criminal acts would apply when Valdivia presented the threat.

---

[3] **Probable cause:** This exists when the totality of the circumstances causes an officer to believe that the person is guilty of a crime reasonably. The totality of the circumstances and the person (s) involved have acted unusually or suspiciously in relation to some criminal act (s), and the person being detained is directly involved.

[4] **California Penal Code section 417 (a) (1):** Every person who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel is guilty of a misdemeanor, punishable by imprisonment. Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel is punishable.

[5] **California Penal Code section 148(a)**(1): Every person who willfully resists, delays, or obstructs any public officer, peace officer, in the discharge or attempt to discharge any duty of his or her office or employment, shall be punished by a fine or imprisonment.

[6] **California Penal Code section 417(c):** Every person who, in the immediate presence of a peace officer, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, and who knows, or reasonably should know, by the officer's uniformed appearance or other action of identification by the officer, that he or she is a peace officer engaged in the performance of his or her duties, and that peace officer is engaged in the performance of his or her duties, shall be punished by imprisonment.

11

The information, observations, and the action of Valdivia, which contributed to the officer's perception, included but were not limited to the following:

- Officer Sun approached Valdivia, closely followed by Officer Meadows, with their weapons drawn.
- Officer Sun demanded to see Valdivia's hands and told him to put his hands up.
- Valdivia moved the bottle he held in his right hand to his left hand and then reached for the area near his right pocket on his waistband with his right hand.
- Once again, Officer Sun instructed Valdivia not to reach for his pockets.
- Valdivia said, "Whatever," as he raised his hands.
- Officer Sun believed that Valdivia's behavior demonstrated that he did not care about anyone's safety.
- Officer Meadows also found Valdivia's response strange and somewhat nonchalant, which raised concern that Valdivia might be unpredictable.
- When Valdivia raised his hands, the handle of a black handgun was visible in his front waistband area.
- Officer Meadows was concerned that Valdivia might take the two people next to him hostage or that he might run into the liquor store and endanger patrons.
- At approximately 2217 hours, after multiple commands from Officers Sun, Cardoza, and Meadows, Valdivia placed his beer bottle down and began to go down to the ground as directed.
- However, as Valdivia bent to the ground, he positioned himself on the ground with his left arm and torso above the ground before reaching for his waistband.
- Both Officers Sun and Meadows ordered Valdivia to stop reaching for his waistband.
- Instead of complying with the officers, Valdivia pulled out a black handgun, a replica of a Glock pistol, and pointed it at Officers Sun and Meadows.

3. Based on my review of the listed materials, it is my opinion that a police officer acting consistently with standard police practices and training would conclude that Officers Sun, Meadows and Cardoza used reasonable force in self-defense and defense of others to stop the threat presented by Valdivia, who they believed was armed with a handgun. Additionally, the use of force by the officers included the following applications.  All of which was consistent with standard police practices and de-escalation tactics and were reasonable given the totality of the circumstances:

- Uniform presence (show of force)
- Repeated verbal commands
- Presented a firearm in preparation for self-defense and defense of others
- Use of deadly force

4. Based on my review of the listed materials, it is my opinion that an officer conforming to standard police practices and training would conclude that it was reasonable to believe Valdivia posed a deadly threat to Officers Sun, Meadows, and Cardoza.

An officer conforming to standard police practices and training would conclude that Valdivia presented an immediate threat of death and/or serious bodily injury based on the totality of the circumstances.

Furthermore, Valdivia's deliberate actions included refusing to comply with repeated commands, acts consistent with an attempt to assault a police officer with a deadly weapon (firearm), and placing others in imminent danger.  These undertakings enhanced the officer's perceived threat assessment. The totality of the circumstances (TOC) that contributed to the officer's perception included but were not limited to:

**Officer Sun**
- *As he was leaving his vehicle, Officer Sun heard dispatch state that Mr. Valdivia had a gun in his right pocket.*
- *Officer Sun got out of the car, firearm in hand.*
- *Officer Sun moved towards the scene and observed Mr. Valdivia who matched the description of a Hispanic male in his 40s wearing a black sweatshirt, about 20 to 25 yards away from him.*
- *Officer Sun took note of Mr. Valdivia's baggy clothing, and he was aware that people concealed weapons in such clothing.*
- *Officer Meadows also ordered Mr. Valdivia to get on the ground in an effort to clear him for weapons. The officers wanted to detain, handcuff and pat search Mr. Valdivia to investigate the brandishing allegation.*
- *Officer Sun indicated that the subsequent events felt like they were in slow motion.*
- *He observed Mr. Valdivia move his beer bottle from his right hand to his left hand, potentially freeing up his right hand to reach for a weapon.*
- *Mr. Valdivia then began getting to the ground, landing first on his knees, looking at the ground as if he was seeing exactly what he wanted to land, and putting his right palm and left elbow down.*
- *Officer Sun found that position to be unusual as Mr. Valdivia appeared to be in a triangle platform with his left elbow and two, legs.*
- *Mr. Valdivia's torso was still up and he was leaning towards the left, stretching out his body.*
- *Mr. Valdivia looked directly at Officer Sun, who thought that Mr. Valdivia was about to reach for his waistband or his right pocket where he believed a gun was located.*
- *The officer thought to himself, "Please don't reach for the gun. Please don't reach for the gun. I don't want to have to make a decision."*

13

- *He thought that Mr. Valdivia was going to pull out his gun, shoot either of the officers, and kill them.*
- *Officer Sun worried that Mr. Valdivia was going to kill whoever else the bullets hit behind the officers.*
- *Since the shopping center behind the officers was also busy, he was worried that Mr. Valdivia would shoot others in the plaza.*
- *He worried that Mr. Valdivia would barricade himself, create a hostage situation in the liquor store, and escalate to a shootout with officers, leaving mass casualties.*
- *Officer Sun believed that Mr. Valdivia was watching Officer Sun to determine where his target was located.*
- *Officer Sun had one hand on his own gun and notified others on the radio that Mr. Valdivia had already reached for his pocket.*
- *Mr. Valdivia brought his hand down.*
- *Officer Sun brought up his weapon and yelled as loud as he could not reach for it.*
- *In his mind, Officer Sun felt as if he was begging Valdivia not to reach for his gun.*
- *Mr. Valdivia appeared to be experienced with guns, given how he quickly reached for the gun without hesitation.*
- *He directly and deliberately put his hands in his pocket and pulled out a black handgun.*
- *Officer Sun did not believe that efforts to de-escalate the situation were fruitful.*
- *Nor did he believe there was time to obtain or use nonlethal force.*
- *Mr. Valdivia was noncompliant with verbal commands and was believed to be in possession of a gun.*
- *When Mr. Valdivia lifted the gun, Officer Sun knew that if Mr. Valdivia managed to point the gun at the officers, they would be unable to react in time to protect themselves.*
- *Internally, Officer Sun begged Mr. Valdivia not to shoot and begged him to not force the officers to make the decision to shoot.*
- *He thought to himself that if Mr. Valdivia pointed the gun at them, he was going to kill the officers and other civilians.*
- *Officer Sun was afraid. As Mr. Valdivia pulled out his gun, he brought it forward towards Officer Sun with the barrel in the officers' direction.*
- *Officer Sun held his firearm with both hands, aimed at Mr. Valdivia's torso and pulled the trigger.*
- *Officer Sun fired a sequence of shots, until he saw Mr. Valdivia stop moving and drop his gun, inches away from himself. He believed he shot five or six rounds.*

