# EXHIBIT B

# RJF & Associates Inc.
**Robert Fonzi**
*Training and Consulting*
robert.fonzi@yahoo.com

**P.O. Box 1154**
**Yucaipa, CA  92399**
**951-312-9679**

**May 1, 2025**

Manning & Kass
15th Floor at 801 Tower 801 South Figueroa Street
Los Angeles, California 90017-3012

Attention: Roslynn Wilfert
Re: ___E.V. and X.V. et al. vs. City of Covina et al___. or ___Valdivia vs. City of Covina et al.___
Case No. 5:23-cv-05162-CBM-SHK
**Supplemental /rebuttal report**

Dear Ms. Wilfert,

In accordance with the Federal Rules of Civil Procedure 26(a)(1)(B), this report sets forth my opinions regarding police procedures, specifically the issues related to the police response, de-escalation efforts, and use of force involving Covina Police Officers Sun, Meadows, and Cardoza.

*Please note that this is a supplement and rebuttal report to the Plaintiff's expert's opinions, in addition to my original report dated April 10, 2025.  After reviewing the supplemental materials provided, my original opinions remain the same.*

It is my understanding that additional discovery materials may still be pending. I reserve the right to obtain additional discovery that may assist in further evaluating this matter. Additionally, I reserve the right to add, change, or delete any of my opinions based on further discovery, should a supplemental report be submitted. I will be available for deposition upon reasonable request before the discovery cut-off date at a mutually agreeable date and time.

I.    **Additional materials reviewed:**  As of the date of this report, I have reviewed the following additional reports, materials, and documents.

1. BWC 2022_0409_221629COVPD07_LL0007-001_20220410110421 [CPD 001111]
2. BWC 2022_0409 _22 1716COVPD22_LL0022-001_202 0410110045 [CPD 001112]
3. BWC 2022_0409 _221731COVPD13_LL0013-001_20221 410113442 [CPD 001113]
4. BWC 2022 0409 222108COVPD23 LL0023-001 2022 1410021805 [CPD 001114]
5. BWC 2022=0409=222253COVPD24=LL0024-00(2022~410021641 [CPD 001115]

1

6. BWC 2022_0409_223806COVPD24_LL0024-001_2022 , 410022126 [CPD 001116]
7. BWC 2022_0409_223957COVPD07_LL0007-001_2022 410110845 [CPD 001117]
8. BWC 2022_0409 224002COVPD22_LL0022-001_2022 410110250 [CPD 001118]
9. BWC 2022_0409_224222COVPD13_LL0013-001_2022 410113542 [CPD 001119]
10. BWC 2022_0409_224442COVPD44_LL0044-002_2022 410042104 [CPD 001120]
11. BWC 2022_0409 _224646COVPD36_LL0036-002_2022p410043841 [CPD 001121]
12. BWC 2022 0409 224730COVPD48 LL0048-002 2022p410094521 [CPD 001122]
13. BWC 2022 0409 224839COVPD21 LL0021-003 2022b410035354 [CPD 001123]
14. BWC 2022=0409=230632COVPD07 =LL0007-00(2022p4101 l 1043 [CPD 001124]
15. BWC 2022 0409 231058COVPD23 LL0023-001 2022e4l0022743 [CPD 001125]
16. BWC 2022_0409 231325COVPD22_LL0022-001_2022p410110715 [CPD 001126]
17. BWC 2022_0409 23 l 722COVPD57 LL0057-003_2022p41 l 124112 [CPD 001127]
18. BWC 2022_0409_233401COVPD07_LL0007-001_2022p410111158 [CPD 001128]
19. BWC 2022_0410_011755COVPD10_LL0010-001_202!410051008 [CPD 001129]
20. BWC 2022 0410 012747COVPD57 LL0057-004 2022 411120446 [CPD 001130]
21. BWC S20220409-221539-221621-01p401000000_2022 1410064611 [CPD 001131]
22. BWC S20220409-221649-222602-01p401000000_20229412091033 [CPD 001132]
23. BWC S20220409-221649-224545-01p401000000_20229410105121 [CPD 001133]
24. BWC S20220409-222602-225602-0lp401000000_20229412102134 [CPD 001134]
25. BWC S20220409-222602-225602-0lp402000000_2022Q41210461 l [CPD 001135]
26. BWC S20220410-000000-003000-0lp401000000_2022d412121820 [CPD 001136]
27. BWC S20220410-000223-000331-0lp401000000_2022d413102911 [CPD 001137]
28. DOJ Photos of Bandana
29. DOJ Photos of Black Hat
30. DOJ Photos of Black Pants
31. DOJ Photos of Black Shirt
32. DOJ Photos of Black Socks
33. DOJ Photos of Black Sweatshirt
34. DOJ Photos of Black Vans Shoes
35. DOJ Photos of Glock 17 BB Gun
36. DOJ Photos of Plaid Boxers
37. DOJ Photos of Projectile 1
38. DOJ Photos of Projectile 2
39. DOJ Photos of Projectile 3
40. FARO Scans re 3,812 PNG and JPG image files

