# EXHIBIT A

# E.V. and X.V. et al. v City of Covina Department et al.

## Case No. 5:23-cv-05162-CBM-SHK
### United States District Court – Central District of California

### Expert Witness Report of Jeffrey A. Martin, J.D., M.S., C.F.V.T.
### Pursuant to FRCP Rule 26(a)(2)(B)

**IDENTIFICATION AND QUALIFICATIONS**

My full name is Jeffrey Alan Martin. I am a retired police sergeant from the San Jose, California, Police Department. I currently divide my time between consulting, expert witness services, and teaching. I am a former labor relations attorney whose practice focuses on representing public safety personnel in administrative matters. I also worked as an author of "Daily Training Bulletins" regarding various police practices, including the use of force, for Lexipol, L.L.C. In that capacity, I regularly applied policy, legal, and other police practices concepts to fact patterns to determine whether the presented conduct would likely be deemed within policy.

I started my full-time law enforcement career as an officer with the San Francisco Bay Area Rapid Transit District (B.A.R.T.) Police Department from October 1981 through December 1984. While there, I worked in uniformed and plainclothes patrol assignments and was a collateral-duty baton instructor. After starting my tenure at the San Jose Police Department, I was promoted to sergeant in 1995. I worked in the Patrol Division, the Administrative Unit of the Bureau of Field Operations, as the training coordinator, the Airport Division, and as a supervisor in the Training Division.

Before that, I was a police officer, and my assignments included Patrol, the Parks Enforcement Unit, the Field Training Officer Program, and as an investigator in the Narcotics/Covert Investigations (NCI) Unit. While in the NCI unit, I participated in the execution of about 100 search warrants, several probation searches, parole searches, and planned arrests.

My training regarding the **technical preparation, examination, and interpretation of video evidence** totals over 180 hours, including the following:

- ► A 40-hour course titled "Level 1: Forensic Video Analysis & the Law" provided by LEVA.

- ► A 40-hour course titled "Level 2: Digital Multimedia Evidence Processing," provided by LEVA, completion of which provided certification as a "Certified Forensic Video Technician."

- ► Provided testimony regarding the importance of properly analyzing video evidence in administrative hearings in Wisconsin and California.

- ► Provided training on the basics of examining video evidence in other investigations

1

courses, as well as training and technical assistance to the Inspectors of the San Mateo County District Attorney's Office.

► Presented on the topic of forensic evaluation of video evidence at the 2021, 2022, and 2023 annual training symposiums of the International Homicide Investigators Association, as well as in the 2021, 2022, and 2024 Public Safety Discipline and Internal Investigations Seminar for Americans for Effective Law Enforcement on the limitations of video evidence as well as proper interpretation.

► I have testified to digital video analysis and demonstrative video exhibits I had prepared in nine California Superior Court trials and hearings and one federal court trial.

My training and experience in **human factors** include the following:

► I hold a Bachelor of Arts in Psychology from California State University, Hayward (now "East Bay").

► I hold a graduate certificate in Human Factors Psychology from Grand Canyon University.

► I hold a Master of Science degree in Psychology with an Emphasis on Human Factors Psychology from Grand Canyon University.

► I completed an additional graduate-level Human Factors and Ergonomics course at San Jose State University.

► I was invited back to San Jose State University as a guest lecturer regarding applying fundamental human vision to a forensic setting.

► For the POST-ICI OISI course, I was recruited to develop and deliver a block of instruction on "Human Factors." The curriculum includes the basics of sensory and cognitive factors and how they form the reasonable officer's perspective, including basic vision, attention, perception, memory, reaction time, officer-subject interactions, pattern (gestalt) v. detailed (feature-intensive) processing, time-to-stop-shooting responses, human memory compared to video evidence, fatigue, and stress reactions.

► I am a member of the Human Factors and Ergonomics Society (H.F.E.S.)  I have presented at the annual meetings in 2016, 2018, 2020, and 2023, each accompanied by the publication of peer-reviewed proceedings papers. I was the ad-hoc program chair for the Forensic Professionals Technical Group for the 2023 and 2024 Annual

2

Meetings.

▸ Other authors and researchers have cited my published work.

▸ I have testified on human factors in 10 state criminal court trials or hearings and once in federal court.

I hold a Juris Doctor Degree from Northwestern California University and am a member of the State Bar of California. I also have a Bachelor of Arts in Psychology from California State University, Hayward (now "East Bay"). I also hold a Master of Science Degree in Psychology – Emphasis on Human Factors Psychology from Grand Canyon University.

My expertise and qualifications to conduct forensic video analysis, including the preparation, examination, and interpretation of video evidence, flow from the following:

1.  My education, personal experiences, and training.

2.  My forensic video analysis expertise includes preparing, examining, and interpreting video and audio evidence.

3.  My forensic workflow and process are similar to those of other experts in the field. It is sufficiently documented so that another analyst can replicate my work product using the same starting video or audio data, the same software, and the same steps.

4.  My training, experience, and education in human factors and applying it to law enforcement contexts.

5.  I understand the facts of this case, e.g., the round counts from the three involved officers, as needed to verify or support specific data.

