Mildred K. O'Linn (State Bar No. 159055)
  *missy.olinn@manningkass.com*
Robert E. Murphy (State Bar No. 103936)
  *robert.murphy@manningkass.com*
David Fleck (State Bar No. 192912)
  *David.Fleck@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants, CITY OF COVINA, VANESSA CARDOZA, DAVID MEADOWS, and BILLY SUN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| E.V. and X.V., minors by and through their guardian ad litem, Karla Juarez; D.V., a minor, by and through his guardian ad litem, Elias Valdivia; individually and as successors-in-interest to Daniel Luis Valdivia, deceased; JESSICA VALDIVIA; LUIS VALDIVIA JR., individually;, <br><br>　　　　　Plaintiffs, <br><br>　　v. <br><br>CITY OF COVINA; VANESSA CARDOZA; DAVID MEADOWS; BILLY SUN; DOES 1-10, inclusive, <br><br>　　　　　Defendants. | Case No. 5:23-cv-01562-CBM-ACCV <br> District Judge: Consuelo B. Marshall <br> Magistrate Judge: Angela C. C. Viramontes <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 1. TO EXCLUDE INFORMATION UNKNOWN** <br><br> Judge:  Hon. Consuelo B. Marshall <br><br> Filed Date:　　　　08/04/23 |

///

///

///

///

///

///

---

**TO THE HONORABLE COURT AND ALL PARTIES AND COUNSEL:**

Defendants CITY OF COVINA; VANESSA CARDOZA; DAVID MEADOWS; and BILLY SUN ("defendants") submit the following Opposition to E.V. and X.V., minors by and through their guardian ad litem, Karla Juarez; D.V., a minor, by and through his guardian ad litem, Elias Valdivia; individually and as successors-in-interest to Daniel Luis Valdivia, deceased; JESSICA VALDIVIA; LUIS VALDIVIA JR., ("plaintiffs") motion in limine no. 1 seeking to exclude "drug and alcohol," "criminal history, wrongs, or bad acts," "gang/violent history," "personal history," "medical history," and "after-acquired investigation material." Said Opposition will be made on the grounds that some information was known to officers and all other information is directly relevant to a determination of liability, causation, motive, and damages. Said Opposition will be based on these papers, the Memorandum of Points and Authorities, the papers and records on file herein, and such oral and documentary evidence as may be presented at the hearing of this Motion.

DATED:  April 14, 2026            Respectfully submitted,

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

By:     /s/ Mildred K. O'Linn
        Mildred K. O'Linn
        Robert E. Murphy
        David Fleck
        Attorneys for Defendants, CITY OF
        COVINA, VANESSA CARDOZA,
        DAVID MEADOWS, and BILLY SUN

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

In their Motion in Limine ("MIL") No. 1, plaintiffs are attempting to exclude highly probative evidence that was either known to officers at the time of the incident or otherwise representative of the same. Plaintiffs also seek to exclude probative evidence without showing how any alleged "prejudice" will form if this court allows probative evidence in for liability and damage determinations. This incredibly broad motion seeks to exclude nearly all relevant information from the jury should this matter go to a trial, including information important to consider when assessing the totality of the circumstances which-contrary to plaintiffs' belief-accounts for more than the seconds when force was applied by officers.

As written, this MIL must be rejected as overly broad, burdensome, and limiting. More specifically, plaintiffs' request to keep out pertinent information regarding decedent Daniel Luis Valdivia ("Valdivia's") substance use, personal history, and what plaintiffs' label "after-acquired findings" must be denied. This information, which includes everything from whether Valdivia had consumed alcohol to officer body camera footage and 9-1-1 calls, is highly probative with no identified prejudice from plaintiffs. This information informs what inferences officers formed the reasonability of those inferences about Valdivia. Further, plaintiffs' desire to exclude plaintiffs' drug history, medical history or gang affiliations and the large swath of evidence plaintiffs' have labeled under "after-acquired findings" will cripple the jury's ability to make legal conclusions under a totality of the circumstances or decide accurate economic and non-economic damages.

Plaintiffs seek to exclude information under six (6) categories, labeled as follows: (A) Drug and Alcohol History; (B) Criminal History; (C) Gangs and Tattoos; (D) Personal History; (E) Medical History; or (F) After-Acquired Findings. Plaintiffs' Motion in Limine ("MIL") No. 1 ("MIL 1"), at ii:11-iii:6. Defendants specifically oppose categories (A), (B), (D), and (F).

1

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1 TO EXCLUDE UNKNOWN INFORMATION

The main argument plaintiffs set forth is that all of this information was not known to officers at the time of their encounter with Valdivia. As discussed below, officers had information regarding Valdivia's alcohol consumption, his belligerence at the time of the incident, and his threats to the community relayed to them via dispatch. These facts are showcased by the very evidence plaintiffs' reference, negating plaintiffs' insistence to the contrary. The additional information discovered via post-force investigation is relevant to the analysis of the reasonability of force, existence of reasonable suspicion and probable cause, and the veracity of claims that plaintiffs are attempting to deny. Further, any and all of Valdivia and pertinent family members' history and work information is directly tied to the claimed damages and cannot be excluded for that reason alone.

## II.     PLAINTIFFS' NONCOMPLIANCE WITH LOCAL RULE 7-3

Defendants notice the court that plaintiffs' statement of compliance with Local Rule 7-3 is defective. Plaintiffs did not provide this motion in limine to defense counsel in writing or discuss the substance of the motions telephonically before filing them with this Court. Plaintiffs state that at least "partial" resolution was reached but they have not met and conferred with defense counsel on motions in limine since 2025 and certainly did not present these motions in limine to defense counsel. Based on this failure, defendants request the Court reject plaintiff's motion in limine 2 as defective. Declaration of Robert E. Murphy, at 5.

## III.    LEGAL AUTHORITY

Federal Rules of Evidence Rule 401 defines "relevant evidence" to mean evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Per FRE 403, evidence may be excluded if its probative value is substantially outweighed by one or more of the articulated dangers or consideration. This requires that the probative value of the evidence be compared to the articulated reasons for exclusion and permits exclusion only if one or more of those reasons

2

"substantially outweigh" the probative value. FRE 403 favors admissibility, while concomitantly providing the means of keeping distracting evidence out of the trial. *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000).

## IV. CATEGORY (A) DRUG AND ALCOHOL INFORMATION MUST BE ADMITTED AS KNOWN TO OFFICERS, PROBATIVE, AND NOT PREJUDICIAL

For category (A), plaintiffs ask this court to exclude "any drug or alcohol use or possession by Valdivia, and any Plaintiff or Guardian ad Litem, at any time, including on the date of the shooting". Opposition at ii:11-14. However, Valdivia's alcohol use and potential drug use were all factors observed by officers and used in their determination of how to approach Valdivia. As discussed more in depth below, plaintiffs also seek to exclude officer reports along with body camera footage to further erase any proof of officers belief regarding Valdivia's behaviors, state of inebriation, and how his intoxication may have affected his decision making. Information about Valdivia's perceived drunkenness or being under the influence is not barred by any means under either the FRE or by the ninth circuit. In this case, it is also directly relevant as well as pertinent to establishing the intentions and beliefs held by officers at the time of the incident and those of Valdivia. Information proving officers' beliefs to be true (such as toxicology reports) and officers' interviews, testimonies, or reports wherein they admit to or describe their perceptions and beliefs are also admissible.

Plaintiffs heavily rely on out-of-state and out-of-circuit caselaw to support their lengthy contention that drug and alcohol use in particular is too prejudicial to be admitted into trial. While advising caution when using this information, relevant precedent does not call for its exclusion, especially when this information was the information reasonably inferred by officers. In fact, illicit substance consumption has been allowed into evidence time and again as relevant to corroborate or disprove an officer's account or otherwise explain the situation before the jury. *See Boyd v. City*

3

*and County of San Francisco*, 576 F.3d 938, 944 (9th Cir. 2009)("where evidence that the decedent was under the influence is probative of his behavior at the time, it may be admissible to corroborate the officer's account of what happened."); *see also Turner v. County of Kern* (E.D. Cal., Feb. 13, 2014, No. 1:11-CV-1366 AWI SKO) 2014 WL 560834, at *2 ( "It is not uncommon for courts to permit evidence that a plaintiff/decedent was under the influence of drugs or alcohol in order to explain unusual behavior or to corroborate the officers' version of how a decedent acted.")

Plaintiffs' purported concerns are also hollow. Plaintiffs claim that they fear "Defendants will attempt to take every opportunity to insert…drug detail having nothing to do with this incident…into as many witnesses' testimony as possible to inflame the passions of the jury against Valdivia and Plaintiffs." Opposition at 14:1-6. However, plaintiffs admit that defendants, via pending stipulation, have communicated that they would agree to exclude nearly all references to substance use outside of the substance use Valdivia performed at and around the time of the incident. Opposition, at v:6-9, v:16-19, v:20-vi:6. By their own admission, plaintiffs' fears are unfounded and do not indicate that the risk of any prejudice is high due to the likely behavior of defendants.

## V. CATEGORY (B) CRIMINAL HISTORY AND (D) PERSONAL HISTORY INFORMATION MUST BE ADMITTED AS KNOWN TO OFFICERS, PROBATIVE, AND NOT PREJUDICIAL

For category (B), plaintiffs ask this court, in part, to exclude: "arrests, convictions, custody, incarceration…related reports, allegations of crimes including domestic violence…and child protective services history of Valdivia…." Opposition, at ii:16-22. For category (D), plaintiffs ask this court, in part, to exclude: "Valdivia, and any Plaintiffs or Guardian ad Litem's…family history, residence history, education history, disciplinary history, child support history, custody history, work history, tax history, income history, other children history, social medial history, and living arrangements." Opposition, at ii:25-iii:2.

4

MANNING | KASS

With respect to (B)'s "related reports" and "allegations of crimes," Valdivia's so-called "bad acts" as nested under the label of criminal history are admissible as having been known to officers arriving on the scene. Valdivia was undisputably the subject of multiple calls, the contents of which dispatch relayed to officers. These acts, per officers' beliefs and understandings, included brandishing a gun at people, arguing with people, and being threatening to people with said gun. Declaration of Robert E. Murphy ("Murphy Decl."), at ¶ 2-4, Exhibit A at 41:4-17, 42:16-22,43:1-5, 45:3-46:6; Exhibit B at 28:1-21, 84:8-85:6, Exhibit C at 44:14-24, 47:1-23. This information was known to officers and factors into the totality of circumstances.

All other information within categories (B) and (D) are admissible as probative to the question of all damages in this case. There are three damage claims in this case: (1) wrongful death damages, (2) survival damages, and (3) punitive damages. Opposition, at 8:10-11. Plaintiffs claim to be focused on "loss of Valdivia's love, companionship, conform, care, assistance, protection, affection, society, moral support, training, and guidance" to his family along with Valdivia's own injuries. Opposition, at 8:10-25. In reaching a determination about these factors, a jury is not limited only to information known to officers at the time of the incident. Plaintiffs' argument to the contrary is not sensible or legally supportable. The cases regarding focus on the actions of defendant are inapposite regarding this issue. Information about Valdivia's arrests, whether he had custody of his successors in interest, whether or not he lived with any plaintiffs, and whether he had a history of domestic violence or even child abuse with any of the plaintiffs will certainly be necessary to inform a jury on the actual "love…care…[and] assistance" that was lost to plaintiffs.

Moreover, this information will be necessary to determine economic damages. Plaintiffs' economic claims and Valdivia's loss of life and enjoyment claims, insofar as they come in the form of current or future earnings, will be impacted by Valdivia's criminal and disciplinarian history as well as education as these circumstances affect Valdivia's employability and what jobs he was able to undertake. Criminal and related

5

history are not excludable when they are relevant to the damages elements of plaintiffs' claims. *Estate of Casillas*, 2019 U.S. Dist. LEXIS 23710, *8-11 (E.D. Cal. Feb. 13, 2019) (*citing N.W. v. City of Long Beach*, 2016 U.S. Dist. LEXIS 194469, *13-14 (C.D. Cal. June 7, 2016) (decedent's criminal record deemed relevant to future earnings); *Knudsen v. Welsh*, 872 F.2d 428 (9th Cir. 1989) (holding that prior bad acts were "properly introduced for the purpose of proving damages"); *P.C. v. City of L.A.*, 2011 U.S. Dist. LEXIS 165075, *7-8 (C.D. Cal. Aug. 22, 2011) (denying plaintiff's motion in limine to exclude decedent's criminal record partly due to the issue of damages, and stating that while the nature of decedent's convictions would raise FRE 403 concerns, inquiry into the "length of time decedent spent in prison . . . are probative of damages and of the credibility of damages witnesses who may testify to having spent considerable time with decedent")

## VI. CATEGORY (F) "AFTER-ACQUIRED" INFORMATION MUST BE ADMITTED AS REPRESENTATIONS OF INFORMATION KNOWN TO OFFICERS, AS PROBATIVE, AND NOT PREJUDICIAL

For category (F), plaintiffs ask this court to exclude copious amounts of admissible and relevant evidence. Defendants object to the following: "after-acquired investigatory records (post-incident discovered, drafted, created) and information therefrom, including any officer-involved shooting post-incident briefing; any 9-1-1 calls not heard by the Defendant Officers (including CPD 1-4); any witness statements that include information not known to the Defendant Officers; any post-incident video of interview of witnesses giving information unknown as well as opinions (including CPD 952); body-worn camera video from officers not depicting the incident… Defendant City of Covina's various reports (including … DOJ Letter…DOJ Notice… Property Report…CPD Incident Reports…POST Training CPD… DOJ Report CPD – unless for impeachment or record refresh); whether the replica gun was loaded." Opposition, at iii:5-iv:3.

Plaintiffs' laundry list of information they label as "after-acquired investigatory

6

MK MANNING | KASS

records" encompass information that serves as representations of what was known or identified by officers at the time of the incident. For example, the "post-incident briefing," "various reports" that come from officers on the scene at the time of the incident or directly involving officer statements thereabout necessarily reflect officers' understandings, beliefs, and decision-making with respect to the use of force. Plaintiffs' desire to exclude body camera footage is also legally unsound as this request is attempting to exclude evidence that even more directly showcases what officers were faced with at the time of the incident relevant to proving officer intention, motivation, and decision making. Plaintiffs have not shown how they will be prejudiced by this information.

Plaintiffs also wish to exclude the 9-1-1 calls from the date of the incident. Plaintiffs' insistence that officers did not know about the 9-1-1 calls or their contents has been debunked by officers repeatedly. Officers have time and again explained that they knew of the content of the calls about Valdivia, including claims that he brandished his gun at people, was scaring people, and that there had been three different calls asking for police help to stop Valdivia disturbing the peace while observably armed possibly under the influence. Murphy Decl., at ¶ 2-4, Exhibit A at 41:4-17, 42:16-22,43:1-5, 45:3-46:6; Exhibit B at 28:1-21, 84:8-85:6, Exhibit C at 44:14-24, 47:1-23. This information formed the basis of officer beliefs regarding the number of officers needed, the level of threat Valdivia may have posed, and the necessary force to use. In short, officers knew that Valdivia had been the subject of multiple calls, they knew the content of some of these calls, and they acted in part based on this information.

Officers' incident reports are also highly probative and not prejudicial at all, establishing what they believed, assumed, and interpreted at the time of their use of force to attempt to detain Valdivia. It tends to show the totality of the circumstances of the incident near and at the time rather than in far hindsight.

7

## VII.   THE EVIDENCE IS NOT OFFERED TO PROVE PLAINTIFF'S CHARACTER AND IS NOT EXCLUDABLE HEARSAY

Defendants do not seek to offer evidence of plaintiffs' alcohol or drug use, "bad acts," personal information including his past impacting his family engagement and earning capacity, or what plaintiffs label "after-acquired" information as character evidence. The information, as set forth above, are admissible to prove the state of the situation that faced officers when they encountered Valdivia at the time of the incident as well as Valdivia's mental and physical state.  The information that plaintiffs would see excluded is necessary to enable the jury in order to grasp as accurately as possible Valdivia's quality of life, earning prospects, and motivations and intent; it is necessary to inform the jury on what the loss of Valdivia looked like both emotionally and economically for plaintiffs in life, not in theory or fantasy. Evidence of Valdivia's erratic behavior, officers' expressed perceptions of the events they were faced with, and the best evidence available which tends to depict the parties' states of being leading up to the incident provides the jury with the totality of the circumstances upon which they can rely upon making their determinations as to liability.