14

**Officer Meadows**

- *Dispatch informed them that another caller had reported that the subject put a gun in his pocket.*
- *When Officer Meadows got out of his car, he unholstered his department-issued firearm because of the nature of the call and his knowledge of the area.*
- *Two of them put their hands up, but Mr. Valdivia began reaching towards his waistband pocket area.*
- *Officer Sun told him not to reach for his pockets and to put his hands back up.*
- *Mr. Valdivia raised his hands and said something to the effect of "whatever."*
- *Officer Meadows found Mr. Valdivia's response strange since the typical response when officers approached in this way was either worry, a sense of urgency, or compliance.*
- *As Mr. Valdivia raised his hands, his sweatshirt and shirt lifted up, exposing the handle of a black handgun in his front waistband area.*
- *Officer Meadows recalled seeing the finger grooves in the handle of the gun, which looked like a Glock pistol.*
- *He was worried that Mr. Valdivia was next to a couple of people whom he could take hostage and/or that he could run into the liquor store where there were several other people.*
- *Officer Meadows ordered Mr. Valdivia to the ground in an attempt to get a little more control over the situation and to make it harder for Mr. Valdivia to reach for his gun.*
- *Mr. Valdivia placed the beer bottle down and began to get on the ground.*
- *However, he positioned himself on the ground with his left arm and torso facing up towards the officers and began to reach for his waistband again.*
- *Because Officer Meadows knew that Mr. Valdivia had a gun, he worried about what Mr. Valdivia was trying to do.*
- *Officers Meadows and Sun both commanded Mr. Valdivia to not reach for his waistband, but Mr. Valdivia ignored them and removed the gun from his waistband.*
- *Based on the information that Officer Meadows had at the time, he believed that Mr. Valdivia was looking to either get into a confrontation with someone or hurt someone.*
- *Mr. Valdivia's actions appeared to be willful and deliberate.*
- *As Mr. Valdivia started bringing the gun up in the officers' direction, Officer Meadows felt time slow down.*
- *He was afraid that Mr. Valdivia was going to shoot and kill him or Officer Sun.*
- *Officer Meadows sidestepped, acquired his sights before Mr. Valdivia could get a round off, held his firearm with both hands, and pulled the trigger.*
- *He saw Mr. Valdivia's body collapse and the gun fall out of his hand.*
- *When Officer Meadows saw that Mr. Valdivia was no longer a threat, he did not take another shot.*

15

**Officer Cardoza**

- *She pulled her service weapon out and held it at the low ready position, in front of her body, pointed at the ground, and finger off of the trigger.*
- *She heard her partners command the suspect to not reach for anything and to keep his hands up.*
- *She heard the suspect yell back at her partners, though she could not recall exactly what was said.*
- *Officer Cardoza was to north of Country Liquor, and to the side of the suspect.*
- *Her partners were on the west side of Country Liquor, and in front of the suspect.*
- *Cardoza was able to see the suspect's entire right side.*
- *She made sure that her background was clear and there was nobody behind his location.*
- *She saw that the two people with whom the suspect had been conversing had walked away, and the suspect was not complying with Officer Sun's commands.*
- *Mr. Valdivia's hands were halfway up, not fully extended.*
- *Mr. Valdivia began to lie down.*
- *As he did so, he lifted his sweater with his right hand and Officer Cardoza saw the handle of a black gun in the waistband of his pants.*
- *Mr. Valdivia reached for it with his right hand, pulled it out, and started to point it at Cardoza's partners.*
- *Officer Cardoza felt like events were unfolding in slow motion.*
- *Officer Cardoza believed that Mr. Valdivia was going to kill her partners, so she began firing her weapon, pointing at Mr. Valdiva's chest area.*

5. Based on my review of the listed materials, it is my opinion, as determined by standard police practices and training, that under the circumstances, the use of deadly force by Officers Sun, Meadows, and Cardoza was consistent with standard police practices. Therefore, an officer conforming to standard police practices and training would conclude that in a split-second moment, it was objectively reasonable, based on their perception and ***fear for their own lives and/or that of others***[7], to use deadly force to stop the life-threatening actions that Valdivia created.

The actions of Valdivia would cause a reasonable officer acting consistently with standard police practices under the same circumstances to believe that he was attempting to assault Officers Sun, Meadows and Cardoza with a deadly weapon *(**bb gun that was a replica of a Glock 17 semi-automatic handgun***) and threaten the safety of others in the immediate area; thus, creating a situation that appeared to be life-threatening.

---

[7] **Fear for his own life and/or that of others.** An officer may use deadly force to protect oneself or others when (from the perspective of a reasonable law enforcement officer) the officer has the objective and reasonable belief that his/her life, or the life of another, is in imminent danger of death or serious physical injury based upon the totality of the facts known to the officer at the time.

Furthermore, the use of deadly force to stop Valdivia's life-threatening actions, under the totality of the circumstances, comports with both national and statewide training standards.

6.  Based on my review of the listed material, it is my opinion, under the totality of the circumstances, that it would be reasonable for an officer acting consistently with standard police practices and training to believe that Valdivia posed a threat of ***imminent danger[8]*** that was life-threatening.  Valdivia's non-compliant and perceived assaultive behavior contributed to a reasonable belief that he had the intent to commit an assault with a deadly weapon ***(bb gun that was a replica of a Glock 17 semi-automatic handgun)*** toward the officers and others.

7.  Based on my review of the incident and the material provided thus far, "action vs. reaction time" is a factor that must be considered when evaluating the dynamics of this incident and Officers Sun, Meadows, and Cardoza's decision to use deadly force.

    "Action vs. Reaction Time" training addresses what's "reasonable" in a use-of-force encounter with a suspect and an officer's split-second response to a suspect's attack and/or assault.  An officer's split-second response to a suspect's actions (action vs. reaction time) can be defined or explained as the difference in time between an action and a reaction.

    In law enforcement, it refers to the response of a police officer to the actions of a suspect.  The delayed response is because the suspect will have the advantage of lag time, which is the brief period it takes for a police officer to 1) perceive a threat, 2) formulate a response, and 3) execute a reaction.

    Several factors influence lag time, including distractions, divided attention, focused vision, environmental factors, and other related variables. A suspect can act and decide before an officer can perceive the act, recognize it as a danger, and determine how to react. The issue is further explained later in this report.