Note: I am informed and believe that I have received all Disclosures and Discovery Responses produced in this case, as well as all deposition transcripts completed before the date of this report. The foregoing list underscores those records to which I devoted substantial consideration. If any items were inadvertently omitted from the foregoing list, this expert will gladly supplement it upon questioning under oath and reserve the right to supplement the list in a supplemental report.

II. **Summary of Supplemental Opinions:** The following supplemental opinions are based on my review of the above-listed materials, training, knowledge, and experience.  I am prepared to testify and/or explain my opinions regarding the use of force in this incident.  I do not intend to offer my opinions on the ultimate issues in this action. However, I reserve the right to offer opinions based on my areas of expertise, even if such opinions embrace the ultimate issues in the incident.

Note: None of my opinions are intended to usurp the jury's province and are not stated as ultimate issues. Instead, my opinions involve the consistency of the officers' actions with standard police practices.

**NOTE: The text in this report in italics is taken verbatim from the discovery materials and has not been edited for spelling, grammar, content, and/or context.**

1. **Opinion regarding video evidence:**

   **Body worn cameras (BWC)**: Based on my review of the listed materials, it is my opinion, as determined by standard police practices and training, that body worn cameras (BWC) have become an effective tool for law enforcement and will continue to play a vital role in capturing events as they occur. However, a BWC has limitations during many police encounters, especially when the circumstances unfold quickly and without advance notice. The safety of a police officer and the public is significant, and it plays an important role when an officer's attention is focused on a threat. If the attention of a police officer is suddenly or briefly divided, it could compromise the officer's and public safety and lead to significant consequences.

   Based on my experience reviewing over 1,000 police-related videos, many police practices experts, trainers, supervisors, and command staff have concluded that surveillance video and body-worn cameras (BWC), the assessment, use, and application of video evidence, have limitations for several complex reasons.

   This case involves video evidence. Based on my training and experience, video evidence of a police officer's use of force is generally valuable to an investigation. Still, it has several significant limitations that investigators and adjudicators must be aware of.

   - Videos are two-dimensional technology, but police officers perform and make decisions in tense, rapidly evolving situations under enormous stress in a live three-dimensional world.
   - BWC videos do not capture the involved officer's point of view because cameras are not mounted on an officer's head, which tracks every eye movement of the officer.
   - Surveillance or security video is even less from the officer's perspective.
   - Videos capture objects and events that the officer did not see.

- Videos do not always capture objects and events that the officer did see.
- Video cameras do not capture objects/movements that are blocked from the camera lens.
- Videos may document vastly different lighting conditions than actually occurred.
- Some videos have a low frame rate; thus, they do not capture real-time.
- Bystander cell phone videos tend not to capture the entire incident.
- Bystander cell phone videos are not always pointed at the action.
- Video cameras are neutral, inanimate objects; thus, videos do not experience the biomechanical, physiological and psychological aspects that the involved human being experiences under stress in terms of perception, fear, adrenalin-influenced physiological changes (such as breathing, heart rate, and blood pressure), interpretation of contextual cues, narrowly focused attention ("tunnel vision"), time distortion, sound distortion, memory (formation, storage, and retrieval), and other human performance phenomena.
- Videos of police officers' use of force incidents tend to cause emotion-based reactions (not fact-based) by viewers, because police use of force is generally not pleasant to view.
- Videos are not "the ultimate truth." Investigators and adjudicators must determine what the officer perceived at the time and apply the totality of the circumstances, along with policy, training, and the law, to determine whether or not the officer's perceptions and actions were objectively reasonable.