My curriculum vitae is attached and incorporated into the body of this report by this reference. It comprehensively lists my professional experiences, activities, and publications from the previous ten years. It also contains a list of the cases in which I have testified as an expert in deposition or trial during the past four years.

Much of my professional life involves studying and analyzing the conduct of peace officers and law enforcement agencies and their practices, including liability issues and human performance factors. This has, by necessity, caused me to become familiar with forensic video analysis, including the limitations on the information that can be obtained from it. My hourly rate is $375.00 per hour and $475.00 per hour while testifying. My fee agreement for the work in this matter is also attached and incorporated by reference.

3

## **WHY EXPERT TESTIMONY IS REQUIRED TO ASSIST THE FINDER OF FACT IN THIS MATTER TO UNDERSTAND THE PROPER EXAMINATION, PREPARATION, AND INTERPRETATION OF DIGITAL VIDEO EVIDENCE**

It should be remembered that California peace officers are trained on constitutional legal standards regarding the limitations of their use of force. If those standards dictate that the use of force will be judged from the officers' perspectives, digital video evidence must be put into proper context. This is because digital video evidence does not necessarily reflect the reasonable officers' perspectives, especially how officers processed the actual event in real time and how that compares to what is or is not depicted in a video file. As I have written before, ***"Cameras record; people process."***

When compared to how humans detect and perceive visual information, it is essential to remember the following limitations of video evidence:

1. Even when a camera is mounted on an officer's head, it does not perfectly represent the officer's visual perspective;

2. The video perspective is limited to the field of view recorded in each frame;

3. The viewer of a video usually knows the outcome of the event, while an officer experiencing the same event in real time does not, thereby failing to accurately represent the fears, emotions, and stressors that might be affecting an officer's reasonable perceptions and decision-making;

4. Video records a series of still images at constant or variable frame rates. Most people are accustomed to watching video that is recorded and played back at 29.97 FPS. The faster the frame rate, the smoother the motion will appear.[1] Video recorded at significantly slower frame rates tends to miss a lot of action or contribute to the perception that movements or actions depicted were more forceful than they were, thereby making the video less accurate and reliable in depicting the events;

5. Even though metadata readers might indicate that a video file is played back at a particular frame rate, that rate frequently represents an average, and it cannot be assumed that each frame accurately represents even time intervals between frames This is because frames might be encoded or displayed at various time intervals and/or for different durations;

---

[1] Scientific Working Group on Digital Evidence, *S.W.G.D.E. Technical Overview of Digital Video Files,* Version 1.3, 8/5/2024. https://www.swgde.org/17-v-001/

4

6. Humans usually perceive their visual worlds in three dimensions; video is two-dimensional and can have a "flattening" effect that influences the perception of depth, space, and distance;

7. Most body-worn cameras (BWCs) used by law enforcement agencies have a relatively wide field of view, i.e., they use wide-angle lenses with inherent distortion, which makes their representations of depth and distance even more difficult to gauge accurately;

8. During fast-paced events, actions that are shown to have been perceived and reacted to by officers in video evidence may not be stored in an officer's long-term memory if the time and/or effort to reflect on them is interfered with;[2]

9. Most humans usually see in clear detail, while recordings that are recorded and/or stored at low resolution have the potential to obscure that detail;

10. The quality and accuracy of video evidence can be significantly affected by what is known as "spatial" and "temporal" compression.[3] Temporal compression occurs when "predictive framing" algorithms are used to encode the data for most of the frames and can fail to record movement that occurred, produce movement that did not happen, or cause the same object to appear in two different locations within the same frame  Spatial compression occurs within individual frames whereby redundant or less important color aspects are removed and can result in the loss of detail – making the images visually distorted;

11. Video data can be further degraded or altered through compression if it is processed, even if that processing includes emailing a video directly from a cell phone, uploading to a social media platform, or on-screen recording, any of which can also include the loss of entire frames; and

12. While inferences may be drawn about what viewers believe video images depict, there might be qualitative factors such as resolution, frame rate, compression, distance, motion, perspective, and lighting that constitute the "bandwidth."[4] The bandwidth of the video determines whether or not the video can be said to be authenticated, i.e., is it adequate to accurately represent what it is being offered to

[2] Schwartz, Bennett L. *Memory: Foundations and Applications*. Thousand Oaks, CA: SAGE, 2018.

[3] *Supra at Note 1.*

[4] Chen, Jessie Y., and Jennifer E. Thropp. "Review of Low Frame Rate Effects on Human Performance." *IEEE Transactions on Systems, Man, and Cybernetics - Part A: Systems and Humans* 37, no. 6 (2007): 1063–76. https://doi.org/10.1109/tsmca.2007.904779.

5

prove, given how it was originally generated? In other words, what is the question the evidence is believed to answer? Therefore, when video evidence has low bandwidth attributes, it must always be considered that it might be insufficient to answer specific questions conclusively, such as, "Did the kick land on the arm or the head?" Another consideration is if one or more cameras had recorded the same event while closer to the action, at a higher frame rate, or from a better perspective, different interpretations might result;

13. It is inappropriate and unempirical to make determinations as to what people are perceiving or intending based upon the video evidence alone, and

14. The video must be viewed with a player that can single-frame advance and reverse so that the content and context will most likely be interpreted accurately. I recommend Switch®, as it will play most of the exhibits on Windows or Mac operating systems, allowing for single-frame advancing and reversing.