The evidence plaintiffs seek to exclude are also not hearsay as a matter of law. Plaintiffs appear to claim that officer reports, recordings of interviews  at the time of the incident, and later lab reports, criminal history and DOJ investigations are all hearsay. It is well established and recently reaffirmed that police officer reports, more specifically items that represent what officers themselves understood and observed, are not excluded as hearsay. *UNITED FARM WORKERS, et al., Plaintiffs, v. NOEM, et al., Defendants.*, No. 1:25-CV-00246 JLT CDB, 2026 WL 892070, at *31 (E.D. Cal. Apr. 1, 2026) (*citing Sandoval v. Cty. of San Diego*, 985 F.3d 657, 692 n.4 (9th Cir. 2021) Moreover, official records including factual investigation records, which a DOJ factfinding report or coroner's report could be considered, are also exempted from the hearsay prohibition. FRE § 803(8).

## VIII.   CONCLUSION

8

For the reasons set forth herein, defendants respectfully request the court deny plaintiffs' motion in limine no. 1 as to (A) Drug and Alcohol History; (B) Criminal History [specifically information in a limited fashion about the bad acts that 9-1-1 callers and witnesses alleged Valdivia performed and prior convictions, arrests, or other circumstances that would directly impact Valdivia's economic prospects or prove the state, involvement, and quality of Valdivia's relationship with plaintiffs]; (D) Personal History [specifically information regarding all plaintiffs' family history including where Valdivia resided, whether he had custody of plaintiffs, and whether he had a positive relationship with plaintiffs]; and (F) After-Acquired Findings [specifically the 9-1-1 calls and contents thereof, witness statements, officer body camera footage, officer incident reports on the date, officer interviews regarding the officer involved shooting, officer training, and information about the gun officers saw plaintiff have on him].

DATED: April 14, 2026         Respectfully submitted,

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

By:      /s/ Mildred K. O'Linn
         Mildred K. O'Linn
         Robert E. Murphy
         David Fleck
         Attorneys for Defendants, CITY OF COVINA, VANESSA CARDOZA, DAVID MEADOWS, and BILLY SUN

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1 TO EXCLUDE UNKNOWN INFORMATION

# DECLARATION OF ROBERT E. MURPHY

I, Robert E. Murphy, declare as follows:

1.     I am an attorney duly admitted to practice before this Court.  I am  a partner with Manning & Kass, Ellrod, Ramirez, Trester LLP, attorneys of record for Defendants, CITY OF COVINA, VANESSA CARDOZA, DAVID MEADOWS, and BILLY SUN.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.

2.     Attached hereto as **Exhibit A** is a true and accurate copy of relevant excerpts of the deposition of Cheng-Wei Sun;

3.     Attached hereto as **Exhibit B** is a true and accurate copy of relevant excerpts of the deposition of David Meadows;

4.     Attached hereto as **Exhibit C** is a true and accurate copy of relevant excerpts of the deposition of Vanessa Cardoza.

5.     Plaintiffs' Counsel has not conferred with my office regarding the contents of this motion in limine. In mid 2025, plaintiffs' counsel and my office did confer to seek to stipulate in lieu of motions in limine. Since that time, plaintiffs' counsel has refused to meet and confer with defense counsel on potential motions in limine or further stipulation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 14th day of April, 2026, at Los Angeles, California.

/s/ Robert E. Murphy
Robert E. Murphy

1

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 1 TO EXCLUDE UNKNOWN INFORMATION

# EXHIBIT A

# Exhibit 28

**(Officer Sun's Deposition Transcript)**

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

E.V. and X.V., minors by and )
through their guardian ad litem, )
Karla Juarez; D.V., a minor, by )
and through his guardian ad litem,)
Elias Valdivia, individually and )
as successors-in-interest to )
Daniel Luis Valdivia, deceased; )
Jessica Valdivia; Luis Valdivia )
Jr., individually, )
)
    Plaintiffs, )
) CASE NO.
    vs. ) 5:23-cv-01562-CBM-SHK
)
CITY OF COVINA; VANESSA CARDOZA; )
DAVID MEADOWS; BILLY SUN; DOES )
1-10, inclusive, )
)
    Defendants. )
)
_____)

VIDEOCONFERENCE

DEPOSITION OF OFFICER CHENG-WEI (BILLY) SUN

Date:           Thursday, March 6, 2025
Time:           1:34 p.m. - 4:19 p.m.

Location:       MANNING KASS
               801 S. Figueroa Street, 15th Floor
               Los Angeles, California 90017

Reporter:      Cynthia F. Zeller, CSR
               Certified Shorthand Reporter #10834

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 2

I N D E X

EXAMINATION BY:                                            PAGE

MR. SINCICH, ESQ...................................... 5

MS. O'LINN, ESQ...................................... 92


Appearance Page...................................... 3

Exhibit Page......................................... 4

Certified Questions...............................None

Reporter's Certified Page........................... 95

Errata Sheet........................................ 96

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 3

A P P E A R A N C E S

For the Plaintiffs:        LAW OFFICES OF DALE K. GALIPO
                           Attorneys at Law
                           21800 Burbank Blvd., Suite 310
                           Woodland Hills, California 91367


                           PHONE:  (818) 347-3333
                           FAX:    (818) 347-4118
                           EMAIL:  Msincich@galipolaw.com


                           BY:  MARCEL F. SINCICH, ESQ.


For the Defendants:        MANNING KASS
                           Attorneys at Law
                           801 S. Figueroa Street, 15th Floor
                           Los Angeles, California 90017


                           PHONE:  (213) 624-6900 ext. 2451

                           EMAIL: Missy.olinn@manningkass.com

                                  Delia.Flores@manningkass.com


                           BY:  MILDRED K. O'LINN, ESQ.


Also Present:              Officer David Meadows
                           Officer Vanessa Cardoza

                              --oOo--

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

**Page 4**

E X H I B I T S

EXHIBIT NO.                                                    PAGE

Exhibit 1      Portion of Officer Sun's body-worn
               camera video, 4-9-22................ 82

---oOo---

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 5

OFFICER CHENG-WEI (BILLY) SUN, called as a witness and having been first duly sworn by the Certified Shorthand Reporter, was examined and testified as follows:

THE WITNESS:  I do.

EXAMINATION BY MR. SINCICH, ESQ.

BY MR. SINCICH:

Q.  Good afternoon, Officer.  Can you please state and spell your name for the record.

A.  My legal name is Cheng-Wei, that's the first name.  It's spelled C-h-e-n-g dash W-e-i, and last name is Sun, S-u-n and I go by Billy.

Q.  Thank you, Officer.  Have you had your deposition taken before?

A.  Yes.

Q.  How many times?

A.  Once.

Q.  Was it work related?

A.  Yes.

Q.  What was the general circumstances of that case?

A.  I was a witness in a lawsuit against a business.

Q.  Okay.  It wasn't a use of force incident or anything like that?

A.  No.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 8

give your best testimony today about the incident?

A.  No.

Q.  Do you recall the date of the incident?

A.  Yes.

Q.  What is it?

A.  April 9th, 2022.

Q.  Approximately what time did you receive the call for this incident?

A.  It was 10:14 p.m.

Q.  And approximately what time did the officer-involved shooting occur?

A.  10:17 p.m.

Q.  Approximately how long were you on scene prior to the officer-involved shooting?

A.  45 seconds.

Q.  Did you use force during this incident?

A.  I did.

Q.  What type of force?

A.  Deadly force.

Q.  How many rounds did you fire?

A.  Six rounds.

Q.  Did you intentionally pull the trigger each time?

A.  I did.

Q.  Did you intend for each shot to strike

Mr. Valdivia?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 9

A.  I did.

Q.  Were you aiming during all of your shots?

A.  I was.

Q.  In what area were you aiming?

A.  Center mass.

Q.  And what was center mass from your observation on Mr. Valdivia when you were firing your rounds?

A.  The area of the torso.

Q.  After review of the video, it appears that Mr. Valdivia was sort of in a prone position; is that fair?

MS. O'LINN:  You can explain.

THE WITNESS:  He was leaning on his left side with his torso facing down, but not in a full prone.

BY MR. SINCICH:

Q.  Was his body oriented east to west?

A.  As in his head pointing to the east?

Q.  At first was his body pointing east to west?

MS. O'LINN:  Do you not understand the question?

THE WITNESS:  Yes.  Can you rephrase that, sir.

BY MR. SINCICH:

Q.  So I'm wondering if his body was like my pen, was it north to south or east to west?

A.  At what point?

Q.  When the officer-involved shooting occurred.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 12

Mr. Valdivia?

A.  I don't know.

Q.  Do you know if from your shooting position and knowing Mr. Valdivia's position, if your rounds would have struck Mr. Valdivia in the head?

A.  I don't know.

Q.  What about to his shoulder?

A.  I don't know.

Q.  Did you assess in between each shot?

A.  Yes.

Q.  What's the importance of an assessment based on the training?

A.  The importance of an assessment is to continuously evaluate the threat.

Q.  And are officers required to do anything based off that evaluation?

A.  Yes.

Q.  What is that?

A.  To continuously evaluate the threat.

Q.  Right.  So if you find out that the person is, for instance a deadly threat, would that mean deadly force would be authorized?

A.  Yes.

Q.  And if during the evaluation in between shots if the officer observed that the person was not a deadly

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 16

hit by shrapnel.

Q. Approximately how far were you from Mr. Valdivia when you fired your first round?

A. 20 feet.

Q. Were you moving while you were firing your six rounds?

A. Yes.

Q. In which direction?

A. South.

Q. Why were you moving south?

A. We are trained to move as we shoot, because a stationary target is easier to hit than a moving target.

Q. Is there any other reason why you moved south?

A. There's also an pony wall that could act as cover.

Q. How tall was that pony wall?

A. Three to four feet.

Q. Is that a brick wall?

A. I don't know what it's composed of, sir.

Q. Did it seem to be a solid wall of some sort?

A. Yes.

Q. Was Officer Meadows to your right?

A. He was.

Q. And that would have been south as well?

A. Yes.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 17

Q.   While you were firing, did you close the distance from that 20 feet range?

A.   I believe the distance was approximately the same as I moved south.

Q.   Can you describe Mr. Valdivia's position when you fired your first round?

A.   He had his left elbow or left arm planted on the ground.  His knees and legs were on the ground.  He was leaned to his left and he had the firearm pointed in my direction.

Q.   That would have been with his right hand?

A.   Yes.

Q.   Okay.  So when you fired your first round, was it your belief that the gun was pointed at you?

A.   Yes.

Q.   Did Mr. Valdivia move at all in between your first round and your sixth round?

A.   He had continuously pointed the firearm at me between my first and sixth round, that is what I perceived.

Q.   Is that why you fired your weapon?

A.   Yes.

Q.   Do you believe that he was pointing the gun at you and that's why you fired the weapon?

A.   Yes.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 18

Q. Other than continuously pointing the gun at you, did he have any other movement while you were firing?

A. Not that I perceived.

Q. Approximately how long was it from the time of your first shot to your last shot?

A. I believe it to be less than a second and a half.

Q. Okay. Did you give a deadly force warning prior to firing your first shot?

A. No.

Q. Did you hear anyone else give a warning prior to firing any shots?

MS. O'LINN: Objection; vague, ambiguous, argumentative.

You can explain.

THE WITNESS: In terms of a deadly force warning, no.

BY MR. SINCICH:

Q. At the time of the incident, were you aware that other officers were using deadly force?

MS. O'LINN: Simultaneously with him using deadly force, is what you mean, Marcel?

MR. SINCICH: No, that's not what I mean. That would assume facts and I'm going to get there.

BY MR. SINCICH:

Q. My question is, at the time of the incident,

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 19

were you aware that other officers also used deadly force?

A.  As in when I started shooting?

Q.  At any point in time during this incident.

A.  After I realized that two other officers had shot as well.

Q.  After you stopped firing you, you realized other officers also fired?

A.  Yes.

Q.  What occurred that allowed you to realize that other officers also fired?

A.  I heard it.

Q.  Did you hear anyone firing prior to you firing your first shot?

A.  No.

Q.  And did you hear anyone firing after you fired your last shot?

A.  No.

Q.  Was it your perception that officers were firing simultaneously?

MS. O'LINN:  Objection; calls for speculation and lack of foundation.

You can explain or ask him to rephrase it.

THE WITNESS:  Can you rephrase it, sir.

BY MR. SINCICH:

Q.  Yes.  I'm wondering, based off of your

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 20

perception at the time of the incident, if officers were firing simultaneously at the same time?

A.  At the time of the incident I don't remember when they were firing exactly.  I just knew that I was firing and at some point they were firing.

Q.  Okay.  Did you have an understanding at the time of the incident that firing your weapon at a person could cause death or serious bodily injury?

A.  I did.

Q.  In your law enforcement career, had you encountered other people, besides Mr. Valdivia, with a gun or something that you perceived to be a gun?

A.  I have.

Q.  Approximately how many times?

A.  20, 25.

Q.  Other than Mr. Valdivia, out of that 20 or 25 occurrences, did you use deadly force?

A.  No.

Q.  Is it fair to say, based on the training that merely having a gun in a person's hand is not sufficient to justify use of deadly force?

A.  Can you rephrase that, please.

Q.  Sure.  Did you ever receive any training, prior to the incident, that the mere fact that a person has a gun in their hand does not justify the use of deadly

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 21

force?

A.   Yes, I've received that training, sir.

Q.   And is that the same training that's taught currently at Covina Police Department?

A.   Yes.

Q.   And you're a firearms instructor, right?

A.   I am.

Q.   Do you have SWAT training as well?

A.   I do, sir.

Q.   How long was the SWAT training?

A.   Two weeks, sir.

Q.   Was SWAT a collateral duty for you at the time?

A.   Yes.

Q.   Do you know if anyone else involved in this incident also had SWAT training?

A.   Not at the time of the incident.

Q.   Do you know now if someone does?

MS. O'LINN:  Objection; vague, ambiguous, overbroad, calls for speculation as to who was quote, unquote "involved."

If you know.

THE WITNESS:  People that were involved in the incident got on to SWAT after, at some point in time after the incident.  However, no one on scene at that time in point -- no one else except for me was a SWAT

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 24

do have a sniper team as well.

Q.   What type of chemical agents are you referring to?

A.   OC and PepperBall.

Q.   Now, as a SWAT officer if you're not on a SWAT call but just on patrol prior to the incident, would you have access to any of those special weapon systems?

A.   Not while responding to a call.

Q.   Okay.  Where do you keep those special weapon systems at the time of the incident?

A.   They are stored in a container at our station.

Q.   Is it fair to say that while en route to this incident, you kind of took charge with setting up the containment?

A.   Yes.

Q.   Is that because you knew that you had that SWAT training?

A.   I don't think independently that that's what caused it, however it did help.

Q.   In terms of the officer-involved shooting, did you consider yourself to be the officer in charge?

A.   Can you specify at what time?

Q.   At the time the shooting occurred.

MS. O'LINN:  Objection; argumentive as to officer in charge.  Vague, ambiguous.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 25

You can explain.

THE WITNESS: I think both Officer Meadows and I were maintaining control of the scene and there were also auxiliary officers.

BY MR. SINCICH:

Q. So at the time of the officer-involved shooting, who would you consider to be the supervisor on scene?

A. From my recollection there was no supervisor on scene.

Q. Based on your training, is it fair to say that officers cannot use deadly force merely because a person is not complying with commands?

A. Could you rephrase that, sir.

Q. Sure. Did you receive training with Covina Police Department that officers should not use deadly force merely because a person is not complying with commands?

A. Yes.

Q. Were you trained that officers cannot use deadly force unless there is an immediate threat of death or serious bodily injury?

A. Yes.

Q. Other than this incident have you been involved in any other officer-involved shooting incidents?

MS. O'LINN: Objection; asked and answered.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

**Page 40**

A.  It says I see everything frame by frame before we had to act.

Q.  And you were referring to being able to see Mr. Valdivia's actions before you used force?

A.  Yes.

Q.  What were you doing prior to getting this call?

A.  I was writing a report, sir.

Q.  And what was the information that you received from this call?

A.  Dispatch advised of a 417 call, which is the penal code for brandishing a firearm, and that there were multiple calls received at Country Liquor, 124 East Arrow.