8.  Based on my review of the listed material, it is my opinion, as determined by standard police practices and training, that police officers have no duty or obligation to perform advanced first aid or medical care beyond their experience and basic law enforcement training. However, the training does instruct police officers to secure the scene and to summon emergency medical personnel as soon as practical.

    The allegations include criticisms that the *"Officer Defendants failed to summon medical care in a timely manner or permit medical personnel to treat the Decedent." The delay of medical care to the decedent was a contributing cause of the decedent's harm, injury, pain and suffering, and ultimate death,* which, based on the discovery material provided thus far, is unfounded.

---

[8] **Imminent danger** that was life-threatening: means a significant threat that peace officers reasonably believe will result in death or serious bodily injury to themselves or to other persons. Imminent danger is not limited to "immediate" or "instantaneous." A person may pose an imminent danger even if they are not at the very moment pointing a weapon at another person.

- Officer Sun secured Valdivia's gun, and the officers immediately began rendering medical aid to Valdivia.
- Glendora Police Department Officers were also dispatched to the scene and began rendering assistance upon arrival.
- The officers administered aid until the Fire Department personnel arrived and took over.
- Shortly thereafter, Valdivia was transported to Pomona Valley Hospital.

9. Based on my review of the material listed, it is my opinion, as determined by standard police practices and training, that the officers followed appropriate state law, department policies, tactics, de-escalation/escalation of force principles, and the training guidelines taught statewide by California P.O.S.T.

10. Based on my review of the listed material, it is my opinion that no indication in the City of Covina Police Department's policies, procedures, and/or training suggests the existence of a custom, policy, or practice that encourages or condones poor police tactics, procedures, or the use of excessive force (deadly or non-deadly) by any member of the Department.

**NOTE: The text in this report that is in italics is taken verbatim from the discovery materials and has not been edited for spelling, grammar, content, and/or context.**

## VII.    Basis for Opinions:

1. **911 calls and dispatch recordings:** On April 9, 2022, at approximately 2212 hours, Covina Police Communications Center received two reports of a Hispanic male adult, approximately 40 years old with facial hair, wearing a black sweater and shorts, holding a can of beer and a black gun at Country liquor market on 124 E. Arrow Highway. Three additional calls were received at approximately 2215 hours regarding a verbal altercation with two other subjects in front of the liquor store. A Starbucks employee reported that there was a group of three to four male subjects in front of the location and that a subject with a gun had placed the gun back into his front pocket.

2. **Incident involving Daniel Valdivia:**  On April 9, 2022, at approximately 2210 hours, the Covina Police Dispatch received multiple calls (three) for service. The calls indicated that there was a Hispanic male adult, later identified as Daniel Valdivia (hereinafter referred to as Valdivia), wearing a black hoodie sweatshirt and waving around a handgun in the parking lot in front of Country Liquor.  While enroute to the call, Police Dispatch received three additional calls regarding the same incident. It indicated that the suspect, Valdivia, was now arguing with two other males, who were later identified as Jonathan Logan and Willie Mendoza. When the officers arrived on the scene, they located Valdivia, who was suspected of possessing a firearm, in front of the Country Liquor Market.

Officers arrived in the Country Liquor parking lot shortly after receiving reports from dispatch and parked out of sight. Officers Sun and Meadows approached Valdivia from the drive-thru area of a Starbucks, located next door to the liquor store, approximately 5 yards away from Valdivia.

At approximately 2216 hours, as officers arrived on scene, dispatch further advised that another caller had reported the subject (Valdivia) had a gun in his front pocket. Officer Sun approached  Valdivia, closely followed by Officer Meadows, with their weapons drawn. Officer Cardoza positioned herself near the sidewalk north of Valdivia, approximately 15 yards from him, facing southbound; she had her firearm drawn in a low ready. The officers saw two other individuals standing next to Mr. Valdivia, later identified as Jonathan Logan and Willie Mendoza.

Shortly thereafter, Officer Sun demanded to see Valdivia's hands and told him to put his hands up.  Valdivia moved the bottle he held in his right hand to his left hand and then reached for the area near his right pocket on his waistband with his right hand. Once again, Officer Sun instructed Valdivia not to reach for his pockets.  Valdivia said, "Whatever," as he raised his hands. It was Officer Sun's belief that Valdivia's behavior demonstrated he did not care about anyone's safety. Officer Meadows also found Valdivia's response strange and somewhat nonchalant, which caused concern that Valdivia may be unpredictable.

When Valdivia raised his hands, the handle of a black handgun was visible in his front waistband area.  Officer Meadows was concerned that Valdivia might take the two people next to him hostage or that he might run into the liquor store and endanger patrons. At approximately 2217 hours, after multiple commands from Officers Sun, Cardoza, and Meadows, Valdivia placed his beer bottle down and began to go down to the ground as directed. However, as Valdivia bent to the ground, he positioned himself on the ground with his left arm and torso above the ground before reaching for his waistband.  Both Officers Sun and Meadows ordered Valdivia to stop reaching for his waistband.  Instead of complying with the officers, Valdivia pulled out a black handgun, a replica of a Glock pistol, and pointed it at Officers Sun and Meadows.

Officers Cardoza and Meadows believed that Valdivia was going to shoot and possibly kill them and harm civilians in the area.  In response to the threat posed by Valdivia, after Valdivia drew his gun, all three officers fired their weapons until Valdivia stopped moving and dropped his gun.

Officer Sun secured Valdivia's gun, and the officers immediately began rendering medical aid to  Valdivia. Glendora Police Department Officers were also dispatched to the scene and began rendering assistance upon arrival. The officers administered aid until the Fire Department personnel arrived and took over.  Shortly thereafter, Valdivia was transported to Pomona Valley Hospital, where he was pronounced deceased at approximately 2306 hours.

19

3.  **According to Officer Sun's summary of an interview with Agent Zurawski:** *On April 9, 2022, Officer Sun responded to a dispatch call just before 10:00 PM, regarding a possibly violent or physical incident at County Liquor. While enroute, dispatch advised that the man was brandishing a gun in a threatening manner. Officer Sun began directing additional units to the scene. Shortly thereafter, dispatch advised of three additional calls of a man arguing and possibly fighting with other people in the area.*

*Officer Sun directed fellow officers to their positions. He knew Officer Meadows was driving behind him. At least five units responded with him, and other units were joining. He directed two units to set up on the east side of the location, and Officer Avila to set up on the west side; he and Officer Meadows set up behind the Starbucks.*

*He told additional units arriving later to set up at the Salvation Army area to hold the containment area.*

*Officer Sun knew that Country Liquor was located in a high crime. area that had generated multiple calls for service for stabbings, domestic violence, narcotics violations, and alcohol violations. He was also aware that transients, often on drugs, and active gang mer11bers resided in the area as well. This knowledge of the area and the information provided from dispatch put Officer Sun on high alert. He decided officers should undertake a stealth approach to maintain an element of surprise.*