2. **Opinion offered by Plaintiff's expert, Scott Holdaway's report, dated March 10, 2025, retention date (only dated mentioned in report).**

*Note: Since the security footage is 30fps, and the BWC's are 25fps, the BWC footage needs 5 extra frames per second to play at the same speed as the security footage. A duplicate frame is added every 5 frames to the 25fps footage to play it at the same speed as the 30fps video. This could cause an offset in the synchronization of the two videos by up to 3 frames. I have also created an uncompressed (.bmp) image sequence, PDF, and .mp4 version of this video.*

*This video has a mono audio track present. When viewing file CPD 000054 - BWC Officer V. CARDOZA [054. C].mp4 there is a jump in time at 16:08 where the time/date stamp jumps from 21:28:59 to 22:18:07. **This could be an indication that the footage has been edited and encoded and that I have not been provided with the camera original footage**.*

**Rebuttal:** Mr. Holdaway offers an opinion in his report that " … *there is a jump in time at 16:08 where the time/date stamp jumps from 21:28:59 to 22:18:07. **This could be an indication that the footage has been edited and encoded and that I have not been provided with the camera original footage**.* However, there is no basis or conclusion to support such a claim.

4

**3. Opinions offered by Plaintiff's expert, Roger Clark's report dated April 11, 2025:**

**Opinion #1:** *The above left image from Officer Sun's BWC video shows Mr. Valdivia complying with officer commands to put his hands in the air. Above right is approximately four (4) seconds later, clearly showing that Mr. Valdivia had his hands up in compliance for that time. Additionally, Mr. Valdivia only lowered his hands from the position above his head in order to further comply with Officer Meadows' command to get on the ground.* Image on page 9 of 47

**Rebuttal:** Mr. Clark attaches two snapshots of a tense, rapidly evolving incident threatening public and officers' safety. The snapshots provide no context, nor are they accurate from the officer's perspective under actively changing circumstances. The time stamps were removed, and the snapshots are blurry. Plaintiff's expert Scott Holdaway has indicated in his report that he believes the video(s) provided to him may have been edited … *"This could be an indication that the footage has been edited and encoded and that I have not been provided with the camera original footage."* Ironically, the two plaintiff experts appear to conflict with one another. One indicates that the video may have been edited, and the other removes time stamps that are part of the video evidence.

**Body worn cameras (BWC)**: Based on my review of the listed materials, it is my opinion, as determined by standard police practices and training, that body worn cameras (BWC) have become an effective tool for law enforcement and will continue to play a vital role in capturing events as they occur. However, a BWC has limitations during many police encounters, especially when the circumstances unfold quickly and without advance notice. The safety of a police officer is significant, and it plays an important role when an officer's attention is focused on a threat. If the attention of a police officer is suddenly or briefly divided, it could compromise the officer's safety and lead to significant consequences.

**Opinion #2:** *The below image from Officer Sun's BWC video clearly showing Mr. Valdivia' apparent intent to discard the BB gun, and object and undisputable fact that Mr. Valdivia discarded the BB gun on his own (without a command to do so or physical prompting by any officer), prior to any shot being fired. It is clear that Mr. Valdivia was not pointing a gun at any officer when the use of deadly force occurred.* Image on page 10 of 47

*The above image from Officer Sun's BWC video clearly demonstrates how Mr. Valdivia's hand moved away from the BB gun after it was discarded.* Image on page 11 of 47

**Rebuttal:** This snapshot's image (page 11 of 46) is extremely blurred, unfairly representing the actual incident when the officer perceived the threat under the totality of the circumstances in real time. Once again, this single snapshot has no context and is inaccurate from the officer's perspective in real time. The time stamp was removed, and is too blurry to provide any commentary, as Mr. Clark has done.

5

Mr. Clark's opinion that *"… image from Officer Sun's BWC video clearly showing Mr. Valdivia's apparent intent to discard the BB gun, and object and undisputable fact that Mr. Valdivia discarded the BB gun on his own."*

First, the so-called BB gun was known after the fact. During the incident that had a high-level threat assessment, the officers reasonably believed that the weapon in Valdivia's possession was a real gun. The BB gun was an identical replica of a Glock 9mm.