These technical realities make it critical to know the processing history of video files and to ensure that **anyone** using video evidence in investigations or evaluations of peace officer conduct understands the recognized best practices in the technical preparation, examination, and interpretation of digital video evidence.[5]

It is also important to note that when using video evidence in investigating or evaluating police conduct, the same perceptual dynamics that influence how people perceive real-time experiences also apply; their previously held beliefs and biases can influence what they see and how they interpret video images, including a false sense that the video comprises the same experiences as the participants.[6] This dynamic also applies to human performance limitations, such as limited visual acuity, which can lead viewers to look at only one aspect of the video event, such as what the officer appears to be doing, not what a resistive suspect or another officer is doing contemporaneously.

In addition to educating the finder of fact about the nuances of digital video evidence, expert testimony is needed, in this matter, via the demonstrative exhibits to assist the finder of fact with (1) being able to see as much information as can be obtained from the images, and (2) obtaining timing data.

## <u>THE TECHNICAL PREPARATION, EXAMINATION, AND INTERPRETATION OF THE VIDEO EVIDENCE IN THIS CASE</u>

I received several video files in this case, both from a file-sharing download and later via

---

[5] Scientific Working Group on Digital Evidence, *S.W.G.D.E. Best Practices for Digital Forensic Video Analysis*, Version 1.1, 3/22/20. https://www.swgde.org/18-v-001/

[6] Granot, Yael, Emily Balcetis, Neal Feigenson, and Tom Tyler. "In the eyes of the law: Perception versus reality in appraisals of video evidence." *Psychology, Public Policy, and Law* 24, no. 1 (2018): 93.

a USB drive containing 27 Lens Lock body-worn camera (BWC) and dash camera video files. I imported the video files from the file share into Amped FIVE, build date 3/26/2025, Revision 36648, which generated SHA256 hash values for verification. I also reviewed them to locate the files containing the time period and area of interest. I next took the 27 Lens Lock files from the USB drive and imported them into Amped FIVE. I again generated SHA256 hash values and used those values to match them to the video files from the file share download.

I also used the MediaInfo version embedded in Amped FIVE to interrogate the files and obtain the metadata. I also ran a "frame analysis" and examined the structure of the group of pictures (GOP). The video file contained the time period and area of interest, with the metadata revealing the following:

(Via File Share) 300. BWC. Ofcr. Sun. Arrival and Incident. 55 min. 57 sec. [CONFIDENTIAL CPD 000037].mp4
(Via USB Drive) 2022_0409_224442COVPD44_LL0044-002_20220410042104.MP4
SHA256:  0929221fe9a4ab7e0a36bcdde20cc8cf06f37c07a25ac57782a514bdd66163b2
Codec: AVC1
Format: MPEG-4
Size: 2.01 GB
Duration: 55:57.200
Encoded Date and Time: Not displayed.
Resolution: 1280x720
Display Aspect Ratio: 16:9
Frame Rate: 25.00 FPS
Frame Rate Mode: Constant
Total frames: 83930
Audio: AAC LC
Channels: 1

The metadata and an examination of the file suggest that it is "camera original", i.e., it is the same as was originally recorded by the LensLock BWC and stored via upload to the LensLock server. Additionally, the on-screen date and time correspond to the date and time of the incident.

To make it easy to recognize which officer wore the camera, recognize exact frames being referenced, and to facilitate the measurement of time intervals, I used Amped Five to add the following text overlays: The last six digits of the file name just before the extension, the officer's name, and the Bates number at the top center, a timer in the upper left corner in formatted "presentation time stamp" (PTS) time, and the original frame number (OFN) in the lower left corner. I also trimmed the portion of the video after the shooting to keep the file size manageable. I then rendered it as a "visually lossless" H.264 file, and saved it as the following demonstrative exhibit:

**042104 CPD 000037 Sun Marked.mp4**

7

To create a file that narrowed the time period of interest to Mr. Valdivia's movements leading up to when Officer Sun fired the first shot, I trimmed the file to OFNs 4248 through 4533. I rendered it as above and saved it as:

**Sun Close Trim.mp4**

I also exported the Sun Close Trim.mp4 file audio and examined it in Ocen Audio. Significant clipping was visible. This is the cause of the distortion heard in the audio portions of the BWC recordings, making it very difficult to identify each firearm discharge sound. However, based on the rough observations of the beginning and end of the shooting, it appears that the officers collectively fired their rounds in about 2 seconds or less.