Q.  Did you have any other information besides 417 brandishing a firearm at that location?

A.  Description of the subject.

Q.  What was the description that you recall?

A.  Male Hispanic in his 40s wearing a black sweater and shorts with a beer bottle.

Q.  Was there any other information from the initial call?

A.  Not from the initial radio traffic that I recollect, sir.

Q.  After receiving that call, how long did it take before you started en route to the scene?

A.  Almost immediately, sir.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

**Page 41**

Q.  I think I asked you earlier, but it was a couple minute drive or so.

A.  Approximately two, sir.

Q.  Okay.  Did you receive any additional information related to this incident while en route?

A.  Yes, sir.

Q.  What information did you learn en route?

A.  I learned that more people had called regarding the same circumstances, that he was actively 415 to the front with two other subjects, which to me means that he's argumentative, aggressive, trying to start a fight. And then I also had learned that he had placed the gun in his pocket.

Q.  What does 415 mean?

A.  It's the term that we use as combative or uncooperative, argumentative.  It's kind of a reflection of the Penal Code 415.

Q.  You said argumentive, aggressive and trying to start a fight; do you recall that?

A.  Just now?

Q.  Yes, a moment ago.

A.  Yes.

Q.  Does every 415 call mean that a person is being aggressive?

A.  Could you rephrase that question.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
*Officer Cheng-Wei (Billy) Sun on 03/06/2025*

Page 42

Q. Right. I'm trying to understand what a 415 call means based on your training at Covina Police Department?

MS. O'LINN: 415 as put out on the radio, Counsel?

MR. SINCICH: I'm sorry. Can you say that again?

MS. O'LINN: You're referring to when it's put out over the radio as 415?

MR. SINCICH: Right, a 415 call.

THE WITNESS: Yes. In this case, yes. The only other difference is, if they say 415 party, which was a party call; however, that was not what was said in this instance.

BY MR. SINCICH:

Q. Okay. So this was just a 415 individual?

A. Yes.

Q. So when you receive a call for a 415 individual, did that mean to you that by the nature of the training, he was going to be aggressive?

A. It led me to perceive that the reporting parties, callers notified dispatch that he was aggressive and that we were likely going to encounter someone who was aggressive as well.

Q. When you were en route, did you know what the reporting parties said to dispatch?

A. No.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 43

Q. What specifically did dispatch tell you with regard to the 415?

A. That there were multiple callers and the subject of the initial call, was the subject that the causing the 415 with two others.

Q. So dispatch didn't tell you that he was starting a fight?

A. No, not specifically those words.

Q. And did dispatch tell you that he was being aggressive?

A. Not using those specific words.

Q. Can a person be 415 and not be aggressive?

A. Not in this instance.

Q. Well, in this instance you received this information while you were on the road, right?

A. Yes, sir.

Q. So you weren't there to see what was happening?

A. No, but it was information provided to us by multiple callers through dispatch.

Q. So multiple callers said that he was 415?

A. I don't know what the callers told dispatch exactly. They are trained to analyze that information and disseminate it to us.

Q. And the information that they disseminated to you, was that multiple callers called in for a 415

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 44

individual with two subjects?

A.   Yes.

Q.   And no additional details?

A.   The initial call was 417 indicating that he had a gun as well.

Q.   Right.  And then you also received information that the gun was in his waistband or pocket?

A.   Yes, they stated at one point that the gun was in his pocket.

Q.   Okay.  So from the time of the initial call, was it your understanding that he went from brandishing the firearm to then putting the firearm in his pocket?

A.   Based on the totality of the information, I knew that there was a man with a gun, that there were multiple callers, that he was actively arguing and at some point he had placed the gun in his pocket.

However, I know also that there's a delay from phone call to dispatch, to dispatch to us, which means that any one of those situations could have been possible.  It didn't necessarily mean that the gun was no longer in play.

Q.   And you didn't know, for instance, who started the argument based off of the call?

A.   That information was not provided to me, sir.

Q.   Prior to your use of deadly force, did you

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 45

receive any information from dispatch that Mr. Valdivia pointed the gun at anybody?

A. Yes. The initial call was multiple callers of a 417, which is the penal code for brandishing a firearm.

Q. The brandishing of a firearm can be done without even touching a firearm; isn't that fair to say?

A. Could you clarify, sir. I don't understand.

Q. I'm wondering based off your understanding of what brandishing is, that's showing a weapon, correct?

A. Yes.

Q. It's not necessarily pointing a weapon; is that fair?

A. It's displaying the firearm in a threatening manner.

Q. And that doesn't necessarily mean that it was being pointed, right?

MS. O'LINN: Objection; argumentive as phrased. You can explain.

THE WITNESS: Even though it doesn't necessarily mean that it was being pointed, I think the nature of a 417 is someone brandishing a firearm, which it tells that they are using it as a means of force, threat and imminent loss of life.

BY MR. SINCICH:

Q. Do you think that a brandishing is an imminent

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 46

loss of life?

A. Yes.

Q. How is brandishing an imminent loss of life?

A. If someone is pointing a gun at you, sir, it only takes milliseconds to pull the trigger and end someone's life.

Q. Okay. And it was almost four minutes from the initial call to your use of force, right?

A. I don't know when the initial call came in. I just know that from the radio call to when I got there, was approximately two minutes and then probably another minute from contact to the use of force. So approximately three, sir.

Q. So in that entire time frame, is it fair to say that Mr. Valdivia never shot anybody?

A. He did not shoot anybody.

Q. And when you were en route to the scene, was it your understanding that you and your team were there to investigate the call?

A. Yes, every call is an investigation, sir.

Q. Have you been on calls where after the investigation, you found out that things didn't happen exactly the way that the caller described it?

A. Yes.

Q. Did that go through your mind in this instance

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 47

that it was possible that Mr. Valdivia didn't point the gun at anybody?

A.   In this instance there were multiple callers alleging similar facts or similar observations which was related to me, and upon my arrival and assessment of the scene, it was consistent with his actions.

Q.   When you arrived, did he have a gun in his hand?

A.   No.

Q.   Was he brandishing a firearm when you arrived?

A.   No, sir.

Q.   Was he pointing a gun when you arrived?

A.   At one point he did, yes.

Q.   When you first arrived and saw Mr. Valdivia, did he point a gun?

A.   No, sir.

Q.   Do you know how old Mr. Valdivia was?

A.   He appeared to be in his late 30s.

Q.   And when you saw Mr. Valdivia, was he wearing black shorts?

A.   No.

Q.   Had you ever met Mr. Valdivia before?

A.   No.

Q.   Prior to your use of deadly force, did you have any information about Mr. Valdivia's personal or family history?

**Page 48**

A.   No, sir.

Q.   Prior to your use of force, did you have any information about whether he had a criminal history?

A.   No, sir.

Q.   Did you have any specific information as to whether or not he ever physically harmed anyone?

A.   I did not have that information, sir.

Q.   Did you have any information as to whether or not Mr. Valdivia was involved in a gang?

A.   No, sir.

Q.   Prior to your use of force, did you have any information that Mr. Valdivia had a history of drug or alcohol use?

A.   I did not know, sir.

Q.   Did you know, prior to your use of force, whether or not Mr. Valdivia was under the influence of any drugs?

A.   I did not know, sir.

Q.   Did you know whether he was under the influence of alcohol?

A.   I didn't know, sir.

Q.   Prior to your use of force, did you know whether Mr. Valdivia had any experience handling weapons, like a gun?

A.   I didn't know, sir.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

**Page 49**

Q. When you first saw Mr. Valdivia, what was he doing?

A. He was arguing, sir.

Q. What was he saying?

A. I was too far away to hear, sir.

Q. Who was he arguing with?

A. There were two other subjects to the front of the liquor store with him.

Q. Were they arguing as well?

A. No. It looked like they were trying to get him to stop.

Q. When you first saw the three men in front of the liquor store, was it your impression that, who you know now to be Mr. Valdivia, matched the description of the initial call?

A. Yes.

Q. Was there anything about the other gentlemen that led you to believe that they did not match the description?

A. Yes.

Q. What was that?

A. The other two gentlemen, one was wearing a gray hoodie and they were both male blacks or African American descent. And they did not appear to be the primary aggressors in this situation.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 50

Q.   Prior to your use of deadly force, did you have any information that Mr. Valdivia verbally threatened anybody?

A.   Based on the radio call that was provided to me, that was what I was led to believe.

Q.   What about the radio call led you to believe that there was a verbal threat?

A.   Dispatch said that there was a 415, and then a verbal argument between the subject of the 417 and two other people.

Q.   So what verbal threat did you understand to have occurred?

A.   I understood that there was a threat, but they didn't specify the specific words.

Q.   Okay.  Did you hear Mr. Valdivia verbally threaten anyone?

MS. O'LINN:  Objection; argumentative.  Vague, ambiguous.

You can explain.

THE WITNESS:  What I perceived was an argument when I initially had saw him; however, I could not make out what he was saying, but his intonations and tones provided that.  It appeared that he was the one doing the arguing, sir.

BY MR. SINCICH:

**Page 51**

Q.  Right.  And I'm not talking about arguing.  I'm more interested right now in whether or not you heard a verbal threat.

MS. O'LINN:  Objection; asked and answered multiple times.

MR. SINCICH:  You can answer.

MS. O'LINN:  Do you know what the question is?

THE WITNESS:  Yes.  The answer is no.

BY MR. SINCICH:

Q.  From your perspective what was Mr. Valdivia's height and weight?

A.  He appeared to be approximately 5' 11", 230 to 250 pounds.

Q.  What was your height and weight at the time of the incident?

A.  Five feet eight inches and 175 pounds, sir.

Q.  When you were en route to the scene, which direction were you driving?

A.  I was driving north.

Q.  On what?

A.  On Citrus, sir.

Q.  And then where did you go?

A.  And then I pulled into the driveway of Starbucks, which is in the same shopping center as the radio call.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

**Page 52**

Q.   Was it your plan to do a stealth approach on Mr. Valdivia?

A.   That was part of my plan, sir.

Q.   Is that why you parked on the other side of Starbucks?

A.   Yes.

Q.   What was the other part of your plan, other than a stealth approach?

A.   To arrive and assess the location before further determining my actions.

Q.   And did you have any other plan in mind?

A.   I set up a containment as well, sir.

Q.   Anything else?

A.   Not in the planning phase of it, sir.

Q.   Okay.  Did you inform any other officers that there was going to be a stealth approach?

A.   I informed Officer Meadows that we would approach on foot from Starbucks.

Q.   Did you tell Officer Meadows that it was going to be a stealth approach, though?

MS. O'LINN:  Objection; argumentative.
You can explain.

THE WITNESS:  No, I didn't need to. Officer Meadows and I work very closely together, and a lot of our communication and tactics are aligned and are

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

**Page 53**

not -- our communication a lot of times is nonverbal.

BY MR. SINCICH:

Q.  **What nonverbal communication did you provide to Officer Meadows to inform him that it was going to be a stealth approach?**

A.  He walked up behind me and we arrived at the same time, approximately.  And I was under the impression that he would understand that the speed that I was moving and how I was moving, that he would understand my intention.

Q.  **Did you know that other officers were also en route?**

A.  I did.

Q.  **How many officers did you believe were en route to this incident?**

MS. O'LINN:  Prior to the shooting, right?

MR. SINCICH:  Yes, prior to the shooting.

THE WITNESS:  At least four other officers, aside from Meadows and I.

BY MR. SINCICH:

Q.  **And which officers were those, to your knowledge, at the time?**

A.  On the east side would be Cardoza and Officer Dixon.  On the northwest would be Officer Avila and I had observed a unit driving up behind me and

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

**Page 54**

Meadows, and I designated that officer to take the south alley of the location.

Q.   And did you instruct Officers Cardoza and Dixon to set up containment on the east side?

A.   I did.

Q.   And did you do that while you were en route?

A.   Yes, sir.

Q.   And did you tell the unit that was behind you to set up on the south alley while you were en route as well?

A.   Yes, sir.

Q.   Did you communicate to any of those officers how they were to approach?

A.   No.

Q.   Was it your understanding that all of the officers would approach Mr. Valdivia in order to take him into custody?

A.   No.

Q.   What was your understanding of who was going to actually approach to assist in taking Mr. Valdivia into custody upon arrival?

A.   It was my understanding that it would be Officer Meadows and I.

Q.   Based on your training and experience with Officer Meadows, did you feel that the two of you would be able to handle the situation alone?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 55

MS. O'LINN:  Objection; argumentative.

You can explain.

THE WITNESS:  Yes, but I also knew that more units were coming due to the nature of the call and the understanding and work ethic of my partners, and so that we were likely to have officers showing up as the scene evolved.

BY MR. SINCICH:

Q.  And was it your understanding upon arrival, that Officer Cardoza would be the less lethal option?

A.  No, that was her discretion.

Q.  Was it your understanding that of all the officers that arrived, they all could potentially have their lethal weapons out?

A.  Could you rephrase that, sir.

Q.  Did you have understanding, prior to use of force, whether any officer was designated as a less lethal option?

A.  I leave that discretion to each officer, since we carry lethal and less lethal options.  And there was a man with a gun, which would prompt us to not use a less lethal option as the first resource.

Q.  Do you know which officer was in the south alley containment?

A.  I don't.

Page 56

Q. Did you know that there were two sergeants also en route at some point?

A. I didn't learn that until after the incident.

Q. So you parked on the west side of Starbucks, right?

A. Yes, sir.

Q. And then you traveled along the north side of Starbucks towards the parking lot?

A. Yes, sir.

Q. Where were you along that path when you first saw Mr. Valdivia?

A. I was in the northwest corner of Starbucks.

Q. And did you maintain sight on him as you approached?

A. Yes, sir.

Q. From the time you first saw him -- strike that.

At some point you gave him a command, right?

A. Yes, sir.

Q. And you were closer when you gave him the command?

A. I was, sir.

Q. From the time that you first saw him to the time of your first command, did you see a gun in his hand?

A. No, sir.

Q. Did you see anything in his hand?

Page 57

A.   A beer bottle, sir.

Q.   Did you see a gun anywhere on his person during that time?

A.   Can you specify the time, sir.

Q.   When you were, from the time that you first saw him to the time of your first command?

A.   I did not.

Q.   Did you know where Officer Cardoza was from the time that you first saw him to the time of your first command?

MS. O'LINN:  Generally or specifically?

THE WITNESS:  It was my impression that she was set up in the northeast corner, but not specifically exactly where she was, but she was in that northeast area of the parking lot.

BY MR. SINCICH:

Q.   When you instructed Officers Cardoza and Dixon to do containment on the east side, what was your impression of what they would be doing?

A.   So I had instructed Officer Dixon to take a containment position and Officer Cardoza had responded as an additional.  So I had designated Dixon to actually take that containment position.

Q.   And what did you expect him to do as being in a containment position?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

**Page 58**

A. Hold the spot to prevent escape of a possible violent suspect.

**Q. But since Officer Cardoza asked about the beanbag shotgun, were you under the impression that she was going to join you and Officer Meadows?**

A. I did not make any assumptions based off that statement, sir.

**Q. Did you believe that she was going to remain in position at the northeast corner on containment?**

A. I didn't make any assumptions of what she was going to do.

**Q. What was the first command that you gave Mr. Valdivia?**

A. I said, hey, let me see your hands.

**Q. Did he respond to your first command?**

A. I believe he looked in my direction.

**Q. What was the next thing you said?**

A. Put your hands up.

**Q. After you gave him the command, "put your hands up," did he put his hands up?**

A. No, sir.

**Q. At some point in time during this incident did he put his hands up?**

A. Yes, sir.

**Q. Was it after your command to put your hands up?**

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 59

A. Yes, sir.

Q. Approximately how long after?

A. Five to ten seconds, sir.

Q. Did you view him putting his hands up after your command as a sign of compliance?

A. No, because he put his hands down again right after.

Q. When he first put them up, did you see that as a sign of compliance?

A. At that time, yes.

Q. What did you say after that?

A. After he put his hands up?

Q. After "show me your hands."

MS. O'LINN: Counsel, I'm confused as to where you are, because you asked him to put his hands back down. So where are you in the sequence? It's kind of confusing.