*As he was leaving his vehicle, Officer Sun heard dispatch state that Mr. Valdivia had a gun in his right pocket. Officer Sun got out of the car, firearm in hand. He incorrectly*

*heard over dispatch that Officer Marquez was already at the scene with the subject. Concerned for Marquez's safety, Officer Sun moved towards the scene and observed Mr. Valdivia who matched the description of a Hispanic male in his 40s wearing a black sweatshirt, about 20 to 25 yards away from him. Officer Sun took note of Mr. Valdivia's baggy clothing, and he was aware that people concealed weapons in such clothing.*

*As Officer Sun approached, firearm in hand, he observed Mr. Valdivia facing the liquor store and arguing with two other subjects. Worried about the rapidly evolving situation, concerned about the potential for hostages, and wanting to ensure he was close enough to react if necessary, Officers Sun and Meadows approached from the Starbucks drive-thru area and got within 7 to 10 yards away from Mr. Valdivia.*

*Officer Sun pointed his firearm at Mr. Valdivia and commanded him to show his hands. Mr. Valdivia looked at him. The two individuals next to Mr. Valdivia looked relieved, raised their hands, and backed away as Mr. Valdivia shifted his body toward the officers. Officer Sun told Mr. Valdivia to keep his hands up and to stay still. Mr. Valdivia put his hands down, switched the beer bottle he had from his right hand to*

*his left hand, and then put his hand down towards his right pocket. The officer once again commanded Mr. Valdivia to "put [his] fucking hands up." However, the officer's use of profanity had no effect on Mr. Valdivia. Again, the officer told Mr. Valdivia to keep his hands up and not to reach for his pocket. Mr. Valdivia put his hands up and said, "whatever," giving Officer Sun the impression that Mr. Valdivia did not care about anybody's safety. Officer Sun said, "don't fucking move," as he had observed*

*Mr. Valdivia reach for the area in the baggy clothing where Officer Sun believed he was concealing a gun based on information from dispatch.*

*Officer Meadows also ordered Mr. Valdivia to get on the ground in an effort to clear him for weapons. The officers wanted to detain, handcuff and pat search Mr. Valdivia to investigate the brandishing allegation. Officer Sun indicated that the subsequent events felt like they were in slow motion. He observed Mr. Valdivia move his beer*

*bottle from his right hand to his left hand, potentially freeing up his right hand to reach for a weapon. Mr. Valdivia then began getting to the ground, landing first on his knees, looking at the ground as if he was seeing exactly what he wanted to land, and putting his right palm and left elbow down. Officer Sun found that position to be unusual as Mr. Valdivia appeared to be in a triangle platform with his left elbow and two, legs. Mr. Valdivia's torso was still up and he was leaning towards the left, stretching out his body. Mr.. Valdivia looked directly at Officer Sun, who thought that Mr. Valdivia was about to reach for his waistband or his right pocket where he believed a gun was located. The officer thought to himself, "Please don't reach for the gun. Please don't reach for the gun. I don't want to have to make a decision."*

*As Officer Sun watched Mr. Valdivia, many thoughts ran through his head. He thought that Mr. Valdivia was going to pull out his gun, shoot either of the officers, and kill them. Officer Sun worried that Mr. Valdivia was going to kill whoever else the bullets hit behind the officers. Since the shopping center behind the officers was also busy, he was worried that Mk Valdivia would shoot others in the plaza. He worried that Mr. Valdivia would barricade himself, create a hostage situation in the liquor store, and escalate to a shootout with officers, leaving mass casualties.*

*Mr. Valdivia looked at Officer Sun. Officer Sun believed that Mr. Valdivia was watching Officer Sun to determine where his target was located. Officer Sun had one hand on his own gun and notified others on the radio that Mr. Valdivia had already reached for his pocket. Mr. Valdivia brought his hand down.*

*Officer Sun brought up his weapon and yelled as loud as he could to not reach for it. In his mind, Officer Sun felt as if he was begging Mr. Valdivia not to reach for his gun. Mr. Valdivia appeared to be experienced with guns, given how he quickly reached for the gun without hesitation. He directly and deliberately put his hands in his pocket and pulled out a black handgun. Officer Sun did not believe that efforts to*

*de-escalate the situation were fruitful. Nor did he believe there was time to obtain or use nonlethal force. Mr. Valdivia was noncompliant with verbal commands and was believed to be in possession of a gun.*

*When Mr. Valdivia lifted the gun, Officer Sun knew that if Mr. Valdivia managed to point the gun at the officers, they would be unable to react in time to protect themselves. Internally, Officer Sun begged Mr. Valdivia not to shoot and begged him to not force the officers to make the decision to shoot. He thought to himself that if*

*Mr. Valdivia pointed the gun at them, he was going to kill the officers and other civilians. Officer Sun was afraid. As Mr. Valdivia pulled out his gun, he brought it forward towards Officer Sun with the barrel in the officers' direction. Officer Sun held his firearm with both hands, aimed at Mr. Valdivia's torso and pulled the trigger.*

*Officer Sun fired a sequence of shots, until he saw Mr. Valdivia stop moving and drop his gun, inches away from himself. He believed he shot five or six rounds.*

*Once he stopped shooting, Officer Sun assessed the scene to ensure there were no associates of Mr. Valdivia nearby, trying to engage with them. Unsure if Mr. Valdivia was still alive, Officer Sun told Officer Meadows that he was going to secure Mr. Valdivia, and Officer Meadows called for medical assistance. Officer Sun moved the gun away from Mr. Valdivia to prevent any further contact with it. Officer Meadows and other officers began to administer first aid.*

*Officer Sun brought Mr. Valdivia's gun to his patrol vehicle. The weight of the gun was similar to his own duty weapon. The slide was metal. The finger grooves, the textured pattern on the grip, and the magazine release were consistent with the Generation 3 Glock 17.  It also had all the markings of a Glock 17 on the side, just as the officer's own service weapon did. The gun looked worn down as if someone had unholstered and reholstered it multiple times. Officer Sun put the gun on the hood of the patrol vehicle. He put on gloves and then hit the slide release on the gun. The magazine came out. It looked different from his service weapon. It was a metal object that looked like a CO2 cartridge. He tried to slide the lock and noticed that the handgun could not chamber a round. At*

*that point, the officer determined that the gun was an airsoft or an air gun that was made to be an exact replica of a Glock handgun.*

4. **According to Officer Meadows's summary of an interview with Agent Zurawski:** *Officer Meadows and Officer Sun were in the downtown area when he heard a radio call regarding a male subject holding a beer, brandishing a gun, and arguing with customers at Country Liquor. Officer Meadows knew the area to be a high traffic area known for narcotics violations. The area was next to a bar where he had personally responded for fights. Stabbings, domestic violence, and other violent crimes had*

*occurred in the bar or in the parking lot next to the liquor store. In light of the gun mentioned and his knowledge of the area, he chose to respond with Officer Sun. Both Officers Meadows and Sun got into their respective patrol vehicles and responded to the scene.*