Second, P.O.S.T. training states explicitly that ***"The totality of the circumstances must be evaluated from the perspective of the officer at the scene, rather than from an outsider's benefit of "20/20" hindsight. The facts and circumstances known to the peace officer at the time the force was used will be the basis for the determination of reasonableness."***

It appears that Mr. Clark has failed to acknowledge P.O.S.T. training or does not understand the training provided to police officers in California.  The opinion that … *"Officer Sun's BWC video clearly showing Mr. Valdivia's apparent intent to discard the BB gun, and object and undisputable fact that Mr. Valdivia discarded the BB gun on his own"* is misleading and completely misrepresents the circumstances and P.O.S.T. training.

P.O.S.T. training explicitly states, ***"The determination of reasonableness must allow for the fact that peace officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."*** The images and commentary Mr. Clark has offered in his report misrepresent the totality of the circumstances faced by the officers in this case.

Mr. Clark's opinion that *"The above image from Officer Sun's BWC video clearly demonstrates how Mr. Valdivia's hand moved away from the BB gun after it was discarded"* (Image on page 11 of 47).  Once again, there is no context, and the time stamp has been removed.

**P.O.ST. LD-20 p1-3 Graham v. Connor:**  *In 1989, the United States Supreme Court decided the case of Graham v. Connor, 490 U.S. 386, (1989), which established that a peace officer's use of force, under the Fourth Amendment, would be judged using the "objective reasonableness" standard.*

*The Court noted that determining the objective reasonableness for the use of force must be fact specific, based on the totality of the circumstances confronting the officer at the time that the force is used.* ***The determination of reasonableness must allow for the fact that peace officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving. The reasonableness of a particular use***

6

*of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The evaluation should be based on the facts and circumstances confronting the officer without regard to the officer's underlying intent or motivation.*

*Of these factors, the most important is whether the individual poses an immediate threat to the officer or public.*

**P.O.S.T. training LD-20, p1-6 - Officer's perspective:** *Peace officers will constantly be faced with decisions of when to use force and to what degree it should be applied.*

*The totality of the circumstances must be evaluated from the perspective of the officer at the scene, rather than from an outsider's benefit of "20/20" hindsight. The facts and circumstances known to the peace officer at the time the force was used will be the basis for the determination of reasonableness.*

**Opinion #3:** *The Required (and Trained) Tactical Response to this Incident: A seminal aspect of this incident was the gross departure from required tactics, which resulted in the unjustified use of deadly force against Mr. Valdivia. These tactics are so fundamental that absent highly unusual and rare instances, failures to adhere to them are not excused or forgiven. In this regard, it is helpful to compare what occurred during this incident in view of the basic tactical steps expected from trained law enforcement officers.* Page 27 of 47

**Rebuttal:** Mr. Clark offers the opinion that *"this incident was the gross departure from required tactics, which resulted in the unjustified use of deadly force against Mr. Valdivia."* This opinion is misleading and misrepresents P.O.S.T. training, which provides a variety of tactics that an officer may consider and apply in appropriate situations.

Mr. Clark talks about situational awareness and setting up a perimeter, which may be considerations.  However, Law Enforcement training has changed significantly since Mr. Clark was a sworn police officer.  One significant change occurred after the Columbine High School massacre on April 20, 1999, in Littleton, Colorado.  The training following the Columbine High School massacre indicates that if there is still an active threat, an officer is to respond and take action, even if it compromises the officer's safety.  In this case, suggesting that the officers should have stepped back and taken a position around a perimeter is flawed, inappropriate, and contrary to current standards.

Based on my review of the listed materials, it is my opinion, as determined by standard police practices and training, that the officers in this case had situational awareness and responded reasonably when faced with an active threat posed by Valdivia.

**III.**    **Conclusion for Rebuttal and Supplemental Report**:  The foregoing opinions are based upon my review of the materials and information received concerning the incident that gave rise to this litigation.  Should I obtain additional information affecting these opinions, I will submit a supplemental report and/or be prepared to discuss them during future proceedings.

This report was signed on **May 1, 2025**, in the City of Yucaipa, State of California.

**Robert J. Fonzi**