I used Amped Five to decompile those frames as lossless TIFF images. I then used Adobe Bridge to convert them into a lossless PDF file, saving it as:

**Sun PDFs.pdf**

To make Mr. Valdivia more salient in the images, I used the "Magnify" filter in Amped FIVE to magnify him within the frames for OFNs 4417 through 4469, with OFNs 4468 and 4469 annotated to point out the possible and confirmed first discharge of Officer Sun's handgun, respectively. I exported these images as lossless TIFFs and converted them to lossless PDFs using Adobe Bridge and saved them as:

**Sun Annotated Tiffs.pdf**

(Via File Share) 302. BWC. Ofcr. Statler. Incident. 22 min. 11 sec. [CONFIDENTIAL CPD 000038].mp4
(Via USB Drive) 2022_0409_221629COVPD07_LL0007-001_20220410110421.MP4
SHA256: 254c688843b5bde18a90972b298dd0693d8ac196d161e7555020385a44a0 9085
Codec: AVC1
Format: MPEG-4
Size: 915 MB
Duration: 22:11.720
Encoded Date and Time: Not displayed.
Resolution: 1280x720
Display Aspect Ratio: 16:9
Frame Rate: 25.00 FPS
Frame Rate Mode: Constant
Audio: AAC LC

8

Channels: 1

Using Amped FIVE, I trimmed the video file to the first 2401 frames and added text overlays with the OFN in the top left corner, the file name as above ins the top center, and the timer in the top right corner. I rendered it as above and saved it as:

**110421 CPD 000038 Statler Marked.mp4**

(Via File Share) 306. BWC. Ofcr. Rasmussen. Speaking with Witnesses in Liquor Store. 45 min. 1 sec. [CONFIDENTIAL CPD 000042].mp4
(Via USB) 2022_0409_224730COVPD48_LL0048-002_20220410094521.MP4
SHA256: 72e17459bcca1d469de35a081e8e83180ca912ccf9772192bf7ba42ffc4418c0
Codec: AVC1
Format: MPEG-4
Size: 1.99 GB
Duration: 45:01
Encoded Date and Time: Not displayed.
Resolution: 1280x720
Display Aspect Ratio: 16:9
Frame Rate: 25.00 FPS
Frame Rate Mode: Constant
Audio: AAC LC
Channels: 1

I trimmed this video to the first 1,001 frames and added the overlays in the same manner as the previous video. I rendered it as above and saved it as:

**094521 CPD 000042 Rasmussen Marked.mp4**

(Via File Share) 309. BWC. Ofcr. Meadows. Incident and Guns Drawn. 39 min. 30 sec. [CONFIDENTIAL CPD 000045].mp4
(Via USB) 2022_0409_224646COVPD36_LL0036-002_20220410043841.MP4
SHA256: 4f1a50cf130e864ad863b69a588566bf723a0f7706bd5c8a41d371f0b5c1e66a
Codec: AVC1
Format: MPEG-4
Size: 1.46 GB
Duration: 39:30
Encoded Date and Time: Not displayed.
Resolution: 1280x720
Display Aspect Ratio: 16:9

9

Frame Rate: 25.00 FPS
Frame Rate Mode: Constant
Audio: AAC LC
Channels: 1

I trimmed this video to the first 2,101 frames and added the file name to the top left, the OFN in the bottom left, with the timer just below it. I rendered it as above and saved it as:

**043841 CPD 000045 Meadows Marked.mp4**

To create a file that narrowed the time period of interest to Mr. Valdivia's movements just before Officer Meadows fired the one shot, I trimmed the file to OFNs 1260 through 1482. I rendered it as above and saved it as:

**Meadows Close Trim.mp4**

I used Amped Five to decompile those frames as lossless TIFF images. I then used Adobe Bridge to convert them into a lossless PDF file, saving it as:

**Meadows TIFFs.pdf**

To make Mr. Valdivia more salient in the images, I used the "Magnify" filter in Amped FIVE to magnify him within the frames for OFNs 4417 through 4469, with OFNs 4468 and 4469 annotated to point out the possible and confirmed first discharge of Officer Sun's handgun. I exported these images as lossless TIFFs and converted them to lossless PDFs using Adobe Bridge and saved them as:

**Meadows Annotated TIFFs.pdf**

I also imported the **Sun Close Trim.mp4** and **Meadows Close Trim.mp4** exhibits into Final Cut Pro X version 11.1. Like Mr. Holdaway, I used the liquor store sign's color change to synchronize them visually. I rendered a version via ProRes 422 and another version via H.264, saving them respectively as:

**Valdivia & Sync HI.mov**
**Valdivia & Sync LO.mov**

I then used Final Cut Pro X to export the synchronized video into lossless TIFFs, then converted them to a lossless PDF using Adobe Bridge. I saved that exhibit as:

**Valdivia & Sync TIFFs.pdf**

10

(Via File Share) 317. BWC. Ofcr. Cardoza. 1 hr. 5 min. 3 sec. [CONFIDENTIAL CPD 000054].mp4

(Via USB) 2022_0409_224839COVPD21_LL0021-003_20220410035354.MP4

SHA256: e462570eda19bfc7c0bc505d216a7d132dc65c98aa175e7b28464032b9ff93bc

Codec: AVC1

Format: MPEG-4

Size: 2.25 GB

Duration: 1:05

Encoded Date and Time: Not displayed.