BY MR. SINCICH:

Q. Yes. I'm wondering what your next command was.

A. My next command was in response to him putting his hands down, and I told him to "show me your fucking hands."

Q. Okay. What did he do after that?

A. He said, "whatever."

Q. And then what did he do?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 60

A.   He had the beer bottle in his right hand and began moving it to his left hand.

Q.   **And then what did he do?**

A.   And then he put his hands near his waistband again.

Q.   **What did you do when you saw him put his hands next to his waistband?**

A.   I told him to get his hands out of his pockets.

Q.   **Was his hand in his pocket?**

A.   No, but it was reaching towards there.

Q.   **After you told him to get his hands out of his pockets, did he stop reaching towards his pocket?**

A.   At that time, yes.

Q.   **Did you see that as an act of compliance?**

A.   At that time, yes.

Q.   **What did he do after that?**

A.   He was ordered to get on the ground by Officer Meadows.

Q.   **Did he start to lay on the ground after that order?**

A.   He began getting on the ground; however, he did not.  He started leaning to his left and getting in a modified -- what I perceived to be a modified prone shooting position.

Q.   **When he first started going down to the ground**

Page 61

after Officer Meadows instructed him to do so, did you see that as an act of compliance?

A. When he first started getting on the ground?

Q. Yes.

A. At that time, yes.

Q. Did you hear Mr. Valdivia say anything except for "whatever"?

A. Not that I recall.

Q. Knowing everything you knew about the nature of the call, when you first were giving commands to Mr. Valdivia based on your training, would it have been appropriate to use deadly force?

MS. O'LINN: Objection; vague, ambiguous, calls for speculation.

THE WITNESS: Could you rephrase that, sir.

BY MR. SINCICH:

Q. Sure. At the time that you got into a position where you gave your first command to Mr. Valdivia and you saw him in the parking lot, based on your training would it have been appropriate to use deadly force against him at that time?

A. At that specific time, I didn't think so.

Q. Why not?

A. At that time our job as officers was an attempt to get his compliance in order to investigate the

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 62

situation.  And even though he had demonstrated to the public that there was some propensity for violence and an immediate threat to others, I felt that we were conducting an investigation as well as attempting to deescalate him to get his compliance at the time.

Q.  What were you doing to attempt to deescalate the situation?

A.  Firstly, we saw him in an argument with these two other people who he allegedly threatened with a firearm at some point reported by multiple witnesses.

We attempted to draw his attention towards Officer Meadows and I, away from the incident victims and have him divert his attention to us, and then we would have tried to investigate it, if he was complying.

Q.  Prior to Officer Meadows' command to go down to the ground, based on your training would it have been appropriate to use deadly force against him?

MS. O'LINN:  Objection.  Vague, ambiguous, calls for speculation.

If you understand.

THE WITNESS:  Could you rephrase it, sir.

BY MR. SINCICH:

Q.  Sure.  I want to take you to the time frame of you giving commands, you've made your approach, he's already put his hands up and then put his hands down, but

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 63

just before Officer Meadows gives his command to go down to the ground; based on your training, would it be appropriate to use deadly force at the time?

A. Given the totality of the circumstances I would not have.

Q. And why is that?

A. He was not posing an imminent threat towards me.

Q. And based on the training in order to use deadly force, it has to be an imminent threat of death or serious bodily injury; right?

A. Yes, sir.

Q. Is it fair to say that any person that you meet on patrol is a potential threat?

A. Yes, sir.

Q. But to use deadly force it has to be a deadly threat in order to respond in deadly force; is that fair?

MS. O'LINN: Objection; argumentative as phrased. You can answer.

THE WITNESS: An imminent threat with the likelihood of death or serious bodily injury.

BY MR. SINCICH:

Q. Did you ever announce yourself as a police officer prior to your use of deadly force?

A. No, but my partner did.

Q. What did you hear Officer Meadows say?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 64

A.  I heard Officer Meadows very loudly he said, "police, put your hands up."

(Reporter clarification.)

BY MR. SINCICH:

Q.  Did Officer Meadows say that at around the same time that you were giving commands?

A.  Around that time.

Q.  Is it fair to say that if a person discards a gun, they wouldn't have the ability to use the gun imminently?

MS. O'LINN:  Objection; incomplete hypothetical, calls for speculation, vague, ambiguous and overbroad.

You can answer, if you understand.

THE WITNESS:  They can still retrieve it, so they can still be perceived as a threat, sir.

BY MR. SINCICH:

Q.  Right.  Is it fair to say based on your training if a person discards the gun, but doesn't make a movement to retrieve the gun, that they wouldn't be an immediate threat of death or serious bodily injury?

A.  Can you rephrase that, sir.

Q.  Sure.  Based on your training is it fair to say that a person would not be an immediate threat of death or serious bodily injury if they discard the gun and then don't make any movement to retrieve the gun?

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 71

THE WITNESS:  If that person -- if I know for a fact that that person is not going to move whatsoever, then yes, the ability would not be there.

MR. SINCICH:  What time did we take a break?

MS. O'LINN:  About an hour and five minutes ago.

MR. SINCICH:  Let's take a break.  Off the record.

(Off the record.)

BY MR. SINCICH:

Q.  Officer Sun, did you ever see Mr. Valdivia attempt to flee?

A.  No.

Q.  Did you ever see him attempt to take a hostage?

A.  No.

Q.  Did you ever see him attempt to punch or kick anybody?

A.  No.

Q.  Did you ever see him attempt to grab anybody?

A.  No.

Q.  So my understanding from your testimony today was that you started to shoot because you saw Mr. Valdivia point the gun at you; is that fair to say?

A.  Yes.

Q.  And you fired six rounds?

A.  Yes.

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 72

Q. Why did you stop shooting?

A. I stopped shooting because I no longer perceived a threat.

Q. What was it about Mr. Valdivia that you perceived such that he was no longer a threat?

A. The entire time I was shooting, I perceived him as pointing the firearm at me.

Q. And what did you perceive that made you believe that he was no longer a threat?

A. When the firearm was no longer pointed at me.

Q. How far was the gun from Mr. Valdivia after it hit the ground?

A. Several inches away.

Q. Several inches away from what part of his body?

A. His right hand.

Q. Where was his right hand after he had dropped the gun?

A. On the ground.

Q. His right hand was on the ground?

A. Yes.

Q. Can you describe his arm position in relation to his body after he dropped the gun?

A. It was like -- can I just show you? Can I demonstrate it?

Q. Please.

VALDIVIA, ET AL vs CITY OF COVINA, ET AL.
Officer Cheng-Wei (Billy) Sun on 03/06/2025

Page 75

besides those three civilians, other than officers?

A.  No.

Q.  When you were using force, did you have cover?

A.  No.

Q.  When you were first approaching Mr. Valdivia, could you have directed those two civilians to move away?

A.  They did move away, sir.

Q.  How far away did they move?

A.  Five to ten feet.

Q.  Was one of the things you were thinking about when you were approaching Mr. Valdivia was to ensure that you protected their lives?

A.  Yes, sir.

Q.  Are officers trained to attempt to remove unnecessary people from a scene in order to control it?

A.  Yes, sir.

Q.  Did you attempt to do that with those other two civilians?

A.  It was done.  They did back up, sir.

Q.  Was that in response to any officer command?

A.  I believe our presence and the redirection of Mr. Valdivia's attention to us, gave the opportunity for the other two bystanders to try to distance themselves from the active violent scene.

Q.  When you say "violent scene," what was happening

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 80

there was a need to designate that to him.  Again, we just work very well together, so I didn't need to say anything to him.

Q.  Right.  And because you guys work so well together, didn't you feel like he was going to be your cover officer and have lethal coverage for you?

A.  Again, this is a call with a man with a gun. And I feel that I would make my -- the best decision for myself to keep myself safe as well as my partners.

I didn't have time nor did I have the worry to focus about what Officer Meadows' weapon platform was at the time.

Q.  Could you have waited on the west side of Starbucks for Officer Meadows to join up with you before making your approach?

MS. O'LINN:  Objection; calls for speculation. Incomplete hypothetical.

You can explain.

THE WITNESS:  No.

BY MR. SINCICH:

Q.  Why couldn't you do that?

A.  The call was a multiple callers calling about a man 417 with a gun, brandishing it in a threatening manner.  While on the way to the call, more callers had advised that the same subject was argumentative with

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 81

other subjects to the front.

When we arrived, I observed the subject matching the description, who was later identified as Mr. Valdivia, arguing with the two subjects out front with a beer bottle in his right hand.

Based on the totality of the circumstances, knowing that, as well as knowing that the liquor store is open, my training led me to believe that if we didn't act immediately, he could potentially take hostages, escalate the argument into -- and pull out the gun again or take hostages inside the store, so the need to approach was imminent.

Q.   Okay.  I'm actually contemplating prior to you actually seeing Mr. Valdivia.

After you first got out of the car on the west side of Starbucks, you weren't able to see Mr. Valdivia, right?

A.   That's correct.

Q.   Could you have waited for Officer Meadows to meet you right there before making the approach?

MS. O'LINN:  Objection; asked and answered. That's exactly what he just answered, but you can answer again.

THE WITNESS:  The corner of Starbucks, the northwest corner, provided me -- it let me assess the scene visually, while maintaining cover.  And upon

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

**Page 92**

A.  My perception of the incident is he's still pointing the firearm as I am firing -- he's still pointing the firearm at me, which prompts me to fire.

Q.  **Is that your recollection of the incident or is that based on your review of the video?**

MS. O'LINN:  Or both.

THE WITNESS:  It's both.  It's what I remember.

MR. SINCICH:  Okay.  All right, Officer.  I have no further questions for you at this time.

Counsel, do you have anything?

EXAMINATION BY MS. O'LINN, ESQ.

BY MS. O'LINN:

Q.  **Officer Sun, were you concerned at any point during this incident that Mr. Valdivia would attempt to flee?**

A.  Yes.

Q.  **Were you concerned that he would take a hostage?**

A.  Yes.

Q.  **Were you concerned that he would hurt someone?**

A.  Yes.

Q.  **Were you concerned that he would grab someone?**

A.  Yes.

Q.  **Were you concerned that if you delayed contacting him, that there would be harm to members of**

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

the public?

A.   Yes.

Q.   Do you put the safety of others above yourself when you approached Mr. Valdivia given the facts and information you had at that time?

A.   Yes.

Q.   Would it be appropriate, in your opinion, to have officers responding to a containment on a man with a gun call, to direct them to have less lethal in their hands?

A.   That would not be appropriate.

Q.   Why not?

A.   The alleged threat level is -- the perceived threat level is a suspect with a gun.  To come in with a less lethal option, would put you at a disadvantage.  Not only that, to go from a less lethal option to a lethal option, would create a significant delay on top of a reaction time, which would not only put yourself at risk, but possibly others at risk if you're trying to stop the suspect.

Q.   Had Mr. Valdivia pulled that gun in the middle of that parking lot and ran in the direction of one officer who had less lethal in their hands, that potentially creates a crossfire situation for another officer that was providing a cover position with lethal

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
**Officer Cheng-Wei (Billy) Sun on 03/06/2025**

Page 94

coverage?

A.  That's correct.

MR. SINCICH:  Incomplete hypothetical.  Calls for speculation and assumes facts.

BY MS. O'LINN:

Q.  **The businesses that were open at that time in that area of that parking lot included what businesses?**

A.  Country Liquor, which is a busy liquor store, Starbucks, which had people in the drive-through, and there was also Trompetas, which is a bar.  There's often a lot of people there.

(Reporter clarification.)

MS. O'LINN:  No further questions.

THE REPORTER:  Same order as before?

MS. O'LINN:  Yes.

MR. SINCICH:  Yes.  Off the record.

(The deposition concluded at 4:19 p.m.)

//

WITNESS CERTIFICATION

I, _BILLY CHENG-ZUEI SUN_____, do
hereby declare under penalty of perjury that I have read the
foregoing deposition and that, to the best of my knowledge,
said deposition is true and accurate, save and except for the changes and/or
corrections indicated by me on the DEPOSITION ERRATA SHEET hereof, with the
understanding that I offer these changes as if still under oath.

Signed on the _25th__ day of ___APRIL_____, 20_25_.

_____

                    Witness Signature

**VALDIVIA, ET AL vs CITY OF COVINA, ET AL.**
Officer Cheng-Wei (Billy) Sun on 03/06/2025

**Page 95**

UNITED STATES DISTRICT COURT          )
                                       )
CENTRAL DISTRICT OF CALIFORNIA    )


        The witness, Officer Cheng-Wei (Billy) Sun, in the foregoing deposition appeared before me, Cynthia F. Zeller, a Certified Shorthand Reporter, in and for the State of California.

        Said witness was then and there at the time and place previously stated, by me placed under oath to tell the truth, the whole truth and nothing but the truth in the testimony given on the date of the within deposition.

        The testimony of the witness and all questions and remarks requested by Counsel and reported thereafter, under my direction and control, caused to be transcribed into typewritten form by means of Computer-Aided Transcription.

        I am a Certified Shorthand Reporter licensed by the State of California.  I further certify that I am not of counsel or attorney for either or any of the parties to the case named in the within caption, and that I am not related to any party thereto.

        IN WITNESS WHEREOF, I have hereunto affixed my signature this 18th day of March 2025.


_____
CYNTHIA F. ZELLER, CSR
Certified Shorthand Reporter #10834

# EXHIBIT B

# Exhibit 29

## (Officer Meadows's Deposition Transcript)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

E.V. and X.V., minors by and ) through their guardian ad ) litem, Karla Juarez; D.V., a ) Case No. minor, by and through his ) 5:23-cv-01562-CBM-SHK guardian ad litem, Elias ) Valdivia; individually and as ) successors-in-interest to ) Daniel Luis Valdivia, ) deceased; JESSICA VALDIVIA; ) LUIS VALDIVIA JR., ) individually, )
                                )
          Plaintiffs,           )
     vs.                        )
                                )
CITY OF COVINA; VANESSA         )
CARDOZA; DAVID MEADOWS; BILLY   )
SUN; DOES 1-10, inclusive,      )
                                )
          Defendants.           )
                                )

REMOTE DEPOSITION OF DAVID MEADOWS

COVINA, CALIFORNIA

FRIDAY, MARCH 7, 2025

STENOGRAPHICALLY REPORTED BY:

Patricia L. Davis, RPR
CSR No. 11521

**Page 2**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

E.V. and X.V., minors by and )
through their guardian ad )
litem, Karla Juarez; D.V., a ) Case No.
minor, by and through his ) 5:23-cv-01562-CBM-SHK
guardian ad litem, Elias )
Valdivia; individually and as )
successors-in-interest to )
Daniel Luis Valdivia, )
deceased; JESSICA VALDIVIA; )
LUIS VALDIVIA JR., )
individually, )
)
          Plaintiffs, )
     vs. )
)
CITY OF COVINA; VANESSA )
CARDOZA; DAVID MEADOWS; BILLY )
SUN; DOES 1-10, inclusive, )
)
          Defendants. )
)

REMOTE DEPOSITION OF DAVID MEADOWS, TAKEN ON BEHALF OF

THE PLAINTIFFS, IN COVINA, CALIFORNIA, COMMENCING AT

10:01 A.M. AND ENDING AT 12:07 P.M. PACIFIC STANDARD

TIME ON FRIDAY, MARCH 7, 2025, BEFORE PATRICIA L. DAVIS,

RPR, CERTIFIED SHORTHAND REPORTER NO. 11521.