*On the way to the location, Officer Meadows heard Officer Sun set up a containment at the location with other officers responding. Officer Cardoza came on the radio and either asked or told Officer Sun that she would retrieve the less lethal shotgun, a Remington 870, a dedicated bean bag shotgun that was purposed specifically for less lethal rounds. The initial plan was to contain the area and attempt to get the suspect's compliance by talking with him.*

*Officers Meadows and Sun arrived at approximately the same time. Dispatch informed them that another caller had reported that the subject put a gun in his pocket. They parked their vehicles in the parking lot of Starbucks, on the west side of Country Liquor, to say out of sight. When Officer Meadows got out of his car, he unholstered his department-issued firearm because of the nature of the call and his knowledge of the area, and he jogged to Officer Sun, who was approaching the northwest corner of the Starbucks building.*

*As he turned the northwest corner with Officer Sun slightly ahead of him, Officer Meadows heard people arguing. He saw Mr. Valdivia standing without his gun with two other people. Officer Meadows scanned the location and saw a couple of other people farther down the parking lot and several people in the liquor store.*

*Officer Sun continued to approach with Officer Meadows behind ~ him. Officer Meadows kept a visual of Mr. Valdivia as he hugged the north wall of the Starbucks and stayed closer to the drive-thru area. They were about thirty feet away from the suspect when Officer Meadows pointed his firearm at Mr. Valdivia, announced their presence by saying, "police," and ordered all three subjects to put their hands up. Two of them put their hands up, but Mr. Valdivia began reaching towards his waistband pocket area. Officer Sun told him not to reach for his pockets and to put his hands back up. Mr. Valdivia raised his hands and said something to the effect of "whatever." Officer Meadows found Mr. Valdivia's response strange since the typical response when officers approached in this way was either worry, a sense of urgency, or compliance. But Mr. Valdivia seemed nonchalant, and in Officer Meadows' experience, people like that were unpredictable.*

*As Mr. Valdivia raised his hands, his sweatshirt and shirt lifted up, exposing the handle of a black handgun in his front waistband area. Officer Meadows recalled seeing the finger grooves in the handle of the gun, which looked like a Glock pistol. He was worried that Mr. Valdivia was next to a couple of people whom he could take hostage and/or that he could run into the liquor store where there were several other people. Officer Meadows ordered Mr. Valdivia to the ground in an attempt to get a little more control over the situation and to make it harder for Mr. Valdivia to reach for his gun.*

23

*Mr. Valdivia placed the beer bottle down and began to get on the ground. However, he positioned himself on the ground with his left arm and torso facing up towards the officers and began to reach for his waistband again. Because Officer Meadows knew that Mr. Valdivia had a gun, he worried about what Mr. Valdivia was trying to do. Officers Meadows and Sun both commanded Mr. Valdivia to not reach for his waistband, but Mr. Valdivia ignored them and removed the gun from his waistband. Based on the information that Officer Meadows had at the time, he believed that Mr. Valdivia was looking to either get into a confrontation with someone or hurt someone. Mr. Valdivia's actions appeared to be willful and deliberate.*

*As Mr. Valdivia started bringing the gun up in the officers' direction, Officer Meadows felt time slow down. He was afraid that Mr. Valdivia was going to shoot and kill him or Officer Sun. Officer Meadows sidestepped, acquired his sights before Mr. Valdivia could get a round off, held his firearm with both hands, and pulled the trigger. He saw Mr. Valdivia's body collapse and the gun fall out of his hand. When Officer Meadows saw that Mr. Valdivia was no longer a threat, he did not take another shot.*

*During the incident, Officer Meadows heard the volley of shots from other officers. However, he did not take another shot after he saw the gun fall out of Mr. Valdivia's hand. Officer Meadows moved up and kept cover on Mr. Valdivia, while Officer Sun retrieved the gun and took it to a safer location. Officer Meadows immediately proceeded with lifesaving measures and other officers approached to assist.*

5. **According to Officer Cardoza's summary of an interview with Agent Zurawski:**
*On April 9, 2022, while on routine patrol on the downtown area, Officer Cardoza was getting gas around 10:00 PM. Her partners were dispatched to a call at Country Liquor about a man with a gun. Cardoza knew the area was known for high foot traffic, a lot of drug sales, and many physical altercations. When the call came, only three officers were dispatched, but Officer Cardoza decided to assist, as she was free at the time. On the way to the scene, she asked Officer Sun if she should retrieve the less lethal weapon, and he responded that she should if she had the time.*

*When Officer Cardoza arrived on the scene, she parked behind a building some distance away to remain hidden. She had previously had many calls for service to this strip mall, and she knew the area to have a lot of drug sales, intoxicated bar patrons, and aggressively mannered people.*

*Officer Cardoza peeked into the parking lot and saw a man matching dispatch's description speaking with two other people about 10 to 15 feet from her location. As she watched for a couple of seconds, she heard her partners giving commands and she started running over to help them. She did not have time to get the less lethal weapon. She pulled her service weapon out and held it at the low ready position, in front of her body, pointed at the ground, and finger off of the trigger. She heard her partners command the suspect to not reach for anything and to keep his hands up.*

*She heard the suspect yell back at her partners, though she could not recall exactly what was said.*

*Officer Cardoza was to the north of Country Liquor, and to the side of the suspect. Her partners were on the west side of Country Liquor, and in front of the suspect. Cardoza was able to see the suspect's entire right side. She made sure that her background was clear and there was nobody behind his location. She saw that the two people with whom the suspect had been conversing had walked away, and the suspect was not complying with Officer Sun's commands. Mr. Valdivia's hands were halfway up, not fully extended.*

*Mr. Valdivia began to lie down. As he did so, he lifted his sweater with his right hand and Officer Cardoza saw the handle of a black gun in the waistband of his pants. Mr. Valdivia reached for it with his right hand, pulled it out, and started to point it at Cardoza's partners. Officer Cardoza felt like events were unfolding in slow motion. Officer Cardoza believed that Mr. Valdivia was going to kill her partners, so she began firing her weapon, pointing at Mr. Valdiva's chest area. She believed she had fired two rounds and stopped firing when she saw that Mr. Valdivia's gun was no longer in his hands and that he was no longer a threat. Officer Sun secured the Mr. Valdivia's gun, and Officer Meadows ensured there were no more weapons on Mr. Valdivia. Officer Cardoza kept her eyes on the scene to make sure that no one was retaliating or trying to attack them.*

*Officer Cardoza did not feel she had enough time to obtain a less lethal weapon, given the speed with which the situation evolved. Attempts at de-escalation via verbal commands were unsuccessful.*