Resolution: 1280x720

Display Aspect Ratio: 16:9

Frame Rate: 25.00 FPS

Frame Rate Mode: Constant

Audio: AAC LC

Channels: 1

Upon viewing this file, I noticed the same gap in the images and on-screen display as noted by Scott Holdaway on pages 7 and 8 of his report. The gap in the continuity at OFNs 24208 and 24209 (on-screen display times 21:28:59 and 22:18:07, respectively). In determining whether this gap was from editing, I requested and received a freshly downloaded set of the LensLock videos described above.[7] I confirmed that the recently obtained video was identical to the original via SHA256 hash value.

I also contacted Mr. Ryan DaFoe at LensLock on 4/29/2025 and sent him the video file via a file-sharing link he provided via email. Mr. DaFoe told me he could locate the original file in their system but could not conduct a hash analysis at the time. He also said that the gap could have resulted from a technical issue and not post-download editing. I have not performed any further work on this file.

(Via File Share) 366. DOJ. Liquor Parking Lot. XVR. Ch. 4. Main. 040922. 24 min. 46 sec. Confidential.mp4

SHA256: ea00436a6fd28ac258aa56ae625208bb00a78ea48352c8f258765ab1b622faae

Codec: AVC1

Format: MPEG-4

Size: 93.5 MB

Duration: 24:46

Encoded Date and Time: Not displayed.

Resolution: 960x480

---

[7] The receipt of a download audit from the Covina Police Department is still pending at the time of this writing.

11

Display Aspect Ratio: 2.00 (18:9)

Frame Rate: 30.000

Frame Rate Mode: Variable

Minimum Frame Rate: 29.412

Maximum Frame Rate: 30.303

Audio: None

I trimmed the video to OFNs 33350 through 34022 and added text overlays with the OFN on the top left, the file name on the top center, and the timer on the right center. I rendered it as above and saved it as:

**366 DOJ Liquor Store Marked.mp4**

A complete listing of the demonstrative exhibits created is in Appendix B.

## Time and Motion Analysis

**Table 1. Timing Analysis From Demonstrative Exhibit 4 Sun Annotated Tiffs.pdf**

| OFN | Movement | PTS Time |
|---|---|---|
| 4417 | Right hand on ground with elbow bent | 2:56.680 |
| 4423 | Right hand moving rearward with elbow bent | 2:56.920 |
| 4428 | Right hand further rearward with elbow bent at apparent extent of motion | 2:57.120 |
| 4432 | Right hand and arm still in relatively same posture | 2:57.280 |
| 4433 | Right hand and arm start forward motion | 2:57.320 |
| 4435 | Right hand and arm start continuing forward and officers start yelling | 2:57.400 |
| 4444 | Right hand starts becoming visible | 2:57.760 |
| 4449 | Right hand and arm continues forward movement | 2:57.960 |
| 4452 | Blurred | 2:58.080 |
| 4453 | Left arm blocks camera | 2:58.120 |
| 4463 | Left arm clears camera, Mr. | 2:58.520 |

12

| | Valdivia's right hand is forward, and handgun to the front left of him. | |
|---|---|---|
| 4464 | Mr. Valdivia's right hand is forward, and handgun to the front left of him. | 2:58.560 |
| 4465 | Mr. Valdivia's right hand is forward, and handgun to the front left of him. | 2:58.600 |
| 4466 | Mr. Valdivia's right hand has moved toward his left hand and the handgun is to the left front of him. | 2:58.640 |
| 4467 | Mr. Valdivia's right hand is closer to his left hand and the handgun is to the left front of him | 2:58.680 |
| 4468 | Mr. Valdivia's posture is similar and there is possibly discharge gas being emitted from Officer Sun's handgun | 2:58.720 |
| 4469 | Gas from Officer Sun's handgun obscures Mr. Valdivia | 2:58.760 |

Noted Intervals until OFN 4469:

- 4423—From hand moving rearward until first shot: ~1.9 s.
- 4428—From hand reaching the apparent rearmost position until the first shot: ~1.7 s.
- 4433—From the hand and arm moving forward until the first shot: ~1.4 s.
- 4444—From the right hand starting to become visible until the first shot: ~1.0 s.
- 4463—From right hand forward with handgun to the front: ~ 0.2 to .3 s.
- 4466—From right hand forward with handgun further to the front: ~ 0.1 to 0.2 s.

**Table 2. Timing Analysis From Demonstrative Exhibit 10 Meadows Annotated TIFFs.pdf**

| OFN | Movement | PTS Time |
|---|---|---|
| 1356 | Right hand on ground | 54.240 |
| 1361 | Right hand starts rearward | 54.440 |
| 1367 | Hand continues rearward | 54.680 |
| 1368 | Left arm blocks view of right hand | 54.720 |

13

| 1428 | Left arm blocks view of Mr. Valdivia and Officer Meadows handgun discharges | 57.120 |
|---|---|---|

Noted Intervals until OFN 4469:

- 1361—From right hand starting rearward until first shot: ~2.7 s.
- 1367—From right hand continuing rearward until first shot: ~ 2.4 s.