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 3

APPEARANCES (VIA VIDEOCONFERENCE):


FOR PLAINTIFFS:

        LAW OFFICES OF DALE K. GALIPO
        BY:  MARCEL F. SINCICH, ESQ.
        21800 BURBANK BOULEVARD
        SUITE 310
        WOODLAND HILLS, CA  91367
        818-347-3333
        MSINCICH@GALIPOLAW.COM


FOR DEFENDANTS:

        MANNING & KASS, ELLROD, RAMIREZ, TRESTER, LLP
        BY:  MILDRED K. O'LINN, ESQ.
           ROSLYNN M. WILFERT, ESQ.
        801 S. FIGUEROA STREET
        15TH FLOOR
        LOS ANGELES, CA  90017-3012
        213-624-6900
        MISSY.OLINN@MANNINGKASS.COM


ALSO PRESENT:

        VANESSA CARDOZA
        BILLY SUN

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

**Page 4**

INDEX TO DEPOSITION OF DAVID MEADOWS

MARCH 7, 2025

EXAMINATION BY:                                          PAGE

MR. SINCICH ....................................... 5

MS. O'LINN ...................................... 83

EXAMINATION BY:

MR. SINCICH ...................................... 86

EXHIBITS

MARKED          DESCRIPTION                      PAGE

Exhibit 7   Body-worn camera video              72

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 5

Covina, California

Friday, March 7, 2025

~~~ 10:01 a.m. PST ~~~

-o0o-

THE REPORTER:  We are now on the record.  My name is Patricia Davis.  I am a California Certified Shorthand Reporter, License No. 11521.

Mr. Meadows, please raise your right hand to be sworn.

DAVID MEADOWS,

having been first duly sworn by the Certified Shorthand Reporter to tell the truth, the whole truth, and nothing but the truth, responded, "I do," and testified as follows:

EXAMINATION BY MR. SINCICH

Q   Good morning, Officer Meadows.

A   Good morning.

Q   Could you please state and spell your name for the record.

A   My first name is David, D-A-V-I-D, last, Meadows, M-E-A-D-O-W-S.

Q   Have you had your deposition taken before?

A   Yes.

Q   How many times?

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 9

Q   How much time passed from the time that you arrived on scene to the time of your shot?

A   I would say less than a minute.

Q   And when I say arrived on scene, I'm referring to like when you parked your car.  Is that what you understood?

A   Yes.

Q   Okay.  And then at some point in time did you approach Mr. Valdivia and give him commands?

A   Yes.

Q   How much time passed from when you first made contact with Mr. Valdivia to the time of your shot?

A   I would say approximately 30 seconds.

Q   Are you right-handed?

A   Yes.

Q   Did you fire in a two-handed grip?

A   Yes.

Q   Did you have any optic on your weapon when you fired?

A   No.

Q   Were you focused on Mr. Valdivia when you fired?

A   Can you rephrase your question.

Q   Sure.  Sometimes when people fire without an optic, they focus on their front site post and other

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 10

times people fire and they focus on their target.  So I'm wondering where was your focus?

A   My focus was on my front site.

Q   Okay.  And did you feel like you had a site picture and site alignment on Mr. Valdivia?

A   Yes.

Q   Did you assess the surrounding area, including the backdrop, before you fired?

A   Yes.

Q   Did you see any civilians in the area other than Mr. Valdivia?

A   Yes.

Q   Where were they?

A   They were off to my right-hand side.

Q   Approximately how many feet away from Mr. Valdivia were they?

MS. O'LINN:  At the time he fired, Counsel?

MR. SINCICH:  Yes.

MS. O'LINN:  Thank you.

THE WITNESS:  I'd say approximately 15 feet.

BY MR. SINCICH:

Q   And how many people are you referring to?

A   Two.

Q   Okay.  Was there anybody else in the parking lot that you saw during this incident prior to firing?

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 13

Q   Were you moving while you were firing?

A   Yes.

Q   Which direction?

A   To my right.

Q   Why were you moving?

A   I was moving towards a point of cover.

Q   What was the cover that you were moving behind?

A   There was an approximate 3-foot cinder block wall and a vehicle on the other side of that.

Q   Between you and Mr. Valdivia?

A   Yes.

Q   Do you know if Officer Sun was also behind the 3-foot cinder block wall.

        MS. O'LINN:  At which point, Counsel?

BY MR. SINCICH:

Q   During the officer-involved shooting.

A   No, he was not.

Q   Okay.  Were you moving immediately prior to shooting?

A   Yes.

Q   Is there something that you saw that made you want to move?

A   Yes.

Q   What did you see?

A   I saw Mr. Valdivia reaching towards his

**Page 14**

waistband where I had seen the grip of a firearm.

Q   When was the first time that you saw the grip of a firearm?

A   After contacting him and giving him commands and once he complied and put his hands up, I could see the grip of a firearm protruding from his waistband.

Q   Did you inform your team that you were able to identify the gun at that time?

A   No.

Q   When you saw the gun grip in Mr. Valdivia's waistband, what did you do?

A   I gave him commands to get on the ground.

Q   Why would you give him that command?

A   From my perspective, it gave us more control of the situation and took his ability away to potentially take hostages or flee the scene.

Q   Okay.  Had you ever been in an officer-involved shooting other than this one?

A   No.

Q   How long have you been in law enforcement?

MS. O'LINN:  As of now, Counsel, or then?

MR. SINCICH:  Yes, total.

THE WITNESS:  Total, approximately 11 years.

BY MR. SINCICH:

Q   In your time in law enforcement, other than

Page 27

Q   What did you have?

A   I had a taser.

Q   Anything else?

A   No.

Q   How far were you from Mr. Valdivia when you fired your shot?

A   Approximately 30 feet.

Q   Prior to this call, I understand you were writing reports with Officer Sun?

A   I was with Officer Sun, yes.

Q   Okay.  Approximately what time did you receive the call for this incident?

A   Approximately 10:13 p.m.

Q   And what time did you make your way to the scene location?

A   After receiving the radio call.

Q   Was it pretty much immediately?

A   Yes.

Q   Did you and Officer Sun have a discussion prior to getting in your respective vehicles?

A   Can you rephrase your question.

Q   Did you and Officer Sun talk about this radio call prior to getting in your vehicles?

A   I just believe I informed him that I was going to respond to it.

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 28

Q    Okay.  What was your understanding of the nature of the call at 10:13?

A    My understanding was that there was a subject in front of a liquor store that was brandishing a firearm.

Q    Have you arrested individuals for brandishing a firearm before?

A    I can't remember specifically if I personally have.  I know I've been present when we have arrested subjects for brandishing a firearm.

Q    How many -- I'm sorry.

A    I'm sorry, no, go ahead.

Q    How many occurrences, approximately, were you involved with an arrest for brandishing a firearm?

A    Approximately one, maybe two.

Q    Do you have an understanding of the criminal code for brandishing?

A    Yes.

Q    What is it to your understanding?

A    To my understanding, someone that shows another person a firearm in a threatening manner.

Q    Under the code, can a person show a firearm in a threatening manner, for instance, if the firearm is in their waistband and they lift up their shirt?

A    Yes.

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 29

Q    And in that scenario, the person's not even touching the firearm; is that fair?

A    Yes.

Q    So based on the nature of the call, is it fair to say that officers didn't know specifically how Mr. Valdivia would have been brandishing the firearm?

A    Specifics we didn't know.

Q    And at some point in time, I believe around your arrival, you received an update that the firearm was in his waistband or a pocket?

A    I believe they stated it was pocket.

Q    Do you recall if dispatch told you which pocket?

A    I believe it was the right pocket.

Q    And is that consistent with the general area where you ended up seeing the handle when he had his hands in the air?

A    Yes.

Q    When you first saw Mr. Valdivia, did he have anything in his hands?

A    Yes.

Q    What did he have?

A    He had a beer bottle.

Q    Were you able to tell when you first saw him whether he still had the gun in his possession?

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 30

A    Not at the time I initially saw him.

Q    While you were en route, did you receive any additional information about the incident?

A    Our dispatch had told us that they had received multiple calls.

Q    Was there any specific details that you considered in your analysis for using deadly force?

A    I'm sorry, can you rephrase your question.

Q    Yeah.  Was there any additional details from the information you received from dispatch that you considered in your analysis on whether to use deadly force or not?

A    Other than he had been threatening other individuals or in an argument with other individuals.

Q    Okay.  Is it fair to say that officers didn't know who started the argument?

A    Yes.

Q    And you and your team were there to investigate to see what was actually happening; is that fair?

A    Yes.

Q    Had you ever met Mr. Valdivia prior to this incident personally?

A    I don't believe so.

Q    Did you have any knowledge of Mr. Valdivia prior to your use of force?

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 42

Q   Okay.

A   Or you can activate your overhead red and blue lights.  It will activate it.

Q   When you were en route to this incident, did you activate your lights?

A   No.

Q   Why not?

A   Based on the nature of the call, I did not want to alert Mr. Valdivia or the subject in question to our presence immediately or as we were approaching.

Q   Okay.  Did you essentially follow Officer Sun's vehicle to the Starbucks parking lot?

A   Yes.

Q   Why did you specifically want to respond to this call?

A   Due to the nature of the call, knowing that there's a potential of an imminent threat to officers and to the general public.  I knew more officers was better to have than not.

Q   Was one of the reasons why you wanted to respond to this call is you knew you had the K-9 option?

A   Yes.

Q   And that was knowing that there was a potential gun involved and a potential brandishing of the gun; right?

**Page 46**

option?  Did you say that to the investigators?

A   Yes.

Q   Was it your understanding that the shotgun was going to be a less lethal option during this incident?

A   It's a potential option because most of the patrol vehicles have them in them.

Q   Okay.  But it was your understanding that she was going to grab the less lethal shotgun; right?

A   I knew it was an option for her.

Q   Okay.  And when you say, It was going to give us another less lethal option, other than the beanbag shotgun, what was the other less lethal options that you were considering for this specific incident?

A   We had taser, my K-9.

Q   Okay.  And are those the less lethal options that you considered knowing the information related to this call?

A   Yes.

Q   Did you communicate with any of the other officers to coordinate how you were going to make the approach on to the subject?

A   Can you rephrase your question, please.

Q   Yeah.  Was there a plan communicated to the team as to how the officers were going to approach Mr. Valdivia?

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 47

A   Yes.  Officer Sun was setting up a containment.

Q   Right.  So Officer Sun communicated over the radio that he wanted certain vehicles in certain locations; is that fair?

A   Yes.

Q   Did anyone communicate to the team how the officers were going to approach Mr. Valdivia?

A   Yes.

Q   Who communicated that to the team?

A   Officer Sun.

Q   And what did Officer Sun say to the team?

A   I recall Officer Sun specifically stating to me that I was going to be with him.

Q   Okay.  Other than you being with him, was there any communication as to how you would approach Mr. Valdivia?

A   I'm not quite understanding your question.

Q   For instance, was there any communication that you guys would approach in a stealth manner?

A   It was understood to me that we were going to approach in a stealth manner.

Q   Okay.  And how did that understanding come about?

A   First, the way he mentioned that we were going to park on the west side of Starbucks led me to

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 48

understand that we weren't going to drive right up to him with lights and sirens on.

Q   Okay.  Was there any communication between you and Officer Sun as to who was going to be the contact officer and who was going to be the cover officer?

A   Can you rephrase your question, please.

Q   Do you have training on the terms "contact" and "cover" officer?

A   Yes.

Q   And as part of that training, does the contact officer typically take the lead in communicating with the subject?

A   Generally, no.

Q   What is the role of the contact officer based on your training?

A   To provide cover and --

MS. O'LINN:  He said contact officer.

THE WITNESS:  Right.  To provide cover for the -- oh, I'm sorry, for the contact officer.

BY MR. SINCICH:

Q   Yeah, the contact officer.

A   To initially contact the individual in question or to handle the initial investigation.

Q   Okay.  And just so that there's no confusion because maybe you misunderstood my question, the

Page 52

taco shop you saw a couple civilians in that area?

A    They were walking, yes.

Q    Which way were they walking?

A    There's like an alleyway that's further east. I remember seeing someone kind of in that general direction.

Q    Would that be in between the taco shop and the car wash?

A    Yes.

Q    Okay.  What was one of the reasons why you wanted Mr. Valdivia to go down to the ground?

A    Well, a couple of reasons.  One, to gain better control of him to prevent him from fleeing the scene or possibly taking hostages.  I knew also if he was on the ground on his stomach it would be more difficult for him to reach for the firearm.

Q    Okay.  Would it also be more difficult for him to engage with the firearm if that were to occur?

MS. O'LINN:  Objection.  Calls for speculation --

(Unintelligible.)

(Reporter clarification.)

MS. O'LINN:  It's okay.

THE WITNESS:  I'm sorry, can you rephrase your question.

Page 55

distance plus cover equals time?

A  Yes.

Q  And then time equals options?

A  Yes.

Q  Was there any discussion as to whether there was a better route to get to the liquor store parking lot where officers could maintain cover?

A  No.

Q  Prior to this incident, had you been to that liquor store parking lot before?

A  Yes.

Q  Were you generally familiar with the area?

A  Yes.

Q  Why did you use deadly force in this incident?

A  Because I perceived an imminent threat of death or great bodily injury.

Q  What did you perceive that led you to believe Mr. Valdivia was an imminent threat of death or great bodily injury?

A  He was pointing a gun at us.

Q  When you say us, who are you referring to?

A  Officer Sun and myself.

Q  Did you believe that he was pointing a gun at both of you simultaneously?

A  In our direction, yes.

Page 56

Q   Well, based on your assessment, where was the gun actually pointed?

MS. O'LINN:  Objection.  Argumentative as phrased.  Calls for speculation.

You can answer.

THE WITNESS:  In both of our direction.

BY MR. SINCICH:

Q   Okay.  I'm wondering if he -- well, strike that.

You know now that it was a BB gun or an airsoft gun; right?

A   Yes.

Q   If it was a real gun or even if it had a BB loaded into it and he pulled the trigger, would you feel like you were going to be hit by that BB?

A   Yes.

Q   Did you feel like if he pulled the trigger, Officer Sun would have been hit by the same BB?

A   I don't understand your question.

Q   I'm trying to figure out where the gun was actually pointed at the time of your use of deadly force.

A   It was pointed in our direction.

Q   Right.  So were you ever trained on the phrase "point aim, point impact"?

Page 57

A   I've heard that phrase, yes.

Q   Is it fair to say that with a pistol wherever it's aimed, that's typically where it's going to impact?

A   It depends.

Q   Right.  If there's no obstacles or anything like that in front of it, it generally hits where it's being aimed; right?

A   Not necessarily.  It depends.  There's many factors.

Q   Like what?

A   The way the person pulls the trigger, their physiology can cause them to be off line if they're not properly trained.  There's just so many different human factors and other factors to be considered --

Q   Right.

A   -- the manufacturing of the firearm, the barrel.

Q   Yeah.  Would it be fair to say that in whatever direction the barrel is facing, that's the direction the bullet's going to go?

A   Again, it depends.

Q   Okay.

MS. O'LINN:  Counsel, let us know when it's time for a break because we took a fragmented break --

MR. SINCICH:  We had a 10-minute break about

Page 58

half an hour ago, maybe 40 minutes ago.  I wasn't planning on going too much longer.

(Simultaneous speaking.)

(Reporter clarification.)

MS. O'LINN:  He was coughing his head off during that break, so I just want to make sure he has an opportunity to have a personal break, but I'm just asking whenever.

MR. SINCICH:  Yeah.  And, Officer, when you need a break, would you let me know?

THE WITNESS:  Yes.

MR. SINCICH:  Okay.

BY MR. SINCICH:

Q    Why did you only shoot one round?

A    During my assessment, I stopped shooting when I perceived the threat was done.

Q    And what did you perceive that led you to believe that the threat was done?

A    I saw the gun on the ground, and I didn't see any imminent threat at that point.

Q    Is that because the gun was on the ground and not in his hand?

A    Also, I didn't see him reach for the gun after the gun was on the ground.

Q    Okay.  If you had saw Mr. Valdivia take the gun

Page 59

out and then throw it down to the ground, would you have used deadly force?

MS. O'LINN:  Objection.  Calls for speculation.

THE WITNESS:  No.

BY MR. SINCICH:

Q   Why not?

A   If he threw the gun to the ground, I wouldn't have perceived an immediate imminent threat.

Q   And is the training that it has to be more than just any imminent threat in order to use deadly force?

A   Can you rephrase your question, please.