6. **According to Sergeant Rasmussen's summary of interview with Agent Zurawski:** *On April 9, 2022, Sergeant Rasmussen heard a radio call regarding a Hispanic male in dark clothing at the Country Liquor store with a beer in one hand and waving a gun around in the other. Because the call appeared to be serious, involving a man with a handgun in a location known to have a lot of pedestrian traffic, both Sergeant Rasmussen and Sergeant Statler responded to the scene in the same unit. Sergeant Rasmussen was familiar with the area due to multiple calls for service related to drugs, homeless individuals, and gang activity. They were concerned t l at this man was going to use the gun to harm the public.*

*Upon arrival, Sergeant Rasmussen saw officers running towards the liquor store. He followed and approached the north side of the Starbucks building towards the suspect's location approximately 20 feet away. He immediately saw Mr. Valdivia starting to lie down on the ground on his stomach, while officers were giving him orders.*

25

*As Mr. Valdivia was lying on th'4 ground, he grabbed near his rear waistband and then pulled out what appeared to be a black Glock semiautomatic handgun in front of the officers giving him commands. Officers Sun and Meadows Jere directly in front of Sergeant Rasmussen, who also had his service weapon out. Officers on the scene fired several shots. Sergeant Rasmussen did not fire his weapon because he would have hit the officers in front of him. Officer Sun took custody of Mr. Valdivia's gun. Sergeant Rasmussen ordered officers to begin first aid, and then began investigating the incident.*

7. **Body Worn Camera (BWC) video evidence:**  According to Officer Suns body worn camera (BWC), he told Valdivia, "Hey let me see your hands," "Let me see your hands," "Put your hands up, don't fucking move." Valdivia, who was holding a bottle in his right hand, transitioned it to his left hand and then appeared to reach toward his waistband area with his right hand. In response, Officer Sun orders Valdivia, "Hey get your fucking hands out of your pockets dude."  Valdivia then put both hands over his head while still holding the bottle in his left hand. Valdivia responds by saying, "Whatever." Officer Meadows can be heard in the BWC footage then telling Valdivia, "Get on the ground now" and "Don't reach for anything."  Valdivia responded by putting the bottle down and appeared to be getting into a prone position on the ground.

   As Valdivia was getting down on the ground, the BWC footage (2022/04/09 22:17:07) shows Valdivia grabbing what appears to be a firearm from his right-side waistband area as he pulls it out.  Almost simultaneously, Officer Sun can be heard telling Valdivia, "Don't reach for it." In that moment and in response to the perceived threat, Officers Sun, Meadows, and Cardoza discharged their firearms, striking Valdivia.  Officer Sun fires six rounds, Meadows fires one round, and Cardoza fires five rounds.

8. **Valdivia's Firearm recovered from the scene:**  A BB gun that was in Valdivia's possession at the time of the incident was recovered near his body.  An inspection of the BB gun revealed it was marked as a Glock 17, pellet/bb gun, that had a serial number of DAS22042. The magazine had a capacity to hold eighteen .177 BBs.

9. **According to Witness Juan Castilloarreola's verbatim interview with Officer Dixon:** *Castilloarreola was a customer inside Country Liquor II.  Castilloarreola told Officer Dixon he observed Valdivia in an argument with a "black guy" with a hat to the front of Country Liquor II. Castilloarreola entered Country Liquor and heard Valdivia yell at the subject that he was going to start to "shoot."  Castilloarreola stated he was waiting in the checkout line at the location and heard gun fire begin to erupt, but did not see the OIS.*

**10. According to Witness Robert Turner's verbatim interview with Officer Dixon:**

*W-Turner stated he is an employee at Country Liquor and worked as a stocker. While working that evening, 04/09/2022, he observed S-1 to the front of the location and noticed that S-1 appeared to be extremely intoxicated. W-Turner recognized S-1 from prior contacts at the location and described him as generally being calm, but stated S-1 was "drunk" at the time of the incident. W-Turner stated an argument ensued between S-1 and another subject to the front of the location after S-1 accused the subject of calling him a "wetback". W-Turner attempted to calm S-1 down and tell him that the subject did not call him a racial slur. W-Turner then observed S-1 retrieve an "all black" handgun from his front pants pocket.*

*W-Turner described the handgun as a semi-automatic handgun and pointed to my holstered department issued Glock 17 pistol as being a similar style pistol as the weapon he observed S-1 retrieve. 14-Turner saw S-1 retrieve the handgun from his pocket several times and stated he "believed it to be a gun". While S-1 was arguing with the subject, W-Turner heard S-1 repeatedly state, "I'm just going to shoot this motherfucker up". Fearing that S-i was going to begin firing the weapon he had just presented, W-Turner instructed his wife, who was inside Country Liquor to go to the back of the business.*

*W-Turner stated he heard S-1 yelling at the subject to leave or "he was going to take him out". When asked for a direct quote, W-Turner stated he heard 5-1 state, "Get the fuck out of here, or I'm going to fucking kill you". N-Turner was inside the store when the officer involved shooting occurred and did not see the incident. W-Turner stated*

*when he heard the gun shots he, "thought he (S-1) was out there shooting". W-Turner stated while S-1 and the subject were arguing, he went out to the parking lot in an attempt to de-escalate the situation and "swore it was a gun". W-Turner stated while the subject was arguing with S-1, the subject was attempting to "talk it out" with S-1, but S-1 pulled the firearm out of his pants. This concluded my interview with W-Turner.*

**11. According to Witness Hitchem Dhab's verbatim interview with Detective Lee:**

*Dhab is an employee at Country Liquor II. Dhab stated he heard a loud verbal argument coming from the front of the business. Dhab stated he walked out and saw Valdivia holding a black object in one hand and a bottle of beer in his other hand. DHAB stated he had just sold Valdivia the bottle of beer prior to this incident. Dhab stated Valdivia placed the black object into his waistband on his left side. Dhab stated fearing it was a firearm/handgun he called 911 to report a man with a gun. Dhab did not witness the OIS.*

*At approximately 2130 hours, W/Dhab saw S1 shouting at W-Logan, W/Dhab told me S1 and V/Logan frequents the business, W/Dhab knows both subjects from working at Country Liquor. W/Dhab told me he stepped in and told both S1 and V/Logan to leave the parking lot and they left in different directions.*

27

*Approximately 20-30 minutes later, W/Dhab heard a loud verbal argument coming from the front of the business, W/Dhab stated he walked out and saw S1 holding a black object in one hand and a bottle of beer in his other hand.  W/Dhab stated he just sold S1 the bottle of beer prior to the incident. W/Dhab stated S1 placed the black object into his waistband on his left side.  W/Dhab stated fearing it was a firearm/handgun he called 911 to report a man with a gun. W/Dhab also stated there was a "crowd" of people watching S1 from the parking lot.*

*CPD Officers arrived at approximately 2216 hours and made contact with S1 when an Officer Involved Shooting occurred.*