Noted Sequence from Valdivia & Sync HI.mov:

- FCPX FN 98/3:92: Sun yells, "Don't reach for anything."
- FCPX Screen Shot of FN 187/7.48: Multiple officers start yelling once Mr. Valdivia's arm moves forward from rearward motion.
- FCPX Screen Shot of FN 220/8.80: Officer Sun fires the first shot.
- FCPX Screen Shot of FN 235/9.40: Officer Meadows fires one shot.
- FXPX Screen Shot of FN 265/9.40: Last shot fired.

Summary:

- Officer Sun fired the first shot from his handgun roughly 1.25 seconds to 1.50 seconds after the officers started yelling and as Mr. Valdivia was bringing his right hand and arm forward after making the rearward motion.

- Officer Meadows fired his shot, roughly 1.75 to 2.0 seconds after the officers started yelling, and Mr. Valdivia was bringing his right hand and arm forward after making the rearward motion.

## **OPINIONS AND BASES THEREOF**

**Context:** On 4/9/2022, Covina Police Department Officers Billy Sun, David Meadows, and Vanessa Cardoza were on duty and in uniform. At approximately 2213 hours, they received a call typed as a "417" (brandishing a weapon) at the Country Liquor Store, located at 124 East Arrow Highway. The three officers became aware of the following details of the call as they responded:

- The subject of the call was a male Hispanic, 40 years old, wearing a black sweater, shorts, and had facial hair;
- The subject was holding a can of beer and a black handgun;
- Updates included that the subject was still near the front door of the liquor store and was engaged in an argument with two other subjects;
- Two additional reporting parties also reported that there were about three to four males in front of the liquor store, and that the subject with the handgun had put it

14

into his front pocket; and

- All three officers knew the area had a reputation for criminal activity. (Cardoza 4/18/2022 Interview Transcript; Meadows 4/18/2022 Transcript; Sun 4/18/2022 Transcript; Cardoza Deposition; Meadows Deposition; Sun Deposition; CPD Call Detail Report, Call #C2209977

Upon arriving at 2217 hours, Officer Sun approached the liquor store parking lot on foot from the west across the front of the Starbucks, and Officer Meadows followed him. Officer Cardoza approached from the east on the south sidewalk of Arrow Highway. Once Officers Sun and Meadows reached the area near the short wall dividing the liquor store parking lot from the Starbucks, the sequence of events unfolded as follows:

- They saw a subject, subsequently identified as Daniel Valdivia, and determined he was the subject of the call as he matched the description provided;
- Officers Sun and Meadows, with their handguns drawn and pointed in the general direction of Mr. Valdivia, identified themselves as police and told Mr. Valdivia to put your hands up;
- Mr. Valdivia transferred a large bottle he was holding in his right hand to his left hand and started reaching toward his right-front pants pocket;
- Mr. Valdivia complied, raised both hands into the air (including the bottle in his left hand), and complied with getting on the ground as directed by Officer Meadows;
- As Mr. Valdivia went to the ground, he "posted" on his left arm and reached rearward toward the left-rear quadrant area of his waistband, while keeping his head up and looking at the officer(s);
- As Mr. Valdivia's right hand and arm started moving toward the officers, Officer Sun yelled, "Don't reach for it";
- Officer Sun fired because he perceived that Mr. Valdivia pulled a handgun from his person and pointed it at them;
- Officer Meadows had seen the grip of a handgun in Mr. Valdivia's waistband before the forward arm movement from the waistband, and he perceived that Mr. Valdivia pointed the handgun at them; and
- Officer Cardoza, who entered the parking lot from the northeast, saw the black handgun in Mr. Valdivia's waistband as Mr. Valdivia was getting on the ground, and saw Mr. Valdivia draw it and start to point it at Officers Sun and Meadows.

In response, Officer Sun fired six rounds (firing the first shot), Officer Meadows fired one round, and Officer Cardoza fired five rounds at Mr. Valdivia. (Valdivia & Sync HI.mp4, FNs 0 through 261; (Cardoza 4/18/2022 Interview Transcript; Meadows 4/18/2022 Transcript; Sun 4/18/2022 Transcript; Cardoza Deposition; Meadows Deposition; Sun Deposition; CA DOJ Investigation Report by S. Wyatt)

15

**Opinion One: Mr. Valdivia's motion of reaching for the handgun under the circumstances would very likely cause trained and reasonable peace officers facing the same circumstances to believe he was in the process of drawing and firing a handgun at them.**

Humans, in general, are very fast at reading the patterns of motion by other humans and perceiving what they are doing, whether they are acting with hostile or friendly intentions.[8] Police officers are trained to have an increased sensitivity to patterns of movement that they perceive immediately threatening, such as a motion of drawing a handgun from one's person.