Q   Yeah.  In other words, is the training that it has to be more than just any threat?  It has to be specifically an immediate threat of death or serious bodily injury in order for officers to use deadly force?

A   Yes.

Q   When you arrived on scene, did you believe that the scene location was contained?

A   Can you rephrase that question, please.

Q   Yes.  You had mentioned earlier that Officer Sun had coordinated a containment of the location; is that right?

A   Yes.

Q   So did you have an understanding that there was two vehicles on the east side of the parking lot?

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 60

A    My understanding was that there was a containment that was setting up and officers arriving on the scene.

Q    Okay.  So by the time that you engaged verbally with Mr. Valdivia, did you believe that the containment had been set?

A    I don't quite understand your question.  I'm sorry.

Q    Did you believe that the parking lot where the shooting incident occurred was contained by the time that you gave your commands to Mr. Valdivia?

A    I knew that containment had been communicated, and that the officers were arriving on scene during that time.

Q    Okay.  Other than Officer Cardoza and Officer Sun, how many other officers did you believe were en route to the scene?

A    To my understanding, three other officers.

Q    Which officers?

A    Officer Avila, Officer Dixon, and Officer Marquez.

Q    Did you know before your use of force that there were two sergeants on scene?

A    No.

Q    When you used force, did you know that anybody

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 64

Q    Did you know that Officer Sun was a SWAT officer when you arrived on scene?

A    Yes.

Q    Did you essentially follow his lead during this incident?

MS. O'LINN:  Objection.  Argumentative.  Vague, ambiguous, and overbroad.

You could explain.

THE WITNESS:  My understanding was he was the primary officer and I was there to assist him.

BY MR. SINCICH:

Q    Okay.  Just give me a second here.  I want to make sure I don't ask you a question twice if I can avoid it.

Did you give a deadly force warning prior to your use of deadly force?

MS. O'LINN:  Go ahead.  You can answer.

THE WITNESS:  No.

BY MR. SINCICH:

Q    Did you hear any of the other officers giving a deadly force warning prior to any shots fired?

A    No.

Q    Prior to Mr. Valdivia retrieving the gun from his waistband, did you believe that he was somewhat compliant?

**Page 65**

MS. O'LINN:  Objection.  Argumentative as phrased.

You can answer.

THE WITNESS:  Can you rephrase that question, please.

BY MR. SINCICH:

Q   Yeah.  Prior to Mr. Valdivia retrieving the gun from his waistband, based on your perception of his conduct in response to officer commands, did you perceive him to be somewhat compliant?

MS. O'LINN:  Objection.  Argumentative.  Vague, ambiguous, and overbroad.

You can answer.

THE WITNESS:  Based on the totality of circumstances in my interaction with him, I would not consider him compliant.

BY MR. SINCICH:

Q   Okay.  Do you recall telling the investigators that he was only somewhat compliant?

A   Yes.

Q   Is it fair to say then that Mr. Valdivia was somewhat compliant during this incident?

MS. O'LINN:  Objection.  Argumentative.

You can answer.

THE WITNESS:  He complied with some of our

Page 66

commands and some of them he did not, so I would consider him not compliant.

BY MR. SINCICH:

Q   Which commands did he comply with?

A   He complied at one point when he put his hands up and at one point as he began to get on the ground.

Q   Okay.  And those were both in response to officer commands based on your perception?

A   Yes.

Q   And when you were moving south along that pony wall, was it your intent, in addition to being behind cover, to get off the X?

A   Yes.

Q   And what's the training with that regard?

A   A moving target is harder to hit, and I was moving towards a point of cover.

Q   Was Mr. Valdivia's body generally stationary during the shooting?

A   I don't understand your question.  I'm sorry.

Q   Was Mr. Valdivia moving at all during the shooting?

A   Yes.

Q   How was he moving --

A   He was --

Q   -- while shots were fired?  Sorry.

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 67

How was he moving while shots were fired?

A    He was pointing a gun at us.

Q    What was his movement?

A    Retrieving the firearm from his waistband and pointing it at us.

Q    Based on your perception, were any shots fired while he was retrieving the gun from his waistband?

A    No.

Q    Based on your perception, were any shots fired while he was in the process of pointing the gun after he retrieved it?

A    My recollection is the shots were fired as he was pointing the firearm at us.

Q    Okay.  And so was there any movement by Mr. Valdivia as the shots were being fired?

A    Yes.

Q    What part of his body was moving?

A    His arm and his head.

Q    How was his arm moving while the shots were being fired?

A    It was extended pointing towards us and it was moving.

Q    In which direction was it moving?

A    In the direction of Officer Sun and myself.

Q    Was his like elbow extending?  Is that what

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 78

I'm asking what you recall during the incident.

MS. O'LINN:  Thank you for that clarification, Counsel.

THE WITNESS:  I just recall him being face down.

BY MR. SINCICH:

Q   Okay.  And do you recall his right hand being near the top of his head?

MS. O'LINN:  Objection, Counsel.  Vague as to time.

BY MR. SINCICH:

Q   And that's fair.  After you fired your shot.

A   I don't understand the question.

Q   Okay.  When you perceived Mr. Valdivia dropping the gun and then you decided not to shoot a second shot, was Mr. Valdivia in the position depicted at 58 seconds of Exhibit 7?

A   No.

Q   How was he different?

A   His arm was still slightly extended.

Q   And was his arm in the process of moving back towards this position with his hand next to his head?

A   At some point after he dropped the firearm, it did.

Q   Okay.  I'll just continue to play this.

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 82

MR. SINCICH:  I'm almost there.

BY MR. SINCICH:

Q    Do you understand the definition of imminent according to the policy?

A    Yes.

Q    Can you describe what that is?

A    When someone has the present ability, opportunity, and intent to cause death or serious bodily injury.

Q    Okay.  And do you have an understanding as to whether or not that is meant to align with Penal Code 835a?

A    Yes.

Q    Are you familiar with Penal Code 835a?

A    Yes.

Q    As part of the definition of imminent, are you familiar -- or was it your understanding at the time of the incident that imminent meant not merely a fear of future harm?

A    Yes.

Q    No matter how great the fear?

A    Yes.

Q    And no matter how great the likelihood of the harm?

A    Yes.

E.V., ET AL. vs CITY OF COVINA, ET AL.
David Meadows on 03/07/2025

Page 83

MR. SINCICH:  Okay.  I have no further questions at this time.

MS. O'LINN:  I do, Counsel, sorry.

MR. SINCICH:  All right.

-o0o-

EXAMINATION BY MS. O'LINN

Q   Officer, you were asked a number of questions about less lethal options.  Do you recall some of those questions?

A   Yes.

Q   With regard to a situation where you're responding to an incident where a man you've been informed is brandishing a firearm, do you have any concerns with regard to officers being deployed with less lethal options in their hands?

A   Yes.

MR. SINCICH:  Vague and ambiguous.

BY MS. O'LINN:

Q   Would you please explain.

A   If someone -- if an officer is engaged by someone that has lethal force and they have a less lethal force option in their hands, it puts them at a significant disadvantage and a greater risk of death or great bodily injury to themselves.

Q   In responding to this particular incident, was

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
**David Meadows on 03/07/2025**

Page 84

one of your primary concerns public safety at the location?

A   Yes.

Q   And were you very familiar with the general environment that you were responding to with regard to the open businesses?

A   Yes.

Q   And counsel asked you if you saw Mr. Valdivia attempt to take someone hostage.  You didn't see that, did you?

A   No.

Q   Was that one of your concerns?

A   Yes.

Q   Was one of your concerns that he would harm someone?

A   Yes.

Q   And you were asked a number of questions about turning someone away from yourself to achieve a tactical advantage.  Do you recall that?

A   Yes.

Q   In this circumstance, in the middle of a parking lot with open businesses and those other people standing around, was there any direction that you believed you could have asked Mr. Valdivia to turn away to that would have been safe for the members of the

Page 85

==highlighted== public and yourself?

A   No.

Q   And so asking him or directing him to get down on the ground was, in your opinion, the safest option at that point?

A   Yes. ==highlighted==

MR. SINCICH:   Leading.

BY MS. O'LINN:

Q   At the time that you approached Mr. Valdivia, were you in a full uniform?

A   Yes.

Q   Clearly identifiable as a police officer?

A   Yes.

Q   And prior to the shooting, there were three officers pointing guns at him?

A   Yes.

MR. SINCICH:   Calls for speculation.

BY MS. O'LINN:

Q   Did you have any doubt at that point when you ordered him to get down on the ground that he knew you were a police officer?

A   No.

MR. SINCICH:   Calls for speculation.

BY MS. O'LINN:

Q   Did you hear him say something in response to

Page 86

the commands by yourself and Officer Sun at any point?

A   He said, Whatever.

Q   That's one word, whatever, quote?

A   Yes.

Q   What did you take that to mean?

A   I took that to mean he wasn't taking the situation seriously, and that he could be unpredictable.

Q   Did that indicate to you that he knew you were a police officer?

A   Yes.

MR. SINCICH:  Calls for speculation.  Lacks foundation.

MS. O'LINN:  One moment, Counsel.

MR. SINCICH:  I'm sorry, I couldn't hear you.

MS. O'LINN:  I said one moment.  Just let me --

MR. SINCICH:  Oh.

MS. O'LINN:  -- I think I'm done.

I have nothing further.

MR. SINCICH:  Okay.  Just maybe -- when an attorney says he's got one question, he might have more than one.

-oOo-

FURTHER EXAMINATION BY MR. SINCICH

Q   Based on your training, is it fair to say that officers cannot use deadly force based on subjective

Page 87

fear alone?

A   Yes.

Q   Okay.

MR. SINCICH:  No further questions.

MS. O'LINN:  Madam Court Reporter, as we discussed prior to the deposition commencing, we'll take a copy with a condensed and a Word version.

Please contact my assistant, Delia Flores, as I provided you with her email for all communications with regard to the transcript.  You can include me on that email as well, but she needs to be on it.

Thank you very much for your assistance today. Do you need any spellings?

THE REPORTER:  Are we off the record now?

MR. SINCICH:  Yeah, we're off the record. Thanks.

MS. O'LINN:  Yes.

(End of record, 12:07 p.m.)

I, DAVID MEADOWS, do hereby declare under penalty of perjury that I have reviewed the foregoing transcript; that I have made any corrections, additions, or deletions in my testimony that I deemed necessary; and that the foregoing is a true and correct transcript of my testimony in this matter.

EXECUTED this __3rd___ day of __April_____,

20 _25_ , at _Covina_____, _CA_____.
                    (City)                          (State)

_____
DAVID MEADOWS

**E.V., ET AL. vs CITY OF COVINA, ET AL.**
David Meadows on 03/07/2025

Page 89

REPORTER'S CERTIFICATE

I, Patricia L. Davis, a Certified Shorthand Reporter for the State of California, do hereby certify:

That said proceedings were taken before me at the time and place set forth herein and was stenographically reported by me in shorthand, and I hereby certify that said proceedings are a full, true, and correct transcript of my shorthand notes so taken; that the dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificate null and void.

Further, that if the foregoing pertains to the Original transcript of a deposition in a federal case, pursuant to F.R.C.P. 30(e)(2) before completion of the proceedings, review of the transcript was not requested.

I further certify that I am neither counsel for, nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name this 18th day of March, 2025.

PATRICIA L. DAVIS
CSR No. 11521

# EXHIBIT C

# Exhibit 30

## (Officer Cardoza's Deposition Transcript)

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____
E.V. and X.V., minors by and          )
through their guardian ad litem,   )
Karla Juarez; D.V., a minor, by    )
and through his guardian ad litem,)
Elias Valdivia; individually and   )
as successors-in-interest to        )
Daniel Luis Valdivia, deceased;    )
Jessica Valdivia; Luis Valdivia    )
Jr., individually,                        )
                                                )
     Plaintiffs,                          )
                                                ) CASE NO.
     vs.                                      ) 5:23-cv-01562-CBM-SHK
                                                )
CITY OF COVINA; VANESSA CARDOZA;   )
DAVID MEADOWS; BILLY SUN; DOES     )
1-10, inclusive,                        )
                                                )
     Defendants.                          )
                                                )
_____)

VIDEOCONFERENCE

DEPOSITION OF OFFICER VANESSA CARDOZA

Date:              Thursday, March 6, 2025
Time:              10:03 a.m. - 12:35 p.m.

Location:        MANNING KASS
                       801 S. Figueroa Street, 15th Floor
                       Los Angeles, California 90017

Reporter:        Cynthia F. Zeller, CSR
                       Certified Shorthand Reporter #10834

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 2

I N D E X

EXAMINATION BY:                                           PAGE

MR. SINCICH, ESQ...................................... 5

Appearance Page....................................... 3

Exhibit Page.......................................... 4

Certified Questions................................None

Reporter's Certified Page..........................94

Errata Sheet.......................................95

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

**Page 3**

A P P E A R A N C E S

For the Plaintiffs:      LAW OFFICES OF DALE K. GALIPO
                         Attorneys at Law
                         21800 Burbank Blvd., Suite 310
                         Woodland Hills, California 91367


                         PHONE:  (818) 347-3333
                         FAX:    (818) 347-4118
                         EMAIL:  Msincich@galipolaw.com


                         BY:  MARCEL F. SINCICH, ESQ.



For the Defendants:      MANNING KASS
                         Attorneys at Law
                         801 S. Figueroa Street, 15th Floor
                         Los Angeles, California 90017


                         PHONE:  (213) 624-6900 ext. 2451

                         EMAIL: Missy.olinn@manningkass.com
                                Delia.Flores@manningkass.com


                         BY:  MILDRED K. O'LINN, ESQ.


Also Present:            Officer Billy Sun
                         Officer David Meadows

                            --oOo--

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
Officer Vanessa Cardoza on 03/06/2025

Page 4

E X H I B I T S

EXHIBIT NO.                                                    PAGE

Exhibit 1        Portion of Officer Sun's body-worn
                 camera video, 4-9-22................ 82

Exhibit 2        First two minutes of Sergeant Slater's
                 body-worn camera video.............. 85

Exhibit 3        Google Map of the scene............. 87

Exhibit 4        Screenshot from Sergeant Statler's
                 body-worn camera at 22:17:08.........88

Exhibit 5        Screenshot from Sergeant Statler's
                 body-worn camera at 22:17:13.........90

Exhibit 6        Screenshot from Sergeant Statler's
                 body-worn camera at 22:17:26.........91

---oOo---

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 5

OFFICER VANESSA CARDOZA,

called as a witness and having been first duly sworn by

the Certified Shorthand Reporter, was examined and

testified as follows:

THE WITNESS:  I do.


EXAMINATION BY MR. SINCICH, ESQ.

BY MR. SINCICH:

Q.  Good morning.  Could you please state and spell your name for the record.

A.  Yes.  My name is Vanessa, V-a-n-e-s-s-a.  Last name Cardoza, C-a-r-d-o-z-a.

Q.  Have you had your deposition taken before?

A.  Yes.

Q.  How many times?

A.  Once.

Q.  Was it work related?

A.  Yes.

Q.  What was the general circumstances of that deposition?

A.  I was a witness to a use of force.

Q.  What type of force was used in that incident?

A.  Just effecting an arrest, so just hands-on.

Q.  Were you one of the officers that used force?

A.  Yes.

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 9

Q.   Generally, were you and your partners going out to apprehend Mr. Valdivia?

A.   Yes.

Q.   Did you use force during the incident?

A.   Yes.

Q.   What type of force?

A.   Deadly force.

Q.   How many rounds did you fire?

A.   Five.

Q.   Did you intend to pull the trigger each time you did?

A.   Can you rephrase that question, please.

Q.   Yes.  Did you intentionally pull the trigger when you fired each round?

A.   Yes.

Q.   And did you intend for each of those shots to strike Mr. Valdivia?

A.   Yes.

Q.   Were you aiming for each shot?

A.   Yes.

Q.   Where were you aiming?

A.   Center mass.

Q.   Is that for all of your shots?

A.   Yes.

Q.   And what were you looking at in terms of his

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 10

body that you would call center mass?

A.  It's mostly the chest area.

Q.  Were you able to see his chest when you pulled the trigger?

A.  No, due to the angle I was in.

Q.  So due to the angle that you were in, what were you able to see that you were aiming at?

A.  It's the right side, right shoulder, right ribs, you would say.

Q.  Okay.  Were you using an optic at the time?

A.  Yes.

Q.  What type of optics were you using?

A.  It was a red dot.

Q.  Okay.  And do you know the purpose of that?

A.  In order to have better aim.

Q.  Does it essentially assist you in shooting faster and more accurate?

MS. O'LINN:  Objection; compound.

THE WITNESS:  Can you rephrase the question, sir.

BY MR. SINCICH:

Q.  Yes.  Does the red-dot sight assist you in shooting faster?

A.  No.

Q.  Does it assist you in shooting more accurately?

A.  Yes.

Page 11

Q. Are you able to shoot in part with the red dot with both eyes open?

A. Yes.

Q. And did that assist you in helping to continue to assess the situation while you're using force?

A. Yes.

Q. Did you fire with a one- or two-handed grip?

A. Two.

Q. And did you have a tactical light on your weapon?

A. Yes.

Q. Did you utilize it at all?

A. No.

Q. Was the lighting sufficient on scene where you didn't need to utilize it?

A. Yes.

Q. Do you know where your shots struck Mr. Valdivia?

A. I don't.

Q. Did you assess in between shots?

A. Yes.

Q. Do you know approximately how long it was from the time that you fired your first shot to your fifth shot?

A. It was under a second.

Q. Would you say you fired in rapid succession?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 12

MS. O'LINN:  Objection; argumentative.

You can explain.

THE WITNESS:  I believe I did.

BY MR. SINCICH:

Q.  And were you trained to do an assessment between each shot?

A.  Yes.

MS. O'LINN:  Objection; argumentative. Give me a chance to object.  Objection; argumentative as phrased as to "between."

You can answer.

THE WITNESS:  Yes, we are trained to assess after each shot.

BY MR. SINCICH:

Q.  And what's the training in that regard?

A.  After each shot, you look to see whether the subject is still a threat.

Q.  Okay.  Is it to determine whether or not you should continue shooting or not?

A.  Yes.

Q.  Did you consider your background when you were determining whether to use deadly force?

A.  Yes.

Q.  Did you feel that your background was clear?

A.  Yes.

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 13

Q.  What was in your backdrop or background?

A.  It was a vehicle, and behind the vehicle was a brick wall.

Q.  Generally, the incident occurred in a parking lot?

A.  Correct.

Q.  Were there any third-party civilians in the area?

A.  Can you rephrase that one.

Q.  Yes.  Besides the officers that were on scene and the subject Mr. Valdivia, was there anybody else in the parking lot?

A.  Yes.

Q.  How many people?

MS. O'LINN:  Objection; present and calls for speculation on the part of the witness.

But you can answer.

THE WITNESS:  I believe there was only one subject at that time.

BY MR. SINCICH:

Q.  And when you say at that time, what are you referring to?

A.  When the incident occurred.

Q.  Okay.  Did you ever see more than one other person in the parking lot?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 14

A. Yes.

Q. **When did you see another person in the parking lot?**

A. When I first arrived.

Q. **Okay.**

MS. O'LINN:  And, Counsel, you mean other than other officers, correct?

BY MR. SINCICH:

Q. **Yes, other than the civilians, the decedent and the other officers; is that what you understood, Officer Cardoza?**

A. So other than the officers, Valdivia and another person; is that what you said?

Q. **Yes.**

A. Yes.

Q. **Okay.  Approximately where were you standing when you fired your first shot?**

A. I believe I was approximately 40 feet.

Q. **In what area?**

A. Can you rephrase the question.

Q. **Yeah.  In relation to the parking lot, what area were you in?**

A. I was north of Mr. Valdivia.

Q. **Were you moving during your shots?**

A. I believe so.

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 15

Q. In which direction?

A. South.

Q. You were moving towards Mr. Valdivia?

A. Yes.

Q. Were you moving for all of your shots?

A. I don't recall. I don't remember.

Q. Okay. Approximately how much ground did you cover moving south for those five shots?

A. I can't recall, sir.

Q. Can you give me an estimate of how much in terms of feet?

MS. O'LINN: If you know.

THE WITNESS: I don't know. I'm sorry.

BY MR. SINCICH:

Q. Okay. In what position was Mr. Valdivia in when you fired your first round?

A. He was laying on his stomach with his body weight on his left arm and kind of leaned to the left arm side.

Q. Were his legs straight out behind him?

A. His left leg was straight. His right leg, I believe was kind of canted like in an angle, kind of giving him a mounted stance, if that makes sense.

Q. Are you familiar with the recovery position?

A. Yes.

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 16

Q.   Is it similar to the recovery position?

A.   No.

Q.   Okay.  But his right leg was bent a little bit, is that what you're saying?

A.   Yes.

Q.   Okay.  Did you see where his left arm was?

A.   Yes.

Q.   Where was that?

A.   It was tucked underneath his body.

Q.   Okay.  And you said that his weight was kind of on his left arm or left side?

A.   Yes.

Q.   And did you see his right arm?

A.   Yes.

Q.   Where was his right arm when you fired your first shot?

A.   It was holding a handgun that was pointed at my partners.

Q.   Did Mr. Valdivia move at all during your five shots?

A.   Yes.

Q.   How did he move?

A.   He continued to point the firearm at my partners.

Q.   What was his movement that he made while you

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
Officer Vanessa Cardoza on 03/06/2025

Page 17

were shooting?

A.   The handgun continued to go up and point towards my partners.

Q.   Was it pointing at your partners when you fired your first round?

A.   It was canted, but yeah.

Q.   Was he in the process of pointing it from your perspective when you fired your first round?

A.   Yes.

Q.   And then as you fired your subsequent rounds, he was still in the process of pointing or pointing the gun from your perspective?

A.   Yes.

Q.   In what position was he in when you fired your fifth round?

A.   I believe he was still pointed.

MS. O'LINN:  By the way, Officer Cardoza, if you need a break at any point, let us know.

BY MR. SINCICH:

Q.   Was his body in the same general position as you described earlier?

A.   Sorry.  Can you rephrase that one.

Q.   Yes.  Was his body in the same position for the fifth round as it was that you described for the first round?

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 18

A.  No.

Q.  **How did his body change?**

A.  The gun was pointed at my partners during the fifth round.

Q.  **Did his body change, his body position?**

MS. O'LINN:  Counsel, I think what you're referring to is like his torso.  Can you be more specific.

BY MR. SINCICH:

Q.  **Sure.  That's a good word, the torso.**

**Did his torso change at all?**

A.  I can't recall exactly, sir.

Q.  **Okay.  Did his posture change, like whether he was being lifting up or going down in terms of his torso?**

MS. O'LINN:  For the fifth shot.

MR. SINCICH:  For the fifth shot.

THE WITNESS:  It started to go down.

BY MR. SINCICH:

Q.  **And where was his right hand for the fifth round?**

MS. O'LINN:  Objection; asked and answered.

You can answer again.

THE WITNESS:  Still on the firearm.

BY MR. SINCICH:

Q.  **Okay.  What did he do after you fired your five rounds?**

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 19

A.   He dropped the firearm.

Q.   Okay.  How many total officers were on scene at the time of your use of force, that you know of?

MS. O'LINN:  Objection; vague as to "on scene." Counsel, could you be more specific.

MR. SINCICH:  Sure.

BY MR. SINCICH:

Q.   How many officers first --

MS. O'LINN:  I'm not trying to be difficult.  I mean, it's a parking lot.

BY MR. SINCICH:

Q.   It's okay.  I'm asking it differently.

How many officers were in the parking lot at the time of your use of force that you knew of?

A.   That I knew of including me, three.

Q.   And what officers were those?

A.   Me, Officer Sun and Officer Meadows.

Q.   Okay.  Were you aware at the time of the use of force that there were other officers nearby?

MS. O'LINN:  At the time.

THE WITNESS:  At the time I was aware that they were nearby, yes.

BY MR. SINCICH:

Q.   What other officers were you aware of that were nearby?

Page 43

MR. SINCICH:  Okay.  Off the record.

(Off the record.)

MR. SINCICH:  Back on.

BY MR. SINCICH:

Q.  Prior to receiving the call related to this incident, what were you doing?

A.  I was at city yard getting gas.

Q.  And you were in a single-person vehicle?

A.  Yes, I was by myself.

Q.  What information did you receive from the initial call?

A.  The initial call stated there was a man with a firearm.  He was waving it and people were fearful in the area.  And he was described as a male Hispanic, in his 40s, black sweater, black shorts with facial hair.

Q.  Okay.  And when you say that the call stated that people were fearful in the area, did you receive that information over the radio or on your computer screen?

A.  Over the radio.

Q.  When you reviewed the radio communication and read the transcript in preparation for today, did you see that information in the transcript?

A.  Sorry.  Can you rephrase that one.

Q.  Yes.  When you reviewed the transcript of the

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 44

radio communication in preparation for today, did you see a reference of people being fearful in the area?

A. Yes.

Q. And do you know if that was the first caller or was it subsequent callers that provided that information?

A. It was the first caller who advised people were running or fearful. Sorry.

Q. Say that again.

A. People were fearful.

Q. And you said running?

A. Yes, I believe so. Leaving the area.

Q. Any other information from the initial call?

A. Not that I can remember.

Q. Approximately how long did it take for you to drive to the scene?

A. Approximately only two to three minutes.

Q. Did you learn any additional information while en route?

A. Yes.

Q. What did you learn?

A. That the subject was in a verbal argument with two other -- sorry. Mr. Valdivia was in a verbal argument/altercation with two other subjects at the location to the front.

Q. Did the information that you received en route

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 45

identify the subject as Mr. Valdivia?

A.   Sorry.  Can you rephrase that one.

Q.   Well, you said that it was Mr. Valdivia in an altercation with two other people, right?

A.   Correct.

Q.   Did you receive information about Mr. Valdivia's name while you were in en route?

A.   No, we did not know his name.

Q.   Okay.  So to your understanding, en route there was basically one subject that was in a verbal altercation with two other people?

A.   Correct.

Q.   Did you learn anything else en route?

MS. O'LINN:  Other than what she's already testified to, Counsel; correct?

MR. SINCICH:  Yes, anything else.

THE WITNESS:  That he, the subject Mr. Valdivia, had placed the firearm in his pocket and was holding a beer or alcoholic beverage in his hand.

BY MR. SINCICH:

Q.   Okay.  Is it fair to say that you didn't know what the altercation was about?

A.   Correct.

Q.   And when you received information about an altercation, was it your understanding that it was verbal

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 46

and not physical?

A.   We were advised it was a verbal altercation.

Q.   Okay.  Prior to the incident, had you ever met Mr. Valdivia before?

A.   No.

Q.   Did you have any information about his personal or family life?

A.   No.

Q.   Prior to your use of force, did you have any information about whether he had a criminal history?

A.   No.

Q.   Any specific information as to whether he was involved in a gang?

A.   No.

Q.   Did you have any information as to whether Mr. Valdivia had a history of drug or alcohol use?

A.   No.

Q.   And I understand that you said that the information was that he was holding a beer?

A.   Correct.

Q.   Did you have any specific information that he had actually consumed any alcohol prior to your use of force?

MS. O'LINN:  Prior to arriving at the scene or prior to the use of force, Counsel?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 47

MR. SINCICH:  My question was prior to your use of force.

MS. O'LINN:  Okay.

THE WITNESS:  I was not aware specifically that he was consuming that alcohol.  But from my understanding, it was advised that he was possibly under the influence of alcohol or drugs.

BY MR. SINCICH:

Q.  Who advised you of that?

A.  Dispatch.

Q.  Did dispatch say possibly under the influence of alcohol or drugs?

A.  Yes.

Q.  And did you have any specific information as to whether he was under the influence of drugs prior to your use of force?

A.  I was not aware.

Q.  Did you have any specific information as to whether or not he had a history of violence?

A.  No, I did not know.

Q.  Is it fair to say that the allegations in the call needed to be investigated?

A.  Yes.

Q.  While you were en route, was there any discussion of a tactical plan?

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 48

A. Officer Sun did set up a containment.

Q. What was your understanding of the containment set up by Officer Sun?

A. In order to be -- plan ahead in case the subject Mr. Valdivia decided to run or flee in a vehicle.

Q. Okay. That would be the purpose of the containment?

A. Correct.

Q. What was your understanding of how the scene was actually being contained?

A. Sorry. Can you rephrase that one.

Q. Yeah. While you were -- strike that.

Say by the time that you arrived on scene, what was your understanding of the actual containment of the scene location?

A. Sorry. I'm not understanding. Can you rephrase.

Q. When you first arrived on scene, did you have the belief that the scene was contained?

A. Not at that time, no.

Q. Okay. So other than Officer Sun attempting to set up a containment, was there any discussion of a tactical plan while you were en route?

A. I did ask Officer Sun if he wanted me to grab the less lethal while en route.

Q. And what did he let you know?

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 49

A. He said yes.

Q. Okay. Was it your understanding that you would be the less lethal option for this incident?

A. Yes.

Q. So other than containment and you being the less lethal option, was there any other discussion of a tactical plan?

A. Not that I'm aware of, no.

Q. Was there a specific tactical plan of how to approach Mr. Valdivia?

A. No.

Q. I'm sorry. I can't remember if I asked you already, but did you have any information prior to your use of force, that Mr. Valdivia ever physically harmed anyone?

MS. O'LINN: Objection; asked and answered. You can answer him.

THE WITNESS: We were not aware, sir.

BY MR. SINCICH:

Q. Were you physically harmed during this incident?

A. No.

Q. Did you have any specific information that Mr. Valdivia ever verbally threatened anybody?

A. We were not sure at that time.

Q. Prior to your use of force, did you hear

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 50

Mr. Valdivia verbally threaten anybody?

A.  No.

Q.  When you arrived on scene, were you able to see Mr. Valdivia?

A.  Yes.

Q.  Can you describe what he was wearing?

A.  He was wearing a black sweater, black hat, black shorts.

Q.  Did you see him in black shorts?

A.  Yes.

Q.  Did you see facial hair on Mr. Valdivia when you first saw him?

A.  Not immediately, sir.

Q.  When were you able to see facial hair on him?

A.  When I approached.

Q.  Was that after the shooting?

A.  Prior to the shooting.

Q.  Okay.  What was his approximate age from your perspective, when you first saw him?

A.  Late thirties.

Q.  What was his approximate height and weight from your perspective?

A.  5'9" approximately 200 to 250.

Q.  When you were driving to the scene, were you utilizing lights and sirens?

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 53

to park?

A.  No.

Q.  Did you receive any communication from any of the other officers that you were going to make a stealth approach?

A.  No.

Q.  After you parked your vehicle, what did you do?

A.  I got out of my vehicle and I looked to see in the parking lot if I could see Mr. Valdivia.

Q.  And were you able to see him?

A.  I was.

Q.  What was he doing?

A.  He appeared to be talking to the two other subjects, and appeared to be some type of, I would consider, verbal altercation occurring.

Q.  What made it a verbal altercation in your eyes?

A.  The other two subjects appeared to be kind of like backing away, kind of had their hands up and Mr. Valdivia continued to kind of walk towards them in an aggressive manner.

Q.  Approximately how far was Mr. Valdivia from the other two individuals when you first saw them?

A.  I would say approximately five feet.

Q.  Okay.  Were you able to hear them say anything?

A.  No.

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 54

Q. Were they yelling or anything like that?

A. Not that I could hear.

Q. Did you see Mr. Valdivia attempt to like grab or strike any of those people?

A. Not at that time.

Q. Did you ever see Mr. Valdivia attempt to grab or strike anybody?

A. No.

Q. When you were first observing Mr. Valdivia, did you know where Officer Sun was?

A. I heard him over the radio saying he was going 97, which states he was arriving on scene.

Q. Is that what going 97 means?

A. Yes.

Q. Did you know where he was physically?

A. He had put out that he was going to park behind the Starbucks.

Q. Did you know where Officer Meadows was at the time?

MS. O'LINN:  That she arrived?

BY MR. SINCICH:

Q. At the time that you first saw Mr. Valdivia with the two men.

A. I knew he was with Officer Sun because he put them both arriving at the scene at the same time.

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 55

Q. Okay. Can you describe the two men that you saw with Mr. Valdivia?

A. Both were male blacks. One was wearing a dark green sweater and the other one was wearing a black sweater.

Q. And how long were you able to observe them before you first saw Officer Sun?

A. I would say within a couple of seconds.

Q. Okay. After observing them for a couple of seconds, did you also hear Officer Sun starting to give commands?

A. Yes.

Q. Did you ever communicate to your partners where you parked?

MS. O'LINN: Objection to the extent that calls for attorney/client privilege communications.

Other than that, you can answer.

THE WITNESS: I advised them I was going to be north of the scene.

BY MR. SINCICH:

Q. When did you tell them you would be north of the scene?

A. When I advised Officer Sun I was coming from westbound Arrow.

Q. Did you advise your partners of your location

Page 56

when you were observing the three subjects?

A.  No.  I only put out I was at the scene.

Q.  Was there a plan for the officers to meet in any particular area and approach together?

A.  No.