12. **According to Witness Jonathan Logan's verbatim interview with Detective Hulsey:** *V-Logan began by telling me that the incident "all happened so fast." He explains that he was in front of Country Liquor and was "talking shit" to a friend when S-Valdivia arrived. V-Logan stated he does not know S-Valdivia.  V-Logan stated he did not know where S-Valdivia came from when he approached  V-Logan. S-Valdivia pulled his gun out and showed it to him, saying, "Hey check what I got."  V-Logan stated he immediately told S-Valdivia to put the gun away.  When describing how S-Valdivia pulled his gun out, V-Logan motioned with his hand in the shape of a "finger gun," with his index finger extended and his thumb pointing upward.  V/Logan referred to S-Valdivia's gun as, "his strap, his gun, the motherfucking pistol." I asked V-Logan to describe S-Valdivia's pistol, and he said it was a "black Glock."*

*V-Logan explained that he did not know what S-Valdivia's intentions were with the gun. I asked V-Logan if he was scared, and he replied, "Fuck yeah!"  V-Logan stated S-Valdivia was pointing the gun around, "at the air" and, " at everything but us," which is why people called the police.  V/Logan repeated that he told S-Valdivia to put the gun away and that he should leave. He stated the police then arrived, describing their arrival as, "that's how fast it was." V-Logan stated, "We all dropped to the ground." He said, "I know for some reason he tried to like slide it out to show these motherfuckers."*

*While motioning with his hand in the shape of a "finger gun" close to his front pocket, and pointing his index finger outward, V-Logan said, "He did this type of shit, on the ground." I asked V-Logan if it appeared S-Valdivia pointed the gun at officers, and he said, "It looked like he pointed that shit at they fucking, at they, at them" V-Logan then began describing S-Valdivia's gun again, stating it looked like a real Glock, and did not have "orange plastic shit on the top."*

*V-Logan described S-Valdivia as possibly being under the influence. He stated, "He was buzzed, we was all buzzed. But he was a little more buzzed and he was hitting the little crystal meth, so I know he was high, and he wanted to prove like he a bad motherfucker." I asked V-Logan if he saw S-Valdivia smoking methamphetamine, and he stated he did not, however S-Valdivia asked V-Logan if he wanted to smoke some. V-Logan reiterated that S-Valdivia "wasn't sober."*

28

*I asked V-Logan what the officers were saying upon their arrival. V-Logan replied that officers said, "Put that motherfucking gun down!" I asked V-Logan if S-Valdivia complied with officers' orders, and he said S-Valdivia "dropped to the ground," but that the gun was still "on his person." V-Logan also stated, "He slid that motherfucker out and dusted him." V-Logan stated he felt the officers did not care about him, because as he laid on the ground next to S-Valdivia, he was being struck by "shrapnel" and "gravel" as the officers fired their weapons. I asked V-Logan if he was injured at all, and he said he was not.*

*V-Logan began discussing again the moment when officers arrived and gave commands for he and S-Valdivia to get on the ground. V-Logan stated he got on the ground immediately, however S-Valdivia did not. V-Logan began reenacting S-Valdivia's movements again, showing that S-Valdivia was initially slow to comply with officers' orders to get on the ground. V-Logan speculated that S-Valdivia was thinking about when he was going to pull the gun out on the officers. He also speculated that officers must have seen S-Valdivia pull his gun out, causing them to shoot him. I asked V-Logan which hand S-Valdivia was holding the gun in, and he began reenacting S-Valdivia's movements again, and concluded that S-Valdivia was holding the gun in his left hand. V-Logan reiterated that the incident happened very fast. I concluded my interview at that time.*

13. **Law Enforcement Standard:** Based on my training, knowledge, and experience, I am familiar with the national standards followed by police officers regarding police procedures and the use of force, as well as the specific standards established by the Covina Police Department, which are consistent with standard police practices. Although the wording of the standard may appear to vary somewhat, the standard applied to police officers allows an officer to use reasonable force for self-defense, overcome resistance, prevent an escape, and effect an arrest.

Police officers are vested with an affirmative duty to investigate circumstances and situations that may compromise public safety.  Therefore, the use of force in self-defense and defense of others to stop the attack by Valdivia was reasonable and in conformance with polices, practices, and training statewide and nationally.  Based on my review of the incident, the following law enforcement principles would apply to the use of reasonable force:

- Police officers are entitled to protect themselves against a reasonably perceived threat.  Both California State law and POST (Peace Officer Standards and Training) training authorize the use of reasonable force in self-defense, to overcome resistance, to prevent an escape, and to effect an arrest. Because the incident was tense, uncertain, and rapidly evolving, it was appropriate and reasonable to use measures to stop the attack posed by Valdivia under the totality of the circumstances.

29

- There is a duty for a person to refrain from using force to resist detention, arrest, or acts of a threatening manner.  Whether an officer is detaining someone to investigate, dealing with a disturbance, trespassing, or performing other required procedures, the person has an obligation to comply.

- A person has no right to resist lawful detention, arrest, or the legal process that is required.  If the suspect does not comply, they have violated Penal Code section 148 (obstructing or delaying an officer in the performance of their duties). An officer may use reasonable force for self-protection and to overcome resistance.

- If a person has knowledge, or by the exercise of reasonable care, should have knowledge, that he is being detained, arrested, or confronting a police officer, it is the duty of such person to refrain from using force to resist such or engage in acts of a threatening manner. *(California Penal Code Section 834a: Duty to Refrain from Resisting Arrest).*

- A police officer, who has reasonable cause to believe that the person to be detained or arrested has committed a public offense, may use reasonable force to effect the arrest, to prevent escape or to overcome resistance.  A police officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the

    person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense using reasonable force to effect the arrest, or to prevent escape, or to overcome resistance.

The incident at hand represents an arrest and use of force.  The following law enforcement principles apply to the police officers:

- An officer is vested with an affirmative duty to ensure public safety as well as officer safety.
- An officer is vested with an affirmative duty to investigate circumstances that tend to support criminal activity and/or other violations of the law.
- An officer is vested with an affirmative duty to protect themselves against an attack and overcome a suspect's resistance.

14. **P.O.S.T. Training and basis for opinions offered:**  Police officers must use the force option appropriate for the situation as conditions may change rapidly.  Officers must continually reevaluate the subject's action and must be prepared to transition as needed to the appropriate force options.

    Reasonable force is a legal term for how much and what kind of force a police officer may use in a given circumstance.  Penal Code Section 835a states, "Any peace officer

30

who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance."

Fourth Amendment "objective reasonableness" standard in 1989, the United States Supreme Court applied an objective standard to a force situation and further established how reasonable force must be judged objectively (Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865) (1989)). The Court's analysis began by considering the subject's Fourth Amendment right to remain free from any unreasonable seizure against the government's interest in maintaining order through effective law enforcement.

P.O.S.T. Training and Courts have noted that in determining the objective reasonableness for the use of force must be fact-specific, and establish the following four components for determining reasonableness:

- Judged from the perspective of a reasonable officer.
- Examined through the eyes of an officer on the scene at the time the force was applied, not the 20/20 vision of hindsight.
- Based on the facts and circumstances confronting the officer without regard to the officer's underlying intent or motivation; and
- Based on the knowledge that the officer acted properly under the established law at the time.