As applied to the facts of this case, Mr. Valdivia's movements, as depicted in the video images, the original BWC videos, and the listed demonstrative exhibit, are the motion patterns that police officers are generally very sensitive to.[9]

**Opinion Two: Officers' firearms discharge well after they have perceived the stimuli to fire, decided to fire, and completed the movements to fire. During these time intervals, the postures, orientations, and status of weapons possessed change, as they did in this case.**

One of the most commonly understood limitations of human information processing in the human factors and law enforcement fields is perception-response time (PRT). PRT associated with this circumstance includes stimulus detection, evaluation, response selection, and movement time.[10]

As applied to the facts of this incident, when Mr. Valdivia started moving his right hand forward after having moved it to the right-rear quadrant of his torso, Officers Sun and Meadows started yelling, "Don't reach. Don't reach." (Transcript of Sun BWC Video, 3:15-16; Transcript of Meadows BWC Video, 2:8-10)

The approximate interval from when Officer Sun started yelling, "Don't reach…" until he started firing, roughly 1.25 to 1.5 seconds elapsed. By this time, Mr. Valdiva had already removed the black Glock replica from his person and extended it toward the officers, and it had landed in front of him (see Appendix C, Figures 2 and 3)

The approximate interval from when Officers Sun and Meadows started yelling, "Don't reach…" until Officer Meadows fired was roughly 1.75 to 2.0 seconds. By this time, Mr. Valdivia had already removed the black Glock replica from his person and extended toward the officers, and it had landed in front of him (see Appendix C, Figures 2 and 4).

**Opinion Three: Once the officers decided to fire at Mr. Valdivia, the process of shooting him likely interfered with their respective abilities to see the handgun leave Mr. Valdivia's right hand and land on the ground in front of him.**

---

[8] Blake, Randolph, and Maggie Shffrar. "Perception of Human Motion." Annual Review of Psychology 58, no. 1 (2007): 47-73.

[9] California Commission on Peace Officer Standards and Training: Learning Domain 33: Arrest and Control, v5.1, pp. 1-6, 1-7, 2-3.

[10] Campbell, Amity, Andrea Roelofs, Paul Davey, and Leon Straker. "Response time, pistol fire position variability, and pistol draw success rates for hip and thigh holsters." *Human Factors* 55, no. 2 (2013): 425-434.

16

Officer Sun recalled that once he decided to fire at Mr. Valdivia, he used his Holosun Model 509T X2 optic to aim at Mr. Valdivia. The housing of the Holosun Model 509T X2 is approximately 1 inch wide and almost 1 inch tall. The interior window is 0.9 inches wide and 0.66 inches tall.[11] The area of visual obstruction from placing the sight between Officer Sun's dominant eye (assuming he used his dominant eye) would be determined by the optic size in Officer Sun's visual field relative to how far he was from Mr. Valdivia. While I currently don't have that data, Mr. Valdivia's posture and orientation toward Officer Sun would increase the area of Mr. Valdivia and the handgun's movements obstructed by the optic and even the pistol.

Officer Meadows was using the open sights on his Glock 17. However, the same effect can be expected, as shooters use their iron sights between their dominant eye and their targets. In addition to the visual obstruction created, law enforcement officers are generally trained to accommodate (i.e., shift their focus) to the front sight, which causes the targets to go out of focus. These dynamics also make it less likely that Officer Meadows was able to see the handgun leave Mr. Valdivia's hand before firing.

Officer Cardoza was further away from Mr. Valdivia than Officers Sun and Meadows, and Mr. Valdivia presented a different orientation. She used a "red dot" optic, although I don't have the make and model. However, given that the optic size in her visual field would likely remain constant, the further distance would cause the optic to obstruct more of her vision of Mr. Valdivia because he would be smaller in her visual field.

**Opinion Four: The fact that Mr. Valdivia was already moving the handgun toward Officers Sun and Meadows before the time they decided to fire at him, would make giving a verbal warning before shooting unfeasible, i.e., it would unreasonably increase the risk to themselves.**

It takes approximately one second to say, "Stop, or I'll shoot." By the end of this one second, had Mr. Valdivia possessed a loaded firearm, he would have likely been able to fire it in less than one second, even less than one-half a second.[12,13] Actual incidents support this, demonstrating that once a subject has a handgun in hand, they can point and shoot it in well under one second.[14,15] This would likely apply to the facts of this case since Mr. Valdivia's right hand and arm were already moving forward when he officers stated yelling at him just before shooting.

---

[11] https://holosun.com/products/pistol-sights/509/he509t-gr-x2.html

[12] Ernest J. Tobin & Martin L. Fackler, "Officer Reaction-Response Times in Firing a Handgun," 3 *Wound Ballistics Review, 6–9 (1997)*

[13] Jon M. Shane & Zoë Swenson, Unarmed and dangerous: Patterns of threats by citizens during Deadly Force encounters with police (Routledge, Taylor and Francis Group) (2020).

[14] Person. "Copa Releases Bodycam Video of Lawndale Police Shooting That Injured 2 Officers, Suspect." ABC7 Chicago. WLS-TV, June 10, 2021. https://abc7chicago.com/chicago-police-shooting-lawndale-cpd-assault/10768951/.

[15] "'Tell My Family I Love Them': Video Captures Near-Death Shooting of Cop." Police1, August 11, 2017. https://www.police1.com/police-products/body-cameras/articles/tell-my-family-i-love-them-video-captures-near-death-shooting-of-cop-vNmDWHj8BW0otoFq/

17

Respectfully submitted,

JEFFREY A. MARTIN, J.D., M.S., C.F.V.T.