Q.  Was there any kind of communication to coordinate movements between the officers?

MS. O'LINN:  Objection; asked and answered, argumentive as phrased.

You can explain.

THE WITNESS:  Not with me.

BY MR. SINCICH:

Q.  Okay.  Did anyone check with you to make sure that you had the beanbag shotgun before they approached?

A.  No.

Q.  Did you have the beanbag shotgun?

A.  No.

Q.  Why not?

A.  When I arrived on scene, like I said, I was watching the subject for a couple of seconds trying to see if I could see a firearm or anything like that.  And that's when I heard Officer Sun giving commands and I ran to help.

Q.  Were you able to see a firearm when you first saw Mr. Valdivia?

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 57

A.   Not when I first saw him.

Q.   **Why did you feel it necessary to run to help?**

A.   Because when a call came out with a male with a gun, and there's only two of my partners I knew at the time that were there contacting him, and I knew that they needed an extra person.

Q.   How far were you from your vehicle when you were observing Mr. Valdivia for that couple of seconds?

A.   Five to ten feet.

Q.   **Where is the beanbag shotgun located in your vehicle at the time?**

A.   In the trunk.

Q.   The AR and the lethal shotgun, were they in the front seat area?

A.   Yes, they are in between the driver and the passenger.

Q.   Is there a reason why the beanbag shotgun wasn't located there as well?

A.   I don't know, sir.

Q.   **Was there a protocol from the department as to where those weapon systems were required to be stored?**

A.   I believe so.

Q.   **Was the protocol to have the lethal weapons up front and the less lethal in the back?**

A.   I'm assuming, yes.

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 58

Q.  When you first saw Mr. Valdivia prior to running, did he have anything in his hands?

A.  A bottle.

Q.  What commands did you hear your partners giving?

MS. O'LINN:  Objection.  Counsel, vague, ambiguous, overbroad.  Scope in time.

Do you understand the question?

THE WITNESS:  Sorry, sir.  Can you rephrase.

BY MR. SINCICH:

Q.  Sure.  What commands did you hear from your partners that triggered you to start running towards them?

A.  I heard them giving commands of put your hands up.  Don't reach for anything.

Q.  Okay.  At some point in time did you see Mr. Valdivia's hands up?

A.  Not while I was running.

Q.  When Mr. Valdivia was in a standing position, did you see his hands up at any point in time?

A.  I recalled his hands, seeing his hands kind of at his shoulder height.

Q.  And what were you doing at the time?

A.  I was still running.

Q.  Okay.  So while you were running, you saw Mr. Valdivia with his hands up by his shoulders?

A.  Yes.

Page 59

Q.   And was that after you heard the command of hands up?

A.   Yes.

Q.   Did you hear any other commands prior to running?

MS. O'LINN:  Other than what she's already testified to.

You can answer.

THE WITNESS:  Not prior to running.

BY MR. SINCICH:

Q.   And then while you were running, did you hear any other commands?

A.   I continued to hear don't reach for it.

Q.   Okay.  Approximately how long were you running prior to firing your first shot?

A.   Can you rephrase the question.

Q.   Yeah.  How long did it take for you to get from the position five feet from your vehicle to the position that you were in when you took your first shot?

A.   A couple of seconds.

Q.   Okay.  And then how long were you in that position where you took your first shot prior to actually taking the first shot?

A.   Sorry.  Can you say that one again.

Q.   How long approximately were you in the position when you took your first shot prior to actually taking

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 60

your first shot?

A.   Again, probably a couple of seconds.

Q.   Okay.  In that couple second timeframe prior to taking your first shot, did you hear any other commands?

A.   Again, just don't reach for it.

Q.   Prior to taking your first shot, did you hear Mr. Valdivia say anything?

A.   I knew he was saying something back to them, but I couldn't hear what it was.

Q.   Was he speaking too low for you to hear him?

A.   I believe so.

Q.   Do you know now that Mr. Valdivia had a BB gun or an airsoft gun on his person?

A.   After the incident, yes.

Q.   Did you ever hear the command to go down to the ground?

A.   Yes.

Q.   Did you hear both Officer Sun and Officer Meadows giving commands?

A.   Yes.

Q.   Could you tell who was giving which commands?

A.   Yes.

Q.   Okay.  Who was telling Mr. Valdivia to put his hands up?

A.   Both were.

Page 61

Q.  And who told Mr. Valdivia to go to the ground?

A.  Officer Meadows.

Q.  Did you hear Officer Meadows tell Mr. Valdivia go to the ground in that couple second timeframe prior to your first shot?

A.  Yes, he advised him to go on his stomach.

Q.  And did you see Mr. Valdivia attempt to go down to the ground?

MS. O'LINN:  Objection; argumentative "attempt."
You can answer.

THE WITNESS:  I saw him get on the ground partially.

BY MR. SINCICH:

Q.  In that position that you were describing earlier where he was on his stomach?

MS. O'LINN:  Objection; argumentative.
Misstates the testimony of the witness.
You can explain.

THE WITNESS:  He wasn't completely on his stomach.  He was on his left forearm and had weight on his left forearm and was -- had his both legs on the ground.

BY MR. SINCICH:

Q.  Okay.  Is it fair to say he started going down to the ground after he was instructed to do so?

Page 62

A.   Yes.

Q.   At the time of the incident, did you think that you fired only two rounds?

A.   Yes.

Q.   Why did you think you only fired two rounds?

MS. O'LINN:   Objection; calls for speculation on the part of the witness.

If you know.

THE WITNESS:   I don't know.  At the time, I thought I fired two rounds.

BY MR. SINCICH:

Q.   And why did you stop shooting?

A.   He was no longer a threat.

Q.   And why was he no longer a threat?

A.   I didn't see the gun in his hand.

Q.   Was that based on your training?

A.   At the time it was based on my observation.

Q.   What did you observe that made him not a threat?

A.   The gun was no longer in his hand.

Q.   Okay.  And that's why you stopped shooting?

A.   Correct.

Q.   Is it fair to say based on your training if a person is no longer a threat, officers should stop using deadly force if they already chose to do so?

A.   Sorry.  Can you rephrase that one.

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 63

Q.  Is it fair to say based on your training that if a person is no longer a deadly threat, officers should stop using deadly force if they already chose to do so?

A.  Based on our training and experience, each person has their own observation of when they consider a person a threat and not a threat.

So from my observation, I stopped shooting because he was no longer a threat in my eyes.

Q.  Right.  And would you agree that the training is that, if the officer doesn't objectively perceive a deadly threat, that the officer shouldn't use deadly force?

A.  That is correct.

Q.  Did you see Mr. Valdivia drop the gun?

A.  Yes.

Q.  Did you ever see him reach for the gun after he dropped the gun?

A.  I don't recall.

Q.  What did you see him doing with his right hand after he dropped the gun?

A.  It went to the ground.

Q.  Was it out in front of him or more towards his face area, if you recall?

A.  It was completely straight out in front of him.

Q.  Approximately how far was the gun after he

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 64

dropped it from Mr. Valdivia's hand?

A. It wasn't very far. I would say put it less than a foot.

Q. When you first arrived, I think you described it as like peeking through the vehicles; based on your training, would it have been appropriate to use deadly force at the time?

MS. O'LINN: Based on her observations.

THE WITNESS: Like while I was at my vehicle?

BY MR. SINCICH:

Q. Right. When you were peeking between the cars at Mr. Valdivia, based on your training, would it have been appropriate to use deadly force at that time?

A. No.

Q. And why is that?

A. He wasn't a threat to anybody at that time.

Q. And based on your training, if a person has a gun and then points the gun, but then drops it, would it be appropriate to use deadly force after they dropped the gun?

MS. O'LINN: Objection; incomplete hypothetical. You can answer.

THE WITNESS: Sorry. Can you rephrase that one.

BY MR. SINCICH:

Q. Based on your training, if a person has a gun in

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 68

BY MR. SINCICH:

Q.  Did you give a deadly force warning prior to firing your shots?

A.  I did not.

Q.  Did you hear any of your partners give a deadly force warning prior to firing any shots?

A.  I don't recall, no.

Q.  Did you announce yourself as a police officer at all?

A.  No.

Q.  Did you hear anyone announce themselves as a police officer?

A.  I believe Officer Sun and Meadows did.

Q.  What did they say to your belief?

A.  Police.

Q.  Was that before or after they gave the commands that you heard?

A.  Prior.

Q.  Did you ever see Mr. Valdivia attempt to flee?

A.  No.

Q.  Did you ever see him attempt to run or lunge at anybody?

A.  No.

Q.  I think you said earlier that you fired because you saw him point the gun at your partners?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 69

A.   Yes, he was in the motion of pointing it.

Q.   Right, and that's what I want to clear up.  In the motion of, is that different than actually pointing?

A.   It was a gun coming out of his waistband and going towards him.

Q.   Okay.  Is it fair to say that the gun from your observation wasn't actually pointed at him -- at your partners?

MS. O'LINN:  Counsel, I couldn't understand whether you said was or wasn't.  Could you clarify your question.

MR. SINCICH:  Of course.

BY MR. SINCICH:

Q.   From your observations, is it fair to say that the gun was not actually pointed at your partners prior to you firing your rounds?

A.   No, my observation was that it was pointed at them.

Q.   Do you recall in your statement saying that he started to point the weapon at your partners?

A.   Yes, it was going towards my partners.

Q.   Right.  And I think another time in your statement you said that he began to point, something to that effect?

A.   Yes.

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 70

Q. Were you inferring that by those statements to the investigators, that from your perspective he was in the process of pointing it but he didn't actually point the gun?

A. During my observation, I saw him going -- pulling the firearm out and going to point it in the direction of my partners.

Q. Okay. That was your belief?

A. That was my observation, yes.

Q. Did you ever see Mr. Valdivia attempt to take a hostage at any point?

A. No.

Q. Other than your observations of Mr. Valdivia in the motion of pointing the gun at your partners, did you see him doing anything that was threatening to harm anybody?

A. He was, from my observation, he was in a verbal altercation with the other two subjects.

Q. Did you see him threaten to harm those subjects?

MS. O'LINN: Objection. Asked and answered. You can answer again.

THE WITNESS: I couldn't hear, but the verbal altercation obviously could have stemmed into more.

BY MR. SINCICH:

Q. Did you ever see Mr. Valdivia physically harm

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 77

Q. Okay. Did the department provide you with training that when using deadly force, officers should have reverence for human life?

A. Yes.

Q. Did the department also provide training that officers need to justify every shot that they fire?

A. Yes.

Q. Did you receive training that officers should control their fear or stress level?

A. Yes.

Q. How would you describe that training?

A. You go through the basic academy of being put under a lot of pressure. They treat you to -- sorry. They teach you to compose your emotions while being screamed at, while under tough situations, scenarios and in-service training, briefing trainings. You know, you go through briefing trainings of different videos, in-service training of just going through different calls of high stress emotions.

Q. Have you ever heard of the phrase stress inoculation?

A. No.

Q. Okay. Is it your understanding that the purpose of that training is to provide the officers with the opportunity to learn how to control their emotions in a

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 87

(Whereupon, Plaintiffs' Exhibit 3

was marked for identification.)

BY MR. SINCICH:

Q.  Does this appear to be an overhead view Google map of the incident location?

A.  Yes.

Q.  Okay.  And this Country Liquor right there, is that the liquor store that the incident occurred in front of?

A.  Yes.

Q.  Okay.  Looking at this map, Exhibit 3, where approximately did you park your vehicle?

MS. O'LINN:  He can make it bigger if you need to.

THE WITNESS:  So I parked just north of the Boca Del Rio on the south sidewalk.

BY MR. SINCICH:

Q.  On the south sidewalk?

A.  Yes.

MS. O'LINN:  You parked on the sidewalk?

THE WITNESS:  Sorry.  Just north of the south sidewalk.

BY MR. SINCICH:

Q.  Okay.  Was it kind of in front of this gray vehicle that has a sunroof?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
**Officer Vanessa Cardoza on 03/06/2025**

Page 88

A.   Yeah.

Q.   Okay.  So it would be to the right of the gray vehicle with the sunroof and just north of the restaurant, Boca Del Rio; is that right?

A.   Yes.

Q.   And which way were you facing?

A.   Westbound.

MR. SINCICH:  I'm going to mark as Exhibit 4 a screenshot of Sergeant Statler's body-worn camera.  And it is at 22 hours 17 minutes and 8 seconds.

(Whereupon, Plaintiffs' Exhibit 4
       was marked for identification.)

BY MR. SINCICH:

Q.   Is that fair to say from your view of the screen?

MS. O'LINN:  We don't have it yet, Counsel.

MR. SINCICH:  Oh, you don't see it.  Oh, I'm sorry about that.  Let me know when you can see my screen.

MS. O'LINN:  It appears to be 22:17:08.

THE WITNESS:  Yes.

BY MR. SINCICH:

Q.   And is this you on the left-hand side of the screen?

A.   Yes.

VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.
Officer Vanessa Cardoza on 03/06/2025

Page 89

Q. And is that approximately your location when you fired your first shot?

MS. O'LINN: If you don't know, don't guess.

THE WITNESS: I don't know, sir.

BY MR. SINCICH:

Q. Okay. Were you in that general area to the north of Mr. Valdivia when you fired your first shot?

A. Yes, I was to the north.

Q. Were you near the sidewalk when you fired your first shot?

A. I can't recall, sir.

Q. Okay. And the foot that's kind of protruding to the left of this officer, that's Mr. Valdivia on the ground?

A. Yes.

Q. And then do you see the two persons standing kind of in the center right of the screen?

A. Officers Sun and Meadows.

Q. Right. I was going to ask you, who was the person that's on to the left between these two people standing?

A. The one you just had your pointer on, that's Officer Sun.

Q. And then the person that has police on the back of their uniform, is that Officer Meadows?

**VALDIVIA, ET AL. vs CITY OF COVINA, ET AL.**
Officer Vanessa Cardoza on 03/06/2025

Page 93

into oblivion, quite frankly.  If you can make sure she's on the emails, and we'll take a copy with a condensed and a word index.

THE REPORTER:  Sounds good.  Marcel, you'll take a copy, I take it?

MR. SINCICH:  Yeah, we'll have whatever the regular copy that it came with.

(The deposition concluded at 12:35 p.m.)

--oOo--

WITNESS CERTIFICATION

I, __VANESSA__ __CARDOZA__, do hereby declare under penalty of perjury that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate, save and except for the changes and/or corrections indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the __9__ day of __APRIL__, 20 __25__.

_____
Witness Signature

**Page 94**

UNITED STATES DISTRICT COURT        )
                                    )
CENTRAL DISTRICT OF CALIFORNIA      )

        The witness, Officer Vanessa Cardoza, in the foregoing deposition appeared before me, Cynthia F. Zeller, a Certified Shorthand Reporter, in and for the State of California.

        Said witness was then and there at the time and place previously stated, by me placed under oath to tell the truth, the whole truth and nothing but the truth in the testimony given on the date of the within deposition.

        The testimony of the witness and all questions and remarks requested by Counsel and reported thereafter, under my direction and control, caused to be transcribed into typewritten form by means of Computer-Aided Transcription.

        I am a Certified Shorthand Reporter licensed by the State of California.  I further certify that I am not of counsel or attorney for either or any of the parties to the case named in the within caption, and that I am not related to any party thereto.

        IN WITNESS WHEREOF, I have hereunto affixed my signature this 17th day of March 2025.


_____
CYNTHIA F. ZELLER, CSR
Certified Shorthand Reporter #10834

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 801 S. Figueroa St, 15th Floor, Los Angeles, CA 90017-3012.

On April 14, 2026, I served true copies of the following document(s) described as **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 1. TO EXCLUDE INFORMATION UNKNOWN** on the interested parties in this action as follows:

**Electronic Mail Notice List**

**The following are those who are currently on the list to receive e-mail notices for this case.**

- **Richard T Copeland**
  **rtc@conflict-solution.com**

- **David L Fleck**
  **David.Fleck@manningkass.com,adriana.alvarado@manningkass.com**

- **Dale K Galipo**
  **dalekgalipo@yahoo.com,dgilbert@galipolaw.com,blevine@galipolaw.com,evalenzuela@galipolaw.com,bjohnson@galipolaw.com,rvalentine@galipolaw.com,slaurel@galipolaw.com,CMayne@galipolaw.com,msincich@galipolaw.com,ldeleon@galipolaw.com,amonguia@galipolaw.com,coopermayne@recap.email,hlee@galipolaw.com**

- **Edlynne Rose Gutierrez**
  **Gigi.Gutierrez@manningkass.com,dxf@manningllp.com**

- **Robert E Murphy**
  **Robert.Murphy@manningkass.com,mireya.linares@manningkass.com,veronica.price@manningkass.com**

- **Mildred K. O'Linn**
  **missy.olinn@manningkass.com,dxf@manningllp.com,docket@manningllp.com,mko@manningllp.com**

- **Marcel F Sincich**
  **msincich@galipolaw.com,amonguia@galipolaw.com**

**BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 14, 2026, at Los Angeles, California.


_____/s/ Sandra Alarcon_____
Sandra Alarcon