15. **Threat Assessment and Decision to Use Force:** The threat assessment is a crucial factor to consider when an officer decides to use force. The threat assessment escalates under the totality of the circumstances when there is a reasonable risk to the public and officer's safety. The risk factors that an officer will consider include:
    - Suspect's actions
    - Public safety concerns
    - Officer's safety concerns
    - Suspect's ability to resist
    - Suspect's ability to escape
    - The inherent risk posed by the suspect(s) if allowed to continue with actions that placed others in danger, e.g., use of an axe/hatchet

16. *P.O.S.T.* **Training - Learning Domain 20: Use of Force/De-escalation and Basis for Opinions Offered:** Police officers must use the force option appropriate for the situation, as conditions may change rapidly. Officers must continually reevaluate the subject's actions and be prepared to transition as needed to the appropriate force options.

    Reasonable force is a legal term that describes the amount and type of force a police officer may use in a given circumstance. Penal Code Section 835a states, "Any peace officer who has reasonable cause to believe that the person to be arrested has

31

committed a public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance."

Fourth Amendment "objective reasonableness" standard in 1989, the United States Supreme Court applied an objective standard to a force situation and further established how reasonable force must be judged objectively (Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865) (1989). The Court's analysis began by considering the subject's Fourth.

Amendment right to remain free from any unreasonable seizure against the government's interest in maintaining order through effective law enforcement.

P.O.S.T. Training and Courts have noted that determining the objective reasonableness for the use of force must be fact-specific and established the following four components for determining reasonableness:

- Judged from the perspective of a reasonable officer,
- Examined through the eyes of an officer on the scene at the time the force was applied, rather than through the 20/20 vision of hindsight,
- Based on the facts and circumstances confronting the officer without regard to the officer's underlying intent or motivation; and
- Based on the knowledge that the officer acted properly under the established law at the time.

17. **Law Enforcement training instructs what is considered in suspect encounters involving action versus reaction time:** An officer's split-second response to a suspect's actions can be defined as the difference in the amount of time between an action and a reaction. In law enforcement, it refers to the response of a police officer to the actions of a suspect. This is because the suspect will have the advantage of lag-time, which is that brief period of time that it takes for a police officer to perceive a threat, formulate a response, and execute a reaction.

Several factors influence lag time, including distractions, divided attention, focused vision, environmental factors, and other related variables. A suspect has the advantage of knowing and making a decision to act before an officer has the opportunity to perceive the act, interpret it as a danger, and decide how to react. The process of perceiving the suspect's movement, interpreting the action, deciding on a response, and executing the response for the officer takes longer than it takes a suspect to perform the action of attacking with a weapon, even though the officer has already aimed his gun at the suspect.

Training and research have concluded that many of the elements that occur in real-life shootings would undoubtedly add significant time to the officer's reaction time. Police officers have the right to use force, including deadly force, when it is reasonable to do so in self-defense and defense of others. An officer may use force, including shooting, when there is an imminent risk of harm to self or others, or to stop someone who poses a danger to others.

According to conclusions reached by researchers in reaction time studies, an officer's decision to use deadly force under circumstances perceived as life-threatening may very well be considered reasonable by the standards established by training, which takes into consideration the Graham vs. Connor decision (P.O.S.T. LD-20).

Suppose a suspect suddenly points a gun in an officer's direction. In that case, the officer is highly unlikely to respond (get a shot off) to defend himself before the suspect shoots the officer. Even under ideal conditions, an officer may only react in self-defense (fire a weapon) no faster than simultaneously with the suspect or attacker.

The findings, which training is based upon, have served to illustrate the extreme danger that an armed suspect presents to police officers. Even in situations where a police officer has their gun aimed at an armed suspect, and the suspect is not aiming a gun at the officer, the officer is still in extreme danger of under-reacting, which has been referred to as the reactionary gap.

The reasonable standard established by the Graham decision is based on what a well-trained, prudent officer would do in a given situation. The results, based on training and research, show that even well-trained officers with their guns aimed at a suspect cannot reasonably be expected to react faster than a suspect can raise his or her weapon and fire.

As determined by standard police practices and training, this study is essential in advancing the understanding of the dynamics of deadly force encounters, which often differ significantly from the perceptions held by the general public and the media.

The process of **(1) perceiving the suspect's movement, (2) interpreting the action, deciding on a response, and (3) executing the response for the officer** takes longer than it takes a suspect to execute the action of shooting, even though the officer already had their gun aimed at the suspect. The training and research related to this issue have often occurred in near-ideal conditions from the officers' perspective.

The officers (volunteers) involved in establishing the baseline for action vs. reaction times were highly experienced and knew they would be encountering a suspect with a gun. The confrontations took place in well-lit rooms, with only a single suspect, with both parties (suspect and officer) remaining stationary, with no distractions, with no attempts by the suspects to deceive the officer(s) before shooting, with officers nowhere close to stress levels related to actual life or death situation, and with no reporting confusing sensory and perceptual distortions.

An essential factor to consider is that the majority of the suspect(s) extended their arms to bring the gun in line with their eyes before shooting in almost every exchange, rather than simply rotating the weapon and firing. Thus, their assault was slower than a spontaneous realistic street encounter experienced by police officers.

33

Based on training and research, the conclusion has been that many of the elements that occur in real-life shootings would undoubtedly add significant time to the average officer's reaction time.

**Perception/Cognitive Processing Time:** This refers to the time required for an individual to receive, recognize, and process sensory signals (e.g., auditory, visual) and formulate a response.  Referring to our brain schematic, it's the time required for the sensory input to pass the "Switchboard" and get processed by the "Thinker" (the sensory cortex).  This is commonly referred to as lag time.

**Motor Reaction Time:** This is the time required for an individual to perform a specific movement, such as lifting their foot off the accelerator, applying the brake, or pulling the trigger on a handgun.  In other words, it's the time required to execute the movement and for the muscles to respond.

**Multi-tasking and its effect on reaction time:** Police officer training and research have concluded that the more an officer multi-tasks and the more complex the required movement is, the longer the reaction times will take.  For example, multiple driving studies (compiled by the National Safety Council, or NSC) have concluded that drivers who multitask while operating a vehicle significantly increase (on average, by 0.6 seconds) their response time required for braking.

## VIII.  Conclusion:

The foregoing opinions are based upon my review of the materials and information received to date concerning the incident that gave rise to this litigation.  I understand that depositions may not yet be conducted in the case, and/or any party may produce additional discovery.  Thus, to that extent, this report should be considered a preliminary report.  Should I receive further information that materially affects any of these opinions, I will submit a supplemental report and/or be prepared to discuss it during future proceedings, as appropriate.  I expect to receive any additional materials or information that might affect my opinions in this matter in a timely manner.

This report was signed on **April 10, 2025**, in the City of Yucaipa, State of California.

**Robert J. Fonzi**