Date: __May 2, 2025__

San Carlos, California

# E.V. and X.V. et al. v City of Covina Department et al.

## Case No. 5:23-cv-05162-CBM-SHK
## United States District Court – Central District of California

## Expert Witness Report of Jeffrey A. Martin, J.D., M.S., C.F.V.T.

## Pursuant to FRCP Rule 26(a)(2)(B)

## APPENDIX A: MATERIALS

1. Complaint for Damages, filed 8/4/2023
2. 300. BWC. Ofcr. Sun. Arrival and Incident. 55 min. 57 sec. [CONFIDENTIAL CPD 000037].mp4
3. 300A. Transcript. BWC. Ofcr. Sun. Arrival and Incident. 010925.pdf
4. 302. BWC. Ofcr. Statler. Incident. 22 min. 11 sec. [CONFIDENTIAL CPD 000038].mp4
5. 306. BWC. Ofcr. Rasmussen. Speaking with Witnesses in Liquor Store. 45 min. 1 sec. [CONFIDENTIAL CPD 000042].mp4
6. 309. BWC. Ofcr. Meadows. Incident and Guns Drawn. 39 min. 30 sec. [CONFIDENTIAL CPD 000045].mp4
7. 309A. Transcript. BWC. Ofcr. Meadows. Incident and Guns Drawn. 010925.pdf
8. 317. BWC. Ofcr. Cardoza. 1 hr. 5 min. 3 sec. [CONFIDENTIAL CPD 000054].mp4
9. Vanessa Cardoza Deposition Transcript
10. David Meadows Deposition Transcript
11. Billy Sun Deposition Transcript
12. 008. Report of Incident. Complete Report pgs 1-29.040922.pdf
13. 009. Report. Det Preciado.040922.pdf
14. 010. Report re Supplement.Ofcr M Flores.041022.pdf
15. 011. Report re Supplement.Ofcr C Avila.040922.pdf
16. 012. Report re Supplement.Ofcr. Rasmussen.040922.pdf
17. 013. Report re Supplement.Ofcr D Dixon.040922.pdf
18. 014. Report re Supplement.Det S Lee.040922.pdf
19. 015. Report re CAD.040922.pdf
20. 025. Report re Use of Force.Lt D Regan.040922.pdf
21. 038. LA Coroner Autopsy Report by Carrillo, M.D.041422.pdf
22. 041. CPD CAD Printout.Confidential.041122_Redacted.pdf
23. 113. DOJ Report 06 re Officer Processing.Confidential.041222.pdf
24. 141.1 DOJ Interview Transcripts re Ofc. Cardoza. Pt. 1.Confidential.041822_Redacted.pdf

1

25.142. DOJ Interview Transcripts re Ofc. Cardoza. Pt. 2.Confidential.041822_Redacted.pdf

26.143. DOJ Interview Transcripts re Ofc. Meadows Pt. 1.Confidential.041822_Redacted.pdf

27.144. DOJ Interview Transcripts re Ofc. Meadows Pt. 2.Confidential.041822.pdf

28.145.1 DOJ Interview Transcripts re Ofc. Sun Pt. 1.Confidential.041822_Redacted.pdf

29.146. DOJ Interview Transcripts re Ofc. Sun Pt. 2 .Confidential.041822.pdf

# <u>E.V. and X.V. et al. v City of Covina Department et al.</u>

## Case No. 5:23-cv-05162-CBM-SHK
## United States District Court – Central District of California

## Expert Witness Report of Jeffrey A. Martin, J.D., M.S., C.F.V.T.

## Pursuant to FRCP Rule 26(a)(2)(B)

### <u>APPENDIX B: DEMONSTRATIVE VIDEO EXHIBITS</u>

1. 042104 CPD 000037 Sun Marked.mp4
2. Sun Close Trim.mp4
3. Sun PDFs.pdf
4. Sun Annotated Tiffs.pdf
5. 110421 CPD 000038 Statler Marked.mp4
6. 094521 CPD 000042 Rasmussen Marked.mp4
7. 043841 CPD 000045 Meadows Marked.mp4
8. Meadows Close Trim.mp4
9. Meadows TIFFs.pdf
10. Meadows Annotated TIFFs.pdf
11. Valdivia & Sync HI.mov
12. Valdivia & Sync LO.mov
13. Valdivia & Sync TIFFs.pdf
14. 366 DOJ Liquor Store Marked.mp4

# E.V. and X.V. et al. v City of Covina Department et al.

## Case No. 5:23-cv-05162-CBM-SHK

### United States District Court – Central District of California
### Expert Witness Report of Jeffrey A. Martin, J.D., M.S., C.F.V.T.
### Pursuant to FRCP Rule 26(a)(2)(B)

## APPENDIX C: SCREENSHOTS OF FINAL CUT PRO X IMAGES AND AUDIO WAVEFORM



*Figure 1. The waveform indicates the start of Officer Sun saying, "Don't reach for it."*

1



*Figure 2. The waveform indicates when Officers Sun and Meadows start yelling as Mr. Valdivia's right hand and arm move forward.*



*Figure 3. The images and waveform show when Officer Sun fired the first shot.*

3



*Figure 4. The images show when Officer Meadow fired.*

4



*Figure 5. The images and waveform indicate the state of affairs at the approximate time the last shot was fired.*